**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**UNITED STATES OF AMERICA,**
        *Plaintiff,*

    v.                Case No.: **6:20-cr-10028-EFM**

**TRAVIS KNIGHTEN,**
        *Defendant.*

---

## MOTION TO SUPPRESS

---

Comes now the defendant, Travis Knighten, by and through his attorney, Mark Thomason, and moves this Court pursuant to Federal Rules of Criminal Procedure Rule 12(b)(3)(C) and 18 U.S.C. § 2510, et seq., to suppress evidence obtained pursuant to wiretap interceptions of wire communications for Target Telephones ("TT") 1 through 4. Because the applications for the challenged wiretaps were deficient, they lacked the required necessity, and because there is no evidence that agents' actions during the period(s) of interception adequately complied with the minimization requirement, and because no good faith exception applies, all interceptions on which Mr. Knighten's voice or text message communications were captured must be suppressed.

In addition, because the evidence was improperly obtained, each of the counts in the Superseding Indictment charging Mr. Knighten with the use of facilities of interstate commerce in furtherance of the charged narcotics conspiracies should be dismissed.

### STATEMENT OF FACTS

Travis Knighten is charged as Defendant 10 in a 24-defendant, 56-count superseding indictment with having "organized and operated a drug trafficking operation in and around Wichita, Kansas" while incarcerated in the Oklahoma State Penitentiary from April through July

2019. Superseding Indictment at ¶ 1. Specifically, the Government asserts that he was engaged in a Continuing Criminal Enterprise (Count 1), that he conspired to distribute a variety of controlled substances (Counts 2-6), that he maintained drug involved premises in furtherance of those conspiracies (Counts 7-10), and that he used facilities of interstate commerce in furtherance of those conspiracies (Counts 11-17, 21-22, 24-25, 38, 40, 44, 47). The allegations stem from a complex investigation in which the Government used multiple law enforcement tools including confidential sources, GPS tracking, surveillance (physical and via pole camera), and the Title III wiretaps challenged herein.

Beginning on or about April 9, 2019, the Government obtained authorization to tap the phone identified herein as TT1, a device used by Mr. Knighten's co-defendant Dorzee Hill. At the time, Mr. Knighten was not named as a target subject. *See* 20-10028-EFM Discovery 0000001 at ¶2.

## I.     <u>Authorization for TT1</u>

The Authorization for the Interception Order Application (20-10028-EFM Discovery 00000014-15) and the letter from the Department of Justice in Washington, D.C. to the United States Attorney in the District of Kansas 20-10028-EFM Discovery 00000016-17) both are stamped with the name of Bruce C. Swartz, Deputy Assistant Attorney General, Criminal Division and dated April 5, 2019. However, the signature that appears before the stamped name does not appear to be that of Mr. Swartz:



APR 0 5 2019
_____
Date

BRUCE C. SWARTZ
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

20-10028-EFM Discovery 00000015

APR 0 5 2019
_____
Date

BRUCE C. SWARTZ
DEPUTY ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

20-10028-EFM Discovery 00000017.

The Affidavit in Support of the Title III authorization for TT1, by Cameron M. Heath, Jr., a Special Agent with the FBI (20-10028-EFM Discovery 00000018 et seq.) likewise is deficient. The Affidavit requests "interception until the attainment of the authorized objectives of the investigation or, in any event, no longer than thirty days of wire and electronic communications of Dorzee Hill, Ronnie McFann, Briontae Hadley-Ponds, Derek Hubbard . . ., Kevin Walker . . ., Kevin Lewis and Darnell Nolan . . . (hereinafter the "**Target Subjects**"); and others yet unknown . . ." Affidavit at ¶ 3 (20-10028-EFM Discovery 00000020) (bold in original).

The Affidavit states generally that there is "probable cause to believe that the Target Subjects, and others yet unknown, have committed, are committing, and will continue to commit" offenses including possession of controlled substances with intent to distribute.

Affidavit at ¶ 4 (20-10028-EFM Discovery 00000021). The Affidavit explains that the investigation into the alleged drug trafficking activities of the "Junior Boys gang" began in April 2018, as a referral from the Wichita Police Department. Affidavit at ¶ 12 (20-10028-EFM Discovery 00000030).

The Affidavit describes the backgrounds of the target subjects. Affidavit at ¶ 7 (20-10028-EFM Discovery 00000023-27). It describes, in some detail, interactions between target subjects Dorzee Hill, Darnell Nolan, Briontae Hadley-Ponds, and a cooperator identified as Confidential Human Source ("CHS").[1] See, generally, Affidavit at ¶¶ 12-25 ("Background Investigation" and "Probable Cause for Interception of Target Telephone 1") (20-10028-EFM Discovery 00000030-40).

In particular, the Affidavit describes multiple interactions between CHS, Nolan, and (later) Hill himself, in which CHS purchased heroin from Hill (through Nolan at first and later directly) throughout 2018 and into 2019. See, e.g., Affidavit at ¶¶ 12, 14-15, 17-19. FBI investigators provided CHS with a recording device to use during controlled buys (Affidavit at ¶¶ 19, 25) and conducted surveillance via pole camera (Affidavit at ¶ 19). Incriminating statements were captured in person, on the phone, and in text messages. Affidavit at, e.g., ¶ 20. FBI investigators also conducted GPS surveillance of Hill through "pings" on the "Target Telephone" (Affidavit at ¶ 16), toll analysis (Affidavit at ¶¶ 21, 22), recorded calls captured on CHS's phone (Affidavit at ¶ 23) and collected information from CHS's direct observation of the interior of the residence (Affidavit at ¶ 25). The Affidavit, in sum, demonstrates that the FBI was

---

[1] The Affidavit notes the assistance of three individuals who are cooperating in the investigation—Confidential Human Source ("CHS"), Source of Information 1 ("SOI-1"), and Source of Information 2 ("SOI-2"). Affidavit at ¶ 9 (20-10028-EFM Discovery 00000028-29). At least one of them, SOI-1 has been found "truthful, reliable and to have direct access to the **Target Subjects**." Affidavit at ¶ 9(b) (20-10028-EFM Discovery 00000029).

in the process of undertaking quite a thorough, multi-pronged investigation of the Junior Boys'
activities.

However, the Affidavit also demonstrates that the FBI made a few careless mistakes in
the investigation, e.g., providing clearly marked bills to the CHS for narcotics purchase and
letting the GPS device use lapse. Paragraph 15 of the Affidavit explains that "During the debrief
with the CHS, CHS advised that NOLAN and HILL were skeptical in that the bills that were
provided to HILL were too crisp, and HILL also noticed a red star on one of the bills. HILL told
NOLAN that only the police would label their bills with a red star." Affidavit at ¶ 15. Paragraph
17 explains that investigators were unable to follow each of Hill's movements because
"Investigators no longer had a GPS ping on the Target Telephone, and it was not relaying to
investigators that HILL would have to leave his residence to pick up the heroin, and as a result,
investigators were unsure on where HILL went." Affidavit at ¶ 17.

In sum, the Affidavit indicates that, over the course of the year from April 2018 to April
2019, investigators performed four physical surveillances, none of which were within five
months of beginning the TIII interceptions; six controlled purchases; one pen register; one pole
camera installation (usage unknown); obtained one GPS warrant; gained information from three
cooperating individuals; and undertook limited, if any financial investigation, grand jury
subpoenas. The Defense has requested but has not received any buy reports from the controlled
purchases or any information about the information provided by the confidential source.

Investigators sought the Title III authorization for TT1, in short, not because the
investigation was unsuccessful—indeed, even the pen registers had provided investigators with
the phone numbers of individuals they believed to have been narcotics customers (Affidavit at ¶
33)—, but because they hoped to find answers to their outstanding questions about the drug

trafficking organization and its suppliers more quickly than they otherwise were able to do. *See*, *e.g.*, Affidavit at ¶ 26 (noting that, even though investigators had gathered information about Hill's stash houses and travel through "surveillance, including electronic, covert, and physical surveillance," cell cite location information would "help investigators identify the location where the HILL DTO stores, distributes, packages and transports the illegal controlled substances that they sell and/or distribute").

Investigators also hoped to broaden their investigation to "identify and gather evidence on the Target Subjects and other individuals currently unknown to the investigation" to locate "stash houses,"°2 "to identify all of the key members of this DTO," and to learn "the methods by which the DTO imports, transports, and distributes its drugs." Affidavit at ¶¶ 34, 35. The Affidavit does not say that the investigators could not learn the information about the DTO's means and methods of importation without a wiretap. It asserts that it is "improbable" that they would be able to learn it. Affidavit at ¶ 35.

The Affidavit then discusses the alternative techniques that investigators assert have been tried and found wanting ("Unavailability of Alternative Investigative Techniques (Affidavit at ¶ 36)), including physical surveillance (Affidavit at ¶¶ 37-44), pole cameras (¶¶ 45-47), undercover police officers and agents (¶¶ 48), cooperating individuals (¶ 49-51), grand jury subpoenas (¶ 52), interviews of subjects or associates (¶ 53-54), mail covers and parcel watches 9¶ 55), trash searches (¶ 56-58), financial investigations (¶ 59), pen register[3] and toll analysis (¶ 60), and search warrants (¶ 61-63). It asserts that a wiretap is warranted to mitigate the risk to investigators due to the Junior Boys gang's possession and trafficking of firearms. Affidavit at ¶

---

[2] But ¶ 57 of the Affidavit discusses the fact that Investigators had identified one location said to be a stash house, based on information from SOI-1 and physical surveillance of Hill.

[3] However, pen register information and call detail information obtained from T-Mobile provided a detailed inventory of the calls made on TT1. Affidavit at ¶¶ 27-32.

64. However, as discussed *supra*, many of these techniques were in fact used successfully and yielded information that had helped the investigators in the course of their investigation.

The Affidavit concludes, "It is my belief that the interception of wire and electronic communications is the best technique with a reasonable likelihood of securing evidence necessary to prove beyond a reasonable doubt that the named Target Subjects, and others unknown, are engaged in the above-described offenses." Affidavit at ¶ 65. It avers that interceptions will be "minimized" through the use of a filter program, that all electronic communications will be "monitored" in compliance with Chapter 119 of Title 18 of the United States Code, "spot checked," "recorded and . . . securely preserved," and that an "electronic log" with full details of each call will be filed with the Court each 15 days following the commencement of interception. Affidavit at ¶¶ 66-71.

The TTI authorization was granted on April 9, 2019. *See* Affidavit at ¶ 78 (20-100028-EFM Discovery 0000065. Just two weeks later, on April 24, 2019, the Government filed a progress report confirming that it had made substantial progress in the first 15 days of the wiretap on TT1. *See* First 15-Day Progress Report ("First Report") (20-10028-EFM Discovery 12.0019-28). In the First Report, the Government explained that 582 calls had been intercepted, of which 145 were deemed pertinent and 10 minimized, and that 26 out of 251 text messages had been marked as pertinent. First Report at ¶ 5. The First Report provided a summary of some of the calls and communications that it believed established that the target subjects were engaging in the possession and distribution of narcotics and agents' surveillance corroborating investigators' interpretations of some of those communications. First Report at ¶¶ 8-21. In sum the First Report averred that the intercepted communications had verified the existence of

narcotics trafficking activity and the activities of the target subjects and had identified other individuals participating in the criminal activities. First Report at ¶ 22.

Nonetheless, because the interceptions "have thus far failed to reveal the entire scope of the illegal drug trafficking organization, including the identity of all the participants, their places and methods of operation and various criminal activities in which they are engaged," the Government asserted that "continued surveillance is necessary . . ." First Report at ¶ 23.

On May 9, 2019, the Government submitted a document entitled Second 15-Day Progress Report ("Second Report") (20-10028-EFM Discovery 12.0029-50), which similarly asserted that, although progress had been made, "The interceptions, however, have thus far failed to reveal the entire scope of the illegal drug trafficking organization, including the identity of all the participants, their places and methods of operation and various criminal activities in which they are engaged. While some evidence regarding the nature of the criminal activities has been gathered, the extent of the criminal organization and sources of drug supply have not yet been fully identified. Consequently, continued surveillance is necessary to gather additional evidence concerning the criminal violations and to identify those conspiratorial areas cited." Second Report at ¶ 45.

## II.    Authorization for TT2 and TT3

On May 17, 2019, the Government sought an extension of the wiretap on TT1 as well as new authorizations for TT2 and TT3, phones being used by Dorzee Hill and Mario Ponds, respectively. *See* 19-cm-60013-JWB Application (20-10028-EFM Discovery 0000086) at ¶ 6. the "Target Subjects" of the investigation were: Dorzee Hill, Ronnie McFann, Briontae Hadley-Ponds, Derek Hubbard, Kevin Walker, Kevin Lewis, Darnell Nolan, Eddie Washington, Mario Ponds, Darryn Frierson, Johnny Murray, Robert L. Irvin, Tiffany Morgan, "and others yet

unknown." Application at ¶ 2. The Affidavit in Support for the authorization of TT1, TT2, and TT3 repeated much of the contents of the initial authorization for TT1. *See* 20-10028-EFM Discovery 0000099-163.

The Affidavit repeats that the same three cooperators were assisting the investigation (¶ 11) and incorporates by reference the Affidavit in support of the original application for TT1 (¶ 14). It notes that, during the first month of interceptions on TT1, target subjects "Walker, Hadley-Ponds, Hubbard, Murray, Ponds, Frierson, Washington, and Nolan" were intercepted. Affidavit at ¶ 10.

Through the TT1 interceptions during the first month of the wiretap "investigators have learned PONDS is HILL's cocaine supplier." Affidavit at ¶ 16. They had been aware that Hubbard is Hill's primary marijuana supplier. Affidavit at ¶ 8(d). The Affidavit recites a series of conversations between Hill, Ponds, and others that the investigators "believe" referred to cocaine transactions. Affidavit at ¶¶ 16-46. In addition, the Affidavit discusses conversations about PCP. ¶¶ 47-55. Based on their investigation and the lack of heroin-related calls on TT1, investigators believed that the second Hill phone (TT2) would be used for heroin calls with Kevin Lewis (Mr. Hill's alleged heroin supplier). Affidavit at ¶ 61.

The Affidavit demonstrates that almost no surveillance techniques were directed at Ponds—no controlled buys, no pole camera, no cooperators directed toward Ponds, no search warrants, no GPS locators, no cell site locators, no financial investigations, and no grand jury subpoenas.

The Affidavit asserts that the TT2 interceptions are needed in order to confirm that Kevin Lewis is Hill's source of supply of heroin. Affidavit at ¶¶ 74, 75. It argues that continued interceptions of TT1 and new interceptions of TT2 and TT3 are necessary because, without

them, "investigators do not possess the means to confirm LEWIS as a source of supply, and furthermore identify additional sources of supply of heroin, cocaine, or PCP." Affidavit at ¶ 75. Again, as with the Affidavit in support of the original wiretap for TT1, the Affidavit does not assert that the information sought could *not* be obtained in other ways. It only describes as "improbable" the change that it could "identify the individuals who may oversee the organization and all of those who carry out the day-to-day activities for HILL and PONDS." Affidavit at ¶ 77.

The Affidavit incorporates, verbatim, many of the paragraphs describing the "unavailability of alternative investigative techniques." *See, e.g.*, ¶ 79. It notes that Hill was "extremely surveillance conscious" and had, on at least one occasion, spotted FBI agents conducting surveillance. Affidavit at ¶ 82.

Similarly, the Affidavit recites the same language about minimization contained in the original affidavit for TT1. Affidavit at ¶¶ 108-111. The application was granted on May 17, 2019.

The First 15-Day Progress Report ("First Report") for TT1, TT2, and TT3 was filed on May 31, 2019. *See* 20-10028-EFM Discovery 12.0051-64. On TT1, 326 calls were intercepted, of which 98 were deemed pertinent. First Report at ¶ 5. On May 23, 2019, a call was intercepted with an unknown male (UM) on phone number (316) 200-1541. The participants in the call discussed, investigators believe, marijuana. First Report at ¶ 9. This call was later attributed to Knighten in the Affidavit in Support of a wiretap on TT4, discussed below.

As to TT2, 470 calls were intercepted, of which 167 were deemed pertinent, as well as 47 minimized calls, of which 12 were deemed pertinent. First Report at 20-10028-EFM Discovery 12.0057. As to TT3, 1286 calls were intercepted, of which 104 were deemed pertinent, as well as

524 minimized calls, of which 9 were deemed pertinent. First Report at 20-10028-EFM Discovery 12.0060.

Although the First Report, like the reports filed before it with respect to TT1 alone, summarizes multiple calls in which activity alleged to have involved narcotics possession and distribution were intercepted, again, the Government asserted that continued monitoring was required because some persons remained unidentified (First Report at ¶ 25) and because "[t]he interceptions , however, have thus far failed to reveal the entire scope of the illegal drug trafficking organization, including the identity of all the participants, their places and methods of operation and various criminal activities in which they are engaged. While some evidence regarding the nature of the criminal activities has been gathered, the extent of the criminal organization and sources of drug supply have not yet been fully identified." First Report at ¶ 26.

The Second 15-Day Progress Report ("Second Report"), filed on June 18, 2019, for the first time mentions Mr. Knighten by name. *See* 20-10028-EFM Discovery 12.0065-98. As to TT1, the Second Report states that 1006 total calls were intercepted, of which 248 were minimized, and 179 were deemed pertinent, including 17 of the minimized calls. *See* 20-10028-EFM Discovery 12.0068. It repeats the summary of the May 23 call with the unknown male using phone number (316) 200-1541. Second Report at ¶ 9.

In addition, it discusses a call on May 30, 2019, between Hill and Washington immediately followed by a text message exchange and phone call with Knighten, using the (316) 200-1541 number. Second Report at ¶ 12. Later the same day, another call between Knighten and Hill was captured on the TT1 interception (Second Report at ¶ 17), as were calls on May 31 (Second Report at ¶ 18), June 1 (Second Report at ¶ 19), and June 2 (Second Report at ¶ 20).

The Second Report also summarized the results of a search pursuant to warrant on May

30, 2019, at 930 N. Yale Avenue. Second Report at ¶¶ 30-32. Following the search, Hill, using

TT2, received a phone call from Knighten, who was using a new phone number, (316) 737-6485.

Second Report at ¶ 33. Additional calls between Hill on TT2 and Knighten were summarized at

¶¶ 34, 35, and 36.

No calls between TT3 and Knighten were summarized in the Second Report.

Using the same boilerplate language, the Government again asserted that continued

monitoring was needed. Second Report at ¶ 52.

### III.    Authorization for TT4

Authorization to intercept communications on TT4, the (316) 737-6485 phone number

identified as Knighten's new number, was sought and obtained on June 21, 2019. At the same

time, the Government sought renewals of the TT1 and TT2 interceptions. *See* 19-cm-60013-

JWB, Affidavit in Support of Application for Order Authorizing Interception of Wire and

Electronic Communications ("Affidavit"), 20-10028-EFM Discovery 0000195-269. The target

subjects of the investigation now included Dorzee Hill, Ronnie McFann, Briontae Hadley-Ponds,

Derek Hubbard, Kevin Walker, Kevin Lewis, Darnell Nolan, Eddie Washington, Mario Ponds,

Darryn Frierson, Johnny Murry, Travis Knighten, Orlando Hogan, David Bell, and Robert

Richmond. Affidavit at ¶ 3.

The Affidavit explained that "Target Telephone 4 was activated on June 4, 2019 and has

no subscriber information associated with it. The primary user of Target Telephone 4 is one of

the Target Subjects, Travis Knighten." Affidavit at ¶ 4. Relying in large part on the proffered

facts in the original application for the TT1 interception, the Affidavit noted that, "investigators

believe Travis Knighten, the user of Target Telephone 4, facilitates the trafficking of an array of

narcotics, to an array of known and unknown individuals, to include Hill." Affidavit at ¶ 8(a).

Knighten was incarcerated in the Oklahoma State Penitentiary in McAlester, Oklahoma, at all times during the course of the investigation. Affidavit at ¶ 8(l). His first possible parole date is in 2041. *Id.* The Affidavit asserts that investigators believe that Knighten is the user of TT4 based on having become familiar with his voice during intercepted conversations between Hill on TT1 and Knighten on his previous phone number (316) 200-1541. *Id.*

Incorporating by reference the original affidavit for TT1 as well as the affidavit for renewal of TT1 and initiation of TT2 and TT3 (Affidavit at ¶ 14), The Affidavit focused its attention on Knighten's conversations with Hill and others in several detailed summaries (e.g., ¶ 16 – May 23 first conversation, ¶ 17 – May 23 second conversation, ¶ 18 – May 24 conversation, ¶ 27 – May 27 conversation, ¶ 33 – May 30 conversation, ¶ 37 – May 31 conversation, ¶ 38 – June 1 conversation, ¶ 39 – June 2 conversation). Further, the Affidavit notes that, on May 30, 2019, a search and seizure warrant was executed at 930 N. Yale Avenue as a result of wire interceptions between TT1 and Knighten's cell phone. Affidavit at ¶ 34-36.

Further, the Affidavit relates that SOI-3 [4] provided information about Knighten's anticipated change of phone number, that he was waiting for a prison guard at OSP to replace this phone he had been using, and that the searched house at 930 N. Yale Avenue was one of several stash houses in the area controlled by Knighten. Affidavit at ¶ 40.

In short, without repeating verbatim the contents of the Affidavit, it spends significant time discussing Knighten and his conversations with Hill (primarily) and others. In addition, because one of the individuals arrested during the search at 930 N. Yale was Mr. Knighten's brother, after seizing his phone, investigators reviewed text messages that Knighten had exchanged with him. Affidavit at ¶¶ 49-56. For the first time, investigators alleged that Knighten

---

[4] The Government now had four cooperators—CHS and SOI-1 through -3. Affidavit at ¶ 11.

"appears to be the highest ranking member of the Wichita, KS area-based gang, the Junior Boys" and that he was "a large scale drug trafficker." Affidavit at ¶ 61.

The Affidavit then sought authorization to intercept TT4's communications "[i]n order to successfully identify and subsequently dismantle the entire DTO." Affidavit at ¶ 62. It asserts that Knighten is "a source of supply" not just for Hill but for other unknown individuals, but that he also must have a supplier for heroin, cocaine, and marijuana because he is incarcerated. *Id.*

Further, the affiant asserted, "I feel that by continuing to intercept wire communications over Target Telephone 1 and Target Telephone 2, it will allow agents the ability to determine if or when KNIGHTEN were to change phones, as KNIGHTEN has shown a pattern of frequently changing the numbers and/or devices that he uses." *Id.* Again, he asserted that, without continued interceptions, "I believe that it is highly improbable that investigators would be able to make seizures and to identify all of the key members of this DTO." Affidavit at ¶ 64.

Concerning the unavailability of other investigative techniques, other than the recycled assertions from the earlier Affidavits, it is alleged that Knighten "might have assistance from OSP employees," which would render it impracticable to seek their assistance in any investigation. Affidavit at ¶ 70.

Surveillance of TT4 began on June 21, 2019, and continued until July 20, 2019. The Title III authorizations were disclosed in or around March 2020. They state that Knighten was intercepted on TT1, TT2, TT3, and TT4. 20-10028-EFM Discovery 0000343-45.

## DISCUSSION

### I.    <u>Mr. Knighten Has Standing To Make This Motion</u>

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, et seq. ("Title III" or the "Act") "generally forbids the intentional interception of wire

communications, such as telephone calls, when done without court-ordered authorization." *United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006) (quoting *United States v. Workman,* 80 F.3d 688, 692 (2d Cir.1996)). Information obtained in violation of the Act is inadmissible at trial. 18 U.S.C. § 2515. Once a wiretap authorization has been issued, however, it is presumed proper, and defendants have the burden of overcoming that presumption. *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997) (referencing *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989)).

Title III permits "[a]ny aggrieved person" to "move to suppress the contents of any wire or oral communications intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that –

    (i)     the communication was unlawfully intercepted;

    (ii)    the order of authorization or approval under which it was intercepted is insufficient on its face; or

    (iii)   the interception was not made in conformity with the order of authorization or approval."

18 U.S.C. § 2518(10)(a). *See also Alderman v. United States,* 394 U.S. 165, 175 & n. 9, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). An "aggrieved person" is "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

That is, to establish standing for a motion to suppress under the Act—that he was an "aggrieved person"—, the movant must show: "(1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises." *Faulkner*, 439 F.3d at 1223 (referencing *United States v. Apple,* 915 F.2d 899, 905 (4th

Cir.1990)).[5]

Mr. Knighten's communications were intercepted on TT1, TT2, and TT4, as quoted in the Affidavits and First and Second Reports described above. In addition, the wiretap efforts as to TT4 were directed at him. The Government's Inventory Application (20-10028-EFM Discovery 0000339-349) states that Mr. Knighten's communications were captured on each of the intercepted phones. *Id.* at V (20-10028-EFM Discovery 0000345). Therefore, because he is an aggrieved person, Mr. Knighten has standing to make this motion to suppress.

## II.    The Application for TT1 Was Facially Insufficient

Title 18 United States Code § 2518(a)(10)(a)(ii) provides that an "aggrieved person" "may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that -- . . . the order of authorization

---

[5] We note that this standard differs from the Fourth Amendment's "reasonable expectation of privacy" standard. *See California v. Ciraolo*, 476 U.S. 207, 211, 106 S. Ct. 1809, 1811, 90 L. Ed. 2d 210 (1986) (referencing *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) and its "two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?"). Thus, the fact that Mr. Knighten was in prison at the time the wiretaps were authorized, or that TT4 was a contraband phone, does not alter his standing to make this motion. Indeed, if anything, the fact that Mr. Knighten did not use the prison's own phone system strengthens his claim. *See, e.g.*, *United States v. Turner,* 209 F.3d 1198, 1200 (10th Cir. 2000) (defendant's implied consent to monitoring vitiates his expectation of privacy in inmate calls); *United States v. Gangi*, 57 Fed. Appx. 809, 815 (10th Cir. 2003) (prisoners have no reasonable expectation of privacy in calls placed from prison phones); *Faulkner*, 439 F.3d at 1224-25 (concluding that phone calls placed on prison phones where inmate had notice that the phones were monitored fell within the "consent exception" to the Wiretap Act and suppression was not required). *See also United States v. Jaques*, No. CR-19-372-F, 2020 WL 7327319, at *2 (W.D. Okla. Dec. 11, 2020) (declining to reach the issue of whether prisoners have a reasonable expectation of privacy in their communications on contraband cell phones). *But see United States v. Hudson*, No. CR-16-119-R, 2018 WL 401546, at *2 (W.D. Okla. Jan. 12, 2018) (distinguishing the use of a contraband cell phone in prison from implied consent to monitoring by inmates using prison phones, rhetorically asking, "why would inmates allegedly use contraband cellphones to conduct drug-trafficking business, if not to evade monitoring by prison staff?")

or approval under which it was intercepted is insufficient on its face." In *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820 (1974), the Supreme Court evaluated the validity of a wiretap application signed by the executive assistant to the Assistant Attorney General and found it insufficient. The *Giordano* Court explained that, "Congress did not intend the power to authorize wiretap applications to be exercised by any individuals other than the Attorney General or an Assistant Attorney General specially designated by him . . ." *Giordano*, 416 U.S. at 508. Therefore, evidence obtained pursuant to a deficient authorization must be suppressed. *Id.*, 416 U.S. at 527-28.

Since, 1974, the list of persons authorized to approve Title III applications has increased to include, "The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division or National Security Division specially designated by the Attorney General." 18 U.S.C. § 2515(1). However, it must be clear that the individual signing is, in fact, one of these persons.

In this case, clarity is lacking. Although the initial Application for TT1 asserts that it has been approved by Bruce C. Swartz (Application at ¶ 3 (20-10028-EFM Discovery 0000002), the signature on the accompanying approval does not appear to be that of Mr. Swartz, but rather an individual whose signature begins with a "J". *See*, *supra*, at p. 2-3. Even assuming, arguendo, that Mr. Swartz had the authority to delegate the signing of the authorization and that it was signed by another authorized, enumerated individual, it is unclear whether Mr. Swartz actually evaluated and approved the Application, or whether he even knew of it.

Because the approval is not unequivocally signed by Bruce C. Swartz, and because the Application for TT1 asserts that Mr. Swartz approved the application, the documents submitted

to the Court for authorization are facially insufficient. As a result, the evidence obtained from TT1, including all of the evidence obtained from the authorizations for TT2, TT3, and TT4 – each of which were obtained as a direct consequence of the investigative progress facilitated by the TT1 wiretap—must be suppressed. The wiretap evidence in its entirety should be thrown out.

Further, the Government has charged Mr. Knighten with multiple counts of using a facility of interstate commerce in connection with the narcotics conspiracies (Counts 11-17, 21-22, 24-25, 38, 40, 44, 47). Because the evidence that Mr. Knighten used the TT4 number during the course of this investigation comes directly from the tainted TT1 application, all of those counts should be dismissed.

### III.    There Was No Independent Basis to Find Probable Cause As to TT4

Title III requires that an application for an order authorizing the interception of wire communications "shall be made in writing upon oath or affirmation to a judge[.]" 18 U.S.C. § 2518(1). Such an application must include "a full and complete statement of the facts and circumstances relied upon by the applicant ... to justify his belief that an order should be issued[.]" 18 U.S.C. § 2518(1)(b). Prior to issuing a wiretap order, a judge must review the application to determine whether there is probable cause to believe (1) that an individual has or is about to commit one of several enumerated offenses; and (2) that particular communications relating to the charged offense will be obtained through the interception. 18 U.S.C. § 2518(3)(a)-(b); *see also United States v. Armendariz,* 922 F.2d 602, 608 (10th Cir.1990).

A finding of probable cause for a wiretap is judged under the same standard used for a search warrant. *Armendariz*, 922 F.2d at 608. That is, the judge must "make a practical, common-sense decision as to whether the facts and circumstances within the affiant's knowledge, based on reasonably trustworthy information, are sufficient to warrant a person of reasonable

caution to believe that an offense has been or is being committed." *Id.* This determination depends on the facts of each case and is judged by the totality of the circumstances. *See United States v. Donovan*, 429 U.S. 413 (1977)

Here, as discussed *supra*, the only evidence that Mr. Knighten was allegedly involved in a conspiracy to possess and distribute narcotics was obtained through investigators' interception of communications on TT1. But because all evidence flowing from the TT1 authorization must be suppressed, Mr. Knighten asserts that the Government lacked an independent basis to find probable cause that he was involved in the charged conspiracies. The investigation here stemmed from a Wichita Police Department local investigation into drug trafficking of the Junior Boys gang. Mr. Knighten, in prison in Oklahoma, could not have been captured on any surveillance, either in person or on video. He could not have interacted with the CHS to facilitate narcotics sales. And SOI-3, who appears to be a prison informant from inside the OSP, would never have been tapped in connection with this investigation, were it not for the intercepted communications on TT1 and TT2 that led investigators eventually to TT4, the contraband cell phone alleged to have been used by Knighten.

For these reasons, because there is no untainted, independent basis for probable cause as to Mr. Knighten's alleged narcotics trafficking, the evidence obtained from TT4 should be suppressed.

## IV. The Applications Contain an Insufficient Showing of Necessity

Title III contains a "necessity" requirement that must be satisfied before a wiretap order may be lawfully issued. *United States v. Castillo-Garcia*, 117 F.3d 1179, 1185 (10th Cir. 1997), *overruled on other grounds*, *United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002) (en banc n. 1). That is, "In order to prove that a wiretap is necessary, the government must

show that traditional investigative techniques have been tried unsuccessfully, reasonably appear to be unsuccessful if tried, or are too dangerous to attempt." *Ramirez-Encarnacion*, 291 F.3d at 1222 (referencing18 U.S.C. §§ 2518(1)(c), 2518(3)(c)); *see also United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997) ("The judge issuing an authorization order then must find that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.' ") (citing 18 U.S.C. § 2518(3)(c) (1994)).

" 'Normal' investigative procedures include standard visual and aural surveillance, questioning witnesses and participants in the crime (including through the use of grand juries), search warrants, and infiltration of criminal enterprises by undercover agents or confidential informants." *United States v. Zapata*, 546 F.3d 1179, 1185 (10th Cir. 2008) (citing *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997)). The government must also explain a failure to use other techniques such as pen registers or trap and trace devices. *United States v. Castillo–Garcia,* 117 F.3d 1179, 1187–88 (10th Cir. 1997), *overruled on other grounds by Ramirez-Encarnacion*, 291 F.3d 1219).

"If a defendant carries his burden by demonstrating that that a wiretap was not necessary, the evidence obtained by the wiretap will be suppressed." *United States v. Jaques*, No. CR-19-372-F, 2020 WL 7327319, at *1–3 (W.D. Okla. Dec. 11, 2020) (referencing *United States v. Foy*, 641 F.3d 455, 464 (10th Cir. 2011)).

As set forth in the factual summary above, investigators were engaged in an extensive and successful investigation into the Junior Boys' drug trafficking activities (although marred to some extent by investigators' errors such as providing clearly marked, crisp bills for controlled buys that aroused suspicion). The Affidavit submitted in support of the wiretap application for TT1 describes multiple controlled buy interactions between CHS and targets of the investigation

throughout 2018 and into 2019. See, e.g., Affidavit at ¶¶ 12, 14-15, 17-19. FBI investigators provided CHS with a recording device to use during controlled buys (Affidavit at ¶¶ 19, 25) and conducted surveillance via pole camera (Affidavit at ¶ 19). Incriminating statements were captured in person, on the phone, and in text messages, even without wiretap authorization. Affidavit at, e.g., ¶ 20. FBI investigators also conducted GPS surveillance of Hill through "pings" on the "Target Telephone" (Affidavit at ¶ 16), toll analysis (Affidavit at ¶¶ 21, 22), recorded calls captured on CHS's phone (Affidavit at ¶ 23), and collected information from CHS's direct observation of the interior of the residence (Affidavit at ¶ 25). In sum, alternative law enforcement techniques were being used successfully and were not too dangerous.

Similarly, although the affidavits in support of the applications for each wiretap assert that tools such as search warrants would be inappropriate because they would alert the targets to the fact of the investigation and would cause theme to change the means of carrying out their activities, law enforcement carried out at least two searches without negative consequences to the investigation—the search at Hill's mother's residence discussed in the Second Report for TT1, TT2, and TT3 (report filed June 18, 2019) and the search at 930 N. Yale Avenue where Knighten's brother was arrested. Despite each of these searches, the alleged drug trafficking organization continued to operate and neither the identities of the confidential sources nor the integrity of the investigation was compromised.

Indeed, the original Affidavit in support of TT1 recounts that investigators sought a wiretap in order to broaden their investigation and to increase the pace of the investigation. Affidavit at ¶¶ 26, 34, 35. They did not aver that it was impossible to carry out the investigation with normal investigative procedures.

Further, the TT4 application and wiretap was entirely unnecessary insofar as the

investigation into Hill and his associates (including Knighten) was well developed through the wiretaps of TT1, TT2, and TT3. Knighten's communications were captured on those devices as well as on the cell phone seized from his brother during the search of 930 N. Yale Avenue. In order to prosecute Knighten for his role in the alleged drug trafficking organization, no more was required.

But instead, the Government chose to broaden the scope of the investigation, converting Knighten, in their paperwork, from a tangential to a central player, and relegating Hill to the sidelines. This documented shift in focus illustrates, again, how far from the original purpose of the TT1 wiretap the TT4 application had moved, and how investigators chose to use interceptions rather than traditional investigative techniques in furtherance of a more rapid broadening of the investigation. This is not what Title III envisioned.

Although it might be tempting to conclude that law enforcement was justified in seeking each of the wiretaps because the result of the interceptions was the arrest and prosecution of a larger network of alleged narcotics traffickers than the investigation had originally identified, that would not be accurate. Law enforcement is not justified in seeking Title III authorization unless other, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c) (1994). Far from failing, normal investigative procedures had yielded evidence of narcotics trafficking among Hill and his co-defendants. The wiretaps were not necessary, and Title III authorization should not have been granted.

## V.    Territorial Jurisdiction Over TT4 Was Manufactured

Title III "specifies that an order can permit the interception of communications 'within the territorial jurisdiction of the court in which the judge is sitting.' § 2518(3)." *Dahda v. United*

*States*, 138 S. Ct. 1491, 1495, 200 L. Ed. 2d 842 (2018). "An authorizing court has jurisdiction where Title III interception occurs—'both where the tapped telephones are located and where law enforcement officers put their listening post.' . . . Because interception occurs in both places, the Government can show proper territorial jurisdiction by merely satisfying one of the two requirements." *United States v. Hudson*, No. CR-16-119-R, 2018 WL 401546, at *3 (W.D. Okla. Jan. 12, 2018) (quoting *United States v. Dahda*, 853 F.3d 1101, 1112 (10th Cir.), *cert. granted on other grounds*, 138 S. Ct. 356 (2017); referencing *United States v. Tavarez*, 40 F.3d 1136, 1138 & n.2 (10th Cir. 1994)).

At all times during the investigation of this case, including the dates of each wiretap authorization on TT1 through TT4, Mr. Knighten was in inmate at the Oklahoma State Penitentiary, outside the territorial jurisdiction of the District of Kansas. Because he was (and is, presently) serving a 90-year sentence in the state, there was no possibility that TT4—a contraband cell phone—would ever enter the territorial jurisdiction of the District of Kansas.

Thus, although the Applications specified that the listening post would be established in the District of Kansas (see, e.g., Application in support of initial application for TT1 at p. 5), there was no possibility that Knighten's own actions would ever occur in the District of Kansas, or that TT4 would ever be located in, or used in, the District of Kansas.

Undeniably, the District of Kansas has an interest in prosecuting criminal activity that occurs within its territory. But to permit prosecution of Mr. Knighten in the District of Kansas, when he has not set foot in the District during the pendency of the charged conspiracy, goes too far. Permitting this prosecution to proceed effectively eviscerates the requirement of territorial jurisdiction. Indeed, there would be nothing theoretically stopping the Government from designating a listening post in Florida or Texas or Maine and, arguably, prosecuting Mr.

Knighten there for actions having nothing to do with those jurisdictions. Surely such a result would not be what Congress intended.

### VI.   Minimization Was Inadequate

Section 2518(5) of Title III requires that wiretaps "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter...." 18 U.S.C. § 2518(5) (1994). If a wiretap was not conducted in conformity with this "minimization" requirement, a defendant may move to suppress evidence obtained therefrom. 18 U.S.C. § 2518(10)(a). "The Supreme Court has held that this provision does not create an 'inflexible rule of law,' but rather demands an evaluation of the 'facts and circumstances of each case.' " *Killingsworth*, 117 F.3d at 1165 (quoting *Scott v. United States,* 436 U.S. 128, 139–40, 98 S.Ct. 1717, 1724, 56 L.Ed.2d 168 (1978)).

The reasonableness of the Government's minimization efforts is evaluated as set forth in *United States v. Yarbrough*, 527 F.3d 1092 (10th Cir. 2008):

> The government must make an initial prima facie showing of reasonable minimization. [*United States v. Willis*, 890 F.2d 1099, 1102 (10th Cir.1989)]. "Once the government has made a prima facie showing of reasonable minimization, the burden then shifts to the defendant to show more effective minimization could have taken place." *Id.* In determining whether the government has made a prima facie showing of reasonable efforts to minimize the interception of non-pertinent calls, we consider the factors identified by the Supreme Court in *Scott:* (1) whether a large number of the calls are very short, one-time only, or in guarded or coded language; (2) the breadth of the investigation underlying the need for the wiretap; (3) whether the phone is public or private; and (4) whether the non-minimized calls occurred early in the surveillance. 436 U.S. at 140–41, 98 S.Ct. 1717. It is also appropriate to consider (5) the extent to which the authorizing judge supervised the ongoing wiretap. *United States v. Lopez,* 300 F.3d 46, 57 (1st Cir.2002); *United States v. Daly,* 535 F.2d 434, 442 (8th Cir.1976); *United States v. Vento,* 533 F.2d 838, 853 (3d Cir.1976).

*Yarbrough*, 527 F.3d at 1098 (10th Cir. 2008).

The Government's 15-day reports assert, in what appears to be a copied and pasted paragraph of standard language that, "prior to commencing interception over [each of] the Target Telephone[s]:

> . . . a meeting was held at which agents and monitoring personnel were briefed on the investigation and provided minimization guidance. The undersigned Assistant United States Attorney discussed the minimization requirements set forth in the Court's interception Order and provided written minimization guidance, a copy of which was thereafter kept at the monitoring location for agents to review as needed, along with a copy of the Court's interception order and related materials including the Application and the Affidavit in support of the Application. Each monitoring agent was required to review the Court's Order and related documents and the minimization guidelines concerning the conduct of the interceptions."

See, e.g., First 15-Day Progress Report for TT1 (20-10028-EFM Discovery 12.0020) at ¶ 3.

However, the Defense has not seen any evidence of this "written minimization guidance," any evidence that monitoring agents adhered to it, or any evidence that the monitoring agents did, in fact, review the Court's Order and the parameters for monitoring set forth therein. The Defense has not seen any set of search terms used to establish pertinence or non-pertinence of interceptions, or the criteria provided to the monitoring agents.

Of additional concern, a careful analysis of the linesheets of TT1 shows that, of the 3,311 calls captured, at least 76 calls over two minutes long—2% of the total—were not minimized. The Defense has not seen clear evidence that each of these calls was pertinent. This analysis supports the conclusion that the monitors were systematically listening longer than they should have been to the calls without minimizing. For example, the Defense is aware of the following sessions that were non-pertinent and not minimized in the TT4 interception:

> Session 1179 – 4:38 call – Bink and Troub - non-pertinent and no minimization
> Session 2787 – 8:16 call – Troub and Stacie Stark - non-pertinent and no minimization
> Session 2805 – 2:57 call – Gary LNU and Troub – non-pertinent and no minimization
> Session 3868 – 11:44 call - Troub and Bink – non-pertinent and not minimized
> Session 4084 – 3:43 call – Troub and Bink - - non-pertinent and not minimized

Session 4206 – 6:30 call – Troub and Kenneth Palmer - - non-pertinent and not minimized

Session 6194 – 4:08 call – Troub and Dallas - non-pertinent and not minimized

Session 6268 – 3:57 call – Troub and Leggs - non-pertinent and not minimized

Session 8321 – 2:43 call – Troub and Bink - non-pertinent and not minimized

Session 9212 – 3:58 call – Troub and Bink - non-pertinent and not minimized

Session 9272 – 3:18 call – Troub and Dallas - non-pertinent and not minimized

Session 9437 – 2:47 call – Troub and juvenile – non-pertinent and not minimized

Session 10662 – 3:25 – Troub and Punchy – non-pertinent and not minimized

Session 10742- 4:34 – Troub and Leggs – non-pertinent and not minimized

Session 10808 – 3:45 - Troub and Punchy – non-pertinent and not minimized

Session 10834 – 3:42 – Troub and Leggs – non-pertinent and not minimized

Session 11163 – 3:47 – Troub and Dallas – non-pertinent and not minimized

Session 11181 – 2:20 – Troub and F Collins – non-pertinent and not minimized

Session 11665 – 7:19 – Troub and Leggs – non-pertinent and not minimized

Session 11666 – 17:25 – Troub and Leggs – non-pertinent and not minimized

Session 12151 – 3:02 – Troub and Punchy – non-pertinent and not minimized

Session 12171 – 3:05 – Troub and Bink – non-pertinent and not minimized

Session 12480 – 3:20 – Troub and Leggs – non-pertinent and not minimized

Session 12640 – 5:57 – Troub and Bink – non-pertinent and not minimized

Session 12719 – 6:05 – Troub and Leggs – non-pertinent and not minimized

Session 12740 – 3:20 – Troub and Leggs – non-pertinent and not minimized

Session 13385- 4:42 - Troub and Bink – non-pertinent and not minimized

Session 13887- 4:15 - Troub and Punchy – non-pertinent and not minimized

Session 14347 – 3:22 – Troub and Leggs – non-pertinent and not minimized

Session 14632 – 6:11 – Troub and Chen – non-pertinent and not minimized

Session 15601 – 5:26 – Troub and K Palmer – non-pertinent and not minimized

Session 15610 – 10:56 – Troub and Leggs – non-pertinent and not minimized

Session 16397– 4:03 – Troub and Wells – non-pertinent and not minimized

Session 19209– 2:32 – Troub and Bink – non-pertinent and not minimized

Session 19218– 9:41 – Troub and Bink – non-pertinent and not minimized

Session 19220– 9:36 – Troub and Bink – non-pertinent and not minimized

Session 19318– 2:26 – Troub and Dallas – non-pertinent and not minimized

Session 22368 – 2:35 – Troub and Leggs – non-pertinent and not minimized

Session 22483 – 3:41 – Troub and Leggs – non-pertinent and not minimized

Session 24714– 4:52 – Troub and Bink – non-pertinent and not minimized

Session 24747– 5:40 – Troub and UM – non-pertinent and not minimized

Session 26047– 3:06 – Troub and Bink – non-pertinent and not minimized

Session 26241– 2:50 – Troub and Leggs – non-pertinent and not minimized

Session 27377– 4:14 – Troub and Leggs – non-pertinent and not minimized

Session 27701– 8:59 – Troub and Bink – non-pertinent and not minimized

Session 29161– 4:24 – Troub and Bink– non-pertinent and not minimized

Session 30510– 2:27 – Troub and Bink – non-pertinent and not minimized

Session 31007– 5:32 – Troub and Leggs – non-pertinent and not minimized

Session 31139 – 2:15 - Troub and Collins – non-pertinent and not minimized
Session 31239 –12:37 - Troub and Bink – non-pertinent and not minimized
Session 32288– 8:08 – Troub and Leggs – non-pertinent and not minimized
Session 32476– 2:39 – Troub and Leggs – non-pertinent and not minimized
Session 32502– 2:53 – Troub and Swazey – non-pertinent and not minimized
Session 32522– 2:04 – Troub and UM – non-pertinent and not minimized
Session 32681– 2:39 – Troub and UM – non-pertinent and not minimized
Session 32716– 2:36 – Troub and Bink – non-pertinent and not minimized
Session 33350– 8:51 – Troub and Hill – non-pertinent and not minimized
Session 34130– 2:03 – Troub and Bink – non-pertinent and not minimized
Session 34384– 7:41 – Troub and Bink – non-pertinent and not minimized
Session 35551– 2:51 – Troub and Bink – non-pertinent and not minimized
Session 37205– 4:28 – Troub and Leggs – non-pertinent and not minimized
Session 37621– 4:06 – Troub and Bink – non-pertinent and not minimized
Session 38524– 3:39 – Troub and Bell – non-pertinent and not minimized
Session 41303– 2:41 – Troub and Leggs – non-pertinent and not minimized
Session 42167– 4:22 – Troub and Leggs – non-pertinent and not minimized
Session 42228– 3:13 – Troub and Bink – non-pertinent and not minimized
Session 42400– 2:29 – Troub and Leggs – non-pertinent and not minimized
Session 42787– 3:00 – Troub and Bink – non-pertinent and not minimized
Session 43330– 6:54 – Troub and Bink – non-pertinent and not minimized
Session 43595– 7:22 – Troub and Hill – non-pertinent and not minimized
Session 44647– 26.28 – Troub and Bink – continuation of call- non-pertinent and not minimized
Session 45597– 2:52 – Troub and UM – non-pertinent and not minimized

Minimization was not adequate here. It is evident from this record that monitoring agents and perhaps even the case agents and/or the prosecution team gained access to materials not subject to interception. Accordingly, Mr. Knighten moves to suppress the evidence obtained from each of the wiretaps.

## VII.  No Good Faith Exception Applies

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violations of its commands." *Arizona v. Evans*, 514 U.S. 1, 10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Nevertheless, the Supreme Court has "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial."  *Herring v. United States,* 555 U.S. 135, 139, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). "[T]his judicially created rule

is 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *Id.* at 139–40, 129 S.Ct. 695 (quoting *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)).

Under the "good faith" exception, however, evidence seized pursuant to a defective warrant is not suppressed where the officer conducting the search relied upon the warrant in "good faith." *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *See also United States v. Barajas*, 710 F.3d 1102, 1110 (10th Cir. 2013) ("The good-faith exception provides that 'evidence seized pursuant to the warrant need not be suppressed if the executing officer acted with an objective good-faith belief that the warrant was properly issued by a neutral magistrate.' ") (quoting *United States v. Campbell*, 603 F.3d 1218, 1225 (10th Cir.2010) (quotation in *Campbell* omitted)).

The Tenth Circuit has not resolved the question of whether the *Leon* good-faith exception applies to Title III. *United States v. Barajas*, 710 F.3d 1102, 1110 (10th Cir. 2013) (referencing *United States v. Arrington,* 216 F.3d 1088, 2000 WL 775576, at *6 (10th Cir. June 16, 2000) ("[T]he applicability of *Leon* to the Title III context is unsettled....")), and collecting circuit cases demonstrating split. The Circuit has, however, "[a]ssum[ed] without deciding that the *Leon* good faith exception does apply to Title III." *Arrington*, 216 F.3d 1088.

Here, Mr. Knighten argues that the entire series of wiretaps obtained in this case must be suppressed because they stemmed from a facially deficient application for TT1. As discussed above, the original application included an approval ostensibly from Bruce C. Swartz that was not signed by him. This discrepancy was clear on its face from looking at the signature above the stamped name. And it would have been clear from the issuing judge, whose knowledge of the

parameters under which he is authorized to approve wiretap applications is assumed, that this incongruity called the validity of the application into question.

Thus, at the outset, the issuing judge should have sent the application back with instructions to confirm that Bruce C. Swartz actually approved the application. Failure to do so rendered the application improperly issued. Further, because the applications for TT2, TT3, and TT4 all stemmed from the interceptions on TT1, the evidence obtained through those wiretaps must likewise be suppressed as tainted by the defective application for TT1.

Because the Government's 15-day reports each assert that the Court's interception orders and the applications therefor were kept at the monitoring stations for agents to review, and because the Government asserts that agents were required to review the documents, it is likewise improbable that any reviewing agent would not have noticed the signature discrepancy. As law enforcement agents who should be familiar with the laws according to which they conduct their duties, agents' failure to question the validity of the facially deficient TT1 order cannot be justified as objective good-faith reliance.

## CONCLUSION

WHEREFORE, for the reasons set forth above, Mr. Knighten's motion to suppress all evidence obtained from the Title III wiretaps in this case and to dismiss the counts charging him with the use of a facility of interstate commerce should be granted.

Respectfully submitted,


/s/ Mark A. Thomason
Mark A. Thomason #22227
Law Office of Mark Thomason, LLC
929 Walnut St Suite 101
Kansas City, MO 64106
816.229.8686 / 816.229.9494 fax
mthomasonlaw@yahoo.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of November 2021, I electronically filed the

foregoing with the Clerk of the Court using CM/ECF system which sent notification of such

filing to all counsel of record.


//s// Mark A. Thomason
*Counsel for Defendant*