IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,       )
                                    )
                    Plaintiff,      )   District Court
v.                                  )   Case Nos.
                                    )   20-10028-11
KEVIN LEWIS and TRAVIS VONTRESS,    )   20-10028-19
                                    )
                    Defendants.     )
                                    )


EXCERPT OF TRANSCRIPT OF JURY TRIAL
VOLUME VIII
TESTIMONY OF CAITLIN MCCAULEY, BRIANNA MCCARTHY,
TOLULOPE OMOSUN, and TREVOR CURTIS


On the 10th day of March, 2022, came on to be heard proceedings in the above-entitled and numbered cause before the HONORABLE ERIC F. MELGREN, Judge of the United States District Court for the District of Kansas, sitting in Wichita, commencing at 9:38 A.M. Proceedings recorded by machine shorthand.  Transcript produced by computer-aided transcription.


APPEARANCES:
The plaintiff appeared by and through:
          Mr. Matt Treaster
          Ms. Katherine J. Andrusak
          United States Attorney's Office
          1200 Epic Center
          301 North Main
          Wichita, Kansas 67202


The defendant Kevin Lewis appeared in person and by and through:
          Mr. Michael J. Shultz
          Shultz Law Office, P.A.
          445 North Waco
          Wichita, Kansas 67202


The defendant Travis Vontress appeared in person and by and through:
          Mr. Kevin W. Babbit
          Fagan & Emert, LLC
          730 New Hampshire
          Suite 210
          Lawrence, Kansas  66044

Also present:
        Special Agent Cameron Heath
        Ms. Kay McNeil, USAO

<pre>
1                        I N D E X
                                              PAGE
2

3

   WITNESSES
4        For the Plaintiff
         CAITLIN MCCAULEY
5          Direct Examination By Mr. Treaster        5
           Cross-Examination By Mr. Shultz          14
6        BRIANNA MCCARTHY
           Direct Examination By Mr. Treaster       17
7          Cross-Examination By Mr. Babbit          23
           Cross-Examination By Mr. Shultz          26
8        TOLULOPE OMOSUN
           Direct Examination By Mr. Treaster       27
9          Cross-Examination By Mr. Shultz          32
         TREVOR CURTIS
10         Direct Examination By Mr. Treaster       34

11

12   REPORTER'S CERTIFICATE                         40

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAITLIN MCCAULEY,

having been first duly sworn to testify the truth, the

whole truth, and nothing but the truth, testified as

09:41:30    follows:

09:41:30    DIRECT EXAMINATION

09:41:30    BY MR. TREASTER:

09:41:33    Q.    Please state your name for the record.

09:41:35    A.    **My name is Caitlin McCauley.**

09:41:37    Q.    And where do you work?

09:41:39    A.    **I currently work with the Drug Enforcement**

09:41:42    **Administration, also known as the DEA.**

09:41:43    Q.    And what do you do for them?

09:41:45    A.    **I work as a forensic chemist.**

09:41:47    Q.    And how long have you done that for them?

09:41:50    A.    **I've been working with the DEA since August of**

09:41:53    **2020.**

09:41:53    Q.    And did you work for the DEA previously before

09:41:56    that?

09:41:56    A.    **I did.  I completed a six-month internship with**

09:42:00    **the DEA's Northeast Lab in New York City, New York.**

09:42:04    Q.    And what is your educational background?

09:42:05    A.    **I have a Bachelor of Science degree from John Jay**

09:42:11    **College of Criminal Justice in New York City in Forensic**

09:42:16    **Science, specializing in Criminalistics.**

09:42:17    Q.    And do you have any specialized training for your

| | | |
|---|---|---|
| 09:42:19 | 1 | position? |
| 09:42:19 | 2 | A.    I do.  I completed a 19-week basic forensic |
| 09:42:23 | 3 | chemist course in Quantico, Virginia, for the DEA, and I |
| 09:42:27 | 4 | also completed a two-month regional training at my lab in |
| 09:42:31 | 5 | Chicago, Illinois. |
| 09:42:31 | 6 | Q.    And did you successfully complete both those |
| 09:42:34 | 7 | periods of training? |
| 09:42:34 | 8 | A.    I did. |
| 09:42:38 | 9 | Q.    Now, did you conduct a forensic examination in |
| 09:42:42 | 10 | your LIMS #2019-SFL5-0556 and -05560? |
| 09:42:50 | 11 | A.    Yes, I did. |
| 09:42:54 | 12 | Q.    And what that types of testing did you do in this |
| 09:42:56 | 13 | case? |
| 09:42:56 | 14 | A.    In this case I completed a Marquis color test.  I |
| 09:43:00 | 15 | also did a gas chromatography-mass spectrometry, also |
| 09:43:08 | 16 | known as a GC-MS test.  I then did a Fourier transform |
| 09:43:13 | 17 | infrared spectroscopy or FTIR test, and finally I did a |
| 09:43:17 | 18 | purity determination on a gas chromatography flame |
| 09:43:21 | 19 | ionization detector, also known as a GC-FID. |
| 09:43:26 | 20 | Q.    Can you describe briefly each one of those tests. |
| 09:43:28 | 21 | A.    Yes. |
| 09:43:29 | 22 | Q.    And what is the GC-MS? |
| 09:43:30 | 23 | A.    So the GC-MS test is a two-part test.  It is |
| 09:43:36 | 24 | comprised of two instruments.  The gas chromatography, or |
| 09:43:39 | 25 | GC-MS portion, separates a mixture into its different |

09:43:44   1   components.  It then goes into the spectrometer, the MS,

09:43:49   2   where it's hit with a large amount of energy, which

09:43:51   3   breaks it into fragments.  The instrument then translates

09:43:55   4   the amount of those fragments into a graph, also known as

09:43:58   5   a spectrum.

09:43:59   6   Q.    And from that you were able to tell what the

09:44:01   7   substance is?

09:44:03   8   A.    Yes.  We can compare that to a known reference

09:44:06   9   material and determine what it is.

09:44:08   10  Q.    And then what is an FTIR?

09:44:12   11  A.    So an FTIR is a technique where we can hit our

09:44:18   12  sample with some light.  Some light is absorbed, other

09:44:22   13  light goes through the sample.  The light that is

09:44:24   14  absorbed causes certain atoms to vibrate and move, and

09:44:29   15  then those movements are then translated by an instrument

09:44:33   16  into a graph, also known as a spectrum, which gives us

09:44:37   17  distinct structural information about the mixture itself.

09:44:42   18  Q.    And then you talked about a Marquis color test.

09:44:45   19  What is that?

09:44:45   20  A.    A Marquis color test, you have a color test

09:44:50   21  solution.  You place it into a small plate, and then you

09:44:53   22  take a small amount of your sample, mix it in with the

09:44:57   23  solution, and then look at what color it gives you.  In

09:45:02   24  this case it gave me an orange-to-brown color, which I

09:45:06   25  compared to our known reference material, which is

09:45:10  1  **indicative of methamphetamine.**

09:45:12  2  Q.      And then did you also -- you said you did a purity

09:45:15  3  test as well?

09:45:16  4  **A.      Yes.**

09:45:16  5  Q.      And you do that with a GC-MS system as well or

09:45:19  6  something different?

09:45:20  7  **A.      The GC-FID.**

09:45:22  8  Q.      Okay.  And how does that work?

09:45:24  9  **A.      That works by testing a pure solution of**

09:45:28  10 **methamphetamine on the instrument.  We then run our**

09:45:31  11 **sample through that instrument, and we compare it to the**

09:45:34  12 **pure solution of the methamphetamine to figure out the**

09:45:38  13 **purity of the sample.**

09:45:39  14 Q.      And also, as you went through this testing

09:45:42  15 process, did you figure out -- calculate a weight of the

09:45:45  16 substance you were testing?

09:45:46  17 **A.      Yes, I did.**

09:45:47  18 Q.      Now, all these tests that you talked about, are

09:45:50  19 they recognized as valid scientific tests for the testing

09:45:53  20 of methamphetamine?

09:45:54  21 **A.      Yes, they are.**

09:45:56  22 Q.      And is your DEA lab an accredited lab?

09:45:59  23 **A.      It is.**

09:45:59  24 Q.      And where is your lab located at that you work at?

09:46:02  25 **A.      My lab is located in Chicago, Illinois.**

```
09:46:06   1   Q.     I'm going to --

09:46:07   2          MR. TREASTER:  Your Honor, may I approach?

09:46:08   3          THE COURT:  You may.

09:46:11   4          (Whereupon, a sotto voce discussion was had among

09:46:12   5   Mr. Treaster, Mr. Shultz, and Mr. Babbit.)

09:46:30   6   BY MR. TREASTER:

09:46:31   7   Q.     I'm going to hand you what's been already admitted

09:46:33   8   as Government's 663, 663A, 669, and 669A.

09:46:50   9          Do you recognize those items?

09:47:11  10   A.     Yes, I do.

09:47:12  11   Q.     And how are you able to identify them?

09:47:15  12   A.     I'm able to identify these pieces of evidence by

09:47:19  13   looking at my signature on the evidence label.  I have my

09:47:27  14   handwriting and initials on the pieces of evidence

09:47:31  15   themselves.  I also have my signature on the Drug

09:47:34  16   Enforcement Administration evidence label as well.  And

09:47:36  17   that applies to all of these pieces of evidence.

09:47:40  18   Q.     Can you explain to the jury how you receive these

09:47:44  19   items at the laboratory.

09:47:45  20   A.     So, to receive these items, my supervisor will put

09:47:52  21   them in the computer for me to pick up.  I then go to our

09:47:55  22   main vault, and one of our evidence technicians will

09:47:59  23   transfer the piece of evidence into my custody.

09:48:02  24   Q.     And when you take possession of those items, do

09:48:04  25   you look for any signs of tampering with them?
```

09:48:07    1   A.      I do.

09:48:07    2   Q.      And did you notice any on these items, any

09:48:10    3   tampering signs?

09:48:11    4   A.      I did not.

09:48:14    5   Q.      Can you tell when they were received by the DEA

09:48:16    6   lab?

09:48:17    7   A.      Yes, I can.  So for Government Exhibit 663, it was

09:48:34    8   received by the laboratory on August 20th, 2019.  For

09:48:39    9   Government Exhibit 669, it was received by the laboratory

09:48:43   10   on August 20th, 2019.

09:48:45   11   Q.      Okay.  And when did you personally take possession

09:48:48   12   of those items to test them?

09:48:50   13   A.      I received these items, Government's 663, on

09:48:56   14   June 15th, 2021, as well as Government Exhibit 669,

09:49:03   15   June 15th, 2021.

09:49:04   16   Q.      And did you run the tests that you talked about

09:49:07   17   before on both of these -- on 663 and 669?

09:49:11   18   A.      I did.

09:49:12   19   Q.      Now, there's a 669A and 663A.  Can you explain to

09:49:18   20   the jury why we have a sub A with each of these two

09:49:22   21   items?

09:49:22   22   A.      Yes.  So both of these items were marked for

09:49:27   23   latent print examination.  So in that instance I

09:49:31   24   separated the original packaging and sent them to our

09:49:35   25   fingerprint department, which you can see here the

09:49:38   1   **original packaging for Government Exhibit 663 and as well**

09:49:45   2   **as the fingerprint original packaging for Government**

09:49:49   3   **Exhibit 669.**

09:49:50   4   Q.    So the original packaging is in 669A and 663A?

09:49:56   5   **A.    Yes.**

09:49:56   6   Q.    Okay.  And then the items that you actually tested

09:49:59   7   are in 669 and 663?

09:50:03   8   **A.    Yes, they are.**

09:50:07   9   Q.    Now, based on the tests that you performed on

09:50:11  10   these items, do you have an opinion, based on the

09:50:14  11   testing, what's contained in 663 and 669?

09:50:18  12   **A.    I do.**

09:50:18  13   Q.    Okay.  Could you tell the jury what you found the

09:50:22  14   presence of in Government's Exhibit 663.

09:50:25  15   **A.    Yes.  I determined that Government Exhibit 663**

09:50:30  16   **contained methamphetamine hydrochloride and dimethyl**

09:50:36  17   **sulfone.**

09:50:36  18   Q.    Okay.  And what is -- and is what you said from

09:50:38  19   the methamphetamine, is that what we call

09:50:40  20   methamphetamine?  Is that a more chemical name for it?

09:50:44  21   **A.    Methamphetamine is the same as methamphetamine**

09:50:50  22   **hydrochloride.  It's a different cell form.**

09:50:53  23   Q.    Okay.  And then you mentioned something else that

09:50:56  24   you found the presence of.

09:50:57  25   **A.    Yes.**

3-10-22 USA v. LEWIS, VONTRESS No. 20-10028          12

| | | |
|---|---|---|
| 09:50:57 | 1 | Q.     And what was that? |
| 09:50:58 | 2 | **A.     Dimethyl sulfone.** |
| 09:51:02 | 3 | Q.     What is that? |
| 09:51:03 | 4 | **A.     Dimethyl sulfone is considered an adulterant,** |
| 09:51:06 | 5 | **which is a non-controlled substances with** |
| 09:51:09 | 6 | **pharmacologically active role.  It also is added to a** |
| 09:51:14 | 7 | **controlled substance likely to add some weight to it.** |
| 09:51:17 | 8 | Q.     Okay.  Did you find a net weight of Government's |
| 09:51:22 | 9 | 663? |
| 09:51:23 | 10 | **A.     I did.** |
| 09:51:23 | 11 | Q.     And what was that? |
| 09:51:24 | 12 | **A.     The net weight of Government Exhibit 663 is 274.6** |
| 09:51:29 | 13 | **grams.** |
| 09:51:31 | 14 | Q.     In your purity test, did you find a purity amount |
| 09:51:35 | 15 | in that? |
| 09:51:35 | 16 | **A.     I did.** |
| 09:51:35 | 17 | Q.     And what was that? |
| 09:51:36 | 18 | **A.     The purity was 99 percent.** |
| 09:51:39 | 19 | Q.     Okay.  So even though there was the dimethyl |
| 09:51:44 | 20 | sulfone, it was almost completely pure meth with that |
| 09:51:46 | 21 | adulterant in it? |
| 09:51:48 | 22 | **A.     Yes.** |
| 09:51:50 | 23 | Q.     And then did you calculate the amount of pure |
| 09:51:53 | 24 | substance in that item? |
| 09:51:54 | 25 | **A.     I did.** |

| | | |
|---|---|---|
| 09:51:54 | 1 | Q.    And what was that? |
| 09:51:56 | 2 | A.    **The amount of pure substance was 271.8 grams.** |
| 09:52:02 | 3 | Q.    Of methamphetamine? |
| 09:52:03 | 4 | A.    **Yes.** |
| 09:52:07 | 5 | Q.    Now, we look at Government's 669.  What was the |
| 09:52:12 | 6 | result of your testing in that item? |
| 09:52:15 | 7 | A.    **I identified methamphetamine hydrochloride.** |
| 09:52:19 | 8 | Q.    And what was the net weight? |
| 09:52:21 | 9 | A.    **The net weight was 31 grams.** |
| 09:52:23 | 10 | Q.    And the purity? |
| 09:52:25 | 11 | A.    **The purity was 98 percent.** |
| 09:52:28 | 12 | Q.    And what was the amount of pure methamphetamine in |
| 09:52:31 | 13 | that item? |
| 09:52:31 | 14 | A.    **The amount of pure substance was 30.3 grams.** |
| 09:52:35 | 15 | Q.    And then once you got done with these items, what |
| 09:52:38 | 16 | do you do with them at the laboratory? |
| 09:52:40 | 17 | A.    **Once I finish my analysis, I then take a reserve** |
| 09:52:43 | 18 | **weight, I then take a brief description of how the** |
| 09:52:46 | 19 | **evidence looks, and then I take a gross weight after** |
| 09:52:49 | 20 | **analysis after I've sealed up everything.** |
| 09:52:51 | 21 | Q.    Okay.  And does there look to be any signs of |
| 09:52:54 | 22 | tampering after you examined these items? |
| 09:53:07 | 23 | A.    **No.** |
| 09:53:09 | 24 | MR. TREASTER:  No further questions, Your Honor. |
| 09:53:10 | 25 | Thank you. |

| | | |
|---|---|---|
| 09:53:10 | 1 | THE COURT:  Thank you, Mr. Treaster. |
| 09:53:11 | 2 | Cross-examination, Mr. Shultz? |
| 09:53:17 | 3 | MR. SHULTZ:  Thank you, Your Honor. |
| 09:53:17 | 4 | CROSS-EXAMINATION |
| 09:53:17 | 5 | BY MR. SHULTZ: |
| 09:53:18 | 6 | Q.   Good morning. |
| 09:53:18 | 7 | **A.   Good morning.** |
| 09:53:19 | 8 | Q.   Just want to ask a couple quick questions just to |
| 09:53:23 | 9 | clarify what you said.  You identified these exhibits by |
| 09:53:26 | 10 | your handwriting and signature on the labels; is that |
| 09:53:28 | 11 | right? |
| 09:53:28 | 12 | **A.   Yes.** |
| 09:53:28 | 13 | Q.   So you can't just look at what's in the bag and |
| 09:53:31 | 14 | go, "Oh, yeah, I remember testing this particular set of |
| 09:53:34 | 15 | crystals" or whatever; right? |
| 09:53:36 | 16 | **A.   No.** |
| 09:53:37 | 17 | Q.   And so your testing, you're not just -- you have |
| 09:53:40 | 18 | to have the stuff to be able to test it; right? |
| 09:53:42 | 19 | **A.   Yes.** |
| 09:53:42 | 20 | Q.   You can't make your determination scientifically |
| 09:53:45 | 21 | off of a picture; correct? |
| 09:53:47 | 22 | **A.   No.** |
| 09:53:48 | 23 | Q.   I asked that badly.  But what I said was correct? |
| 09:53:52 | 24 | **A.   I realize -- I apologize.** |
| 09:53:53 | 25 | Q.   No, that's my fault. |

| | | |
|---|---|---|
| 09:53:56 | 1 | A.    Yeah.  That is correct. |
| 09:53:58 | 2 | Q.    Okay.  You said, I believe, that you sent -- you |
| 09:54:04 | 3 | said the sample was also sent to the fingerprint lab at |
| 09:54:06 | 4 | DEA? |
| 09:54:07 | 5 | A.    The original packaging of the sample was sent to |
| 09:54:10 | 6 | the fingerprint lab.  I kept the actual evidence in my |
| 09:54:13 | 7 | possession for as long as I had it. |
| 09:54:15 | 8 | Q.    You didn't do any fingerprint testing? |
| 09:54:17 | 9 | A.    I did not. |
| 09:54:19 | 10 | Q.    Okay.  You talked about the GC-FID or T test? |
| 09:54:24 | 11 | A.    FID. |
| 09:54:25 | 12 | Q.    FID.  You talked about how you take a pure |
| 09:54:29 | 13 | sample -- |
| 09:54:29 | 14 | A.    Uh-huh. |
| 09:54:29 | 15 | Q.    -- and compare it to the sample you had? |
| 09:54:32 | 16 | A.    Yes. |
| 09:54:32 | 17 | Q.    How is the pure sample determined? |
| 09:54:36 | 18 | A.    The pure sample is made up of a known reference |
| 09:54:39 | 19 | material that we have which has a known purity to it, so |
| 09:54:44 | 20 | we are able to run it and create a calibration curve off |
| 09:54:48 | 21 | of it.  We then use our sample, and when we run it, it |
| 09:54:53 | 22 | will place on the calibration curve and, therefore, we'll |
| 09:54:58 | 23 | know the purity. |
| 09:54:59 | 24 | Q.    So a known reference -- I guess if your test is |
| 09:55:02 | 25 | what determines the purity of the sample here, how does a |

| | | |
|---|---|---|
| 09:55:05 | 1 | known reference sample become a pure sample?  Does that |
| 09:55:09 | 2 | make sense?  Like who decides that that's a pure sample? |
| 09:55:13 | 3 | **A.      We have our special testing laboratory and** |
| 09:55:16 | 4 | **research laboratory.  That's where these pure samples are** |
| 09:55:20 | 5 | **made and then sent to us, and they go through rigorous** |
| 09:55:24 | 6 | **testing.** |
| 09:55:26 | 7 | Q.      And nothing about your testing tells you anything |
| 09:55:28 | 8 | about where the drugs came from or where they went or |
| 09:55:30 | 9 | anything like that; right? |
| 09:55:32 | 10 | **A.      No.** |
| 09:55:32 | 11 | MR. SHULTZ:  That is all the questions I have. |
| 09:55:34 | 12 | Thank you. |
| 09:55:34 | 13 | THE COURT:  Thank you, Mr. Shultz. |
| 09:55:35 | 14 | Mr. Babbit? |
| 09:55:36 | 15 | MR. BABBIT:  I have nothing to add to that, Judge, |
| 09:55:38 | 16 | further. |
| 09:55:38 | 17 | THE COURT:  All right.  Thank you, counsel. |
| 09:55:39 | 18 | Any redirect, Mr. Treaster? |
| 09:55:41 | 19 | MR. TREASTER:  No, Your Honor. |
| 09:55:41 | 20 | THE COURT:  Jury, do you have any questions for |
| 09:55:43 | 21 | the witness? |
| 09:55:58 | 22 | (Brief pause.) |
| 09:56:32 | 23 | THE COURT:  Ms. McCauley, I allow the jury to ask |
| 09:57:00 | 24 | questions, but they have no questions for you.  So thank |
| 09:57:02 | 25 | you for your attendance here.  You are free to go. |

| | | |
|---|---|---|
| 09:57:04 | 1 | THE WITNESS:  Thank you very much. |
| 09:57:07 | 2 | (Witness excused from the witness stand.) |
| 09:57:07 | 3 | THE COURT:  The Government may call their next |
| 09:57:11 | 4 | witness. |
| 09:57:11 | 5 | MR. TREASTER:  Your Honor, the United States would |
| 09:57:13 | 6 | call Brianna McCarthy to the stand. |
| 09:57:33 | 7 | THE COURT:  Ms. McCarthy, if you'll stand in front |
| 09:57:35 | 8 | of my courtroom deputy, he will swear you in, and then |
| 09:57:37 | 9 | you can wind your way around to get into the witness box |
| 09:57:40 | 10 | from the rear.  Thank you. |
| 09:57:42 | 11 | BRIANNA MCCARTHY, |
| 09:57:42 | 12 | having been first duly sworn to testify the truth, the |
| 09:57:42 | 13 | whole truth, and nothing but the truth, testified as |
| 09:57:59 | 14 | follows: |
| 09:58:01 | 15 | DIRECT EXAMINATION |
| 09:58:01 | 16 | BY MR. TREASTER: |
| 09:58:09 | 17 | Q.     Please state your name for the record. |
| 09:58:10 | 18 | **A.     My name is Brianna McCarthy.** |
| 09:58:11 | 19 | Q.     And how are you employed? |
| 09:58:13 | 20 | **A.     I'm employed by the Drug Enforcement** |
| 09:58:16 | 21 | **Administration or DEA.** |
| 09:58:16 | 22 | Q.     And what do you do for them? |
| 09:58:18 | 23 | **A.     I'm a senior forensic chemist.** |
| 09:58:19 | 24 | Q.     And how long have you worked in that capacity for |
| 09:58:22 | 25 | the DEA? |

3-10-22 USA v. LEWIS, VONTRESS No. 20-10028     18

| | | |
|---|---|---|
| 09:58:22 | 1 | A.      I've been employed with the DEA in that capacity |
| 09:58:25 | 2 | for approximately seven years. |
| 09:58:27 | 3 | Q.    And what's your educational background? |
| 09:58:29 | 4 | A.      I have a Bachelor of Science degree in |
| 09:58:33 | 5 | Biochemistry and Molecular Biology, obtained from |
| 09:58:36 | 6 | Michigan State University in 2017. |
| 09:58:37 | 7 | Q.    And do you have any specialized training with the |
| 09:58:40 | 8 | DEA for your position? |
| 09:58:41 | 9 | A.      Yes, I completed an 18-week basic forensic |
| 09:58:44 | 10 | chemistry course in Quantico, Virginia, in 2015. |
| 09:58:47 | 11 | Q.    And have you testified in federal court before? |
| 09:58:51 | 12 | A.      Yes, I have. |
| 09:58:53 | 13 | Q.    On forensic chemistry? |
| 09:58:56 | 14 | A.      Correct. |
| 09:58:58 | 15 | Q.    Did you conduct testing in your LIMS # |
| 09:59:04 | 16 | 2019-SFL5-05533, -0554, -0557, -05558, -0559? |
| 09:59:15 | 17 | A.      Yes, that's correct. |
| 09:59:17 | 18 | Q.    And what types of tests did you use when you were |
| 09:59:21 | 19 | examining the substances in those LIMS numbers? |
| 09:59:25 | 20 | A.      In these exhibits I performed GC-MS, GC-FID, and |
| 09:59:30 | 21 | FTIR. |
| 09:59:30 | 22 | Q.    Did you also compute purity and weight |
| 09:59:33 | 23 | determination? |
| 09:59:33 | 24 | A.      Yes, I did. |
| 09:59:34 | 25 | Q.    And the test that you used, are they recognized as |

| | | |
|---|---|---|
| 09:59:36 | 1 | valid scientific tests? |
| 09:59:38 | 2 | **A.**      **Yes.** |
| 09:59:47 | 3 | MR. TREASTER:  Your Honor, may I approach? |
| 09:59:48 | 4 | THE COURT:  You may. |
| 10:00:00 | 5 | (Whereupon, a sotto voce discussion was had among |
| 10:00:00 | 6 | Mr. Treaster, Mr. Shultz, and Mr. Babbit.) |
| 10:00:00 | 7 | BY MR. TREASTER: |
| 10:00:00 | 8 | Q.    I'm going to hand you a bundle of exhibits.  I'll |
| 10:00:03 | 9 | identify them here for the record in a second. |
| 10:00:10 | 10 | I've handed you Government's Exhibits 664, 665, |
| 10:00:17 | 11 | 665A, 666, 666A, 667, 667A, 668, and 668A.  Could you |
| 10:00:33 | 12 | review those items to see if you can identify them. |
| 10:00:37 | 13 | **A.**      **Yes.  (The witness complies.)  I recognize these.** |
| 10:00:59 | 14 | Q.    And how are you able to recognize each of these |
| 10:01:04 | 15 | items? |
| 10:01:04 | 16 | **A.**      **Each of these items have my signature at the** |
| 10:01:06 | 17 | **bottom on the heat seal, which I applied, and the** |
| 10:01:09 | 18 | **evidence label, as well as my signature in the middle** |
| 10:01:12 | 19 | **white sticker which is the days that I opened and closed** |
| 10:01:15 | 20 | **the evidence, and additionally my initials are on the** |
| 10:01:20 | 21 | **interior packaging that contains the drug substance.** |
| 10:01:22 | 22 | **(Indicating throughout.)** |
| 10:01:22 | 23 | Q.    And when you look at the ones that are marked with |
| 10:01:27 | 24 | the sub A, 665A, 666A, 667A, and 668A, is that the |
| 10:01:34 | 25 | original packaging that each of the respective or |

| | | |
|---|---|---|
| 10:01:37 | 1 | corresponding exhibits came in? |
| 10:01:39 | 2 | **A.     Yes.  Each of the A exhibits contain the original** |
| 10:01:44 | 3 | **packaging, which was separated from the drug substance** |
| 10:01:46 | 4 | **during my analysis, because they had latent print or** |
| 10:01:51 | 5 | **fingerprint examination requests attached to those.** |
| 10:01:54 | 6 | Q.     And are you the one that separated those items? |
| 10:01:57 | 7 | **A.     Yes, I was.** |
| 10:01:58 | 8 | Q.     Okay.  And when did you receive these items at the |
| 10:02:03 | 9 | laboratory -- or when did the laboratory itself receive |
| 10:02:06 | 10 | these items? |
| 10:02:06 | 11 | **A.     The DEA lab received these items on August 20th,** |
| 10:02:10 | 12 | **2019.** |
| 10:02:11 | 13 | Q.     And when did you personally receive them to do |
| 10:02:13 | 14 | your examination? |
| 10:02:14 | 15 | **A.     I took possession of these items on January 29th,** |
| 10:02:18 | 16 | **2020.** |
| 10:02:19 | 17 | Q.     And how do you personally receive those at the |
| 10:02:21 | 18 | laboratory? |
| 10:02:23 | 19 | **A.     My supervisor assigns the exhibits for analysis.** |
| 10:02:27 | 20 | **I request those from the main vault, and then I go to the** |
| 10:02:31 | 21 | **vault to pick those up and take possession of them.** |
| 10:02:34 | 22 | Q.     Okay.  And is that what you did in this case? |
| 10:02:36 | 23 | **A.     It was.** |
| 10:02:37 | 24 | Q.     And the tests that you ran on this, on these |
| 10:02:40 | 25 | items, are those what you had talked about earlier? |

| 10:02:43 | 1 | A.    Correct. |
| 10:02:43 | 2 | Q.    And do you have an opinion, based on your testing, |
| 10:02:46 | 3 | what each of these separate items contain? |
| 10:02:48 | 4 | A.    I do. |
| 10:02:49 | 5 | Q.    Okay.  So we'll start with Government's 664.  What |
| 10:02:56 | 6 | did you determine that item was? |
| 10:03:00 | 7 | A.    Exhibit 664 contains 96 percent d-methamphetamine |
| 10:03:05 | 8 | hydrochloride with a net weight of 1.822 grams. |
| 10:03:08 | 9 | Q.    And did you compute a pure substance amount? |
| 10:03:13 | 10 | A.    Yes. |
| 10:03:13 | 11 | Q.    And what was that for this item? |
| 10:03:13 | 12 | A.    The amount of pure substance for 664 was 1.749 |
| 10:03:19 | 13 | grams. |
| 10:03:20 | 14 | Q.    And then looking at Government's Exhibit 665, what |
| 10:03:24 | 15 | did you find in that item? |
| 10:03:26 | 16 | A.    This exhibit contained 97 percent |
| 10:03:28 | 17 | d-methamphetamine hydrochloride with a net weight of |
| 10:03:33 | 18 | 5.129 grams. |
| 10:03:33 | 19 | Q.    And did you also compute a pure substance amount? |
| 10:03:37 | 20 | A.    Yes. |
| 10:03:38 | 21 | Q.    And what was that? |
| 10:03:38 | 22 | A.    That amount for Government's Exhibit 665 was 4.975 |
| 10:03:43 | 23 | grams. |
| 10:03:44 | 24 | Q.    All right.  And then Government's Exhibit 666, |
| 10:03:49 | 25 | what did you determine that was? |

| 10:03:50 | 1 | A.      Government's Exhibit 666 was determined to be 97 |
| 10:03:55 | 2 | percent d-methamphetamine hydrochloride with a net weight |
| 10:03:58 | 3 | of 1.880 grams. |
| 10:04:00 | 4 | Q.    And did you calculate a pure substance amount for |
| 10:04:03 | 5 | that one? |
| 10:04:04 | 6 | A.      Yes, the amount of pure substance was 1.823 grams. |
| 10:04:09 | 7 | Q.    Okay.  And then in Government's Exhibit 667, what |
| 10:04:15 | 8 | did you determine that was? |
| 10:04:17 | 9 | A.      Government's Exhibit 667 was determined to be 97 |
| 10:04:20 | 10 | percent d-methamphetamine hydrochloride with a net weight |
| 10:04:24 | 11 | of 42.7 grams. |
| 10:04:26 | 12 | Q.    And did you also calculate an amount of pure |
| 10:04:29 | 13 | substance for that item? |
| 10:04:29 | 14 | A.      Yes, the amount of pure substance was 41.4 grams. |
| 10:04:34 | 15 | Q.    And then Government's 668, what did you determine |
| 10:04:37 | 16 | that item was? |
| 10:04:39 | 17 | A.      Government's Exhibit 668 was determined to be 95 |
| 10:04:44 | 18 | percent d-methamphetamine hydrochloride with a net weight |
| 10:04:46 | 19 | of 9.2 grams. |
| 10:04:49 | 20 | Q.    And did you also calculate a pure substance amount |
| 10:04:51 | 21 | for that item? |
| 10:04:52 | 22 | A.      Yes.  The amount pure substance was 8.7 grams. |
| 10:04:55 | 23 | Q.    And what did you do with these items when you were |
| 10:04:58 | 24 | done with your testing? |
| 10:04:59 | 25 | A.      When I'm done with the testing, I perform a heat |

10:05:03   1   **seal on the bottom of the evidence, along with my**

10:05:06   2   **evidence label that I've signed, I complete my final**

10:05:10   3   **report, and I submit that to a peer review.**

10:05:12   4   Q.      And when you took possession of these items, did

10:05:15   5   you see any signs of any tampering on them?

10:05:17   6   **A.      No.**

10:05:18   7   Q.      If you had would you have noted that?

10:05:20   8   **A.      Yes, I would.**

10:05:22   9         MR. TREASTER:  No further questions, Your Honor.

10:05:24   10  Thank you.

10:05:25   11        THE COURT:  Thank you, Mr. Treaster.

10:05:25   12        Cross-examination?  Mr. Babbit?

10:05:28   13                     CROSS-EXAMINATION

10:05:29   14  BY MR. BABBIT:

10:05:30   15  Q.      Good morning.

10:05:39   16  **A.      Good morning.**

10:05:42   17  Q.      I take it that in your -- how long have you been

10:05:45   18  employed with the DEA now?

10:05:46   19  **A.      About seven years.**

10:05:48   20  Q.      I take it in that timeframe you've seen a lot of

10:05:53   21  methamphetamine?

10:05:54   22  **A.      Correct.**

10:05:55   23  Q.      In fact, I hear from someone else at least that

10:06:00   24  was, at least recently, the most common tested matter

10:06:05   25  that they had.  Is that true for you as well?

| | | |
|---|---|---|
| 10:06:07 | 1 | **A.       It's hard to say.  I think it kind of depends.** |
| 10:06:09 | 2 | Q.      Understood.  In any event, when a sample of -- |
| 10:06:15 | 3 | comes to you for testing, obviously you've seen enough |
| 10:06:21 | 4 | meth that you probably look at something and think, |
| 10:06:23 | 5 | "Well, that might be methamphetamine"; right?  Just by |
| 10:06:26 | 6 | eyeball test; right? |
| 10:06:27 | 7 | **A.       You could say it might be, yes.** |
| 10:06:28 | 8 | Q.      Right.  But certainly, in order to make that |
| 10:06:31 | 9 | actual determination, you go through the steps you've |
| 10:06:35 | 10 | described here to make sure what you're looking at is |
| 10:06:38 | 11 | actually methamphetamine; correct? |
| 10:06:39 | 12 | **A.       Correct.** |
| 10:06:41 | 13 | Q.      And obviously that involves the rather -- well, at |
| 10:06:47 | 14 | least the three separate testing mechanisms that you've |
| 10:06:49 | 15 | talked about here today; correct? |
| 10:06:50 | 16 | **A.       Correct.** |
| 10:06:54 | 17 | Q.      And I'm going to state the obvious.  Obviously, if |
| 10:06:57 | 18 | you don't have something in front of you, you can't test |
| 10:06:58 | 19 | it to determine if it's actually methamphetamine; right? |
| 10:07:01 | 20 | **A.       Sure.** |
| 10:07:01 | 21 | Q.      Or any other controlled substances; right? |
| 10:07:04 | 22 | **A.       True.** |
| 10:07:06 | 23 |         MR. BABBIT:  I understand.  Thank you.  No further |
| 10:07:08 | 24 | questions. |
| 10:07:08 | 25 |         THE WITNESS:  Okay. |

| | | |
|---|---|---|
| 10:07:08 | 1 | THE COURT:  Mr. Shultz? |
| 10:07:09 | 2 | MR. SHULTZ:  No questions, Your Honor. |
| 10:07:11 | 3 | THE COURT:  Redirect, Mr. Treaster? |
| 10:07:13 | 4 | MR. TREASTER:  No, Your Honor.  Thank you. |
| 10:07:14 | 5 | THE COURT:  Members of the jury, do you want to |
| 10:07:21 | 6 | kind of give me an indication if any of you have a |
| 10:07:23 | 7 | question for this witness.  All right, we'll collect |
| 10:07:25 | 8 | forms.  Great.  Fill out your forms and when you're ready |
| 10:07:30 | 9 | we'll collect them. |
| 10:07:31 | 10 | (Brief pause.) |
| 10:08:34 | 11 | THE COURT:  All right, Ms. McCarthy, I have a few |
| 10:09:10 | 12 | questions for you from the jury. |
| 10:09:12 | 13 | THE WITNESS:  Okay. |
| 10:09:12 | 14 | THE COURT:  First of all, could you repeat the |
| 10:09:14 | 15 | weights and the purity for Exhibit 664 and 665, if you |
| 10:09:18 | 16 | would, please. |
| 10:09:19 | 17 | THE WITNESS:  Yes.  For Government's Exhibit 664, |
| 10:09:23 | 18 | the net weight was 1.822 grams, with an amount pure |
| 10:09:28 | 19 | substance of 1.749 grams. |
| 10:09:34 | 20 | And was it 665 is the next one? |
| 10:09:37 | 21 | THE COURT:  Yes, please. |
| 10:09:38 | 22 | THE WITNESS:  Okay.  And for Government's Exhibit |
| 10:09:41 | 23 | 665, the net weight was 5.129 grams, with an amount pure |
| 10:09:48 | 24 | substance of 4.975 grams. |
| 10:09:53 | 25 | THE COURT:  All right.  Thank you. |

| | | |
|---|---|---|
| 10:09:55 | 1 | The next question you've already covered.  And the |
| 10:09:59 | 2 | next question relates to Exhibit 667.  Could you repeat |
| 10:10:05 | 3 | the net weight of that one, please. |
| 10:10:10 | 4 | THE WITNESS:  The net weight of Government's |
| 10:10:13 | 5 | Exhibit 667 was 42.7 grams. |
| 10:10:17 | 6 | THE COURT:  All right.  Thank you. |
| 10:10:18 | 7 | And the fourth question you've already covered, so |
| 10:10:21 | 8 | I believe those were all the questions we have. |
| 10:10:24 | 9 | Any follow up for those, counsel? |
| 10:10:25 | 10 | MR. TREASTER:  No, Your Honor. |
| 10:10:26 | 11 | MR. SHULTZ:  Your Honor, just one real quick. |
| 10:10:28 | 12 | THE COURT:  Of course. |
| 10:10:30 | 13 | CROSS-EXAMINATION |
| 10:10:30 | 14 | BY MR. SHULTZ: |
| 10:10:30 | 15 | Q.    664, what did you say the purity was on that? |
| 10:10:34 | 16 | **A.    On Government's Exhibit 664, the substance purity** |
| 10:10:38 | 17 | **was 97 percent.** |
| 10:10:41 | 18 | MR. SHULTZ:  Thank you. |
| 10:10:43 | 19 | THE COURT:  Anything else, counsel? |
| 10:10:44 | 20 | MR. TREASTER:  No, Your Honor.  Thank you. |
| 10:10:45 | 21 | MR. BABBIT:  No, Your Honor. |
| 10:10:46 | 22 | THE COURT:  All right.  Thank you, Ms. McCarthy, |
| 10:10:49 | 23 | you may be excused.  Thank you for your attendance here. |
| 10:10:51 | 24 | THE WITNESS:  Thank you. |
| 10:10:52 | 25 | (Witness excused from the witness stand.) |

| 10:10:52 | 1 | THE COURT:  Mr. Treaster, the Government may call |
| 10:10:53 | 2 | its next witness. |
| 10:10:54 | 3 | MR. TREASTER:  Your Honor the United States would |
| 10:10:56 | 4 | call Tolulope Omosun. |
| 10:11:08 | 5 | THE COURT:  Ma'am, if you would come stand in |
| 10:11:10 | 6 | front of my courtroom deputy, he will swear you in, and |
| 10:11:13 | 7 | then you may have a seat in the witness box around the |
| 10:11:17 | 8 | corner. |
| 10:11:41 | 9 | TOLULOPE OMOSUN, |
| 10:11:41 | 10 | having been first duly sworn to testify the truth, the |
| 10:11:41 | 11 | whole truth, and nothing but the truth, testified as |
| 10:11:42 | 12 | follows: |
| 10:11:42 | 13 | DIRECT EXAMINATION |
| 10:11:52 | 14 | BY MR. TREASTER: |
| 10:11:52 | 15 | Q.    Please state your name for the record. |
| 10:11:53 | 16 | A.    **Tolulope Omosun.** |
| 10:11:56 | 17 | Q.    Could you spell that? |
| 10:11:58 | 18 | A.    **T-o-l-u-l-o-p-e, O-m-o-s-u-n.** |
| 10:12:07 | 19 | Q.    And what do you do for a living? |
| 10:12:10 | 20 | A.    **I am a forensic chemist.** |
| 10:12:11 | 21 | Q.    And who do you work for? |
| 10:12:13 | 22 | A.    **Drug Enforcement Administration, known as the DEA.** |
| 10:12:16 | 23 | Q.    And where's your lab that you work at? |
| 10:12:20 | 24 | A.    **North Central Laboratory, which is in Chicago.** |
| 10:12:24 | 25 | Q.    Okay.  And how long have you worked for the DEA? |

| | | |
|---|---|---|
| 10:12:27 | 1 | A.      Since January of 2020. |
| 10:12:29 | 2 | Q.      And before you worked for the DEA, what was your |
| 10:12:33 | 3 | previous employment? |
| 10:12:34 | 4 | A.      I worked as a laboratory coordinator for Georgia |
| 10:12:40 | 5 | State University and a part-time assistant professor of |
| 10:12:42 | 6 | chemistry for Atlanta Metropolitan State College and |
| 10:12:46 | 7 | Kennesaw State University. |
| 10:12:48 | 8 | Q.      And what years did you do those jobs? |
| 10:12:52 | 9 | A.      That was between 2017 and December of 2019. |
| 10:12:58 | 10 | Q.      Okay.  And in general what did you do in those |
| 10:13:02 | 11 | capacities? |
| 10:13:03 | 12 | A.      As the laboratory coordinator, I trained and |
| 10:13:07 | 13 | supervised assigned personnel, and I make sure that the |
| 10:13:13 | 14 | lab was in -- operated efficiently for laboratory |
| 10:13:17 | 15 | instructions for the student by ensuring that all the |
| 10:13:22 | 16 | reagents are prepared before the lab instruction starts, |
| 10:13:26 | 17 | and I made sure that the instruments were in good working |
| 10:13:29 | 18 | conditions.  I also coordinated procurement of new |
| 10:13:34 | 19 | equipments, and I also taught chemistry classes. |
| 10:13:39 | 20 | Q.      Okay.  And what is your educational background? |
| 10:13:43 | 21 | A.      I have a Ph.D. in Chemistry from Emory University, |
| 10:13:47 | 22 | Atlanta, Georgia.  I have a master's degree in Analytical |
| 10:13:51 | 23 | Chemistry and a bachelor's degree in Chemistry from |
| 10:13:57 | 24 | University of Ibadan, Nigeria. |
| 10:13:58 | 25 | Q.      And do you have any specialized training for your |

| | | |
|---|---|---|
| 10:14:00 | 1 | current position? |
| 10:14:00 | 2 | A.    Yes, I do. |
| 10:14:01 | 3 | Q.    And what is that? |
| 10:14:02 | 4 | A.    I attended training, 18-week training, at DEA |
| 10:14:08 | 5 | Academy in Quantico, Virginia, and I also had some |
| 10:14:12 | 6 | training at my lab. |
| 10:14:13 | 7 | Q.    And did you successfully complete both of those |
| 10:14:16 | 8 | training periods? |
| 10:14:16 | 9 | A.    Yes, I did. |
| 10:14:18 | 10 | Q.    Okay.  And did you conduct testing in LIMS |
| 10:14:21 | 11 | # 2019-SFL5-05555? |
| 10:14:28 | 12 | A.    Yes, I did. |
| 10:14:29 | 13 | Q.    And what types of tests did you run or use in that |
| 10:14:36 | 14 | case? |
| 10:14:36 | 15 | A.    I did some weigh-ins with weight and balances.  I |
| 10:14:40 | 16 | did a color test using Marquis reagents.  I used GC-MS, |
| 10:14:47 | 17 | FTIR, and UV visible spectroscopy. |
| 10:14:51 | 18 | Q.    So did you calculate the weight of the item? |
| 10:14:56 | 19 | A.    Yes, I determined the weight of the item. |
| 10:15:00 | 20 | Q.    And did you calculate the purity then? |
| 10:15:01 | 21 | A.    Yes, I did. |
| 10:15:02 | 22 | Q.    And the tests that you described, are they valid |
| 10:15:05 | 23 | scientific tests for testing of methamphetamine? |
| 10:15:08 | 24 | A.    Yes, they were. |
| 10:15:09 | 25 | Q.    And you did this at your DEA lab in Chicago? |

10:15:12   1   A.      Yes.

10:15:15   2          MR. TREASTER:  Your Honor, may I approach?

10:15:16   3          THE COURT:  You may.

10:15:17   4          (Whereupon, a sotto voce discussion was had among

10:15:18   5   Mr. Treaster, Mr. Shultz, and Mr. Babbit.)

10:15:31   6   BY MR. TREASTER:

10:15:31   7   Q.      I'm going to hand you what's already been admitted

10:15:34   8   as Government's Exhibit 670 and 670A.  Could you review

10:15:41   9   those items, please.

10:15:42  10   A.      (The witness complies.)

10:15:52  11   Q.      Are you able to identify those items?

10:15:55  12   A.      Yes.

10:15:55  13   Q.      And how are you able to identify them?

10:15:58  14   A.      For Exhibit 670, I have my name and signature on

10:16:06  15   the label, and I have -- on the seals I also have my name

10:16:11  16   in my handwriting, and I recognize the LIMS number

10:16:15  17   (indicating throughout).

10:16:16  18          And on the second one, I have my signature and my

10:16:20  19   name, and then I also recognize the LIMS number.

10:16:24  20   Q.      Is it fair to say that Government's 670 came

10:16:29  21   inside Government's 670A?

10:16:34  22   A.      Yes.

10:16:34  23   Q.      So Government's 670A is the original packaging?

10:16:38  24   A.      Yes.

10:16:39  25   Q.      Who separated 670 from 670A?

| | | |
|---|---|---|
| 10:16:42 | 1 | **A.      I did.** |
| 10:16:48 | 2 | Q.      And when you received that item, did you notice |
| 10:16:49 | 3 | any signs of tampering? |
| 10:16:50 | 4 | **A.      No, I didn't.** |
| 10:16:51 | 5 | Q.      And when were these items received by the DEA lab? |
| 10:16:59 | 6 | **A.      I'll have to look at my notes.  They were received** |
| 10:17:03 | 7 | **by the lab on 8-20, 2019.** |
| 10:17:08 | 8 | Q.      And when did you receive them as the examiner? |
| 10:17:10 | 9 | **A.      9-23, 2021.** |
| 10:17:14 | 10 | Q.      And how do you personally receive those items? |
| 10:17:18 | 11 | **A.      The items were assigned to me by my supervisor,** |
| 10:17:21 | 12 | **and I went to our main vault where evidence is stored to** |
| 10:17:27 | 13 | **collect them from the evidence specialist, and -- yeah.** |
| 10:17:32 | 14 | Q.      Okay.  And then did you perform the tests that you |
| 10:17:35 | 15 | talked about earlier on that item? |
| 10:17:37 | 16 | **A.      Yes.** |
| 10:17:38 | 17 | Q.      And do you have an opinion, based on your testing, |
| 10:17:41 | 18 | what was contained in Exhibit 670? |
| 10:17:44 | 19 | **A.      Yes, I do.** |
| 10:17:45 | 20 | Q.      And what did you determine was contained in that |
| 10:17:48 | 21 | item? |
| 10:17:49 | 22 | **A.      The evidence contained methamphetamine** |
| 10:17:52 | 23 | **hydrochloride.** |
| 10:17:53 | 24 | Q.      And did you calculate a net weight? |
| 10:17:56 | 25 | **A.      Yes, I did.** |

| | | |
|---|---|---|
| 10:17:57 | 1 | Q.    And what was the net weight? |
| 10:18:00 | 2 | A.    **The net weight was 28.4 grams.** |
| 10:18:03 | 3 | Q.    And did you calculate the purity on that? |
| 10:18:06 | 4 | A.    **Yes, I did.** |
| 10:18:06 | 5 | Q.    And what was the purity? |
| 10:18:08 | 6 | A.    **96 percent.** |
| 10:18:11 | 7 | Q.    And did you also calculate an amount of pure |
| 10:18:14 | 8 | substance? |
| 10:18:15 | 9 | A.    **Yes, I did.** |
| 10:18:15 | 10 | Q.    And what was the amount of pure substance? |
| 10:18:18 | 11 | A.    **27.2 grams.** |
| 10:18:20 | 12 | Q.    Okay.  And did that conclude your testing on that |
| 10:18:25 | 13 | item? |
| 10:18:25 | 14 | A.    **Yes.** |
| 10:18:25 | 15 | Q.    And what did you do with those items once you were |
| 10:18:28 | 16 | done testing? |
| 10:18:28 | 17 | A.    **Once I was done with testing, I wrote a report,** |
| 10:18:34 | 18 | **submitted that.  Once the report was approved, I then** |
| 10:18:38 | 19 | **took the evidence back -- after the evidence sealed, I** |
| 10:18:41 | 20 | **took them back to the main vault.** |
| 10:18:45 | 21 | MR. TREASTER:  Okay.  No further questions, Your |
| 10:18:46 | 22 | Honor.  Thank you. |
| 10:18:47 | 23 | THE COURT:  Cross-examination? |
| 10:18:54 | 24 | CROSS-EXAMINATION |
| 10:18:54 | 25 | BY MR. SHULTZ: |

| | | |
|---|---|---|
| 10:18:58 | 1 | Q.    Good morning. |
| 10:18:59 | 2 | **A.    Good morning.** |
| 10:19:00 | 3 | Q.    Just a couple of questions.  I'm pretty sure |
| 10:19:03 | 4 | everybody knows what I'm going to ask.  You don't just |
| 10:19:05 | 5 | look -- you actually have to have the material to be able |
| 10:19:08 | 6 | to do your testing; correct? |
| 10:19:09 | 7 | **A.    Yes.** |
| 10:19:10 | 8 | Q.    You can't just look at it and say, "That looks |
| 10:19:12 | 9 | like meth to me"; right? |
| 10:19:14 | 10 | **A.    No.** |
| 10:19:15 | 11 | Q.    Okay. |
| 10:19:15 | 12 | MR. SHULTZ:  That's all the questions I have. |
| 10:19:17 | 13 | Thank you. |
| 10:19:18 | 14 | MR. BABBIT:  Nothing further, Your Honor. |
| 10:19:20 | 15 | THE COURT:  Mr. Treaster, any redirect? |
| 10:19:22 | 16 | MR. TREASTER:  No, Your Honor. |
| 10:19:23 | 17 | THE COURT:  Jurors, questions?  Any of you have |
| 10:19:30 | 18 | questions to submit?  Okay.  Doesn't look like we have |
| 10:19:34 | 19 | any questions from the jury. |
| 10:19:35 | 20 | Ma'am, thank you for your attendance here today. |
| 10:19:38 | 21 | THE WITNESS:  Thank you. |
| 10:19:38 | 22 | THE COURT:  You are excused from the process of |
| 10:19:39 | 23 | the court.  You're free to go. |
| 10:19:40 | 24 | (Witness excused from the witness stand.) |
| 10:19:40 | 25 | THE COURT:  Government, you may call your next |

| | | |
|---|---|---|
| 10:19:45 | 1 | witness. |
| 10:19:45 | 2 | MR. TREASTER:  Your Honor, the United States would |
| 10:19:47 | 3 | call Trevor Curtis to the stand. |
| 10:19:59 | 4 | THE COURT:  Mr. Curtis, if you'll stand in front |
| 10:20:02 | 5 | of my courtroom deputy, he will swear you in and then you |
| 10:20:04 | 6 | may have a seat in the witness box around the corner. |
| 10:20:07 | 7 | TREVOR CURTIS, |
| 10:20:07 | 8 | having been first duly sworn to testify the truth, the |
| 10:20:07 | 9 | whole truth, and nothing but the truth, testified as |
| 10:20:33 | 10 | follows: |
| 10:20:34 | 11 | DIRECT EXAMINATION |
| 10:20:34 | 12 | BY MR. TREASTER: |
| 10:20:40 | 13 | Q.    Please state your name for the record. |
| 10:20:42 | 14 | A.    My name is Trevor Curtis. |
| 10:20:43 | 15 | Q.    And who do you work for? |
| 10:20:46 | 16 | A.    I work for the Drug Enforcement Administration at |
| 10:20:51 | 17 | the North Central Laboratory. |
| 10:20:52 | 18 | Q.    And where's that at? |
| 10:20:53 | 19 | A.    That's in Chicago, Illinois. |
| 10:20:54 | 20 | Q.    And what do you do for them? |
| 10:20:55 | 21 | A.    I am a forensic chemist. |
| 10:20:58 | 22 | Q.    And how long have you worked for the DEA? |
| 10:21:00 | 23 | A.    A little over a year. |
| 10:21:01 | 24 | Q.    And before that, what did you do? |
| 10:21:04 | 25 | A.    I worked at Customs and Border Protection as a |

10:21:08   1   forensic chemist.

10:21:08   2   Q.      And how long did you do that?

10:21:10   3   A.      For approximately four years.

10:21:13   4   Q.      So in total you've been a forensic chemist the

10:21:17   5   last almost five years?

10:21:18   6   A.      Approximately.

10:21:19   7   Q.      And what is your educational background?

10:21:21   8   A.      I have a master's in Forensic Chemistry from

10:21:24   9   Michigan State University, as well as a bachelor's in

10:21:28   10  Chemistry from Michigan Technological University.

10:21:33   11  Q.      And do you have any specialized training for your

10:21:35   12  position?

10:21:35   13  A.      Yes, I do.

10:21:36   14  Q.      And what is that?

10:21:36   15  A.      I received a 18-week training at Quantico,

10:21:41   16  Virginia, from the Drug Enforcement Administration, as

10:21:46   17  well as specific training at my own lab.

10:21:48   18  Q.      And did you successfully complete both those

10:21:50   19  periods of training?

10:21:51   20  A.      Yes, I did.

10:21:52   21  Q.      And did you conduct testing in your LIMS

10:21:56   22  # 2019-SFL5-05547 and -05548?

10:22:01   23  A.      Yes, I did.

10:22:02   24  Q.      And what types of tests did you use in that

10:22:04   25  particular case?

| | | |
|---|---|---|
| 10:22:06 | 1 | A.      In both those cases I used gas chromatography-mass |
| 10:22:10 | 2 | spectrometry, as well as a cobalt thiocyanate color test. |
| 10:22:14 | 3 | Q.      Did you also do a weight determination? |
| 10:22:16 | 4 | A.      Yes, I did. |
| 10:22:17 | 5 | Q.      And are those tests recognized as valid scientific |
| 10:22:20 | 6 | tests for the testing of cocaine? |
| 10:22:22 | 7 | A.      Yes, they are. |
| 10:22:25 | 8 | Q.      And the DEA lab in Chicago, is it an accredited |
| 10:22:28 | 9 | lab? |
| 10:22:28 | 10 | A.      It is. |
| 10:22:29 | 11 |         MR. TREASTER:  Your Honor, may I approach the |
| 10:22:31 | 12 | witness? |
| 10:22:31 | 13 |         THE COURT:  You may. |
| 10:22:32 | 14 |         (Whereupon, a sotto voce discussion was had among |
| 10:22:32 | 15 | Mr. Treaster, Mr. Shultz, and Mr. Babbit.) |
| 10:22:44 | 16 | BY MR. TREASTER: |
| 10:22:44 | 17 | Q.      I'm going to hand you what's been already admitted |
| 10:22:48 | 18 | as Government's Exhibits 638, 638A, and Government's 639 |
| 10:22:54 | 19 | and 639A.  Could you review those items. |
| 10:23:02 | 20 | A.      Yes, sir.  (The witness complies.)  Yes, sir. |
| 10:23:17 | 21 | Q.      Are you able to identify those items after you've |
| 10:23:21 | 22 | reviewed them? |
| 10:23:22 | 23 | A.      I am. |
| 10:23:22 | 24 | Q.      And how are you able to do that? |
| 10:23:24 | 25 | A.      I'm able to identify those items based on my |

10:23:30  1  **signature for both opening and closing them, as well as**

10:23:34  2  **the signature on the seal, when I sealed the evidence up**

10:23:37  3  **(indicating throughout).**

10:23:38  4  Q.    And were these the items that you tested in

10:23:41  5  relation to the LIMS case numbers I talked about?

10:23:46  6  A.    **Yes, sir.**

10:23:47  7  Q.    Okay.  And when you receive those items, did you

10:23:49  8  note any signs of tampering on them?

10:23:52  9  A.    **No, I did not.**

10:23:54  10  Q.    And when were they received by the DEA lab?

10:23:56  11  A.    **If I may refer to my report.**

10:23:58  12  Q.    Sure.

10:24:05  13  A.    **It appears both items were received on 8-20, 2019.**

10:24:10  14  Q.    And when did you receive them as the examiner?

10:24:13  15  A.    **I received them on September 16th, 2021.**

10:24:19  16  Q.    And how do you personally take control of those

10:24:22  17  items when you are doing your testing?

10:24:24  18  A.    **In our lab the samples are assigned through our**

10:24:28  19  **Laboratory Information Management System by our**

10:24:34  20  **supervisor.  Once it is assigned to us, we mark them for**

10:24:37  21  **pickup at the main vault where we receive the -- we**

10:24:43  22  **receive the evidence from the vault custodian and sign**

10:24:46  23  **off the items and chain of custody.**

10:24:49  24  Q.    And based on the testing that you talked about

10:24:51  25  earlier, do you have an opinion what was contained in

10:24:55  1  Exhibit 639 and 638?

10:25:01  2  A.      In both cases the exhibits contained cocaine.

10:25:05  3  Q.      And the Exhibit 639A and 638A, is that the

10:25:08  4  original packaging that came -- that those items came in?

10:25:13  5  A.      Yes.

10:25:15  6  Q.      And did you separate those items?

10:25:16  7  A.      Yes.

10:25:16  8  Q.      So you said both 638 and 639 contained cocaine?

10:25:22  9  A.      Yes.

10:25:22  10 Q.      Could you give the net weight of cocaine that you

10:25:26  11 found in Government's Exhibit 638.

10:25:30  12 A.      In 638, the net weight was 54.9 grams.

10:25:36  13 Q.      And the net weight of cocaine in Government's

10:25:40  14 Exhibit 639?

10:25:41  15 A.      In Government Exhibit 639, the net weight was 68.4

10:25:47  16 grams.

10:25:48  17 Q.      And once you were done with your testing, what did

10:25:52  18 you do with those items?

10:25:54  19 A.      In this case, since fingerprints were also

10:25:58  20 requested, the original packaging was separated, the

10:26:02  21 samples were then taken for reserve weight, sealed in the

10:26:08  22 original -- sealed in the original self-sealed envelope

10:26:12  23 that they appeared in, and then returned to the vault.

10:26:17  24 Q.      Okay.

10:26:17  25         MR. TREASTER:  No further questions, Your Honor.

10:26:19   1   Thank you.

10:26:21   2          THE COURT:  Cross-examination?

10:26:22   3          MR. BABBIT:  I have no questions.

10:26:23   4          MR. SHULTZ:  No questions, Your Honor.

10:26:26   5          THE COURT:  Jury, any questions from the jury?

10:26:29   6   Let me know if you do before I collect sheets.  Okay.

10:26:38   7          JUROR 1:  Could you just repeat the weights.

10:26:43   8          THE WITNESS:  Yes, in Exhibit 638, the net weight

10:26:45   9   was 54.9 grams.  In Exhibit 639, the exhibit was 68.4

10:26:53   10  grams.

10:26:57   11         THE COURT:  Anything else?

10:27:00   12         THE JURY (in unison):  (Shaking head.)

10:27:00   13         THE COURT:  All right.  Mr. Curtis, thank you for

10:27:02   14  your appearance here today.  You are free to go.

10:27:04   15         (Witness excused from the witness stand.)

           16         (End of requested excerpts.)

           17

           18

           19

           20

           21

           22

           23

           24

           25

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 22nd day of March, 2021.


                    s/ Johanna L. Wilkinson
                    Johanna L. Wilkinson, CSR, CRR, RMR
                    United States Court Reporter