IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,      )
                                   )  District Court
                    Plaintiff,     )  Case Nos.
v.                                 )  20-10028-11
                                   )  20-10028-19
KEVIN LEWIS and TRAVIS VONTRESS,   )
                                   )  Circuit No.
                    Defendants.    )  22-3119

TRANSCRIPT OF JURY TRIAL
VOLUME II

On the 1st day of March, 2022, came on to be heard proceedings
in the above-entitled and numbered cause before the HONORABLE
ERIC F. MELGREN, Judge of the United States District Court for
the District of Kansas, sitting in Wichita, commencing at 9:01
A.M. Proceedings recorded by machine shorthand.  Transcript
produced by computer-aided transcription.

APPEARANCES:

The plaintiff appeared by and through:
          Mr. Matt Treaster
          Ms. Katherine J. Andrusak
          United States Attorney's Office
          1200 Epic Center
          301 North Main
          Wichita, Kansas 67202

The defendant Kevin Lewis appeared in person and by and
through:
          Mr. Michael J. Shultz
          Shultz Law Office, P.A.
          445 North Waco
          Wichita, Kansas 67202

The defendant Travis Vontress appeared in person and by and
through:
          Mr. Kevin W. Babbit
          Fagan & Emert, LLC
          730 New Hampshire
          Suite 210
          Lawrence, Kansas  66044

Also present:

Special Agent Cameron Heath
Ms. Kay MacNeil, USAO

I N D E X

                                                        PAGE

VOIR DIRE                                                 22

OPENING STATEMENTS
MS. ANDRUSAK                                             125
MR. SHULTZ                                              146
MR. BABBIT                                              152

WITNESSES
    For the Plaintiff
    SPECIAL AGENT CAMERON HEATH
        Direct Examination By Mr. Treaster              158


JURY CHARGE                                              65


REPORTER'S CERTIFICATE                                  223

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 4 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                4

| | | |
|---|---|---|
| 09:01:46 | 1 | COURTROOM DEPUTY:  All rise. |
| 09:01:49 | 2 | THE COURT:  Good morning.  You may be seated. |
| 09:01:51 | 3 | So a couple of things, counsel, just to let you |
| 09:01:56 | 4 | know.  Ms. McKee provided you with our current list of |
| 09:02:00 | 5 | the 38 sorts 15 minutes ago, so I wanted to give you |
| 09:02:05 | 6 | roughly a half an hour to kind of go through and |
| 09:02:08 | 7 | coordinate your notes from yesterday to these.  I don't |
| 09:02:10 | 8 | know how you all are coming on doing that.  But we're not |
| 09:02:13 | 9 | in a time crunch this morning, so that you can move your |
| 09:02:19 | 10 | notes to this to start the peremptories. |
| 09:02:21 | 11 | But as I predicted, as I expected, overnight some |
| 09:02:26 | 12 | panel members have thought up new potential cause issues. |
| 09:02:29 | 13 | So the first thing that we'll do -- am I on?  Is my mic |
| 09:02:35 | 14 | on? |
| 09:02:35 | 15 | COURTROOM DEPUTY:  I'm very sorry. |
| 09:02:36 | 16 | THE COURT:  You can probably hear me.  I've got a |
| 09:02:38 | 17 | loud, piercing voice.  The first thing we'll do when the |
| 09:02:42 | 18 | jury comes up today is I already know one of them by |
| 09:02:46 | 19 | number that has an issue.  It's actually Ms. ▮▮▮, who |
| 09:02:51 | 20 | spoke to us at bench conference last night and her |
| 09:02:53 | 21 | concerns about English.  Her concerns have continued to |
| 09:02:58 | 22 | percolate on her.  She's very nervous about that. |
| 09:03:00 | 23 | Marlene's informed me there's some others, I don't know |
| 09:03:03 | 24 | who. |
| 09:03:03 | 25 | So what I'm telling you is you can import your |

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 5 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          5

| | | |
|---|---|---|
| 09:03:05 | 1 | notes from the two sessions yesterday into this sheet but |
| 09:03:08 | 2 | we're probably going to have some changes.  But we'll, |
| 09:03:12 | 3 | obviously, make those one at a time.  And I'll probably |
| 09:03:17 | 4 | ask, if I excuse someone, I'll probably ask which session |
| 09:03:20 | 5 | they were in yesterday to help you find your notes and |
| 09:03:23 | 6 | coordinate them in.  I guess that's all I have. |
| 09:03:26 | 7 | Anything that any of you have a question of me |
| 09:03:29 | 8 | or -- no? |
| 09:03:38 | 9 | DEFENDANT LEWIS:  Could I approach the bench, Your |
| 09:03:40 | 10 | Honor, with my attorney?  I have some concerns. |
| 09:03:42 | 11 | THE COURT:  Okay.  Are you familiar with what this |
| 09:03:46 | 12 | is, Mr. Shultz? |
| 09:03:47 | 13 | MR. SHULTZ:  A little bit.  I'll write a note |
| 09:03:51 | 14 | again today. |
| 09:03:52 | 15 | THE COURT:  Is there something we need to discuss |
| 09:03:53 | 16 | in private? |
| 09:03:55 | 17 | MR. SHULTZ:  Would that be better, Kevin? |
| 09:03:57 | 18 | DEFENDANT LEWIS:  Yeah. |
| 09:03:59 | 19 | MR. SHULTZ:  Yes. |
| 09:04:00 | 20 | THE COURT:  Do we need to be on the record for |
| 09:04:03 | 21 | this? |
| 09:04:03 | 22 | DEFENDANT LEWIS:  Yes. |
| 09:04:04 | 23 | MR. SHULTZ:  Yeah, he would like it on the record. |
| 09:04:06 | 24 | THE COURT:  Why don't you come up and why don't |
| 09:04:08 | 25 | you stand here.  Does the Government need to be here? |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 6 of 223

3-1-22  USA v. LEWIS, et al. No. 20-10028                    6

| | | |
|---|---|---|
| 09:04:11 | 1 | MR. SHULTZ:  Ex parte. |
| 09:04:12 | 2 | DEFENDANT LEWIS:  Yes, sir. |
| 09:04:13 | 3 | MR. SHULTZ:  I would a say to start -- |
| 09:04:15 | 4 | THE COURT:  Why don't we start, Mr. Lewis -- "ex |
| 09:04:19 | 5 | parte" means without the other side there in case you |
| 09:04:21 | 6 | have some confidential, and then if the Government has |
| 09:04:23 | 7 | something to come up.  I'm going to ask if you would, |
| 09:04:25 | 8 | since we're going to do this private, come stand here. |
| 09:04:28 | 9 | This microphone will be picked up by the court reporter |
| 09:04:30 | 10 | so we have a record, but we're going to turn on some |
| 09:04:33 | 11 | white noise to mask what you have to say otherwise. |
| 09:04:35 | 12 | (At the bench with Court, Mr. Shultz, and |
| 09:04:35 | 13 | defendant Lewis.) |
| 09:04:36 | 14 | DEFENDANT LEWIS:  Okay, can I speak? |
| 09:04:38 | 15 | THE COURT:  Sure, absolutely. |
| 09:04:39 | 16 | DEFENDANT LEWIS:  I have been having concerns |
| 09:04:41 | 17 | about a few things in regards to the process of this |
| 09:04:45 | 18 | whole thing that I'm involved in.  I have asked for the |
| 09:04:50 | 19 | investigation that they allegedly supposed to had on me |
| 09:04:54 | 20 | in 2017 at the Smoke Shop that was mentioned in the |
| 09:04:59 | 21 | paperwork, in the affidavit that he said (indicating) |
| 09:05:03 | 22 | that was probable cause to believe from source of |
| 09:05:06 | 23 | information number one that I was the source of heroin |
| 09:05:10 | 24 | for Dorzee Hill's DTO. |
| 09:05:11 | 25 | THE COURT:  Right, I remember that was in the |

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 7 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                7

| | | |
|---|---|---|
| 09:05:13 | 1 | initial report. |
| 09:05:14 | 2 | DEFENDANT LEWIS:  Right.  Now in that source of |
| 09:05:17 | 3 | information here, I don't even know if that is source of |
| 09:05:20 | 4 | information one.  I don't know if that person exists. |
| 09:05:23 | 5 | THE COURT:  This is one of the things we went |
| 09:05:25 | 6 | through in our three-day hearing.  The defense attorneys |
| 09:05:27 | 7 | asked for the revelation of confidential sources and, |
| 09:05:32 | 8 | let's see, there was a confidential informants and |
| 09:05:35 | 9 | confidential human sources.  We had a hearing on that. |
| 09:05:37 | 10 | That was one of the issues we addressed in the hearing, |
| 09:05:39 | 11 | and I issued an order that because the Government said |
| 09:05:41 | 12 | they're not going to introduce any of that evidence |
| 09:05:45 | 13 | directly from those people in trial, that the |
| 09:05:49 | 14 | interests -- the public interests in protecting the |
| 09:05:51 | 15 | confidentiality of informants in this case was greater |
| 09:05:54 | 16 | than disclosing them because whatever information those |
| 09:05:57 | 17 | people provided is not going to come up in trial, so I |
| 09:06:00 | 18 | ordered that they need not -- those names need not be |
| 09:06:04 | 19 | disclosed. |
| 09:06:04 | 20 | DEFENDANT LEWIS:  Those same people, meaning this |
| 09:06:07 | 21 | just source of information number one, was the reason |
| 09:06:10 | 22 | that him (indicating) went to -- drafted an affidavit to |
| 09:06:14 | 23 | have probable cause to believe that I -- |
| 09:06:17 | 24 | THE COURT:  I understand. |
| 09:06:18 | 25 | DEFENDANT LEWIS:  -- that I was the source of |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 8 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                8

09:06:19   1   heroin with Dorzee Hill's DTO.

09:06:21   2        THE COURT:  That those people started the

09:06:23   3   investigation into you.  But whatever started with that

09:06:26   4   is not anything the Government's going to actually rely

09:06:29   5   on at trial.  So what brought you to the Government's

09:06:33   6   attention won't be mentioned at trial so the jury won't

09:06:37   7   have to weigh that.

09:06:38   8        DEFENDANT LEWIS:  That don't -- that still affects

09:06:39   9   me because I'm here.

09:06:43   10        THE COURT:  I understand your point.  But legally,

09:06:45   11   because that information won't be presented to the jury,

09:06:49   12   they're not going to know where that came from; they're

09:06:52   13   going to sort of, as it were, join the story in process

09:06:56   14   and then just look at what evidence was ultimately

09:06:59   15   collected.  In any investigation there's a lot of stuff

09:07:02   16   that goes on --

09:07:03   17        DEFENDANT LEWIS:  I understand.

09:07:04   18        THE COURT:  -- that ultimately doesn't come in at

09:07:06   19   trial.

09:07:06   20        DEFENDANT LEWIS:  I understand that, exactly.  I'm

09:07:08   21   not naive to the law.  I understand exactly.  My point

09:07:10   22   and question is this:  when those controlled sales were

09:07:14   23   taking place by him (indicating) with Dorzee Hill, I was

09:07:19   24   at that particular point a target subject, meaning that I

09:07:21   25   was the source of heroin for him.

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 9 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028      9

| | | |
|---|---|---|
| 09:07:24 | 1 | THE COURT: Right. That's what they thought. |
| 09:07:26 | 2 | DEFENDANT LEWIS: That's what they believed from |
| 09:07:27 | 3 | the source of information number one. We had a pole |
| 09:07:32 | 4 | camera in that area. They had his phone tapped. And |
| 09:07:35 | 5 | they was getting controlled buys from him. Not one time |
| 09:07:42 | 6 | that I come up on the phone tap or the pole camera or |
| 09:07:46 | 7 | their physical surveillance that I was involved in this |
| 09:07:48 | 8 | here. |
| 09:07:48 | 9 | THE COURT: Right, right. And at this point |
| 09:07:50 | 10 | you're not charged with being a source of heroin for |
| 09:07:53 | 11 | Dorzee Hill. |
| 09:07:53 | 12 | DEFENDANT LEWIS: But what I'm saying, Your Honor, |
| 09:07:56 | 13 | is those controlled buys allegedly believed that they |
| 09:08:00 | 14 | were coming from me. |
| 09:08:01 | 15 | THE COURT: Right. |
| 09:08:02 | 16 | DEFENDANT LEWIS: Hmm? |
| 09:08:04 | 17 | THE COURT: Yes. |
| 09:08:05 | 18 | DEFENDANT LEWIS: Now I have asked my attorney |
| 09:08:09 | 19 | where are those controlled buys at. |
| 09:08:11 | 20 | THE COURT: You mean where are they at in the |
| 09:08:13 | 21 | evidence in this case? |
| 09:08:14 | 22 | DEFENDANT LEWIS: Because they were saying in the |
| 09:08:16 | 23 | affidavit that they got it, debriefed her, determined the |
| 09:08:21 | 24 | area and collected the tar heroin, as well as was dealing |
| 09:08:24 | 25 | with her having a wiretap on. |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 10 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                    10

| | | |
|---|---|---|
| 09:08:26 | 1 | THE COURT:  Who's "her"? |
| 09:08:27 | 2 | DEFENDANT LEWIS:  Shericka Wimbley.  I've been |
| 09:08:30 | 3 | knowing who the CH was since what?  What have I told you? |
| 09:08:34 | 4 | MR. SHULTZ:  I don't remember. |
| 09:08:35 | 5 | THE COURT:  She won't testify at this trial. |
| 09:08:36 | 6 | DEFENDANT LEWIS:  I know.  She don't know nothing |
| 09:08:38 | 7 | about me.  I understand that.  That's not what I'm |
| 09:08:40 | 8 | saying.  I'm saying that these people here, him |
| 09:08:43 | 9 | (indicating), allegedly that I am his source of heroin. |
| 09:08:48 | 10 | And as these controlled buys are going on, Mr. Lewis |
| 09:08:51 | 11 | don't come up in nothing.  This is what he said in the |
| 09:08:54 | 12 | affidavit -- |
| 09:08:54 | 13 | THE COURT:  Right. |
| 09:08:55 | 14 | DEFENDANT LEWIS:  -- that Mr. -- we don't have |
| 09:08:58 | 15 | enough information to get Mr. Lewis. |
| 09:09:01 | 16 | It became Dorzee Hill's DTO and I was a target |
| 09:09:06 | 17 | subject.  Now they done jumped over Mr. Hill, now they're |
| 09:09:11 | 18 | pursuing me.  That's why this is important to me. |
| 09:09:14 | 19 | THE COURT:  I understand it concerns you because |
| 09:09:16 | 20 | that's how they first started thinking about you, but |
| 09:09:18 | 21 | it's not unusual in an investigation for some early |
| 09:09:22 | 22 | pieces of information to not pan out, and so none of that |
| 09:09:29 | 23 | is going to be presented to the jury at trial. |
| 09:09:31 | 24 | THE DEFENDANT:  I understand. |
| 09:09:32 | 25 | THE COURT:  But because of that they can still |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 11 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028        11

09:09:34  1   present the evidence that they collected later without

09:09:38  2   reference to this.  And so we discussed this in the

09:09:39  3   earlier hearing and I ruled that they did not need to

09:09:44  4   disclose that.

09:09:46  5        DEFENDANT LEWIS:  I understand that.  But what I'm

09:09:48  6   saying, in my situation, I became this mysterious person.

09:09:53  7        THE COURT:  I understand.  So what are you

09:09:55  8   requesting, Mr. Lewis?

09:09:56  9        DEFENDANT LEWIS:  I'm requesting that

09:09:59  10  investigation that they had in 2017 that he [indicating]

09:10:01  11  used as probable cause to get the wiretap, it's in the

09:10:05  12  affidavit --

09:10:05  13       THE COURT:  Right.

09:10:06  14       DEFENDANT LEWIS:  -- supposed to be allegedly I

09:10:08  15  supposed to be selling heroin at the Smoke Shop with the

09:10:11  16  2017 investigation on me from the sheriff's department.

09:10:14  17       THE COURT:  Right, right.

09:10:17  18       DEFENDANT LEWIS:  Where is it?  They used it.  I

09:10:19  19  asked my attorney --

09:10:21  20       THE COURT:  Your attorney asked that it be

09:10:22  21  disclosed.  We had a hearing on that.  I ruled that it

09:10:24  22  did not need to be disclosed.

09:10:26  23       DEFENDANT LEWIS:  I never knew about that.

09:10:28  24       THE COURT:  Well, you were present at the hearing.

09:10:31  25       DEFENDANT LEWIS:  You didn't say anything.

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 12 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          12

09:10:32  1          THE COURT:  The three-day hearing we had two weeks

09:10:36  2  ago, one of the discussions we had about the confidential

09:10:39  3  informant.

09:10:39  4          DEFENDANT LEWIS:  No, what I'm saying the 2017

09:10:41  5  investigation that the sheriffs's department had.

09:10:44  6          THE COURT:  Is that different?

09:10:44  7          MR. SHULTZ:  It's a little bit different.

09:10:47  8          DEFENDANT LEWIS:  That gave him probable cause to

09:10:49  9  draft up the affidavit making me a target subject.

09:10:54  10          THE COURT:  Well, even more than those

09:10:56  11  confidential human sources that I ruled on, those,

09:10:58  12  because they're not a part of the evidence in this case,

09:11:02  13  the law does not require that the details of who provided

09:11:06  14  that information be disclosed.

09:11:07  15          DEFENDANT LEWIS:  I understand that.  All I'm

09:11:10  16  asking for, Your Honor, is to be able to view what

09:11:14  17  happened in that investigation, what caused that -- what

09:11:18  18  led up to that investigation and what would the end

09:11:20  19  result of.

09:11:21  20          THE COURT:  I understand why you're interested in

09:11:23  21  that because that put a spotlight on you, but legally the

09:11:26  22  balancing of it does not require that that be disclosed

09:11:29  23  to you, so it's not been required to be disclosed.

09:11:31  24          DEFENDANT LEWIS:  Okay.  You also had -- July 9th

09:11:36  25  of 2021 you had a closed meeting with my attorney, Ed

| | | |
|---|---|---|
| 09:11:41 | 1 | Robinson, and I think Luna's lawyer, Kari Schmidt, and |
| 09:11:51 | 2 | you had it with the prosecution and further with |
| 09:11:54 | 3 | Mr. Heath (indicating), and you were admonishing them in |
| 09:11:58 | 4 | regards to the way they handled the case. |
| 09:12:02 | 5 | THE COURT:  What was that -- |
| 09:12:04 | 6 | MR. SHULTZ:  I think he's referring to the polecam |
| 09:12:05 | 7 | meeting. |
| 09:12:06 | 8 | THE COURT:  Oh, this is a meeting -- |
| 09:12:11 | 9 | DEFENDANT LEWIS:  It was July 9th, 2021.  You told |
| 09:12:13 | 10 | him, Mr. Heath (indicating), that he -- lack of |
| 09:12:18 | 11 | discretion has jeopardized this case.  That's |
| 09:12:23 | 12 | paraphrasing what was told to me, and you can't go back |
| 09:12:26 | 13 | and fix it. |
| 09:12:27 | 14 | THE COURT:  It's not exactly what I said. |
| 09:12:29 | 15 | THE DEFENDANT:  Well, paraphrasing.  You can't go |
| 09:12:31 | 16 | back and fix it.  Something dealing with the polecam and |
| 09:12:35 | 17 | certain technicalities in the case, as well as |
| 09:12:38 | 18 | constitutional errors that were violated by him having |
| 09:12:40 | 19 | that pole camera up that long. |
| 09:12:42 | 20 | Now, under direct testimony and the *James* hearing, |
| 09:12:48 | 21 | he -- how would I say it -- he acknowledged that that -- |
| 09:12:53 | 22 | THE COURT:  You need to talk into the mic. |
| 09:12:55 | 23 | DEFENDANT LEWIS:  He acknowledged that fact that |
| 09:12:57 | 24 | he was in error and he had changed his tactics because he |
| 09:13:01 | 25 | understood -- |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 14 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                    14

```
09:13:04   1          MARSHAL LEMER:  Can you get a little closer.

09:13:05   2          DEFENDANT LEWIS:  Because he understood the

09:13:07   3   overwhelming effect that it had on the defendant.

09:13:10   4          THE COURT:  Right, yes.

09:13:11   5          DEFENDANT LEWIS:  Based upon me having to choose

09:13:14   6   from speedy trial and ineffective assistance of counsel.

09:13:17   7   And he said he changed his tactics.  That was on his

09:13:22   8   direct testimony.  But that still affected me.

09:13:26   9          THE COURT:  So what happened as a result of that

09:13:28  10   was -- let me give you a bit of broad story here.  I had

09:13:34  11   concerns about that.  I scheduled a meeting with

09:13:36  12   prosecution, defense attorneys, and the FBI to say, "You

09:13:39  13   guys have created potential problems in this

09:13:42  14   investigation.  They are what they are.  I'm just telling

09:13:46  15   you going forward you need to do this differently."

09:13:49  16          And the agent testified at the hearing upstairs

09:13:52  17   that they are doing it differently going forward.  That

09:13:55  18   doesn't change what happened in your case.  Mr. Shultz

09:13:59  19   then filed a motion to dismiss this case on speedy trial

09:14:02  20   grounds, based on those problems, and I have to tell you,

09:14:05  21   candidly, of the however many motions I've ruled on in

09:14:12  22   this case, that was the one that really took the most

09:14:17  23   time and analysis on us, and it was, I guess you could

09:14:21  24   say, the closest call.  I don't know if you've read my

09:14:24  25   order.
```

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 15 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          15

09:14:24  1          DEFENDANT LEWIS:  I have.

09:14:25  2          THE COURT:  But ultimately, as I read the factors,

09:14:27  3  I decided it was a close call but it came down against

09:14:30  4  dismissal.  But that's the order that I issued that arose

09:14:33  5  from those concerns that Mr. Shultz then pretty fully

09:14:36  6  briefed in his motion to dismiss on the speedy trial

09:14:39  7  grounds, saying that the Government's actions had caused

09:14:42  8  this delay.  That's where those were addressed in that

09:14:45  9  order.

09:14:45  10         DEFENDANT LEWIS:  I understood that --

09:14:47  11         THE COURT:  Okay.

09:14:48  12         DEFENDANT LEWIS:  -- when I read that, your

09:14:50  13  question --

09:14:50  14         THE COURT:  So what are you asking now?

09:14:56  15         DEFENDANT LEWIS:  The material that I asked him

09:14:58  16  for, I don't have.

09:14:59  17         THE COURT:  What material?

09:15:01  18         DEFENDANT LEWIS:  The 2017 --

09:15:02  19         THE COURT:  I've already addressed that.

09:15:05  20         DEFENDANT LEWIS:  Well, why I can't have that but

09:15:08  21  they have the luxury to deal with it and say that this is

09:15:13  22  the reason that he pursued me in the affidavit.

09:15:16  23         THE COURT:  So ultimately what initially brings

09:15:19  24  you to their attention, if it's not going to be

09:15:22  25  introduced at trial, isn't required to be disclosed.  At

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 16 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                16

09:15:25  1  that point I have to weigh the balances of that, and so

09:15:29  2  we've determined that does not need to be disclosed.

09:15:32  3      I understand that you may like to see it.  I

09:15:34  4  appreciate that.  But the law --

09:15:36  5      DEFENDANT LEWIS:  I don't have a right to see it?

09:15:38  6      THE COURT:  No.

09:15:39  7      DEFENDANT LEWIS:  Could you give me that?

09:15:41  8      THE COURT:  Your issues are outweighed with the

09:15:43  9  other issues.

09:15:44  10     DEFENDANT LEWIS:  So I don't have a right to

09:15:46  11 everything which you called a tipster about me that got

09:15:50  12 me here now.

09:15:52  13     THE COURT:  That's -- again, although not with

09:15:54  14 specifically just focused on that earlier investigation,

09:15:57  15 but that's the types of issues I addressed in my other

09:16:01  16 order with disclosure of confidential informants.

09:16:03  17     DEFENDANT LEWIS:  'Cause what I'm having a problem

09:16:04  18 with here is how did I become target subject.

09:16:10  19     THE COURT:  I understand.

09:16:11  20     DEFENDANT LEWIS:  And -- but the initial wiretap

09:16:14  21 thing was about Dorzee Hill, and they had six or eight

09:16:21  22 controlled buys from this individual.

09:16:23  23     THE COURT:  Well, we -- I understand your

09:16:25  24 frustration, Mr. Lewis, but I've already discussed it.

09:16:27  25 There's nothing more I can say about that than I already

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 17 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                17

| 09:16:30 | 1 | have, so . . . |
| 09:16:33 | 2 | MR. SHULTZ:  Do you want to address the other -- |
| 09:16:35 | 3 | DEFENDANT LEWIS:  In regards to -- |
| 09:16:37 | 4 | MR. SHULTZ:  I think you mentioned subpoenas. |
| 09:16:39 | 5 | DEFENDANT LEWIS:  Subpoenas. |
| 09:16:40 | 6 | THE COURT:  I'm sorry? |
| 09:16:41 | 7 | DEFENDANT LEWIS:  Don't I have the right to |
| 09:16:43 | 8 | subpoena certain people as far as my defense? |
| 09:16:48 | 9 | THE COURT:  Who are we not subpoenaing? |
| 09:16:49 | 10 | DEFENDANT LEWIS:  I want to subpoena Shericka |
| 09:16:53 | 11 | Wimbley.  I want to subpoena Lawana Hill, which is Dorzee |
| 09:16:59 | 12 | Hill's mother, and I want to subpoena Dorzee Hill. |
| 09:17:00 | 13 | THE COURT:  I don't know what this issue is. |
| 09:17:03 | 14 | MR. SHULTZ:  This is just one of the concerns that |
| 09:17:04 | 15 | he raised at the table while we were talking, I think is |
| 09:17:07 | 16 | part of why he raised his hand. |
| 09:17:09 | 17 | DEFENDANT LEWIS:  And they have it on the list, |
| 09:17:10 | 18 | this list of witnesses.  They said Michael Beard, but |
| 09:17:15 | 19 | they never said that they were going to call him.  I want |
| 09:17:17 | 20 | to subpoena Michael Beard. |
| 09:17:20 | 21 | MR. SHULTZ:  If I can interject, I was going to |
| 09:17:23 | 22 | say there's a strategic question about the first three |
| 09:17:26 | 23 | witnesses that I've made determinations on.  I think |
| 09:17:32 | 24 | Mr. Lewis doesn't agree with those assessments, and |
| 09:17:34 | 25 | Michael Beard we didn't find out wasn't going to |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 18 of 223

3-1-22  USA v. LEWIS, et al. No. 20-10028                18

09:17:37   1   testify -- he was on the Government's witness list.

09:17:39   2   Yesterday they didn't list him, so I presume he's not

09:17:41   3   testifying, and we're still talking about what we want to

09:17:44   4   do with Mr. Beard.

09:17:47   5        THE COURT:  All right.  What's the issue that I

09:17:49   6   need to address in this?

09:17:52   7        DEFENDANT LEWIS:  I'm just asking don't I have a

09:17:54   8   right to subpoena and call witnesses in my defense?

09:17:57   9        MR. SHULTZ:  I've said strategically I don't think

09:18:00  10   we should do some of those.

09:18:03  11        THE DEFENDANT:  I'm just asking the Court, do I

09:18:04  12   have a right?

09:18:04  13        MR. SHULTZ:  He's asking for those to be done

09:18:06  14   anyway.

09:18:06  15        DEFENDANT LEWIS:  I'm just asking the Court do I

09:18:08  16   have a right to do that?

09:18:10  17        THE COURT:  So here's the way the law plays that

09:18:12  18   out, Mr. Lewis.  You've been appointed counsel in this

09:18:15  19   case, and -- which obviously you need counsel in a case

09:18:18  20   like this.

09:18:19  21        DEFENDANT LEWIS:  Uh-huh.

09:18:20  22        THE COURT:  And Mr. Shultz is one of the people

09:18:22  23   that the Court's hand-selected and been very good at what

09:18:25  24   he does to represent defendants.  In a case like this

09:18:29  25   there are certain things that are absolutely your

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 19 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          19

09:18:31  1  decision.  You should at least listen to advice from

09:18:33  2  counsel but they're your decision.  Those include whether

09:18:36  3  or not to plead guilty or go to trial, whether or not to

09:18:40  4  testify, to remain silent.

09:18:43  5       But there are certain things that are counsel's

09:18:45  6  decision because they're familiar with the rules and

09:18:48  7  they've got a lot more experience in strategy, and that

09:18:52  8  is strategic decisions in proceeding at trial.  And in

09:18:56  9  those, just as you should listen to counsel on matters

09:18:58  10  that are your decision, he should listen to you in

09:19:01  11  matters that are his, but ultimately, because he's

09:19:04  12  experienced trial counsel, strategic decisions rest with

09:19:09  13  learned counsel as opposed to with the defendant himself.

09:19:13  14  And so that's an issue sort of between you and your

09:19:16  15  attorney, but that's an issue that the law says are the

09:19:19  16  attorney's decisions to make because they understand how

09:19:21  17  a trial works and what is strategically best to do.  So

09:19:25  18  that's an issue -- that's where that issue falls.

09:19:28  19       DEFENDANT LEWIS:  Okay, all I was asking, based

09:19:31  20  upon the law, do I have a right to call these witnesses

09:19:34  21  or subpoena these witnesses?

09:19:35  22       THE COURT:  So when you say you, let me rephrase

09:19:38  23  that briefly.  Defendants have a right to call witnesses.

09:19:41  24       DEFENDANT LEWIS:  Okay.

09:19:42  25       THE COURT:  But those rights are exercised through

09:19:45  1  their counsel, and it's their counsel's strategic

09:19:47  2  decision as to which witnesses should be called.

09:19:50  3          DEFENDANT LEWIS:  I'm asking for, again --

09:19:54  4          THE COURT:  Mr. -- that's Mr. Shultz's call.  The

09:19:57  5  Court's not -- I don't know enough about this issue to

09:20:01  6  say what the hang-up should be, and I probably shouldn't

09:20:03  7  because I don't want to get into the advice between you

09:20:05  8  and your counsel, but which witnesses are going to be

09:20:08  9  subpoenaed for your case are the strategic decision of

09:20:11  10  counsel.

09:20:11  11          DEFENDANT LEWIS:  Okay.  Me and you will discuss

09:20:14  12  that.  That's what I want.  I wanted that to be on the

09:20:16  13  record.

09:20:16  14          THE COURT:  All right.

09:20:17  15          MR. SHULTZ:  Thank you, Your Honor.

09:20:17  16          (Thereupon, the following proceedings continued in

09:20:26  17  the hearing of the jury, with the defendants present.)

09:20:26  18          THE COURT:  Counsel, how much longer will you all

09:20:35  19  need --

09:20:35  20          That's supposed to be Michael's problem; not mine.

09:20:35  21          How much longer, counsel, do you all need to be

09:20:38  22  prepared to bring the jury up?

09:20:41  23          MR. SHULTZ:  Your Honor, I could probably use

09:20:44  24  another 15 minutes or so, if that would be okay.

09:20:46  25          THE COURT:  What about the rest of you?  Is that

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 21 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028        21

| | | |
|---|---|---|
| 09:20:48 | 1 | going to be adequate? |
| 09:20:50 | 2 | MR. BABBIT:  Yes. |
| 09:20:50 | 3 | MR. TREASTER:  Your Honor, we're ready anytime. |
| 09:20:53 | 4 | THE COURT:  Mr. Babbit? |
| 09:20:53 | 5 | MR. BABBIT:  That's adequate. |
| 09:20:55 | 6 | THE COURT:  I'm sorry? |
| 09:20:55 | 7 | MR. BABBIT:  That's fine, yes. |
| 09:20:57 | 8 | THE COURT:  Okay.  We'll plan to bring the jury |
| 09:20:59 | 9 | up.  I'll ask them to start filing in about 9:30.  That's |
| 09:21:04 | 10 | 10 minutes, Mr. Shultz, but they'll need to file in, find |
| 09:21:07 | 11 | their sheets, I'll have some introductory comments to |
| 09:21:10 | 12 | them, so we'll take about a ten-minute break and then |
| 09:21:12 | 13 | bring them up and start with that. |
| 09:21:14 | 14 | So is there anything else we need to talk about |
| 09:21:16 | 15 | this morning before we proceed then? |
| 09:21:18 | 16 | MR. TREASTER:  No, Your Honor. |
| 09:21:19 | 17 | MR. SHULTZ:  No, Your Honor.  Thank you. |
| 09:21:21 | 18 | THE COURT:  All right.  We'll take a brief recess. |
| 09:21:23 | 19 | Ms. McKee, if you would ask Marlene about 9:30 to start |
| 09:21:27 | 20 | marshalling them this way. |
| 09:21:29 | 21 | COURTROOM DEPUTY:  Okay. |
| 09:21:29 | 22 | THE COURT:  And then we'll convene once they're in |
| 09:21:31 | 23 | the courtroom and all settled in.  We'll be in recess |
| 09:21:35 | 24 | until then. |
| 09:21:36 | 25 | COURTROOM DEPUTY:  All rise. |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 22 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028

22

| | | |
|---|---|---|
| 09:21:37 | 1 | (A recess was taken from 9:21 to 9:38 A.M.) |
| 09:38:11 | 2 | COURTROOM DEPUTY:  All rise. |
| 09:38:12 | 3 | Hear ye, hear ye, hear ye, the United States |
| 09:38:16 | 4 | District Court for the District of Kansas is now in |
| 09:38:19 | 5 | session, the Honorable Eric F. Melgren presiding.  God |
| 09:38:23 | 6 | save these United States and this honorable court. |
| 09:38:29 | 7 | THE COURT:  Thank you.  You may be seated. |
| 09:38:31 | 8 | Good morning, ladies and gentlemen.  Welcome back |
| 09:38:36 | 9 | to day two of our jury selection.  Yesterday, of course, |
| 09:38:40 | 10 | we went through what I called the for-cause portion. |
| 09:38:45 | 11 | Today we're going to then narrow the group down to a |
| 09:38:49 | 12 | final jury who will hear and decide this case. |
| 09:38:54 | 13 | A few matters to take up before we start with the |
| 09:38:59 | 14 | peremptory challenges for counsel.  First of all, |
| 09:39:03 | 15 | Ms. ███, I visited with you yesterday about your concerns |
| 09:39:10 | 16 | about the English language and we talked about those. |
| 09:39:14 | 17 | But I understand you have informed my staff that you have |
| 09:39:17 | 18 | remaining concerns about your ability to understand |
| 09:39:21 | 19 | what's going on in the case.  Is that correct? |
| 09:39:25 | 20 | JUROR 12:  (Nods head.) |
| 09:39:26 | 21 | THE COURT:  Would you -- do we have microphones |
| 09:39:28 | 22 | out for them? |
| 09:39:29 | 23 | COURTROOM DEPUTY:  Yes. |
| 09:39:30 | 24 | THE COURT:  Hand the microphone down if you would |
| 09:39:32 | 25 | to Ms. ███. |

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 23 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                    23

09:39:34  1          Would you like to respond to this?

09:39:39  2          JUROR 12:  I really like try but my English not

09:39:44  3  limited, so I not full understand so I feel bad for not

09:39:50  4  fear for that.  That's why I honest to talk with you.

09:39:54  5          THE COURT:  So you're concerned about your ability

09:39:55  6  to understand everything that goes on in the trial?

09:39:57  7          JUROR 12:  So I cannot do this job.  Sorry.

09:40:01  8          THE COURT:  Okay.  Well, I know we talked about

09:40:03  9  that yesterday, but I knew that you had thought about it

09:40:06  10  overnight and visited with my staff about that.  And so

09:40:11  11  as I understand, you're asking to be excused because of

09:40:14  12  that issue; is that correct?

09:40:15  13          JUROR 12:  Yes.

09:40:16  14          THE COURT:  Okay.  Well, Ms. ███, I appreciate you

09:40:18  15  coming back today.  I appreciate you sharing that concern

09:40:21  16  with us, but I am going to excuse you and we'll call a

09:40:24  17  replacement for you.  You are free to go, ma'am.  Thank

09:40:27  18  you very much.

09:40:27  19          JUROR 12:  Thank you.

09:40:28  20          THE COURT:  Ms. McKee, can you call a replacement

09:40:30  21  for Juror No. 12.

09:40:32  22          COURTROOM DEPUTY:  ███████.

09:40:52  23          THE COURT:  Mr. ███, just to help counsel and

09:40:55  24  all, since we had two sessions in this yesterday, were

09:40:58  25  you in the morning or the afternoon session yesterday?

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 24 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                24

| | | |
|---|---|---|
| 09:41:02 | 1 | JUROR 12:  The afternoon session. |
| 09:41:04 | 2 | THE COURT:  All right.  And this is a long shot. |
| 09:41:06 | 3 | Do you remember what your juror number was yesterday? |
| 09:41:09 | 4 | JUROR 12:  12. |
| 09:41:11 | 5 | THE COURT:  Really?  Well, welcome back to seat |
| 09:41:13 | 6 | No. 12. |
| 09:41:14 | 7 | JUROR 12:  Yeah. |
| 09:41:15 | 8 | THE COURT:  Thank you.  Well, that will help |
| 09:41:17 | 9 | counsel import their notes from yesterday into today. |
| 09:41:19 | 10 | I've also been told, although I don't have names, |
| 09:41:24 | 11 | that there are others of you who overnight may have |
| 09:41:28 | 12 | thought there were additional issues you needed to |
| 09:41:31 | 13 | address with me as to what we call the cause portion of |
| 09:41:34 | 14 | this jury selection.  Are there other people who thought |
| 09:41:37 | 15 | they needed to talk to the court about this? |
| 09:41:40 | 16 | Well, let's -- is there a microphone on that back |
| 09:41:42 | 17 | row?  Let's start with Mr. ████████. |
| 09:41:45 | 18 | JUROR 1:  One of two things:  first thing, I guess |
| 09:41:50 | 19 | I didn't put two and two together yesterday.  I'm not |
| 09:41:52 | 20 | good with dates.  My wife informed me last night that |
| 09:41:57 | 21 | four to six weeks from today hits and we have a vacation |
| 09:42:00 | 22 | already booked to California on the 30th of March.  So |
| 09:42:07 | 23 | that will kind of coincide with that, depending on how |
| 09:42:09 | 24 | long the trial lasts after that. |
| 09:42:10 | 25 | And then, two, I can't remember what the lawyer's |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 25 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                25

09:42:17   1   name over there is, but his comment about shredding off a

09:42:22   2   little slice of innocence, after thinking about that last

09:42:24   3   night --

09:42:25   4        THE COURT:  I'm sorry, his comment about what?

09:42:27   5        JUROR 1:  Shredding off a slice of innocence from

09:42:35   6   the defendants, more or less.

09:42:36   7        THE COURT:  Okay.

09:42:37   8        JUROR 1:  Thinking about that last night, I'm -- I

09:42:41   9   would like to think that I could be impartial, but, I

09:42:46  10   mean, just thinking about it, my conscience tells me if

09:42:52  11   they're in the position they're in right now, then

09:42:54  12   they're at least somewhat guilty; it's just a matter of

09:42:57  13   how much.  And I don't know, I mean, I would like to

09:42:59  14   think I'd be impartial when I'm determining it, but it

09:43:01  15   would be --

09:43:02  16        THE COURT:  So you --

09:43:03  17        JUROR 1:  -- hard for me to do that fully, I

09:43:06  18   think.

09:43:06  19        THE COURT:  So you disagree with the Constitution,

09:43:08  20   that they're entitled to a presumption of innocence?  You

09:43:11  21   disregard that?

09:43:12  22        JUROR 1:  I don't necessarily disregard that.

09:43:16  23   I -- I would like to believe that I could give them a

09:43:19  24   fair trial, but I don't know if there's a doubt in the

09:43:21  25   back of my mind that says if you've got four weeks worth

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 26 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                26

09:43:25   1   of evidence to present and you've been in --

09:43:28   2       THE COURT:  The flip side could be that you could

09:43:29   3   say, "Well, if they're guilty they should be able to

09:43:32   4   prove it more quickly," so I don't know that the four

09:43:35   5   weeks cuts one way or the other.  What I do know is that

09:43:38   6   the Constitution says they're entitled to a presumption

09:43:42   7   of innocence.  I guess I'm concerned about people who

09:43:48   8   say, "Well, that may be what the Constitution says but I

09:43:51   9   don't agree."

09:43:52  10       JUROR 1:  I don't know if -- it's not that I

09:43:55  11   disagree with that.  It's that in the back of my mind, if

09:43:59  12   you're involved with activities that --

09:44:01  13       THE COURT:  But the question is we don't know that

09:44:03  14   they're involved with activities.  That's why we're

09:44:05  15   having a trial, to see if they were involved with

09:44:07  16   activities.  That's not been proven.

09:44:11  17       JUROR 1:  Yes, sir.

09:44:13  18       THE COURT:  Tell me about this vacation you have.

09:44:16  19   Is this a -- it's obviously not spring break if it's

09:44:19  20   March 30th.  Spring break's an earlier issue than that.

09:44:23  21   Is this some prepaid vacation for your family, or what's

09:44:26  22   your status on that?

09:44:27  23       JUROR 1:  Yes, it's my wife and I and some of our

09:44:31  24   friends.  We've paid for flights already to California.

09:44:37  25       THE COURT:  In today's market you can often

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 27 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          27

09:44:44    1    continue those flights, but -- counsel, anything you want

09:44:54    2    to comment in on this?

09:44:59    3            MR. TREASTER:  Nothing further, Your Honor.

09:45:03    4            MR. SHULTZ:  Your Honor, I have no comment about

09:45:05    5    the vacation.  I can't speak to the time of the trial

09:45:07    6    necessarily.

09:45:07    7            THE COURT:  Yeah.

09:45:08    8            MR. SHULTZ:  On the other issue, I guess I would

09:45:10    9    probably move to strike him for cause based on him saying

09:45:13   10    his conscience -- as I interpreted -- his conscience is

09:45:17   11    he thought about it last night means we might start off a

09:45:21   12    little behind, and so --

09:45:22   13            THE COURT:  All right, Mr. Shultz.

09:45:23   14            Mr. ███████, I'm going to let you go, not happily,

09:45:29   15    I guess, but I am going to let you go.

09:45:31   16            Ms. McKee, could would you call a replacement

09:45:33   17    juror, please.

09:45:34   18            COURTROOM DEPUTY:  ███████, I'm sorry.  I'm not

09:45:37   19    sure.

09:45:38   20            JUROR 1:  ███████.

09:45:51   21            COURTROOM DEPUTY:  ████, okay.

09:45:51   22            THE COURT:  And, Mr. ████, again, can you tell us,

09:45:54   23    were you in the morning or the afternoon session

09:45:57   24    yesterday.

09:45:57   25            JUROR 1:  Morning.

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 28 of 223

3-1-22  USA v. LEWIS, et al. No. 20-10028                    28

```
09:45:58   1        THE COURT:  All right.  Do you remember your juror
09:46:00   2   number?
09:46:01   3        JUROR 1:  Four (indicating).
09:46:03   4        THE COURT:  Four.  Thank you.  I saw another hand
09:46:05   5   on the back row before I talked with Mr. ████.
09:46:09   6   Mr. ████.
09:46:09   7        JUROR 3:  Yes, sir.  So -- well, you're not going
09:46:13   8   to be happy with me either, but last night I was thinking
09:46:15   9   the same thing that gentleman was.  If we're already
09:46:21  10   here, there's a doubt in my mind that, because of that,
09:46:26  11   I'm not going to be clear conscience saying that, yes, I
09:46:33  12   will keep their innocence in mind.
09:46:34  13        THE COURT:  So you think that if someone's
09:46:36  14   arrested, they must be guilty?  So there's really no
09:46:38  15   reason to have a trial?  We should simply let the police
09:46:41  16   decide who's guilty?  I mean, that's essentially the
09:46:47  17   consequence of this thought process that, "Well, if
09:46:50  18   they're here it's because they were arrested, if they
09:46:52  19   were arrested, they must be guilty," so this whole
09:46:55  20   thing's irrelevant.  We should just eliminate the sham
09:46:58  21   and let the police decide who goes to jail by themselves.
09:47:01  22        You understand that's the consequences of that
09:47:03  23   line of thought?
09:47:04  24        JUROR 3:  I understand that, sir.
09:47:07  25        THE COURT:  So tell me what your problem is.
```

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 29 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                29

```
09:47:09   1        JUROR 3:  So yesterday they were talking about
09:47:15   2   wiretaps and evidence of police and drugs and all that
09:47:21   3   and --
09:47:22   4        THE COURT:  Of course, you haven't heard any of
09:47:24   5   the evidence.
09:47:24   6        JUROR 3:  I have not heard any of the evidence,
09:47:27   7   but my mind has jumped to that conclusion of running down
09:47:30   8   that thought process of if that's what they have already
09:47:36   9   and that's what we've already discussed.
09:47:43  10        THE COURT:  Ladies and gentlemen, I'm concerned
09:47:47  11   about this school of thought because really there are two
09:47:53  12   ways we can do this system.  We can let the police decide
09:47:55  13   who's guilty, arrest them and throw them in jail, or we
09:47:58  14   can do what the Constitution says, and that is call in
09:48:01  15   ordinary citizens to make those decisions.
09:48:04  16        And if the ordinary citizens are going to say,
09:48:07  17   "Well, if the police arrested them, they must be guilty,"
09:48:09  18   then we don't need a jury system.  We can have a police
09:48:12  19   state.  We can let the police decide who's guilty and
09:48:15  20   just put 'em in jail.  It works really well for Vladimir
09:48:19  21   Putin.  I really didn't think it was a system I wanted to
09:48:22  22   do here.  This, by the way, is something the Government
09:48:25  23   would agree with me.  I used to work in that office.  And
09:48:27  24   we have a strong -- the Government and the prosecution
09:48:32  25   has a strong belief that determinations of guilt should
```

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 30 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                    30

09:48:36   1   not be made by law enforcement officers; they should be

09:48:37   2   made by ordinary citizens.  But if the ordinary citizens

09:48:40   3   are going to say, "Well, they're arrested, they must be

09:48:43   4   guilty," then let's just follow the Putin standard.  This

09:48:50   5   is so at odds with our United States Constitution that it

09:48:53   6   just disturbs me.

09:48:54   7           Mr. ████, I'm going to let you go.  I'm unhappy

09:48:58   8   with this.

09:48:58   9           But, Ms. McKee, call a replacement for Mr. ████,

09:49:04   10  please.

09:49:04   11          COURTROOM DEPUTY:  ██████████.

09:49:18   12          THE COURT:  Mr. ████, what session were you in

09:49:20   13  yesterday?

09:49:20   14          JUROR 3:  Afternoon, seat 30.

09:49:23   15          THE COURT:  Thank you very much, sir.  Is there

09:49:31   16  anybody else that we need to talk to?  Mr. ████.

09:49:34   17          JUROR 13:  Yes.  Mine's more of a family matter.

09:49:39   18  It's -- since I work on the family farm, well, my uncle,

09:49:44   19  he's supposed to -- I didn't know he was going to get it

09:49:47   20  because it was postponed because his white blood cell

09:49:50   21  count was too high for knee surgery for a replacement,

09:49:54   22  and it's supposed to happen on March 15th, and he went

09:49:57   23  and seen the doctor yesterday and everything was good to

09:50:00   24  go.  And it's going to just be a burden for just my dad

09:50:05   25  to take care of all the farmwork and take care of all the

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 31 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          31

09:50:08  1   cows, so I just wanted to bring that up.  That's going to

09:50:12  2   be on my mind anyways so --

09:50:14  3         THE COURT:  So do your dad and your uncle and you

09:50:17  4   all farm together?

09:50:18  5         JUROR 13:  That's correct.

09:50:20  6         THE COURT:  And your uncle's having knee surgery?

09:50:23  7         JUROR 13:  That's correct.

09:50:23  8         THE COURT:  Are there other people that farm with

09:50:26  9   them?

09:50:27  10        JUROR 13:  Not very often.  They all have their

09:50:29  11  own jobs.

09:50:30  12        THE COURT:  Right.

09:50:30  13        JUROR 13:  If we call upon them to help, they

09:50:33  14  could probably do it, but they all have their own jobs.

09:50:35  15        THE COURT:  Well, and I -- Mr. ████, I grew up on

09:50:39  16  a wheat and cattle farm, so I understand this fully.

09:50:44  17  But, I mean, ultimately it comes back to me that

09:50:49  18  everybody is important at their job, and unless we have a

09:50:53  19  jury that's made up just of the retired and the

09:50:55  20  unemployed, then there are going to be some job

09:50:59  21  inconveniences that come from a jury.

09:51:01  22        Now, yesterday I made some excusions for the

09:51:04  23  health care industry because right now we're in kind of a

09:51:06  24  crisis in health care, and I recognize that.  But

09:51:11  25  everybody's employed.  I know we have some retired people

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 32 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          32

09:51:15   1   on the panel.  Everybody who's employed is going to have

09:51:17   2   some inconvenience, particularly over a four-week trial.

09:51:20   3   I'm appreciative of that.  But the validity of our jury

09:51:23   4   system is that we need to have some cross-section of our

09:51:26   5   populace to sit on a jury to kind of represent a

09:51:29   6   collection of wisdom from people from different issues.

09:51:32   7   And I appreciate that it's going to make things difficult

09:51:38   8   on the farm, but at the end of the day that's really not

09:51:40   9   significantly different than other people whose jobs are

09:51:44   10  going to be impacted by their absence.  So I appreciate

09:51:49   11  your concern, but that's not the sort of issue that I

09:51:52   12  typically would excuse people on.

09:51:57   13         JUROR 13:  Okay.

09:51:58   14         THE COURT:  Thank you, Mr. ████████.

09:52:01   15         Who else needed to talk to me?  Well, I see your

09:52:07   16  hand back there, sir, but the way this will work is the

09:52:10   17  jury's going to come out of this group right here, so

09:52:14   18  unless I excuse somebody else and you get called up,

09:52:17   19  right now you're kind of off the radar screen and you may

09:52:20   20  just want to kind of lay low and stay there unless you

09:52:23   21  get pulled in, so otherwise it won't matter.

09:52:25   22         Anybody else?  Well, counsel, let me just --

09:52:33   23  counsel.  Jurors, let me just again reiterate what I

09:52:36   24  talked about at length yesterday, and that is the

09:52:38   25  importance of the presumption of innocence.  We're all

09:52:41   1   theoretically fans of our Constitution, but if we ignore

09:52:45   2   it then our fanning -- fandom, whatever word I want to

09:52:49   3   use, is kind of hypocritical.  And these are the most --

09:52:55   4   among the most important things that our Constitution

09:52:56   5   does, borne out of the process we had with sort of an

09:53:00   6   oppressive rule from England at the time of the colonies,

09:53:05   7   of people being arrested and jailed and going clear back

09:53:08   8   to English common law saying the Government does not get

09:53:11   9   to decide who's guilty, only citizens do.  And if those

09:53:16   10  citizens say, "Well, if the Government arrested them,

09:53:18   11  they must be guilty," then we've completely thrown out

09:53:21   12  all that history of saying those determinations aren't

09:53:23   13  made by law enforcement; they're made by ordinary

09:53:25   14  citizens.

09:53:25   15       This is -- honestly, I say this a lot.  Serving on

09:53:31   16  a jury is second only to military service in the service

09:53:34   17  that a citizen can render to that his or her country,

09:53:36   18  because our system says we pull ordinary citizens from

09:53:40   19  ordinary walks of life, and we say, "You decide this,"

09:53:44   20  not people with big law degrees who wear robes, not

09:53:47   21  people with badges who are law enforcement, but you.  You

09:53:51   22  decide this, ordinary citizens.  That's kind of the

09:53:54   23  heartbeat of our Constitution.  And you nullify that if

09:54:00   24  you say, "Well, they're arrested, they must be guilty."

09:54:03   25       The whole system says you get to decide and you

Case 6:20-cr-10028-EFM     Document 928     Filed 08/10/22     Page 34 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          34

```
09:54:08    1  have to decide and you can't default that to somebody
09:54:11    2  else.  I -- that is, if I were to list the top two or
09:54:16    3  three most critical rights in our Constitution, that
09:54:18    4  would be one of them.  It's a very important.  It's a
09:54:21    5  very solemn responsibility, but it's the hallmark of our
09:54:26    6  whole constitutional system.  So I talked about this
09:54:28    7  yesterday.  I just want to reemphasize how critical that
09:54:31    8  is.
09:54:35    9          Is there anybody else that needs to talk to me
09:54:39   10  about anything?  All right.  So here's what's going to
09:54:45   11  happen.  As I indicated yesterday, the counsel are now
09:54:48   12  going to exercise what are called their peremptory
09:54:51   13  strikes.  "Peremptory" just means, unlike what we've done
09:54:57   14  so far, they don't have to give a reason for striking
09:55:02   15  someone.  They have a -- not completely, but almost,
09:55:08   16  unfettered discretion in who they want to remove.
09:55:13   17          So, counsel don't really get to pick who's on the
09:55:16   18  jury, but they kind of get to pick who's not on the jury,
09:55:19   19  if that makes sense.  So the way this works defendant
09:55:23   20  gets a few more strikes than the Government.  I'm not
09:55:25   21  going to bore you with the math, but they're going to
09:55:29   22  make them kind of alternating one here, one here, back
09:55:33   23  and forth, and you're going to say Ms. McKee, my
09:55:35   24  courtroom deputy, pass a strike sheet back and forth
09:55:38   25  between counsel.  And they'll kind of make their strikes
```

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 35 of 223

3-1-22    USA v. LEWIS, et al. No. 20-10028          35

09:55:41   1   back and forth, and it'll take awhile and nothing will be

09:55:43   2   said and it'll be kind of boring, kind of boring for you

09:55:47   3   all.  So if you want to stand and stretch or something,

09:55:49   4   that's fine.  But counsel's got this big spreadsheet with

09:55:54   5   your names on it and notes, and so I'm going to ask that

09:55:56   6   you stay in the seats that you're in to help them

09:55:59   7   identify and remind themselves who you all are as they do

09:56:03   8   that.

09:56:03   9          We'll get down then to what I'm selecting for this

09:56:08   10  trial is 16 people.  Ultimately that will be 12 jurors

09:56:12   11  and four alternates, although the alternates won't be

09:56:16   12  indicated until the end of the trial.  But we'll get down

09:56:19   13  to 16 people.  Everybody except those 16 from this group

09:56:23   14  will be excused, and then those 16 will be impaneled

09:56:26   15  that'll hear the trial in this case.  So that's our next

09:56:30   16  process.

09:56:30   17         Again, because there are a lot of you, there are

09:56:33   18  38 and so if we're going to end up with 16, that means

09:56:37   19  we're getting rid of 22 of you.  That sounds so harsh.

09:56:44   20  And that'll take a little bit of a while as we pass -- as

09:56:48   21  Ms. McKee passes the strike sheet back and forth.  So

09:56:50   22  just bear with the process if you would.  There's not

09:56:52   23  going to be any sound in here.  There's just going to be

09:56:55   24  marking those off, and it will take us awhile to do that,

09:56:57   25  but bear with the process if you would and that'll get us

3-1-22   USA v. LEWIS, et al. No. 20-10028          36

| | | |
|---|---|---|
| 09:56:59 | 1 | down to our jury who will hear and decide the case. |
| 09:57:02 | 2 | Ms. McKee, would you begin circulating the strike |
| 09:57:06 | 3 | sheet among counsel, please. |
| 09:58:35 | 4 | (Discussion held off the record.) |
| 10:16:09 | 5 | THE COURT: All right. The clerk will announce |
| 10:16:13 | 6 | the jury who will hear and decide this case. |
| 10:16:16 | 7 | COURTROOM DEPUTY: If I say your name, you are a |
| 10:16:21 | 8 | juror. Okay? |
| 10:16:22 | 9 | ██████, ███████, ███████, ██████ |
| 10:16:33 | 10 | ████████, ██████, ████████, ████████, █████ |
| 10:16:48 | 11 | ██████, ███████ -- I'm not even going to try your last |
| 10:16:53 | 12 | name, dear, ███████. Close? Okay. ████████ |
| 10:17:02 | 13 | █████████, █████████, █████████, ████████ |
| 10:17:12 | 14 | ████████, █████████, ████████ |
| 10:17:19 | 15 | THE COURT: If your name was not called, would you |
| 10:17:22 | 16 | excuse yourself to the back of the courtroom for a |
| 10:17:24 | 17 | moment, please. |
| 10:17:26 | 18 | (Excused venire panel members comply.) |
| 10:18:08 | 19 | THE COURT: So Ms. McKee's going to re-seat these |
| 10:18:25 | 20 | people here. And while she does that, let me talk to the |
| 10:18:29 | 21 | rest of you in the back. |
| 10:18:33 | 22 | I appreciate you all coming in yesterday and |
| 10:18:35 | 23 | today. I have to tell you that the jury clerk and my |
| 10:18:39 | 24 | staff have commented that you've been an unusual group |
| 10:18:43 | 25 | because typically we summon people in and one or two |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 37 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                    37

| | | |
|---|---|---|
| 10:18:46 | 1 | don't show up, for whatever reason, sometimes good, |
| 10:18:49 | 2 | sometimes not.  We've had none of that.  Yesterday and |
| 10:18:52 | 3 | today absolutely everybody summoned in has come, and we |
| 10:18:56 | 4 | appreciate that. |
| 10:18:56 | 5 | As I said on my remarks earlier this morning, I |
| 10:19:00 | 6 | really do believe that jury service is the highest |
| 10:19:05 | 7 | service a citizen can render to his or her country.  You |
| 10:19:11 | 8 | all know -- everybody knows -- pardon me -- instinctively |
| 10:19:17 | 9 | the role that the citizens play in our republic with |
| 10:19:21 | 10 | respect to our executive and our legislative branch |
| 10:19:24 | 11 | because you vote for those people.  Of course, at least |
| 10:19:27 | 12 | on the federal side, you don't vote for the federal |
| 10:19:30 | 13 | judges, but in our court system the judges don't decide a |
| 10:19:35 | 14 | lot of the critical issues; the citizens do.  And so |
| 10:19:38 | 15 | you're now experiencing the role that our citizens play |
| 10:19:41 | 16 | in our republic with respect to the judicial branch, that |
| 10:19:47 | 17 | these important and critical decisions are made not by |
| 10:19:52 | 18 | judges, certainly not by law enforcement, but by ordinary |
| 10:19:55 | 19 | citizens impaneled as jurors.  And so that's an important |
| 10:19:59 | 20 | part of how our republic works. |
| 10:20:02 | 21 | Several of you were not seated here this morning |
| 10:20:04 | 22 | for the final selection process.  Many of you even who |
| 10:20:08 | 23 | were seated were not ultimately selected to be on the |
| 10:20:12 | 24 | jury.  Obviously we removed some people yesterday.  But |
| 10:20:15 | 25 | everyone's presence was important to make sure that we |

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 38 of 223

3-1-22  USA v. LEWIS, et al. No. 20-10028                38

| 10:20:17 | 1 | had a good cross-section of citizens to select the jury |
| 10:20:24 | 2 | in this case. |
| 10:20:24 | 3 | Our trials are open in this system, and you're |
| 10:20:28 | 4 | welcome to watch the trial if you want.  I don't know |
| 10:20:31 | 5 | that I've ever had anyone take me up on that offer.  But |
| 10:20:34 | 6 | you're welcome to do that.  Our trial's actually going to |
| 10:20:37 | 7 | occur in a courtroom two floors above us, but the court |
| 10:20:40 | 8 | has no longer any demand or requirement on your time. |
| 10:20:43 | 9 | Do you know, Ms. McKee, do they have any further |
| 10:20:45 | 10 | reporting obligations? |
| 10:20:46 | 11 | COURTROOM DEPUTY:  Marlene gave that all to me. |
| 10:20:48 | 12 | THE COURT:  All right.  So whatever Marlene, our |
| 10:20:51 | 13 | jury clerk downstairs, told you, obviously she has better |
| 10:20:54 | 14 | information than we do, but with respect to this process |
| 10:20:56 | 15 | you are free to go, but you're free to go with the thanks |
| 10:20:59 | 16 | and the appreciation of the Court and of the United |
| 10:21:02 | 17 | States of America.  Thank you very much. |
| 10:21:10 | 18 | Ladies and gentlemen of the jury, no longer the |
| 10:21:13 | 19 | jury panel, but you are now the jury that will hear and |
| 10:21:16 | 20 | decide this case.  Here's what we're going to do.  In |
| 10:21:21 | 21 | just a moment I'm going to have you stand and be sworn as |
| 10:21:24 | 22 | jurors.  At that point my law clerk, Mr. Schmidt, will |
| 10:21:30 | 23 | distribute some notebooks to you.  Those notebooks have |
| 10:21:33 | 24 | notepaper in them for you to take notes, and that's the |
| 10:21:35 | 25 | main reason I'm giving them to you.  They have copies of |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 39 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          39

10:21:39  1  the instructions in them, which I'm going to ask that you

10:21:41  2  not look at until this afternoon.  And then I have some

10:21:44  3  preliminary instructions, more of a logistical and

10:21:50  4  programmed nature than the specific instructions on the

10:21:53  5  law, that I will give you this morning.  When I'm

10:21:55  6  finished with that, Ms. McKee and Mr. Schmidt will take

10:21:58  7  you to your jury room.

10:21:59  8        As I just indicated, this case will be tried in a

10:22:02  9  courtroom on the fourth floor of this building.  They'll

10:22:04  10  show you where that is at, give you a bit of orientation,

10:22:08  11  we'll take an early lunch, and really we won't come back

10:22:13  12  until 1:00 o'clock.  I just -- I just think a lunch break

10:22:17  13  shouldn't end before 1:00 o'clock.  It just doesn't seem

10:22:20  14  right.

10:22:20  15        So we've got a bit more to do through here, but

10:22:23  16  you'll have at least two hours after that for lunch and

10:22:27  17  for the parties to get reoriented.  So then when you come

10:22:31  18  back after lunch, I'm going to give you the instructions

10:22:34  19  on the law.  Again, those are contained in the notebooks

10:22:36  20  which Mr. Schmidt and Ms. McKee are about to pass out to

10:22:39  21  you, but I am asking that you not look at them yet until

10:22:42  22  we can discuss them together this afternoon.

10:22:45  23        We'll come back from lunch, I'll go through those

10:22:48  24  instructions with you, you'll hear opening statements

10:22:49  25  from counsel, and the trial will commence.  So welcome to

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 40 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                    40

10:22:53   1   the jury.

10:22:54   2          Would the jurors now stand to be sworn in this

10:22:57   3   case.

10:22:57   4          (The jurors comply.)

10:22:59   5          COURTROOM DEPUTY:  If you would all raise your

10:23:01   6   right hand, please.

10:23:01   7          You and each of you do solemnly swear that you

10:23:05   8   will well and truly try the issues submitted to you in

10:23:11   9   the case now in hearing and a true verdict give according

10:23:15  10   to the law and the evidence, so help you God.  If so,

10:23:19  11   please say, "I do."

10:23:22  12          THE JURY (in unison):  I do.

10:23:23  13          COURTROOM DEPUTY:  Thank you.

10:23:23  14          THE COURT:  Thank you.  You may be seated.

10:23:25  15          First issue I want to discuss with you, ladies and

10:23:28  16   gentlemen, I mentioned yesterday morning -- gosh, I don't

10:23:31  17   remember if I mentioned this yesterday afternoon or not.

10:23:33  18   But, anyway, the first issue I want to discuss with you

10:23:36  19   is masks.  So initially when we had 40, or today 38, of

10:23:41  20   you all clustered there together, out of an abundance of

10:23:45  21   caution we had you wear masks because obviously you

10:23:47  22   cannot socially distance.  You're still somewhat grouped

10:23:50  23   together.  And I'll tell you that in the trial courtroom

10:23:53  24   upstairs that we'll try this case in there's not this

10:23:55  25   Plexiglas shield that's there.  Some of you may think

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 41 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                41

| | | |
|---|---|---|
| 10:23:59 | 1 | that's good.  Some of you may think that's bad.  But it |
| 10:24:03 | 2 | is, so that's the status. |
| 10:24:04 | 3 | So I want to, now that there's a smaller group of |
| 10:24:08 | 4 | us, I want to talk about masks.  And the first thing I |
| 10:24:14 | 5 | want to say is, notwithstanding anything else, anybody |
| 10:24:17 | 6 | who wants to wear a mask in this proceeding is certainly |
| 10:24:24 | 7 | welcome to do so.  But my question for you is, as a |
| 10:24:28 | 8 | general rule we have required masks in the public areas |
| 10:24:31 | 9 | of this courthouse for now, although that's probably |
| 10:24:35 | 10 | going to change in the next couple weeks.  But be that as |
| 10:24:38 | 11 | it may, that's the current rule.  But we've not |
| 10:24:40 | 12 | necessarily required them in our courtrooms. |
| 10:24:43 | 13 | So after we move to the trial courtroom and you'll |
| 10:24:47 | 14 | be seated kind of like you are now, there's a fixed jury |
| 10:24:51 | 15 | box that seats 14 and then two of you will be seated sort |
| 10:24:54 | 16 | of in front of that box, but still somewhat grouped |
| 10:24:58 | 17 | together.  After we move to that setting, how many of you |
| 10:25:03 | 18 | would prefer not to wear a mask in that setting?  It |
| 10:25:10 | 19 | looks like we may have our -- almost unanimous jury vote. |
| 10:25:16 | 20 | So if I did not require wearing masks, would any |
| 10:25:21 | 21 | of you -- of course you're welcome to wear one anyway. |
| 10:25:24 | 22 | Would any of you be uncomfortable if other jurors were |
| 10:25:27 | 23 | not wearing masks?  Tell me about that briefly, |
| 10:25:35 | 24 | Mr. ███████. |
| 10:25:48 | 25 | JUROR 2:  It's Mr. ███████. |

3-1-22  USA v. LEWIS, et al. No. 20-10028                          42

```
10:25:52   1        THE COURT:  Oh, I'm sorry.  I'm looking at my old

10:25:55   2   thing.  You are Mr. ████.  Mr. ████ [sic] is who used

10:25:57   3   to sit there but he was removed.  I apologize.

10:26:00   4        JUROR 3:  My wife is immunocompromised, so I'm

10:26:08   5   leery of being in an environment where potentially I

10:26:13   6   could get COVID and then pass it on to her.

10:26:16   7        THE COURT:  Okay.  And as I indicated, of course,

10:26:19   8   you're certainly free to wear a mask yourself, but would

10:26:23   9   you be concerned about others being around you not

10:26:26  10   wearing masks?

10:26:27  11        JUROR 3:  Yes, sir.

10:26:29  12        THE COURT:  Would it help if I reseated you -- as

10:26:33  13   I indicated, in the jury box upstairs there will be 14 in

10:26:35  14   the main box and then two sitting in front, probably not

10:26:42  15   right next to each other as those are.  Would it help if

10:26:44  16   I reseated you to the front of the jury box so that you

10:26:47  17   had more distance from the rest of them?

10:26:48  18        JUROR 3:  That would be better.  (Nods head.)

10:26:50  19        THE COURT:  All right.  We may do that even though

10:26:54  20   that'll change our numbering a bit, but I don't think

10:26:56  21   that's a problem.

10:26:56  22        Then you're all going to also be in a jury room

10:27:00  23   together, obviously at breaks, and then at the end of the

10:27:04  24   trial, of course, for deliberation.  And when you're in

10:27:14  25   the jury room, you're sort of your own masters.  And once
```

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 43 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                      43

| | | |
|---|---|---|
| 10:27:18 | 1 | this case is submitted to the jury for deliberation, I'm |
| 10:27:21 | 2 | going to tell you that you're kind of even in control of |
| 10:27:23 | 3 | your own schedule. You can decide whether you want to |
| 10:27:26 | 4 | start at 8:30 or 9:00. I'm going to ask that you not |
| 10:27:29 | 5 | drag in at 10:45, of course. You can decide when you |
| 10:27:32 | 6 | want to take lunch. You're kind of your own masters in |
| 10:27:35 | 7 | the jury room. I won't even come in the jury room until |
| 10:27:39 | 8 | after the trial's completely over when I'll come in |
| 10:27:42 | 9 | informally to visit with you. |
| 10:27:44 | 10 | So what happens there is something you may have to |
| 10:27:46 | 11 | work out a bit separately, if you understand what I mean, |
| 10:27:53 | 12 | and how things are set in there. But for now, can we |
| 10:27:56 | 13 | swap you, Mr. ▇▇▇▇, with one of the seats in the front |
| 10:28:00 | 14 | and do that upstairs as well to give you some social |
| 10:28:03 | 15 | distancing with the rest of the group? |
| 10:28:05 | 16 | JUROR 3: So they're going to unmask right now? |
| 10:28:11 | 17 | THE COURT: Well, either now or when we go |
| 10:28:13 | 18 | upstairs to start the trial. |
| 10:28:15 | 19 | JUROR 3: I mean, I don't need to move if we're |
| 10:28:18 | 20 | not going to unmask right now, but if they're going to |
| 10:28:20 | 21 | unmask -- |
| 10:28:21 | 22 | THE COURT: Well, I might move you anyway just |
| 10:28:23 | 23 | because when we start upstairs we want you all -- this is |
| 10:28:28 | 24 | always kind of a procedure it takes the jury a minute to |
| 10:28:31 | 25 | kind of get a handle. When you file in you've got an |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 44 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                44

| | | |
|---|---|---|
| 10:28:33 | 1 | assigned seat and everybody's there ready to start trial |
| 10:28:37 | 2 | and it's kind of helpful if you sort of know where you're |
| 10:28:39 | 3 | going to sit so that when you come in -- and after a time |
| 10:28:42 | 4 | or two of coming in, everybody figures this out, of |
| 10:28:45 | 5 | course. But now it'd be helpful to kind of have you all |
| 10:28:48 | 6 | kind of know where that's going to be so when the trial |
| 10:28:50 | 7 | actually starts and everybody's there and the jury comes |
| 10:28:54 | 8 | in, you all know where to go, if that makes sense. |
| 10:28:56 | 9 | JUROR 3: That's fine. |
| 10:28:57 | 10 | THE COURT: Okay. Ms. McKee, can you just swap a |
| 10:29:01 | 11 | couple people there for us? |
| 10:29:02 | 12 | COURTROOM DEPUTY: Does it make a difference? |
| 10:29:04 | 13 | THE COURT: Doesn't make any difference to me. |
| 10:29:06 | 14 | COURTROOM DEPUTY: Ms. ████, would you mind |
| 10:29:08 | 15 | going into -- that would make you No. 2 and then if you |
| 10:29:11 | 16 | would take her seat, that makes you No. 16. |
| 10:29:21 | 17 | THE COURT: Anybody else have a concern if other |
| 10:29:24 | 18 | jurors are not masked? I think, Mr. ████ was the only |
| 10:29:28 | 19 | one I did not see raise a hand in my initial question, |
| 10:29:31 | 20 | but I could have missed. Anybody else? All right. |
| 10:29:36 | 21 | So our procedure will be we'll keep Mr. ████ |
| 10:29:40 | 22 | seated in the front of the jury box in one of those two |
| 10:29:44 | 23 | seats and give you some social distancing there, but |
| 10:29:47 | 24 | beyond that I will not require masks during the trial |
| 10:29:52 | 25 | while you're in the jury box. |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 45 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                45

| | | |
|---|---|---|
| 10:29:58 | 1 | Very well.  So, Mr. Schmidt, would you and |
| 10:30:03 | 2 | Ms. McKee pass these jury notebooks out. |
| 10:30:06 | 3 | So you're going to see several things -- |
| 10:30:08 | 4 | COURTROOM DEPUTY:  They don't have anything to |
| 10:30:10 | 5 | write with.  Will we need to be -- |
| 10:30:12 | 6 | THE COURT:  Ooh. |
| 10:30:14 | 7 | COURTROOM DEPUTY:  Well, I can go upstairs and get |
| 10:30:16 | 8 | the ink pens. |
| 10:30:16 | 9 | THE COURT:  Are the pens upstairs? |
| 10:30:18 | 10 | COURTROOM DEPUTY:  Yeah. |
| 10:30:18 | 11 | THE COURT:  Why don't you do that while Jake |
| 10:30:20 | 12 | passes out the notebooks, and we'll do a little song and |
| 10:30:23 | 13 | dance here.  Thank you. |
| 10:30:24 | 14 | I'm going to give you juror notebooks.  There are |
| 10:30:27 | 15 | several things in there.  I'll talk about them.  One of |
| 10:30:29 | 16 | the big things you'll see in there, again, are the |
| 10:30:32 | 17 | instructions.  And I really stress don't look at those |
| 10:30:35 | 18 | now.  That's the first thing we're going to do after |
| 10:30:37 | 19 | lunch, but I really prefer you not start reading them |
| 10:30:40 | 20 | now.  It's better if you'll wait.  But I want to give you |
| 10:30:43 | 21 | these notebooks now so that the notebook paper that's in |
| 10:30:46 | 22 | them, you can take notes on if you want to on the |
| 10:30:50 | 23 | preliminary instructions that I'm about to give you.  And |
| 10:30:52 | 24 | you may not want to take notes.  That's fine.  I only |
| 10:30:54 | 25 | have about five or seven minutes of preliminary |

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 46 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                46

10:30:57  1   instructions to give you anyway.  But I thought we'd go

10:31:00  2   ahead and get those out to you.

10:31:01  3        I'll let Mr. Schmidt, my law clerk, who you'll be

10:31:06  4   seeing daily throughout this trial, distribute those to

10:31:08  5   you and we'll bring the pens back in just a moment and

10:31:11  6   then I'll give you some preliminary instructions.

10:32:03  7        (Brief pause.)

10:32:03  8        THE COURT:  So give us just a moment while

10:32:05  9   Ms. McKee brings these down.  My courtroom is actually on

10:32:09  10  the fourth floor.  This courtroom's larger, and so I

10:32:11  11  borrowed it from my colleague for jury selection because

10:32:16  12  of the larger numbers here, which I don't normally do.

10:32:19  13  So -- she was fast.

10:32:21  14       So we weren't completely on top of all the

10:32:23  15  logistical things we needed to do to start you off here

10:32:26  16  in this courtroom.

10:33:16  17       (Discussion held off the record.)

10:33:17  18       THE COURT:  All right.  Members of the jury, now

10:33:20  19  that you have been chosen as a jury and sworn in this

10:33:22  20  case, I'm going to give you some preliminary operational

10:33:25  21  instructions that's going to guide your participation in

10:33:29  22  this trial.  As I just indicated, after lunch I'm going

10:33:31  23  to give you the formal instructions on the law, and

10:33:33  24  copies of those will be included in your notebook.  And

10:33:36  25  at that time you can read along with me or not as you

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 47 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          47

| | | |
|---|---|---|
| 10:33:38 | 1 | choose, but I'd ask you not look at them until then. |
| 10:33:41 | 2 | I'm not giving you written copies of these |
| 10:33:43 | 3 | preliminary instructions, so feel free to make any notes |
| 10:33:46 | 4 | regarding them that you might wish to make as I go |
| 10:33:49 | 5 | through these with you. |
| 10:33:50 | 6 | It will be your duty, as the jurors in this case, |
| 10:33:56 | 7 | to find from the evidence what the facts are. You, the |
| 10:34:03 | 8 | jury, and you alone, are the judges of the facts. You |
| 10:34:08 | 9 | will have to apply those facts to the law as I will give |
| 10:34:12 | 10 | it to you, and you must follow the law whether you may |
| 10:34:15 | 11 | agree with it or not. |
| 10:34:16 | 12 | Nothing that I say or do during the course of the |
| 10:34:19 | 13 | trial is intended to indicate, and you should not take it |
| 10:34:23 | 14 | as indicating, what I think your verdict and decision as |
| 10:34:28 | 15 | to the facts should be. That is a decision solely for |
| 10:34:34 | 16 | the jury. |
| 10:34:34 | 17 | This is a criminal case, obviously, that's been |
| 10:34:36 | 18 | brought by the United States government. I will |
| 10:34:40 | 19 | alternately refer throughout the trial to the Government |
| 10:34:42 | 20 | as either the Government or the prosecution. As you |
| 10:34:44 | 21 | know, the Government's represented by Assistant United |
| 10:34:46 | 22 | States Attorneys Matthew Treaster and Katherine Andrusak. |
| 10:34:50 | 23 | The two defendants in this case you've already met, |
| 10:34:53 | 24 | Mr. Lewis and Mr. Vontress, are represented by their |
| 10:34:56 | 25 | lawyers that you will see, of course, throughout the |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 48 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                48

| | | |
|---|---|---|
| 10:34:58 | 1 | trial, Mr. Shultz and Mr. Babbit.  And those will be the |
| 10:35:03 | 2 | counsel and parties involved in the case. |
| 10:35:06 | 3 | Seated at the Government table, as you were |
| 10:35:09 | 4 | introduced to yesterday, is the FBI agent who is |
| 10:35:11 | 5 | considered the case agent.  He's entitled to sit with the |
| 10:35:16 | 6 | prosecution during the trial to assist them in the trial. |
| 10:35:20 | 7 | All of the witnesses that the Government may call are |
| 10:35:23 | 8 | only permitted to be in the courtroom during and after |
| 10:35:25 | 9 | their testimony, not before, but the case agent is |
| 10:35:28 | 10 | allowed to be designated to assist the prosecution |
| 10:35:31 | 11 | throughout the trial. |
| 10:35:32 | 12 | I described to you briefly the charges in the |
| 10:35:36 | 13 | indictment yesterday.  Essentially, as I mentioned then, |
| 10:35:40 | 14 | the charges against the two defendants involve their |
| 10:35:45 | 15 | participation in a drug trafficking organization, to |
| 10:35:48 | 16 | distribute various drugs and matters related to that. |
| 10:35:51 | 17 | This afternoon, after lunch, as I go through the |
| 10:35:55 | 18 | indictment with you, I will give you a copy of the |
| 10:35:59 | 19 | charges against these two defendants in specificity, and |
| 10:36:04 | 20 | so I'm going to reserve any further discussion on that |
| 10:36:07 | 21 | until that time.  But, again, I want to remind you -- and |
| 10:36:10 | 22 | I'll remind you again this afternoon -- that an |
| 10:36:13 | 23 | indictment is nothing more than a description of the |
| 10:36:18 | 24 | charge that's been made by the Government against the |
| 10:36:22 | 25 | defendants.  It is by no means evidence of the guilt. |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 49 of 223

3-1-22    USA v. LEWIS, et al. No. 20-10028                49

| | | |
|---|---|---|
| 10:36:25 | 1 | And to the extent that the indictment contains some |
| 10:36:28 | 2 | details, and it will, those details are only a part of |
| 10:36:31 | 3 | the Government's charge or allegation that it's bringing |
| 10:36:36 | 4 | against the defendants. |
| 10:36:39 | 5 | Whether, in fact, those charges are true and those |
| 10:36:43 | 6 | detailed facts happened is a decision for the jury and |
| 10:36:48 | 7 | only for the jury.  The defendants have each pleaded not |
| 10:36:52 | 8 | guilty to all of those charges, and that plea alone is |
| 10:36:57 | 9 | sufficient to retain their presumption of innocence.  And |
| 10:37:00 | 10 | as I've discussed at great length already in the course |
| 10:37:04 | 11 | of this trial, under our Constitution, they are presumed |
| 10:37:08 | 12 | innocent, and any indication to the contrary-wise is |
| 10:37:15 | 13 | going to be placed solely on the responsibility of the |
| 10:37:18 | 14 | Government or the prosecution.  The defendants do not |
| 10:37:20 | 15 | have to prove their innocence.  They are presumed to be |
| 10:37:24 | 16 | innocent and do not have to prove anything further. |
| 10:37:26 | 17 | This indictment is not evidence of guilt.  It's |
| 10:37:32 | 18 | merely a description of the charge.  And the defendants |
| 10:37:34 | 19 | may not be found guilty unless the 12-person jury who |
| 10:37:40 | 20 | ultimately decides this case unanimously finds, with |
| 10:37:45 | 21 | respect to each charge as it relates to each defendant in |
| 10:37:49 | 22 | the case, that the Government has proved that charge |
| 10:37:53 | 23 | against that defendant and the defendant's guilt thereof |
| 10:37:57 | 24 | beyond a reasonable doubt. |
| 10:38:01 | 25 | Because there are several charges and two |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 50 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          50

10:38:03  1  defendants in this case, I want to stress to you that you

10:38:07  2  will have to give separate consideration in this case to

10:38:11  3  each charge and to each defendant.  Some charges will

10:38:16  4  name both defendants.  Each charge and each defendant

10:38:20  5  merits and requires individual consideration.

10:38:23  6      As I said, the first step of the trial after lunch

10:38:26  7  will be me reading and going through to discuss with you

10:38:29  8  the instructions on the law, and those instructions will

10:38:32  9  govern your decisions.  And I'm giving you written copies

10:38:35  10  of those instructions to help you throughout the trial,

10:38:38  11  particularly given the length and complexity of some of

10:38:41  12  the facts that may come in, so that you can refer to

10:38:45  13  those throughout the trial, to help you in an ongoing

10:38:47  14  basis to evaluate the evidence as it comes in against the

10:38:51  15  requirements of the law in this case.  And in the

10:38:54  16  interest of clarity, I will read those instructions to

10:38:58  17  you, to go over them at the commencement of the trial.

10:39:01  18      But although you may refer to them as you listen

10:39:05  19  to the evidence throughout the case, I would strongly

10:39:08  20  urge and caution you not to make any even preliminary

10:39:12  21  decisions as to guilt or innocence on any of the charges

10:39:17  22  against any of the defendants until the trial is

10:39:20  23  completely over and you've heard everything that all

10:39:23  24  parties think you need to hear in this case.  So you may

10:39:26  25  refer to the instructions as we go through the evidence

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 51 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028          51

10:39:29  1  to help you keep track of what applies to what, but your

10:39:34  2  decision as to guilt or innocence should be wholly

10:39:37  3  deferred until the conclusion of the trial when you begin

10:39:40  4  your deliberations.

10:39:43  5       After I've read the instructions to you this

10:39:45  6  afternoon, you'll then hear opening statements from

10:39:47  7  counsel.  The Government, in its opening statement, is

10:39:51  8  going to tell you about the evidence it intends to put

10:39:53  9  before you, to give you a road map of sort of where the

10:39:57  10 Government will be headed.  But just as the indictment is

10:40:02  11 not evidence, the opening statements are not evidence.

10:40:06  12 They're only a road map to tell you where the Government

10:40:10  13 anticipates it will go.

10:40:10  14      After the Government's opening statement, each

10:40:13  15 defendant may also make their own opening statement by

10:40:17  16 their counsel.  Once all opening statements are done,

10:40:21  17 then the trial will commence.  Since the Government has

10:40:23  18 the burden of proof, it goes first in the presentation of

10:40:27  19 evidence.  And so the Government will then, following

10:40:30  20 opening statements, offer its evidence.

10:40:34  21      After the Government's evidence has been offered,

10:40:37  22 the defendants may present evidence but, as I told you

10:40:40  23 yesterday, they're not required to do so.  They're

10:40:43  24 neither required to put on a case or to testify in their

10:40:46  25 own defense because (A) they're not required to prove

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 52 of 223

3-1-22  USA v. LEWIS, et al. No. 20-10028                    52

| | | |
|---|---|---|
| 10:40:50 | 1 | their innocence; and (B) as to the defendants themselves, |
| 10:40:54 | 2 | certainly they have a right to not testify or to remain |
| 10:40:57 | 3 | silent under the Constitution.  If the defendants produce |
| 10:41:03 | 4 | evidence, then the Government, if necessary, will have an |
| 10:41:06 | 5 | opportunity to put on rebuttal evidence. |
| 10:41:08 | 6 | As jurors, you will have to decide this case based |
| 10:41:13 | 7 | solely on the evidence presented in the courtroom and on |
| 10:41:19 | 8 | the law that I instruct you at the beginning of the case. |
| 10:41:22 | 9 | It is very important that you not conduct any independent |
| 10:41:26 | 10 | investigation or research into any of the matters that |
| 10:41:30 | 11 | are at issue in this case or any of the parties involved |
| 10:41:34 | 12 | in this case or any of the witnesses who may be called. |
| 10:41:38 | 13 | All of you, no doubt, have internet access at home, and |
| 10:41:41 | 14 | most of you probably have access remotely on your |
| 10:41:45 | 15 | smartphones or other devices that allows you to quickly |
| 10:41:49 | 16 | find information in matters that are of interest to you. |
| 10:41:53 | 17 | And in this day and age it's very common for us to use |
| 10:41:55 | 18 | those resources to learn more about matters that are of |
| 10:41:59 | 19 | interest to us. |
| 10:41:59 | 20 | But during your service as jurors, it is vitally |
| 10:42:04 | 21 | important that you not do this.  You must limit your |
| 10:42:10 | 22 | consideration and your information about facts solely to |
| 10:42:14 | 23 | the evidence that's presented during the trial of this |
| 10:42:18 | 24 | case.  Don't consult the internet, don't consult |
| 10:42:23 | 25 | dictionaries or other reference materials.  Some of us |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 53 of 223

3-1-22  USA v. LEWIS, et al. No. 20-10028                53

| | | |
|---|---|---|
| 10:42:25 | 1 | are old enough to remember things called encyclopedias. |
| 10:42:29 | 2 | I don't know that there's anything that's relevant.  But |
| 10:42:34 | 3 | whatever, don't look at them.  You must limit your |
| 10:42:36 | 4 | consideration solely to the evidence that you see and |
| 10:42:39 | 5 | hear in the courtroom during trial of this case. |
| 10:42:41 | 6 | The evidence from which you will make your |
| 10:42:43 | 7 | decision as to what the facts are in this case will |
| 10:42:45 | 8 | consist of the testimony of witnesses, and documents or |
| 10:42:50 | 9 | other tangible things that might be received into the |
| 10:42:53 | 10 | record, admitted into the evidence of this case.  And |
| 10:42:56 | 11 | it's possible that the lawyers may agree or stipulate to |
| 10:42:59 | 12 | certain facts and, if so, I'll inform you of that as we |
| 10:43:03 | 13 | go along. |
| 10:43:03 | 14 | There are some things that you'll hear during the |
| 10:43:07 | 15 | trial that are not evidence.  I want to highlight those |
| 10:43:10 | 16 | for you here at the outset.  First of all, statements and |
| 10:43:16 | 17 | arguments and questions by lawyers are not evidence. |
| 10:43:20 | 18 | I've already told you that the opening statement the |
| 10:43:22 | 19 | lawyers make are not evidence.  But sometimes what gets |
| 10:43:28 | 20 | confusing is that a lawyer may ask a question that infers |
| 10:43:32 | 21 | certain things, "Well, didn't this and this and this and |
| 10:43:36 | 22 | this happen on this date?"  And that sounds like it's a |
| 10:43:39 | 23 | factual representation.  But, for instance, if the |
| 10:43:43 | 24 | witness says, "No, it did not," it's the witness' answer |
| 10:43:47 | 25 | that's evidence, and all the matters contained in the |

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 54 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                54

10:43:50  1   lawyer's question are not evidence and you should not

10:43:54  2   consider them as evidence.

10:43:55  3        Next, objections to questions are not evidence.

10:44:01  4   At times during the trial a lawyer may make an objection

10:44:05  5   to a question that's asked by the lawyer or perhaps to an

10:44:09  6   answer that's given by a witness.  This simply means that

10:44:12  7   the lawyer, by making that objection, is requesting me to

10:44:16  8   make a ruling of a particular -- on a particular rule of

10:44:21  9   law as to the appropriateness under our rules of evidence

10:44:25  10  for that material to come in.

10:44:27  11       Lawyers have an objection [sic] to their clients

10:44:31  12  and to the rules of evidence to make objections if they

10:44:35  13  think evidence is being offered that's improper.  Don't

10:44:40  14  draw any conclusion from the objections that are made or

10:44:45  15  from my rulings on the objection.  If I sustain an

10:44:48  16  objection, then it means the witness may not answer the

10:44:52  17  question, and you shouldn't attempt to guess or speculate

10:44:56  18  as to what that answer might have been.

10:44:57  19       If the witness has already given an answer and, in

10:45:03  20  sustaining the objection, I order you to disregard that

10:45:06  21  witness' answer as inappropriate, then you should do

10:45:09  22  that.  If I overrule the objection and the witness is

10:45:13  23  allowed to answer or to make the statement, then you

10:45:15  24  should weigh that answer the same as you would all other

10:45:18  25  testimony from the witnesses.

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 55 of 223

3-1-22  USA v. LEWIS, et al. No. 20-10028                    55

10:45:22  1        And it's possible that I may tell you that you can

10:45:27  2  consider an answer for some purposes but not others.  I

10:45:30  3  know that sounds confusing.  If that happens, I'll

10:45:34  4  explain it to you at the time, and obviously you should

10:45:36  5  follow those instructions as well.

10:45:38  6        Third, and it relates to what I just said to you,

10:45:44  7  testimony that I've excluded or told you to disregard is

10:45:47  8  not proper evidence and, therefore, you can't consider it

10:45:50  9  in your deliberations as to the facts.

10:45:52  10        And, finally, as I've said before, anything you

10:45:56  11  see or hear or learn outside of the courtroom is not

10:46:00  12  evidence and, therefore, it's inappropriate for you to

10:46:03  13  consider in your determinations and deliberations on the

10:46:05  14  issues presented in this case.  And so, of course, the

10:46:09  15  easiest way to disregard them is to not know them at all,

10:46:13  16  by not doing any research.

10:46:15  17        Ultimately it's going to be entirely up to the

10:46:21  18  jury to decide what evidence to believe, which witnesses

10:46:25  19  to believe, which witnesses not to believe, and how much

10:46:29  20  of any witness' testimony you accept or reject.

10:46:34  21        This is a criminal case.  The Government has the

10:46:39  22  burden of proving each defendant guilty of each charge

10:46:43  23  against them beyond a reasonable doubt.  And as I recall,

10:46:47  24  Mr. Babbit in particular, talked to you at length about

10:46:51  25  that during jury selection yesterday.  Evidence -- or

Case 6:20-cr-10028-EFM   Document 928   Filed 08/10/22   Page 56 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028   56

10:46:54  1  proof, rather, beyond a reasonable doubt means that the

10:46:56  2  Government has to produce evidence which, considered in

10:47:00  3  light of all the facts, convinces you of the defendant's

10:47:06  4  guilt beyond any reasonable doubt.

10:47:08  5       I'll talk about that more in the formal

10:47:11  6  instructions in this case, but for now I would say that

10:47:14  7  the Government is not required to produce proof that

10:47:17  8  overcomes every possible doubt or, as people sometimes

10:47:21  9  talk about, any shadow of a doubt.  A reasonable doubt,

10:47:25  10  however, is a doubt that's based on reason and on common

10:47:29  11  sense.  And if the Government fails to meet that burden,

10:47:32  12  then your verdict must be for the defendant as to that

10:47:36  13  charge or allegation which the Government fails to meet.

10:47:39  14       Let me give you a few words about your conduct as

10:47:43  15  jurors during this case.  First of all, I instruct you

10:47:47  16  that during the trial you are not to discuss this case

10:47:52  17  with anyone or permit anyone to discuss it with you or to

10:47:57  18  discuss it in your presence.  In fact, as those that you

10:48:02  19  will come to recognize as having something to do with

10:48:04  20  this case, such as the attorneys or the parties or the

10:48:07  21  witnesses, in order to avoid any appearance of

10:48:12  22  impropriety you should have no conversation with them

10:48:14  23  whatsoever while you are serving on this jury.  If you

10:48:17  24  see these people in the hall or on the elevator or on the

10:48:21  25  street, just ignore them, and they'll understand that

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 57 of 223

3-1-22    USA v. LEWIS, et al. No. 20-10028                57

10:48:25  1  you're not being rude because I'm instructing them to

10:48:27  2  ignore you as well.

10:48:29  3       And the reason for this is quite simple.  If you

10:48:31  4  were to have a brief conversation with one of the

10:48:32  5  attorneys or the defendants, even if you were just

10:48:34  6  talking about the Kansas City Chiefs or my team, the

10:48:40  7  Wichita State Shockers, who had a terrible season, or

10:48:43  8  anything like that at all, if anyone saw a juror and an

10:48:47  9  attorney or a defendant having a conversation outside of

10:48:50  10  the courtroom, we'd probably have to have a brief hearing

10:48:52  11  to discover what was said.  And even if what was said was

10:48:55  12  innocent, that obviously just adds delay and makes it

10:48:58  13  more cumbersome in the process of the trial.  So the best

10:49:03  14  practice is to simply have no conversation about anything

10:49:09  15  connected with anyone with this case.

10:49:12  16       With respect to other people, do not allow them to

10:49:15  17  discuss any facet or aspect of the case with you at all.

10:49:18  18  And this is very important.  It'll be critical because,

10:49:21  19  as you go home, people at home will want to know things

10:49:24  20  about the case, and you can't tell them.  It's important

10:49:28  21  that you not discuss this case at all with anyone else.

10:49:32  22       Now, throughout the trial I am going to allow you,

10:49:38  23  the jury, to discuss this case with your fellow jurors.

10:49:40  24  This is a new practice courts did not used to follow.  We

10:49:44  25  used to say you can't talk about anything even during the

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 58 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                58

| | | |
|---|---|---|
| 10:49:48 | 1 | trial.  I am going to allow you in the jury room to |
| 10:49:50 | 2 | discuss it with each other, but it's important as you do |
| 10:49:54 | 3 | that that you not begin to reach a decision, even a |
| 10:49:58 | 4 | preliminary decision, either individually or |
| 10:50:02 | 5 | collectively, on any of the issues in this case until |
| 10:50:06 | 6 | such time as you've heard all of the evidence and the |
| 10:50:09 | 7 | parties' closing arguments. |
| 10:50:10 | 8 | And at no point until I've accepted a verdict from |
| 10:50:14 | 9 | you and discharged you from this case can you talk to |
| 10:50:18 | 10 | anyone else about this case.  And talking about this case |
| 10:50:20 | 11 | doesn't just mean an oral conversation.  It also means |
| 10:50:25 | 12 | that you can't talk about them through email or texting |
| 10:50:30 | 13 | or blogs or Twitter or chat rooms or other things I don't |
| 10:50:35 | 14 | understand.  You just can't communicate about anything |
| 10:50:39 | 15 | involving this case with anyone by any means until you've |
| 10:50:44 | 16 | been discharged from this case. |
| 10:50:44 | 17 | Now, there are two very slight exceptions to that. |
| 10:50:48 | 18 | First of all, you may, of course, tell your family and |
| 10:50:50 | 19 | your employer that you've been selected for this jury and |
| 10:50:53 | 20 | you may tell them what the anticipated schedule of this |
| 10:50:57 | 21 | trial will be.  But that's it.  Don't tell them anything |
| 10:51:02 | 22 | else about the case, who the lawyers are, who the parties |
| 10:51:05 | 23 | are, who the witnesses were, what the claims are, nothing |
| 10:51:10 | 24 | else until you've been discharged.  If any of you have a |
| 10:51:13 | 25 | problem with your employer or anticipate that you might, |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 59 of 223

3-1-22  USA v. LEWIS, et al. No. 20-10028          59

10:51:16  1    let me know through one of my staff that will be working

10:51:20  2    with you, and, if necessary, I'd be happy to write a

10:51:25  3    letter, an explanation to your employer that the law

10:51:27  4    provides that your appearing as a juror is a part of your

10:51:31  5    civil duty, and the law does not allow your employer to

10:51:33  6    hold your appearance here at all against you.

10:51:37  7         The next thing I want to tell you is during the

10:51:41  8    course of this trial don't listen to any news coverage

10:51:45  9    that may happen on this trial.  I, frankly, don't expect

10:51:49  10   any, but I never know what the news may cover.  And so to

10:51:52  11   the extent there's a news report on it, trust me, you'll

10:51:56  12   know more about this case than the reporter will, and so

10:51:59  13   if you listen to it, you might think, "Well, the

10:52:02  14   reporter's got a lot of that wrong."  It's best just not

10:52:05  15   to cloud your mind with that.  So if there's any news

10:52:08  16   reports on this, ignore them.

10:52:10  17        And third, as I said, don't do any independent

10:52:14  18   investigation in this case.  I know that's typical for

10:52:17  19   how we like to function, but it's important that you not

10:52:20  20   do that.

10:52:20  21        Finally, even as you listen to the evidence, even

10:52:24  22   as you hear the witnesses, even as you make notes,

10:52:28  23   consult the instructions that I've given you, talk with

10:52:31  24   each other during your brief breaks, don't start to form

10:52:35  25   any opinion off any of the matters in this case until all

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 60 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028

60

10:52:40  1  the evidence is in.  Keep an open mind until the evidence

10:52:44  2  has been presented, closing arguments have been made, and

10:52:47  3  you retire to deliberate on the verdict.

10:52:48  4        You may take notes throughout this case if you

10:52:51  5  wish, and that's why I've given you notebooks now to take

10:52:54  6  notes in.  If you do take notes I'm going to ask that you

10:52:58  7  leave those notes in the jury room when you go home at

10:53:00  8  night, and I'm going to remind you that those notes are

10:53:03  9  just for your personal use.  They're not to be used or

10:53:06  10 relied upon by anyone else.

10:53:07  11       Our court reporter is making an official record of

10:53:10  12 this trial.  That's basically to help with matters after

10:53:13  13 trial.  You should not assume that a typewritten copy of

10:53:17  14 the testimony of this trial is going to be available for

10:53:19  15 you during your deliberations.

10:53:21  16       Let me talk a bit about the witnesses that will

10:53:25  17 testify during this trial.  As I indicated, the

10:53:28  18 prosecution will go first and they'll present witnesses

10:53:31  19 and exhibits or other documents that may be introduced

10:53:35  20 into evidence.  And remember, the Government is going

10:53:40  21 first because it has the burden of proof.  After they've

10:53:42  22 presented each witness, the defendant will have an

10:53:45  23 opportunity -- both defendants will have an opportunity

10:53:47  24 to cross-examine those witnesses and ask questions about

10:53:51  25 them.

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 61 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                        61

| | | |
|---|---|---|
| 10:53:51 | 1 | After the witnesses have testified, I'm going to |
| 10:53:56 | 2 | permit the jury to submit questions they would like to |
| 10:54:01 | 3 | have asked of the witnesses, which have not been asked. |
| 10:54:05 | 4 | And if you look on your notebooks, on the inside front |
| 10:54:07 | 5 | cover there is forms of questionnaires that you can |
| 10:54:10 | 6 | submit to the jury [sic] for that purpose.  So in each -- |
| 10:54:14 | 7 | when each witness is finished, I'm going to ask any of |
| 10:54:17 | 8 | you who have a question to write that question on the |
| 10:54:19 | 9 | form, and then I'm going to ask all of you to pass a form |
| 10:54:23 | 10 | in, even if you have no questions and you're handing in a |
| 10:54:27 | 11 | blank form.  It will help protect the anonymity of who's |
| 10:54:30 | 12 | submitting questions if everybody passes in a form.  I'll |
| 10:54:34 | 13 | discard the blank ones and then look at the questions |
| 10:54:38 | 14 | that have been asked. |
| 10:54:39 | 15 | I'll review those questions.  If I determine |
| 10:54:42 | 16 | they're appropriate, I'll ask them.  If that there's a |
| 10:54:45 | 17 | reason I can't ask a question, I may mention that, I'll |
| 10:54:48 | 18 | let you know, and it's possible from time to time I may |
| 10:54:50 | 19 | consult with the attorneys about whether I should ask a |
| 10:54:53 | 20 | question.  But otherwise, the questions that you submit |
| 10:54:56 | 21 | to me will be asked by me of the witnesses at the |
| 10:55:00 | 22 | conclusion of their otherwise testimony. |
| 10:55:02 | 23 | After all the evidence is in and the closing |
| 10:55:06 | 24 | statements have been made, I will give you -- to the |
| 10:55:10 | 25 | extent that there are revisions to the legal instructions |

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 62 of 223

3-1-22  USA v. LEWIS, et al. No. 20-10028                    62

10:55:13   1   I've read to you at the beginning of the trial, because

10:55:15   2   of the way the evidence has developed during the course,

10:55:17   3   I'll notify you of those, I'll give you some final

10:55:20   4   logistical operational instructions, and then the case

10:55:24   5   will be submitted to the jury for its final deliberation

10:55:28   6   to retire and decide on its verdict.

10:55:30   7        So, ladies and gentlemen, again, welcome to the

10:55:34   8   jury in this case.  You'll be seeing Mr. Schmidt

10:55:37   9   regularly throughout this case, and Ms. McKee

10:55:39  10   occasionally will be assisting.  Mr. Schmidt will be with

10:55:42  11   me throughout this trial in the courtroom upstairs.

10:55:44  12        At this point we're going to recess you for lunch.

10:55:48  13   I'm going to have everybody report back at 1:00 o'clock

10:55:51  14   upstairs.  Ms. McKee and Mr. Schmidt will now take you

10:55:55  15   upstairs, show you where your jury room is, and where the

10:55:58  16   courtroom is that we'll reconvene in after lunch.  So we

10:56:02  17   will be in recess until 1:00 o'clock this afternoon.

10:56:08  18        (The jury left the courtroom, after which the

10:56:43  19   following proceedings were had:)

10:57:05  20        THE COURT:  Counsel, you may all be seated.

10:57:07  21        Anything we need to take up before we reconvene at

10:57:12  22   1:00 o'clock to start the trial?

10:57:14  23        MR. TREASTER:  The Government doesn't have

10:57:15  24   anything, Your Honor.  Thank you.

10:57:17  25        MR. SHULTZ:  No, Your Honor.  Thank you.

Case 6:20-cr-10028-EFM    Document 928    Filed 08/10/22    Page 63 of 223

3-1-22   USA v. LEWIS, et al. No. 20-10028                    63

| | | |
|---|---|---|
| 10:57:19 | 1 | MR. BABBIT:  No, Your Honor.  Thank you. |
| 10:57:20 | 2 | THE COURT:  I know that during the jury selection |
| 10:57:24 | 3 | process, I think, Mr. Shultz, you had a question again |
| 10:57:26 | 4 | about how the court selected alternates, and I indicated, |
| 10:57:29 | 5 | as I have throughout, that the alternates are the last |
| 10:57:32 | 6 | four people called to the jury box who survive to the |
| 10:57:37 | 7 | final jury.  And so I just, because there's been |
| 10:57:40 | 8 | confusion on this in the past, want to let you know who |
| 10:57:43 | 9 | those are.  Mr. ████████, who was called to the initial |
| 10:57:48 | 10 | panel as Juror 36, will be Alternate 1.  ████████████ |
| 10:57:55 | 11 | who was called as initially as Juror 38, will be |
| 10:57:59 | 12 | Alternate 2, and then Mr. █████, who was called to replace |
| 10:58:05 | 13 | the seat in jury seat No. 1 is Alternate 3, and then |
| 10:58:09 | 14 | Mr. ██████, who was called to replace a seat in No. 3 but |
| 10:58:13 | 15 | who I've now moved to the front, is Alternate No. 4 |
| 10:58:16 | 16 | because that's the last four that were called to the box. |
| 10:58:19 | 17 | Any questions about that? |
| 10:58:23 | 18 | I will not announce to the jurors who the |
| 10:58:25 | 19 | alternates are until the end of trial, for kind of |
| 10:58:30 | 20 | obvious reasons. |
| 10:58:32 | 21 | Anything else we need to take up?  All right. |
| 10:58:36 | 22 | Well, we will reconvene at 1:00 o'clock in my courtroom |
| 10:58:39 | 23 | upstairs.  At that point I will read the instructions.  I |
| 10:58:43 | 24 | think Mr. Schmidt gave you all a couple of copies of the |
| 10:58:46 | 25 | instructions; correct? |

| | | |
|---|---|---|
| 10:58:47 | 1 | MR. SHULTZ: He did. |
| 10:58:48 | 2 | THE COURT: Right, and we'll proceed with opening |
| 10:58:50 | 3 | statements. |
| 10:58:50 | 4 | Mr. Shultz, you look like you had a question or |
| 10:58:52 | 5 | were you just ready to go? |
| 10:58:53 | 6 | MR. SHULTZ: No, I was just turning my mic off. |
| 10:58:56 | 7 | THE COURT: All right. Well, you'll turn it back |
| 10:58:58 | 8 | on upstairs. Court's in recess until 1:00 o'clock. |
| 10:59:01 | 9 | (A recess was taken from 10:59 A.M. to 12:56 P.M.) |
| 12:56:03 | 10 | CLERK SCHMIDT: All rise. |
| 12:56:03 | 11 | THE COURT: Good afternoon. You may be seated. |
| 12:56:14 | 12 | Is that my exhibit notebook? |
| 12:56:16 | 13 | CLERK SCHMIDT: Yes. |
| 12:56:17 | 14 | THE COURT: You can put them over there, I guess. |
| 12:56:25 | 15 | Counsel, anything we need to talk about before we |
| 12:56:28 | 16 | bring the jury in and get started? |
| 12:56:31 | 17 | MR. TREASTER: Nothing for the Government, Your |
| 12:56:32 | 18 | Honor. Thank you. |
| 12:56:33 | 19 | MR. SHULTZ: Nothing from Mr. Lewis. |
| 12:56:36 | 20 | MR. BABBIT: Nothing, Your Honor. |
| 12:56:37 | 21 | THE COURT: All right. And I'll bet you thought |
| 12:56:46 | 22 | this bench was pretty big. |
| 12:56:49 | 23 | Mr. Schmidt, would you go collect the jury for us, |
| 12:56:51 | 24 | please. |
| 12:58:06 | 25 | (The jury returned to the courtroom, after which |

13:01:41    1    the following proceedings were had:)

13:01:41    2          THE COURT:  Welcome, ladies and gentlemen.  You

13:01:42    3    may be seated.

13:01:43    4          So we will not keep those paper numbers on your

13:01:48    5    chair, which probably aren't particularly comfortable to

13:01:53    6    lean against, and if you want to just tear them off, you

13:01:55    7    can.  It's just to help you get situated as you begin.

13:02:02    8          Are you ready to proceed?

13:02:04    9          THE JURY (in unison):  (Nodding head.)

13:02:06   10          THE COURT:  Very well.  Members of the jury, as I

13:02:08   11    told you this morning, this afternoon I'm going to start

13:02:10   12    by reading the instructions to you.  You have a copy of

13:02:13   13    these instructions in the notebook I provided you this

13:02:15   14    morning, and I asked you not to look at them before now.

13:02:18   15          I'm going to read them to you.  There's a lot of

13:02:21   16    material there, and I think it's best -- this is, in

13:02:23   17    fact, the practice of every court, in the interests of

13:02:25   18    clarity -- to read the instructions to you.  You're

13:02:28   19    welcome to follow along with me as I read if you want to.

13:02:31   20    You obviously don't have to.  But I would ask that you

13:02:34   21    not try to read ahead.  As I read them to you, if you

13:02:40   22    want to follow along, just stay with me, or you can just

13:02:44   23    listen as you prefer, but I'd ask that you not read

13:02:47   24    ahead.

13:02:47   25          Instruction No. 1.

13:02:48    1         Members of the jury:  the time has now come for me

13:02:53    2    to explain to you the law that will govern your

13:02:56    3    deliberations.  And in the interest of clarity, I will

13:02:58    4    read the instructions to you, and each of you has a copy

13:03:01    5    of the instructions to use in the jury room.

13:03:03    6         In any jury trial there are, in effect, two

            7    judges.  I am one of the judges; the other is the jury.

            8    It is my duty to preside over the trial and to determine

            9    what testimony and evidence is relevant under the law for

           10    your consideration.  It is your duty, as the judges of

           11    the facts, to follow and apply that law to the facts as

           12    you find them from the evidence in the case.  You are not

           13    to single out one instruction alone as stating the law,

           14    but you must consider the instructions as a whole.

           15    Neither are you to be concerned with the wisdom of any

           16    rule of law stated by me.  That is, you must not

           17    substitute or follow your own notion or opinion as to

           18    what the law is or ought to be.  It is your duty to apply

           19    the law as I give it to you, regardless of the

           20    consequences.

           21         Instruction No. 2.

           22         The remaining charges of the indictment in this

           23    case charge substantially as follows:  Count 2,

           24    Methamphetamine conspiracy, under 21 U.S.C. 846, from at

           25    least as early as May of 2019 and continuing through July

1  of 2019, in the District of Kansas, and elsewhere, the

2  defendants, Kevin Lewis, also known as "Y," "YT"; Travis

3  Vontress, also known as "Bink," "Gumbo," knowingly and

4  intentionally combined, conspired, confederated and

5  agreed together and with each other, and with other

6  persons known and unknown to the Grand Jury, to commit

7  the following offenses against the United States: (a) to

8  possess with the intent to distribute, and distribute, a

9  mixture and substance containing a detectable amount of

10  methamphetamine, a controlled substance, in violation of

11  21 United States Code § 841(a); (b) to use of a

12  communication facility to facilitate a drug trafficking

13  crime in violation os 21 United States Code § 843(b); and

14  (c) to maintain a drug involved premises, in violation of

15  21 United States Code § 85(a)(1).

16       Quantity of Methamphetamine Involved in the

17  Conspiracy.

18       With respect to defendants, Kevin Lewis and Travis

19  Vontress, each defendant's conduct as a member of the

20  conspiracy charged in Count 2, which includes drug

21  quantities that the defendants directly handled within

22  the scope of the charged conspiracy, as well as drug

23  quantities that were handled by other members of the

24  conspiracy (including named and unnamed coconspirators)

25  within the scope of the charged conspiracy that were

1  reasonably foreseeable to the defendant, involved five

2  hundred grams or more of a detectable amount of

3  methamphetamine, a Schedule II controlled substance, in

4  violation of 21 United States Code § 841(b)(1)(A).

5       Count 4.

6       Heroin conspiracy, from at least as early as May

7  of 2019 and continuing through July of 2019, in the

8  District of Kansas, and elsewhere, the defendants, Kevin

9  Lewis, a/k/a "Y," a/k/a "YT"; Travis Vontress, a/k/a

10 "Bink," a/k/a "Gumbo," knowingly and intentionally

11 combined, conspired, confederated and agreed together and

12 with each other, and with other persons known and unknown

13 to the Grand Jury, to commit the following offenses

14 against the United States: (a) to possess with the intent

15 to distribute and to distribute, a mixture and substance

16 containing a detectable amount of heroin, a controlled

17 substance, in violation of 21 United States Code §

18 841(a); (b) to use of a communication facility to

19 facilitate a drug trafficking crime, in violation of 21

20 United States Code § 843(b); and (c) to maintain a drug

21 involved premises, in violation of 21 United States Code

22 § 856(a)(1).

23      Quantity of Heroin Involved in the Conspiracy.

24      With respect to defendants Kevin Lewis and Travis

25 Vontress, each defendant's conduct as a member of the

1  conspiracy charged in Count 4, which includes drug

2  quantities that the defendant directly handled within the

3  scope of the charged conspiracy, as well as drug

4  quantities that were handled by other members of the

5  conspiracy (including named and unnamed coconspirators)

6  within the scope of the charged conspiracy that were

7  reasonably foreseeable to the defendant, involved one

8  kilogram or more of a mixture and substance containing a

9  detectable amount of heroin, a Schedule I controlled

10 substance, in violation of 21 United States Code §

11 841(b)(1)(A).

12       Count 5.

13       Cocaine conspiracy under 21 United States Code §

14 846, from at least as early as April of 2019 and

15 continuing through July of 2019, in the District of

16 Kansas, and elsewhere, the defendants, Kevin Lewis, a/k/a

17 "Y," a/k/a "YT"; Travis Vontress, a/k/a "Bink," a/k/a

18 "Gumbo," knowingly and intentionally combined, conspired,

19 confederated and agreed together and with each other, and

20 with other persons known and unknown to the Grand Jury,

21 to commit the following offenses against the United

22 States: (a) to possess with the intent to distribute, and

23 to distribute, a mixture and substance containing a

24 detectable amount of cocaine, a controlled substance, in

25 violation of 21 United States Code § 841(a) and

1  (b)(1)(C); (b) to use of a communication facility to

2  facilitate a drug trafficking crime, in violation of 21

3  United States Code § 843(b); and (c) to maintain a drug

4  involved premises, in violation of 21 United States Code

5  § 856(a)(1).

6       Count 6.

7       Crack Cocaine Conspiracy, 21 United States Code §

8  846, from at least as early as June of 2019 and

9  continuing through July of 2019, in the District of

10  Kansas, and elsewhere, the defendants, Kevin Lewis, a/k/a

11  "Y," a/k/a "YT," knowingly and intentionally combined,

12  conspired, confederated and agreed together and with each

13  other, and with other persons known and unknown to the

14  Grand Jury, to commit the following offenses against the

15  United States; (a) to possess with intent to distribute,

16  and to distribute, a mixture and substance containing a

17  detectable amount of cocaine base, in violation of 21

18  United States Code § 841(a); (b) to use of a

19  communication facility to facilitate a drug trafficking

20  crime, in violation of 21 United States Code § 843(b);

21  and (c) to maintain a drug involved premises, in

22  violation of 21 United States Code § 856(a)(1).

23       Count 8.

24       Maintaining a Drug Involved Premises, in violation

25  of 21 United States Code § 856(1)(1), between June 22,

1  2019, and July 17, 2019, in the District of Kansas, the

2  defendant, Kevin Lewis, a/k/a "YT," while knowingly

3  using, maintaining, managing and controlling, whether

4  permanently or temporarily, as an owner, agent lessee,

5  and occupant, a residence located at ███ North Somerset

6  Avenue, Wichita, Kansas, did knowingly and intentionally

7  make available for use, with or without compensation and

8  maintained said residence for the purpose of unlawful

9  storing, using, manufacturing and distributing

10 methamphetamine and marijuana, controlled substances, in

11 violation of 21 United States Code § 856(a)(1), 856(a)(2)

12 and 18 United States Code § 2.

13      Count 10.

14      Maintaining a drug involved premises, 21 United

15 States Code § 856(a)(1), that between June 22, 2019, and

16 July 17, 2019, in the District of Kansas, the defendant,

17 Travis, a/k/a "Bank," a/k/a "Gumbo," while knowingly

18 using, maintaining, managing and controlling, whether

19 permanently or temporarily, as an owner, agent, lessee,

20 and occupant, a resident located at ███ North Holyoke,

21 Wichita, Kansas, did knowingly and intentionally make

22 available for use, with or without compensation and

23 maintained said residence for the purpose of unlawful

24 storing, using, manufacturing and distributing cocaine

25 and heroin, controlled substances, in violation of 21

1  United States Code § 856(a)(1), 856(a)(2), and Title 18,

2  United States Code, § 2.

3       Count 12.

4       Use of a Communication Facility to Facilitate Drug

5  Trafficking Crime, 21 United States Code § 843(b), on or

6  about June 26, 2019, at 15:58:09 (session 8843), in the

7  District of Kansas, the defendant, Kevin Lewis, a/k/a

8  "Y," a/k/a "YT," did knowingly and intentionally use any

9  communication facility, to wit:  a telephone, in

10 committing, causing, and facilitating any act or acts

11 constituting a felony under 21 United States Code

12 §§ 841(a), that is, the offenses set forth in Counts 2,

13 4, and 6 of this Indictment incorporated by reference

14 herein, all in violation of 21 United States Code §

15 843(b) and Title 18, United States Code, § 2.

16      Count 16.

17      Use of a Communication Facility to Facilitate Drug

18 Trafficking Crime, 21 United States Code § 843(b), on or

19 about June 22, 2019, at 10:17:57 (session 949), in the

20 District of Kansas, the defendant, Kevin Lewis, a/k/a

21 "Y," a/k/a "YT," did knowingly and intentionally use a

22 communication facility, to wit:  a telephone, in

23 committing, causing, and facilitating any act or acts

24 constituting a felony under 21 United States Code §§

25 841(a) and 846, that is, offenses set forth in Count 4 of

1    this Indictment incorporated by reference herein, all in

2    violation of 21 United States Code §  843(b) and Title

3    18, United States Code, § 2.

4           Count 21.

5           Use of a Communication Facility to Facilitate a

6    Drug Trafficking Crime, 21 United States Code § 843(b),

7    on or about June 28, 2019, at 15:11:28 (session 12039),

8    in the District of Kansas, the defendants, Travis

9    Vontress, a/k/a "Bink" a/k/a "Gumbo," did knowingly and

10   intentionally use a communication facility, to wit:  a

11   telephone, in committing, causing, and facilitating any

12   act or acts constituting a felony under 21 United States

13   Code §§ 841(a) and 846, that is, offenses set forth in

14   Count 2 of this Indictment incorporated by reference

15   herein, all in violation of 21 United States Code §

16   843(b) and Title 18, United States Code, § 2.

17          Count 22.

18          Use of a Communication Facility to Facilitate a

19   Drug Trafficking Crime, 21 United States Code § 843(b),

20   on or about July 7th, 2019, at 01:06:17 (session 28753),

21   in the District of Kansas, the defendants, Travis

22   Vontress, a/k/a "Bink," a/k/a "Gumbo," did knowingly and

23   intentionally use a communication facility, to wit:  a

24   telephone, in committing, causing, and facilitating any

25   act or acts constituting a felony under 21 United States

1  Code §§ 841(a) and 846, that is, the offenses set forth

2  in Count 2 of this Indictment incorporated by reference

3  herein, all in violation of Title 21, United States Code,

4  § 843(b) and Title 18, United States Code, § 2.

5          Count 23.

6          Possession with Intent to Distribute a Controlled

7  Substance, 21 United States Code § 841(a)(1) and

8  (b)(1)(C), on or about July 17th, 2019, in the District

9  of Kansas, the defendant, Travis Vontress, a/k/a "Bink,"

10 a/k/a "Gumbo," did unlawfully, knowingly and

11 intentionally possess with intent to distribute a mixture

12 and substance containing a detectable amount of cocaine,

13 a controlled substance, in violation of 21 United States

14 Code § 841(a)(1)( and (b)(1)(C).

15         Count 51.

16         Possession of a Firearm in Furtherance of a Drug

17 Trafficking Crime, 18 United States Code § 924(c)(1), on

18 or about July 17th, 2019, in the District of Kansas, the

19 defendant, Travis Vontress, a/k/a "Bink," a/k/a "Gumbo,"

20 did knowingly possess firearms, that is a Smith and

21 Wesson, SW40VE .40 caliber semi-automatic pistol and a

22 Smith and Wesson Shield .40 caliber semi-automatic

23 pistol, in furtherance of a drug trafficking crime for

24 which the defendant may be prosecuted in a court of the

25 United States, that is, conspiracy to possess with intent

1  to distribute cocaine, a controlled substance, as set

2  forth in Count 5 of this Indictment and possession with

3  the intent to distribute cocaine, a controlled substance,

4  as set forth in Count 23 of this Indictment and

5  incorporated by reference herein, all in violation of 18

6  United States Code, §§ 924(c)(1) and 18 United States

7  Code, § 2.

8            Instruction No. 3.

9            An indictment is simply a formal method of

10 accusing a defendant of a crime.  It is not evidence of

11 any kind against a defendant, and does not create any

12 presumption or permit any inference of guilt.  It is a

13 mere charge or accusation -- nothing more and nothing

14 less.

15           Instruction 4.

16           The indictment charges that the crimes were

17 committed "on or about" a certain date.  It is not

18 necessary that the proof establish with certainty the

19 exact date of the alleged crime.  It is sufficient if the

20 evidence shows beyond a reasonable doubt that a crime was

21 committed on a date reasonably near the date alleged.

22           Instruction 5.

23           A separate crime is charged in each count of the

24 indictment.  Each count and the evidence pertaining to it

25 should be considered separately.  The fact that you may

1  find a defendant guilty or not guilty as to one of the

2  crimes charged should not control your verdict as to any

3  other crimes charged.  Your verdict with respect to each

4  count of the indictment must be unanimous.

5       Also, the case of each defendant should be

6  considered separately and individually.  The fact that

7  you may find one or more of the defendants guilty or not

8  guilty of any of the crimes charged should not control

9  your verdict as to any other crime or any other

10  defendant.  You must give separate consideration to the

11  evidence as to each defendant.

12       Instruction No. 6.

13       Each defendant has entered pleas of "not guilty"

14  to each of the charges contained in the indictment.

15  These pleas put in issue every element of the crimes

16  charged, and therefore it is the burden and

17  responsibility of the government to prove beyond a

18  reasonable doubt every element of the crimes charged.

19       Instruction 7.

20       The law presumes a defendant to be innocent of

13:03:04  21  crime.  This presumption remains with him throughout the

22  trial.  Thus, a defendant, although accused, begins the

23  trial with a "clean slate," with no evidence against him

24  and the law permits nothing but legal evidence presented

25  before the jury to be considered in support of any charge

1  against the defendant.  The presumption of innocence

2  alone is sufficient to acquit the defendants now on

3  trial, unless the jurors are satisfied of the defendant's

4  guilt beyond a reasonable doubt, from all the evidence.

5          Instruction no. 8.

6          The burden is always upon the government to prove

7  beyond a reasonable doubt every essential element of the

8  crimes charged against each defendant.  The law does not

9  require the defendant to prove his innocence in any way,

10 or to produce any evidence at all.  The government has

11 the burden of proving the defendant guilty beyond a

12 reasonable doubt, and if it fails to do so, you must find

13 the defendant not guilty.  In determining whether or not

14 the government has met this burden, you must consider all

15 of the evidence.

16         Proof beyond a reasonable doubt is proof that

17 leaves you firmly convinced of the Defendant's guilt.

18 There are very few things in this world that we know with

19 absolute certainty, and in criminal cases the law does

20 not require proof that overcomes every possible doubt.

21 It is only required that the government's proof exclude

22 any "reasonable doubt" concerning the defendant's guilt.

23 A "reasonable doubt" is a real doubt, based upon reason

24 and common sense after careful and impartial

25 consideration of all the evidence in the case.

1          If, based on your consideration of the evidence,

2    you are firmly convinced that the defendant is guilty of

3    the crime or crimes charged, you must find him guilty.

4    If, on the other hand, you think there is a real

5    possibility that he is not guilty, you must give him the

6    benefit of the doubt and find him not guilty.

7          Instruction No. 9.

8          Evidence -- Defined.

9          You must make your decision based only on the

10   evidence that you will see and hear in court.  Do not let

11   rumors, suspicions, or anything else that you may have

12   seen or heard outside of court influence your decision in

13   any way.

14         The evidence in this case will include only what

15   the witnesses will say while they are testifying under

16   oath, the exhibits that I allow into evidence, the

17   stipulations that the lawyers agree to, and any facts

18   that I may judicially notice.

19         Nothing else is evidence.  The lawyers' statements

20   and arguments are not evidence.  Their questions and

21   objections are not evidence.  My legal rulings are not

22   evidence.  And my comments and questions are not

23   evidence.

24         During the trial, I may not let you hear the

25   answers to some of the questions that the lawyers ask.  I

1  may rule that you cannot see some of the exhibits that

2  the lawyers want you to see.  And sometimes I may order

3  you to disregard things that you see or hear, or that I

4  strike from the record.  You must completely ignore all

5  of these things.  Do not even thing about them.  Do not

6  speculate about what a witness might have said or what an

7  exhibit might have shown.  Those things are not evidence,

8  and you are bound by your oath not to let them influence

9  your decision in any way.

10         Instruction 10.

11         Evidence -- Direct and Circumstantial --

12  Inferences.

13         There are, generally speaking, two types of

14  evidence from which a jury may properly determine the

15  facts of a case.  One is direct evidence, such as the

16  testimony of an eyewitness.  The other is indirect or

17  circumstantial evidence, that is, proof of a chain of

18  facts which point to the existence or non-existence of

19  certain other facts.

20         As a general rule, the law makes no distinction

21  between direct and circumstantial evidence.  The law

22  simply requires that you find the facts in evidence in

23  accord with all the evidence in the case, both direct and

24  circumstantial.

25         While you must consider only the evidence in this

1 case, you are permitted to draw reasonable inferences

2 from the testimony and exhibits, inferences you feel are

3 justified in the light of common experience.  An

4 inference is a conclusion that reason and common sense

5 may lead you to draw from facts which have been proved.

6        By permitting such reasonable inferences, you may

7 make deductions and reach conclusions that reason and

8 common sense lead you to draw from the facts which have

9 been established by the testimony and the evidence in

10 this case.

11        Instruction No. 11.

12        Caution -- Consider Only the Crimes Charged.

13        You are here to decide whether the government has

14 proved beyond a reasonable doubt that each defendant is

15 guilty of the crimes charged.  The defendants are not on

16 trial for any act, conduct, or crime not charged in the

17 indictment.

18        It is not up to you to decide whether anyone who

19 is not on trial in this case should be prosecuted for the

20 crime charged.  The fact that another person also may be

21 guilty is no defense to a criminal charge.

22        The question of the possible guilt of others

23 should not enter your thinking as you decide whether each

24 defendant has been proved guilty of the crimes charged.

25        Instruction 12.

1           Possession:  Actual or Constructive Possession.

2           The law recognizes two kinds of possession:

3   actual possession and constructive possession.  Actual

4   possession exists when a person has direct physical

5   control over an item.  A person who, although not in

6   actual possession, knowingly has the power and intent at

7   a given time to exercise dominion or control over an

8   object, either directly or through another person or

9   persons, is then in constructive possession of it.

10          More than one person can be in possession of an

11  object at the same time (meaning two or more people may

12  jointly possess an object) if each knows of its presence

13  and has the power and intent to control it.

14          In the situation where the object is found in a

15  place (such as a room or a car) occupied by more than one

16  person, you may not infer power and intent to exercise

17  control over the object based solely on joint occupancy.

18  Mere control over the place in which the object is found

19  is not sufficient to establish constructive possession.

20  Instead, in this situation, the government must prove

21  some connection between the particular defendant and the

22  object demonstrating the power and intent to exercise

23  control over that object.

24          Instruction 13.

25          Controlled Substances -- Conspiracy, 21 United

1  States Code § 846.

2       Defendants Kevin Lewis and Travis Vontress are

3  each charged in Count 2 with a violation of Section 846

4  of Title 21 of the United States Code.  The Superseding

5  Indictment charges that the crime was committed from at

6  least as early as May of 2019 and continuing to July

7  2019.

8       This law makes it a crime for anyone to conspire

9  with any other person to violate federal laws pertaining

10 to controlled substances.  In this case, the defendants

11 are charged with conspiring to:  possess with the intent

12 to distribute a mixture or substance containing a

13 detectable amount of methamphetamine, distributing a

14 mixture or substance containing a detectable amount of

15 methamphetamine, maintain a drug involved premises or

16 using a communication facility to facilitate drug

17 trafficking.

18      To find one or more defendants guilty of this

19 crime you must be convinced that the government has

20 proved each of the following beyond a reason doubt:

21      First:  two or more persons agreed: (a) to possess

22 with the intent to distribute; or (b) to distribute

23 methamphetamine; or (c) to maintain a drug premises with

24 regard to methamphetamine; or (d) to use a communication

25 facility to facilitate the trafficking of

1  methamphetamine;

2      Second:  the defendant knew the essential object

3  of the conspiracy;

4      Third:  the defendant knowingly and voluntarily

5  involved himself in the conspiracy;

6      Fourth:  there was interdependence among the

7  members of the conspiracy; and

8      Fifth:  the overall scope of the conspiracy

9  involved at least 500 grams of methamphetamine.

10      "To possess with intent to distribute" means to

11  possess with the intent to deliver or transfer possession

12  of a controlled substance to another person, with or

13  without any financial interest in the transaction.

14      "To distribute" means to deliver or transfer

15  possession or control from one person to another, with or

16  without any financial interest in the transaction, and

17  includes the sale of something by one person to another.

18      Methamphetamine is a controlled substance within

19  the meaning of the law.

20      Instruction No. 14.

21      Drug Quantities -- Individual Conspirator.

22      As to any individual defendant who you find guilty

23  of the crime of conspiracy charged in Count 2, you must

24  also determine the quantity of methamphetamine

25  attributable to that defendant, irrespective of the

1    quantity involved in the conspiracy as a whole.  An

2    individual defendant may be attributed both with: (1)

3    quantities of controlled substance which he or she was

4    directly involved, so long as these quantities are within

5    the scope of the conspiracy; and (2) quantities of

6    controlled substances with which other coconspirators

7    were directly involved, so long as those quantities were

8    both within the scope of the conspiracy and reasonably

9    foreseeable to the defendant.

10          An act is "reasonably foreseeable" if a reasonable

11   person who knew everything that the defendant knew at the

12   time would have been able to know of the act in advance

13   with a fair degree of probability.

14          On the verdict form provided with these

15   instructions, you will be asked whether the drug quantity

16   attributed to the defendant as an individual is:  500

17   gams or more of a mixture or substance containing a

18   detectable amount of methamphetamine; or 50 grams or

19   more, but less than 500 grams, of a mixture or substance

20   containing a detectable amount of methamphetamine; or

21   less than 50 grams of a mixture or substance containing a

22   detectable amount of methamphetamine.

23          You are required to determine the quantity of

24   methamphetamine attributable to each defendant beyond a

25   reasonable doubt.

1        Instruction No. 15.

2        Controlled Substances -- Conspiracy, 21 United

3   States Code § 846.

4        Defendants Kevin Lewis and Travis Vontress are

5   charged in Count 4 with a violation of Section 846 of

6   Title 21 of the United States Code.  The Superseding

7   Indictment charges that the crime was committed from at

8   least as early as May 2019 continuing through July 2019.

9        This law makes it a crime for anyone to conspire

10  with someone else to violate federal laws pertaining to

11  controlled substances.  In this case, the defendants are

12  charged with conspiring to:  possess with the intent to

13  distribute a mixture or substance containing a detectable

14  amount of heroin, distribute a mixture or substance

15  containing a detectable amount of heroin, maintain a drug

16  involved premises, or use a communication facility to

17  facilitate drug trafficking.

18       To find one or more of the defendants guilty of

19  this crime you must be convinced that the government has

20  proved each of the following beyond a reasonable doubt:

21       First:  two or more persons agreed:  to possess

22  heroin with the intent to distribute; or to distribute

23  heroin; or to maintain a drug involved premises with

24  regards to heroin; or to use a communication facility to

25  facilitate the trafficking of heroin;

1          Second:  the defendant knew the essential

2     objective of the conspiracy;

3          Third:  the defendant knowingly and voluntarily

4     involved himself in the conspiracy;

5          Fourth:  there was interdependence among the

6     members of the conspiracy; and

7          Fifth:  the overall scope of the conspiracy

8     involved at least 1 kilogram of heroin.

9          "To possess with intent to distribute" means to

10    possess with intent to deliver or transfer possession of

11    a controlled substance to another person, with or without

12    financial interest in the transaction.

13         "To distribute" means to deliver or transfer

14    possession or control from one person to another, with or

15    without any financial interest in the transaction, and

16    includes the sale of something by one person to another.

17         Heroin is a controlled substance within the

18    meaning of the law.

19         As to any individual defendant who you find guilty

20    of the crime of conspiracy charged in Count 4, you must

21    also determine the quantity of heroin attributable to

22    that defendant, irrespective of the quantity involved in

23    the conspiracy as a whole.  An individual defendant may

24    be attributed both with: (1) quantities of a controlled

25    substance which he or she was directly involved, so long

1  as these quantities are within the scope of the

2  conspiracy; and (2) quantities of a controlled substance

3  with which other coconspirators were directly involved,

4  so long as those quantities were both within the scope of

5  the conspiracy and reasonably foreseeable to the

6  defendant.

7         An act is "reasonably foreseeable" if a reasonable

8  person who knew everything that the defendant knew at the

9  time would have been able to know of the act in advance

10  with a fair degree of probability.

11         On the verdict form provided with these

12  instructions, you will be asked whether the drug quantity

13  attributed to the defendant as an individual is:  1

14  kilogram or more of a mixture or substance containing a

15  detectable amount of heroin; or 100 grams or more, but

16  less than 1 kilogram, of a mixture or substance

17  containing a detectable amount of heroin; or less than

18  100 grams of a mixture or substance containing a

19  detectable amount of heroin.  You are required to

20  determine the quantity of heroin attributable to each

21  defendant beyond a reasonable doubt.

22         Instruction 17.

23         Conspiracy.

24         Defendants Kevin Lewis and Travis Vontress are

25  charged in Count 5 with a violation of Section 846 of the

 1  United States Code.  The Superseding Indictment charges

 2  that the crime was committed from at least as early as

 3  April of 2019 continuing through July of 2019.

 4       This law makes it a crime for anyone to conspire

 5  with someone else to violate federal laws pertaining to

 6  controlled substances.  In this case, the defendants are

 7  charged with conspiring to:  possess with the intent to

 8  distribute a mixture or substance containing a detectable

 9  amount of cocaine, distribute a mixture or substance

10  containing a detectable amount of cocaine, maintain a

11  drug involved premises, or use of a communication

12  facility to facilitate drug trafficking.

13       To find one or more of the defendants guilty of

14  this crime you must be convinced that the government has

15  proved each of the following beyond a reasonable doubt:

16       First:  two or more person agreed:  to possess

17  cocaine with the intent to distribute; or to distribute

18  cocaine; or to maintain a drug involved premises with

19  regards to cocaine; or to use a communication facility to

20  facilitate the trafficking of cocaine;

21       Second:  the defendant knew the essential

22  objective of the conspiracy;

23       Third:  the defendant knowingly and voluntarily

24  involved himself in the conspiracy; and

25       Fourth:  there was interdependence among the

1  members of the conspiracy.

2      "To possess with intent to distribute" means to

3  possess with the intent to deliver or transfer possession

4  of a controlled substance to another person or persons

5  without any financial interest in the transaction.

6      "To distribute" means to deliver or transfer

7  possession or control from one person to another, with or

8  without any financial interest in the transaction, and

9  includes the sale of something by one person to another.

10     Cocaine is a controlled substance within the

11  meaning of the law.

12     Instruction No. 18.

13     Controlled Substances -- Conspiracy, 21 United

14  States Code § 846.

15     Defendant Kevin Lewis is charged in Count 6 with a

16  violation of Section 846 of Title 21 of the United States

17  Code.  The Superseding Indictment charges that the crime

18  was committed from at least as early as June of 2019

19  continuing through July of 2019.

20     This law makes it a crime for anyone to conspire

21  with someone else to violate federal laws pertaining to

22  controlled substances.  In this case, the defendant is

23  charged with conspiring to:  possess with the intent to

24  distribute a mixture or substance containing a detectable

25  amount of cocaine base, to distribute a mixture or

1  substance containing a detectable amount of cocaine base,

2  to maintain a drug involved premises, or to use a

3  communication facility to facilitate drug trafficking.

4       To find the defendant guilty of this crime you

5  must be convinced that the government has proved each of

6  the following beyond a reasonable doubt:

7       First:  two or more person agreed:  to possess

8  cocaine base with the intent to distribute; or to

9  distribute cocaine base; or to maintain a drug involved

10 premises with regards to cocaine base; or to use a

11 communication facility to facilitate the trafficking of

12 cocaine base;

13      Second:  the defendant knew the essential

14 objective of the conspiracy;

15      Third:  the defendant knowingly and voluntarily

16 involved himself in the conspiracy; and

17      Fourth:  there was interdependence among the

18 members of the conspiracy.

19      "To possess with the intent to distribute" means

20 to possess with intent to deliver or transfer possession

21 of a controlled substance to another person, with or

22 without any financial interest in the transaction.

23      "To distribute" means to deliver or transfer

24 possession or control from one person to another, with or

25 without any financial interest in the transaction, and

1  includes the sale of something by one person to another.

2          Cocaine base is a controlled substance within the

3  meaning of the law.

4          Instruction 19.

5          Conspiracy -- Defined, 21 United States Code §

6  846.

7          A conspiracy is an agreement between two or more

8  person to accomplish an unlawful purpose.  It is a kind

9  of "partnership in criminal purposes" in which each

10  member becomes the agent or partner of every other

11  member.  The evidence may show that some of the persons

12  involved in the conspiracy charged by the Superseding

13  Indictment are not on trial.  This does not matter.

14  There is no requirement that all members of a conspiracy

15  be charged or tried together in one proceeding.

16          The evidence need not show that the members

17  entered into an express or formal agreement.  Nor does

18  the law require proof that the members agreed on all the

19  details.  But the evidence must show that the members of

20  the alleged conspiracy came to a mutual understanding to

21  try to accomplish a common and unlawful plan.

22          If you are convinced that any of the charged

23  conspiracies in the Superseding Indictment existed, then

24  you must next determine which, if any defendants were

25  part of the conspiracy -- in other words, which, if any,

1  defendants knew at least the essential goals of the

2  conspiracy and voluntarily chose to be a part of it.  The

3  law does not require proof that the defendant knew all of

4  the other members of the conspiracy or knew all the

5  details about how activities were to be carried out.  A

6  person may belong to a conspiracy for a brief period of

7  time or play a minor role.  On the other hand, proof is

8  not sufficient if it merely shows that the defendant knew

9  about the existence of the conspiracy or was associated

10  with members of the conspiracy.  Rather, the evidence

11  must show the defendant knowingly joined the conspiracy

12  with the intent to advance its purposes.

13        You are also required to find that interdependence

14  existed among the members of the conspiracy.  This means

15  that the members intended to act for their shared mutual

16  benefit.  To satisfy this element, you must conclude that

17  the defendant participated in a shared criminal purpose

18  and that his actions constituted an essential and

19  integral step towards the realization of that purpose.

20        Instruction 20.

21        Conspiracy -- Proof.

22        The existence of a conspiratorial agreement may be

23  inferred from the circumstances and the conduct of the

24  parties.  The essence of the crime of conspiracy is an

25  agreement to violate the law; mere knowledge or approval

1  in the object and purposes of a conspiracy, without an

2  agreement to cooperate and achieve such object or

3  purpose, does not make one a party to a conspiracy.

4      In determining whether the conspiracies charged in

5  Counts 2, 4, 5, and 6 of the Superseding Indictment

6  existed, you should consider the actions and

7  determinations of the alleged coconspirators, together

8  with any reasonable inferences to be drawn from such

9  evidence. It is not necessary for the government to

10  prove that the conspirators actually succeeded in

11  accomplishing their unlawful plan.

12      The government is not required to prove that the

13  parties to, or members of, the agreement or conspiracy

14  were successful in achieving any or all of the objects of

15  the agreement or conspiracy.

16      Instruction 21.

17      Coconspirator Statements.

18      If it is established beyond a reasonable doubt

19  that a conspiracy in fact existed and that a particular

20  defendant became a member of the conspiracy, then the

21  acts and declarations of any other member of the

22  conspiracy, in or out of the defendant's presence, done

23  in furtherance of the objects of the conspiracy and

24  during its existence, may be considered as evidence

25  against such defendant. When persons enter into an

1  agreement for an unlawful purpose, they become agents for

2  one another.

3          However, acts or statements of any conspirator

4  which are not in furtherance of a conspiracy, or made

5  before the existence or after its termination, may be

6  considered as evidence only against the person making

7  the.

8          Instruction 22.

9          Unanimity of Theory.

10          Your verdict must be unanimous as to Counts 2, 4,

11  5, and 6, accuses each defendant of committing the

12  following acts within the charged conspiracy:  possession

13  with the intent to distribute a controlled substance,

14  distribute a controlled substance, maintain a drug

15  involved premises or use a communication facility to

16  facilitate drug trafficking.

17          The government does not have to prove all of these

18  different acts for you to return a guilty verdict on

19  Counts 2, 4, 5, and 6.

20          But in order to return a guilty verdict, all

21  twelve of you must agree upon which of the listed acts,

22  if any, each defendant committed and that he committed at

23  least one of the acts listed.

24          Instruction 23.

25          Controlled Substances -- Maintaining Drug Involved

1  Premises, 21 United States Code §§ 856(a)(1), (a)(2).

2       Defendant Kevin Lewis is charged in Count 8 with a

3  violation of Sections 856(a)(1) and 856(a)(2) of Title 21

4  of the United States Code.  The Superseding Indictment

5  charges that the crime was committed between June 22nd,

6  2019, and July 17th, 2019.

7       This law makes it a crime to knowingly use,

8  maintain manage, or control, or make available for use

9  any place for the purpose of storing using manufacturing,

10 or distributing controlled substances.

11      To find the defendant guilty of this crime you

12 must be convinced that the government has proved each of

13 the following beyond a reasonable doubt:

14      First:  the defendant used, maintained, managed,

15 controlled, or made available for use a place at ███

16 North Somerset Avenue, Wichita, Kansas, for the purpose

17 of storing, using, manufacturing or distributing

18 methamphetamine, which is a controlled substance within

19 the meaning of the law;

20      And Second:  the defendant knew that the place was

21 used for such purpose or purposes.

22      This premises is a residence, and the defendant

23 must have had substantial connection to the residence

24 meaning he must be more than a casual visitor to

25 "knowingly maintain" the premises.

1          If a defendant does not reside at the residence

2     the government must prove the defendant exercised control

3     over the premises.   In determining if a defendant

4     "knowingly maintains" a residence acts evidencing such

5     matters as control, duration, acquisition of the site,

6     renting or furnishing the site, repairing the site,

7     supervising, protecting, supplying food to those at the

8     site, and continuity may be found to be evidence of

9     knowingly maintaining the place considered alone or in

10    combination with evidence of distributing from that

11    place.

12          Instruction 24.

13          Conspirator's Liability for Substantive Count.

14          If you find the defendant Kevin Lewis guilty of

15    the conspiracy charged in Count 2 and you find beyond a

16    reasonable doubt that another coconspirator committed the

17    offense in Count 8 during the time Kevin Lewis was a

18    member of that conspiracy, and if you find that the

19    offense in Count 8 was committed to achieve an objective

20    of or was a reasonably foreseeable consequence of the

21    conspiracy, then you may find the defendant guilty of

22    Count 8, even though the defendant may not have

23    participated in any of the acts that constitute the

24    offense described in Count 8.

25          Instruction 25.

1    Controlled Substances -- Maintaining Drug Involved

2    Premises, 21 United States Code §§ 856(a)(1), (a)(2).

3    The defendant, Travis Vontress, is charged in

4    count 10 with a violation of Sections 856(a)(1) and

5    856(a)(2) of Title 21 of the United States Code.  The

6    Superseding Indictment charges that the crime was

7    committed between June 22nd, 2019, and July 17th, 2019.

8    This law makes it a crime to knowingly use,

9    maintain, manage, or control, or make available for use

10   any place for the purpose of storing, using,

11   manufacturing, or distributing controlled substances.

12   To find the defendant guilty of this crime you

13   must be convinced that the government has proved each of

14   the following beyond a reasonable doubt:

15   First:  the defendant used, maintained, managed,

16   controlled, or made available for use a place at ███

17   North Holyoke, Wichita, Kansas, for the purpose of

18   storing, using, manufacturing or distributing

19   methamphetamine, which is a controlled substance within

20   the meaning of the law; and

21   Second:  the defendant knew that the place was

22   used for such purpose or purposes.

23   This premises is a residence, and the defendant

24   must have a substantial connection to the residence

25   meaning he must be more than a casual visitor to

 1   "knowingly maintain" the premises.

 2         If a defendant does not reside at the residence

 3   the government must prove the defendant exercised control

 4   over the premises.  A defendant "knowingly maintains" a

 5   residence acts evidencing such matters as control,

 6   duration, acquisition of the site, renting or furnishing

 7   the site, repairing the site, supervising, protecting,

 8   supplying the food to those at the site, and continuity

 9   are, of course, evidence of knowingly maintaining the

10   place considered alone or in combination with evidence of

11   distributing from that place.

12         Instruction 26.

13         Unlawful Use of a Communications Facility, 21

14   United States Code § 843(b).

15         The defendant, Kevin Lewis, is charged in Count 12

16   with a violation of Section 843(b) of Title 21 of the

17   United States Code.  The Superseding Indictment charges

18   that the crime occurred on or about June 26, 2019.

19         This law makes it a crime to use a communication

20   facility to facilitate the commission of a felony drug

21   offense.

22         To find the defendant guilty of this crime you

23   must be convinced that the government has proved each of

24   the following beyond a reasonable doubt:

25         First:  the defendant knowingly used a telephone;

1  and

2          Second:  the defendant acted with the intent to

3  commit or cause or facilitate the commission of a drug

4  felony, namely the methamphetamine conspiracy (Count 2),

5  the heroin conspiracy (Count 4), or the cocaine

6  conspiracy (Count 6).  You are instructed that the

7  controlled substance conspiracies charged in Counts 2, 4,

8  and 6 are felonies.

9          Third:  that the felony drug offense was actually

10  committed.

11          To "facilitate the commission of a drug felony"

12  means to aid or assist in the commission of the offense.

13          The defendant does not have to initiate use of the

14  communication facility; use is sufficient.

15          Instruction 27.

16          Use of Communications Facility, 21 U.S.C. §

17  843(b).

18          The defendant, Kevin Lewis, is charged in Count 16

19  with a violation of Section 843(b) of Title 21 of the

20  United States Code.  The Superseding Indictment charges

21  that the crime occurred on or about June 22nd, 2019.

22          This law makes it a crime to use a communication

23  facility to facilitate the commission of a felony drug

24  offense.

25          To find the defendant guilty of this crime you

1  must be convinced that the government has proved each of

2  the following beyond a reasonable doubt:

3          First:  the defendant knowingly used a telephone;

4  and

5          Second:  the defendant acted with the intent to

6  commit, cause or facilitate the commission of a drug

7  felony, namely the methamphetamine conspiracy (Count 2)

8  or the heroin conspiracy (Count 4).  You are instructed

9  that the controlled substances conspiracies charged in

10 Counts 2 and 4 are felonies.

11         Third:  that the felony drug offense was actually

12 committed.

13         To "facilitate the commission of a drug felony"

14 means to aid or assist in the commission of the offense.

15         The defendant does not have to initiate use of the

16 communication facility; use is sufficient.

17         Instruction 28.

18         Unlawful Use of a Communications Facility, 21

19 United States Code § 843(b).

20         The defendant, Kevin Lewis, is charged in Count 17

21 with a violation of Section 843(b) of Title 21 of the

22 United States Code.  The Superseding Indictment charges

23 that the crime occurred on or about June 26, 2019.

24         This law makes it a crime to use a communication

25 facility to facilitate the commission of a felony drug

1   offense.

2          To find the defendant guilty of this crime you

3   must be convinced that the government has proved each of

4   the following beyond a reasonable doubt:

5          First:  the defendant knowingly used a telephone;

6   and

7          Second:  the defendant acted with the intent to

8   commit, cause or facilitate the commission of a drug

9   felony, namely the heroin conspiracy (Count 4).  You are

10  instructed that the controlled substance conspiracy in

11  Count 4 is a felony.

12         Third:  that the felony drug offense was actually

13  committed.

14         To "facilitate the commission of a drug felony"

15  means to aid or assist in the commission of the offense.

16         The defendant does not have to initiate use of the

17  communication facility; use is sufficient.

18         Instruction 29.

19         Unlawful Use of a Communications Facility, 21

20  United States Code § 843(b).

21         The defendant, Travis Vontress, is charged in

22  Count 21 with a violation of Section 843(b) of Title 21

23  of the United States Code.  The Superseding Indictment

24  charges that the crime occurred on or about June 28,

25  2019.

1        The law makes it a crime to use a communication

2  facility to facilitate the commission of a felony drug

3  offense.

4        To find the defendant guilty of this crime you

5  must be convinced that the government has proved each of

6  the following beyond a reasonable doubt:

7        First:  the defendant knowingly used a telephone;

8  and

9        Second:  the defendant acted with the intent to

10  commit, cause or facilitate the commission of a drug

11  felony, namely the methamphetamine conspiracy (Count 2).

12  You are instructed that the controlled substance

13  conspiracy charged in Count 2 is a felony.

14        Third:  that the felony drug offense was actually

15  committed.

16        To "facilitate the commission of a drug felony"

17  means to aid or assist in the commission of the offense.

18        The defendant does not have to initiate use of the

19  communication facility; use is enough.

20        Instruction 30.

21        Unlawful Use of a Communications Facility, 21

22  United States Code § 843(b).

23        The defendant, Travis Vontress, is charged in

24  Count 22 with a violation of Section 843(b) of Title 21

25  of the United States Code.  The Superseding Indictment

1  charges that the crime occurred on or about July 7th,

2  2019.

3       This law makes it a crime to use a communication

4  facility to facilitate the commission of a felony drug

5  offense.

6       To find the defendant guilty of this crime you

7  must be convinced that the government has proved each of

8  the following beyond a reasonable doubt:

9       First:  the defendant knowingly used a telephone;

10 and

11      Second:  the defendant acted with the intent to

12 commit, cause or facilitate the commission of a drug

13 felony, namely the methamphetamine conspiracy (Count 2).

14 You are instructed that the controlled substance

15 conspiracies charged in Count 2 is a felony.

16      Third:  that the felony drug offense was actually

17 committed.

18      To "facilitate the commission of a drug felony"

19 means to aid or assist in the commission of the offense.

20      The defendant does not have to initiate use of the

21 communication facility; use is sufficient.

22      Instruction 31.

23      Controlled Substances -- Possession with Intent to

24 Distribute, 21 United States Code § 841(a)(1).

25      The defendant, Travis Vontress, is charged in

1  Count 23 with a violation of Section 841(a)(1) of Title

2  21 of the United States Code.  The Superseding Indictment

3  charges that the crime occurred on or about July 17th,

4  2019.

5       This law makes it a crime to possess a controlled

6  substance with the intent to distribute it.

7       To find the defendant guilty of this crime you

8  must be convinced that the government has proved each of

9  the following beyond a reasonable doubt:  First:  the

10  defendant knowingly or intentionally possessed a

11  controlled substance as charged; Second:  the substance

12  was in fact cocaine; Third:  the defendant possessed the

13  substance with the intent to distribute it; and cocaine

14  is a controlled substance within the meaning of the law.

15       To "possess with intent to distribute" means to

16  possess with intent to deliver or transfer possession of

17  a controlled substance to another person, with or without

18  any financial interest in the transaction.

19       To meet its burden of proving the first element,

20  the government must prove that the defendant knew that

21  the substance that he distributed was a controlled

22  substance.  The government can meet this burden by

23  proving either that: (1) the defendant knew that the

24  substance he distributed is listed as controlled

25  substance under the Controlled Substance Act, even if he

1  did not know the identity of the controlled substance; or

2  (2) the defendant knew that the specific substance was

3  cocaine, even if he did not know that cocaine is listed

4  as a controlled substance under the Controlled Substance

5  Act.

6          Instruction 32.

7          Possession of a Firearm in Furtherance of a Drug

8  Trafficking Crime.

9          The defendant, Travis Vontress, is charged in

10  Count 51 with a violation of Section 924(c)(1) of Title

11  18 of the United States Code.  The Superseding Indictment

12  charges that the crime occurred on or about July 17th,

13  2019.

14          This law makes it a crime to possess a firearm in

15  furtherance of a drug trafficking crime.

16          To find the defendant guilty of this crime you

17  must be convinced that the government has proved each of

18  the following beyond a reasonable doubt:

19          First:  the defendant committed the crime of

20  possession with intent to distribute cocaine, a

21  controlled substance, as charged in Count 23 of the

22  Superseding Indictment, which is a drug trafficking

23  crime;

24          Second:  the defendant possessed a firearm in

25  furtherance of this crime.

1         The term "firearm" means any weapon which will, or

2    is designed to, or may readily be converted to expel a

3    projectile by the action of an explosive.  The term

4    "firearm" also includes the frame or receiver of any such

5    weapon, or any firearm muffler or firearm silencer, or

6    destructive device.

7         Possession "in furtherance of" means for the

8    purpose of assisting in, promoting, accomplishing,

9    advancing, or achieving the goal of the underlying

10   offense.

11        Mere presence of a firearm at the scene is not

12   enough to find possession in furtherance of a drug

13   trafficking crime, because the firearm's presence may be

14   coincidental or entirely unrelated to the underlying

15   crime.  Some factors that may help in determining whether

16   possession of a firearm furthers, advances, or helps

17   advance a drug trafficking crime include, but are not

18   limited to: (1) the type of criminal activity that is

19   being conducted; (2) accessibility of the firearm; (3)

20   the type of the firearm; (4) whether the firearm is

21   stolen; (5) the status of the possession (legitimate or

22   illegal); (6) whether the firearm is loaded; (7) the time

23   and circumstances under which the firearm is found; and

24   (8) proximity to drugs or drug profits.

25        Instruction 33.

1          Aiding and Abetting, 18 United States Code § 2(a).

2          Each applicable count of the Superseding

3    Indictment also charges a violation of 18 United States

4    Code Section 2, which provides that: "Whoever commits an

5    offense against the United States, or aids, abets,

6    counsels, commands, induces or procures its commission,

7    is punishable as a principal."

8          This law makes it a crime to intentionally help

9    someone else commit a crime.  To find the defendant

10   guilty of this crime, you must be convinced that the

11   government has proved each of the following beyond a

12   reasonable doubt:

13         First:  every element of the charged crime (see

14   the Instructions herein for the underlying crime) was

15   committed by someone other than the defendant, and

16         Second:  the defendant intentionally associated

17   himself in some way with the crime and intentionally

18   participated in it as he would in something that he

19   wished to bring about.  This means that the government

20   must prove that the defendant consciously shared the

21   other person's knowledge of the underlying criminal act

22   and intended to help him.

23         The defendant need not perform the underlying

24   criminal act, be present when it is performed, or be

25   aware of the details of its commission to be guilty of

 1  aiding and abetting.

 2       But a general suspicion that an unlawful act may

 3  occur or that something criminal is happening is not

 4  enough.

 5       Mere presence at the scene of the crime and

 6  knowledge that a crime is being committed are also not

 7  sufficient to establish aiding and abetting.

 8       Instruction 34.

 9       Accomplish -- Co-Defendant -- Plea Agreement.

10       The government will call as one of its witnesses

11  an alleged accomplice, who was named as a co-defendant in

12  the Superseding Indictment.  The government has entered

13  into a plea agreement with the co-defendant.  As a part

14  of the plea agreement, the co-defendant is required to

15  comply with his obligations in the plea agreement.  In

16  return the government will dismiss some of the charges he

17  is facing and recommend a lesser sentence than the

18  co-defendant would otherwise likely receive.  Plea

19  bargaining is lawful and proper, and the rules of this

20  court expressly provide for it.

21       The government will also call as one of its

22  witnesses an alleged accomplice, who was not named as a

23  co-defendant in the Superseding Indictment but rather had

24  his own separate pending criminal matter.  The government

25  has also entered into a plea agreement with that

1  accomplice.  As part of the plea agreement, the

2  accomplice is required to comply with his obligations in

3  the plea agreement.  In return the government will

4  dismiss some charges he is facing and recommend a lesser

5  sentence than the accomplice would otherwise likely

6  receive.  Plea bargaining is lawful and proper, and the

7  rules in this court expressly provide for it.

8      An alleged accomplice, including one who has

9  entered into a plea agreement with the government, is not

10  prohibited from testifying.  On the contrary, the

11  testimony on an alleged accomplice may, by itself,

12  support a guilty verdict.  You should receive this type

13  of testimony with caution and weigh it with greater care

14  than the testimony of an ordinary witness.  You must

15  determine whether the accomplice's testimony has been

16  affected by self-interest or by an agreement he has with

17  the government.  You should never convict a defendant

18  upon the unsupported testimony of an alleged accomplice,

19  unless you believe that testimony beyond a reasonable

20  doubt.  The fact that an accomplice has entered a guilty

21  plea to the offense charged is not evidence of the guilt

22  of any other person.

23      Instruction 35.

24      Credibility of Witnesses.

25      I remind you that it is your job to decide whether

1  the government has proved the guilt of the defendants

2  beyond a reasonable doubt.  In doing so, you must

3  consider all of the evidence.  This does not mean,

4  however, that you must accept all of the evidence as true

5  or accurate.

6       You are the sole judges of the "believability" or

7  credibility of each witness and the weight to be given to

8  the witness's testimony.  An important part of your job

9  will be making judgments about the testimony of the

10 witness [and, if applicable, including the testimony of

11 the defendant] who testified in this case.  Ou should

12 think about the testimony of each witness you have heard

13 and decide whether you believe all or any part of what

14 each witness had to say, and how important that testimony

15 was.  In making that decision, I suggest that you ask

16 yourself a few questions:  Did the witness impress you as

17 honest?  Did the witness have any particular reason not

18 to tell the truth:  Did the witness have a personal

19 interest in the outcome in this case?  Did the witness

20 have any relationship with either the government or the

21 defense?  Did the witness seem to have a good memory:

22 Did the witness clearly see or hear the things about

23 which he or she testified?  Did the witness have the

24 opportunity and ability to understand the questions

25 clearly and to answer them directly?  How do you assess

1  the witness's manner while testifying, and the witness's

2  candor, fairness and intelligence?  You may, in short,

3  accept or reject the testimony of any witness, in whole

4  or in part.

5      When weighing the conflicting testimony between

6  witnesses, you should consider whether the discrepancy

7  has to do with a material fact or with an unimportant

8  detail.  And you should keep in mind that innocent

9  misrecollection -- like failure of recollection -- is not

10 uncommon.

11     I remind you that the burden of proof rests solely

12 on the government at all times, and that a defendant has

13 no obligations to testify.  If a defendant does testify,

14 that testimony should be weighed and his credibility

15 evaluated, in the same way as that of any other witness.

16     In reaching a conclusion on a particular point, or

17 ultimately in reaching a verdict in this case, do not

18 make any decisions simply because there were more

19 witnesses on one side than on the other.

20     In addition, while you must consider only the

21 evidence in this case, you are permitted to draw such

22 reasonable inferences from the testimony and exhibits as

23 you feel are justified in the light of common experience.

24 In other words, you may make deductions and reach

25 conclusions which reason and common sense lead you to

1  draw from the facts which have been established by either

2  direct or circumstantial evidence.  I caution you,

3  however, that the process of drawing inferences from the

4  evidence is not a matter of guesswork or speculation.  In

5  order to return a verdict of guilty, you still must be

6  satisfied that the government has proved the defendant's

7  guilt beyond a reasonable doubt on all of the elements of

8  the offense.

9       Instruction 36.

10       Prior Statements.

11       The testimony of a witness may be discredited or

12  "impeached" by showing that his or her testimony at trial

13  differs in some significant way from statements that this

14  witness made before the trial.  This difference may be

15  direct, where the witness' prior statements literally

16  contradict the trial testimony, or it may be indirect, as

17  where a witness provides testimony at trial the witness

18  did not reveal earlier when he or she had the opportunity

19  and reason to speak and did not do so, and, further, does

20  not explain an adequate explanation for the silence.  You

21  are to decide if the explanation is adequate.

22       You are to determine the weight, if any, to be

23  given a witness' testimony whose trial testimony varies

24  from the witness' earlier statements if you conclude a

25  witness has knowingly testified falsely about any matter,

1   you may distrust that witness' testimony regarding any

2   other matters.  You may reject that witness' testimony

3   completely or give it such weight as you think it

4   deserves.

5        Instruction 37.

6        Non-testifying Defendant.

7        As just noted, a defendant is not obligated to

8   testify.  If a defendant does not testify, i remind you

9   that you cannot consider his decision not to testify as

10  evidence of guilt.  I want you to clearly understand,

11  please, that the Constitution of the United States grants

12  to a defendant the right to remain silent.  This means

13  the right not to testify or call any witnesses.  That is

14  a constitutional right in this country, it is very

15  carefully guarded, and you should understand that no

16  presumption of guilt may be raised and no inference of

17  any kind may be drawn from the fact that a defendant does

18  not take the witness stand and testify or call any

19  witnesses.

20       Instruction No. 38.

21       Voluntariness of Statement by Defendant.

22       Evidence may be presented about a statement

23  attributed to the defendant, Travis Vontress, alleged to

24  have been made after the commission of a crime (or

25  crimes) charged in this case but not made in court.  Such

1   evidence should always be considered by you with caution

2   and weighed with care.  You should give any such

3   statement the weight you think it deserves, after

4   considering all the circumstances under which the

5   statement was made.

6            In determining whether any such statement is

7   reliable and credible, consider factors bearing on the

8   voluntariness of the statement.  For example, consider

9   the age, gender, training, education, occupation, and

10  physical and mental condition of the defendant, and any

11  evidence concerning his treatment while under

12  interrogation if the statement was made in response to

13  questioning by government officials, and all other

14  circumstances in evidence surrounding the making of the

15  statement.

16           After considering all this evidence, you may give

17  such weight to the statement as you feel it deserves

18  under the circumstances.  If you determine that the

19  statement is unreliable or not credible, you may

20  disregard the statement entirely.

21           Instruction 39.

22           Expert Witnesses.

23           During the trial, you will hear the testimony of

24  Mark McKee, Cameron Heath, Amy Corrigan, Mindy Harris,

25  Lana Goodson, Caitlin McCauley, Trevor Curtis, Brianna

 1  McCarthy, Tolulope Omosun, and Harold Riddle.  They will

 2  express opinions concerning drug trafficking practices,

 3  downloading cellphone information, fingerprinting and

 4  controlled substances testing.  In some cases, such as

 5  this one, scientific, technical, or other specialized

 6  knowledge may assist the jury in understanding the

 7  evidence or in determining a fact in issue.  A witness

 8  who has knowledge, skill, experience, training or

 9  education, may testify and state an opinion concerning

10  such matters.  The law permits such experts to give their

11  opinions regarding such matters.

12        You are not required to accept such an opinion.

13  You should consider opinion testimony just as you

14  consider other testimony in this trial.  Give opinion

15  testimony as much weight as you think it deserves,

16  considering the education and experience of the witness,

17  the soundness of the reasons given for the opinion and

18  the other evidence in the trial.

19        Instruction 40.

20        Expert and Fact Witnesses.

21        Cameron Heath from the FBI will be the

22  government's first witness.  Before he testifies, I want

23  to point out that he will be testifying in two

24  capacities, wearing "two hats" so to speak.  He will be

25  testifying as an expert witness, where he will be

1   permitted to give his opinion based on his training and

2   experience about narcotics trafficking.  He will also be

3   testifying as a fact witness about the investigation he

4   completed in this matter as the "case agent."  Fact

5   testimony is not based on scientific, technical, or

6   specialized knowledge but is based on the agent's

7   perception or personal knowledge regarding the case.

8   There is nothing unusual about him testifying in a dual

9   capacity, however, it is important that you recognize the

10  difference between the two types of testimony.

11      Additionally, Mark McKee from the Wichita Police

12  Department, will testify in this matter.  First, he will

13  be testifying as an expert witness, where he will be

14  permitted to give his opinions based on his training and

15  experience about narcotics trafficking.  He will also be

16  testifying as a fact witness about his role in the

17  investigation of this matter.  Fact testimony is not

18  based on scientific, technical, or specialized knowledge

19  but is based on the detective's perception or personal

20  knowledge regarding this case.  There is nothing unusual

21  about him testifying in a dual capacity, however, it is

22  important that you recognize the difference between the

23  two types of testimony.

24      These instructions as a whole are to guide you in

25  your evaluation of the different types of witness

1   testimony you will hear in this case.

2        In weighing fact testimony, you should consider

3   the instructions given earlier in these instructions for

4   weighing the credibility and believability of witnesses.

5   In weighing expert testimony, you should consider the

6   instructions given earlier in these instructions

7   regarding specific, technical, or other specialized

8   knowledge testimony.

9        Instruction 41.

10        Attorney Objections and Document Redactions.

11        At times during trial, I will rule on the

12   attorneys' objections to admitting certain items in

13   evidence.  Questions relating to the admissibility of

14   evidence are solely questions of law for me.  You must

15   not concern yourself with the reasons for my rulings and

16   do not draw any inferences from my rulings.  Consider

17   only the evidence admitted.

18        Some of the exhibits may contain redactions.  The

19   portions of those exhibits have been redacted either

20   because I have excluded the redacted portions from the

21   evidence or because the parties have agreed that the

22   redacted portions should not be admitted.  You should

23   disregard any redactions just as you would disregard any

24   other evidence that I have excluded from the record.

25        Instruction 42.

1         Duty of the Jury.

2         In considering the evidence, you are expected to

3   use your good sense; consider the evidence for only those

4   purposes for which it has been admitted, and give it a

5   reasonable and fair construction in the light of your

6   common knowledge of the natural tendencies and

7   inclinations of human beings.

8         You are to perform your duty without any bias as

9   to any party or person.  The law does not permit jurors

10  to be governed by sympathy, or prejudice, or public

11  opinion.  That was the promise you made and the oath you

12  took before being accepted by the parties as jurors and

13  they have the right to expect nothing less.

14        Keep constantly in mind that it would be a

15  violation of your sworn duty to base a verdict upon

16  anything but the evidence in, and the law applicable to,

17  this case.

18        Instruction 43.

19        Duty to Follow Instructions.

20        You, as jurors, are the judges of the facts.  But

21  in determining what actually happened -- that is, in

22  reaching your decision as to the facts -- it is your

23  sworn duty to follow all the rules of law as I explain

24  them to you.

25        You have no right to disregard or give special

1  attention to any one instruction, or to question the

2  wisdom or correctness of any rule of law I may state to

3  you.  You must not substitute or follow your own notion

4  or opinion as to what the law is or ought to be.  It is

5  your duty to apply the law as I explain it to you,

6  regardless of the consequences.  However, you should not

7  read into these instructions, or anything else that I may

8  have said or done, any suggestion as to what your verdict

9  should be.  That is entirely up to you.

10       It is also your duty to base your verdict solely

11  upon the evidence, without prejudice or sympathy.  That

12  was the promise you made and the oath you took.

13       Instruction 44.

14       Summaries and Charts.

15       Certain charts and summaries may be shown to you

16  to help explain the evidence in this case.  Their only

17  purpose is to help explain the evidence in this case.

18  Their only purpose is to help explain the evidence.  Any

19  charts and summaries are not evidence or proof of any

20  facts.

21       Instruction 45.

22       Specific Investigation Technique Not Required.

23       You may hear testimony as to any manner in which

24  the government conducted its investigation in this case

25  including certain investigative method or techniques that

1  were used and certain investigative methods or techniques

2  that were not used.  In attempted to prove its case, the

3  government is under no obligation to use all

4  investigative methods that are available to it or to use

5  any particular method.  The question is whether the

6  evidence presented is sufficient to convince you beyond a

7  reasonable doubt of each defendant's guilt.

8          Instruction 46.

9          Cautionary Instruction During Trial, Transcript of

10  Recorded Conversation.

11          During this trial, you may hear sound recordings

12  of certain conversations.  These conversations were

13  legally recorded and they are a proper form of evidence

14  and may be considered by you as you would any other

15  evidence.  You were also given transcripts of those

16  recorded conversations.

17          Keep in mind that the transcripts are not

18  evidence.  They are given to you only as a guide to help

19  you follow what was being said.  The recordings

20  themselves are the evidence.  If you noticed any

21  difference between what you heard on the recordings and

22  what you read in the transcripts, you must rely on what

23  you heard and not what you read.  If you cannot hear or

24  understand certain parts of the recordings, you must

25  ignore the transcript as far as those parts are

1    concerned.

2          Instruction 47.

3          Do Not Consider the Consequences.

4          It is human nature to wonder what the consequences

5    of your verdict may be, but you must ignore that

6    altogether in your deliberations.  The punishment

7    provided by law for the crimes charged is a matter

8    exclusively within the province of the Court and may not

9    be considered by the jury in any way in deciding whether

10   defendant is guilty or not guilty of the crimes charged.

11         Instruction 48.

12         Notes.

13         The Court will permit you to take notes during the

14   trial, if you want.  If you do take notes, remember that

15   any notes that you take are only aids to your memory.  If

16   your memory differs from your notes, you should rely on

17   your memory and not on the notes.  Your notes are not

18   evidence.

19         If you do not take notes, you should not be

20   influenced by the notes of other jurors but should rely

21   on your independent recollection of the evidence.  Even

22   if you do take notes, you should not be unduly influenced

23   by the notes of other jurors if they differ from yours.

24   There can be a tendency to attach too much importance to

25   what someone has written down, but notes are not entitled

1    to any greater weight than the recollection or impression

2    of each juror about the testimony.  Remember, something

3    that may not have seemed important at the time, and thus

4    was not written down in your notes, may take on greater

5    importance later in the trial in light of all the

6    evidence presented, the Court's instructions on the law,

14:28:01    7    and the final arguments.

14:28:01    8         Therefore, don't attach undue importance to your

14:28:04    9    notes, or be unduly influenced by another juror's notes.

14:28:08    10    Your notes are not evidence, and are by no means a

14:28:11    11    complete summary of the trial.  They are only an aid to

14:28:14    12    your memory, and it is your collective memory that is

14:28:17    13    your greatest asset in deciding this case.

14:28:21    14         Instruction 49.

14:28:23    15         Neither in these instructions nor in any ruling,

14:28:29    16    action or remark that I make during the course of the

14:28:33    17    trial, do I intend to interpose any opinion or suggestion

14:28:37    18    as to how I would resolve any of the issues in this case.

14:28:43    19    If I make any remark you believe indicates how I would

14:28:47    20    decide this case, I instruct you to disregard such

14:28:50    21    remark.

14:28:50    22         The trial will now begin.  You will hear opening

14:28:54    23    statements by counsel, then the evidence the parties wish

14:28:57    24    to present, then closing arguments from counsel.

14:29:00    25    Following closing arguments, I will have a few remaining

14:29:02    1    instructions to give you regarding your deliberations.

14:29:07    2         All right, members of the jury, thank you for

14:29:09    3    bearing with us through the reading of these

14:29:11    4    instructions. As I said, these are the instructions that

14:29:14    5    will guide your deliberations during the trial, and it's

14:29:16    6    on your oath to follow them and to present and understand

14:29:20    7    them. In the interest of clarity we thought it important

14:29:22    8    to read them to you.

14:29:24    9         We've been here a solid hour and a half. We're

14:29:29   10    going to take a recess at this point so that you can

14:29:32   11    refresh yourselves and clear your mind, and then when we

14:29:37   12    come back the counsel will present their opening

14:29:40   13    statements to you in this case. We'll -- let's plan to

14:29:44   14    come back about 2:45 if we can. We'll be in recess until

14:29:47   15    that time.

14:29:47   16         (The jury left the courtroom, after which the

14:30:45   17    following proceedings were had:)

14:30:45   18         THE COURT: Counsel, anything we need to talk

14:30:48   19    about before our recess?

14:30:49   20         MR. TREASTER: Nothing for the Government, Your

14:30:52   21    Honor.

14:30:52   22         MR. SHULTZ: Nothing for Mr. Lewis, Your Honor.

14:30:54   23         MR. BABBIT: No, Your Honor.

14:30:55   24         THE COURT: Mr. Shultz, again, just so the record

14:30:58   25    will be clear to reflect, it's my observation -- you had

14:31:01  1  earlier before the trial started expressed your

14:31:06  2  legitimate concern about a jury being a fair

14:31:08  3  cross-section of the state, particularly with respect to

14:31:12  4  your defendant -- or to your client's race.  And my

14:31:15  5  observation is that jurors 7 and 14, I believe, are both

14:31:19  6  African American jurors.  Do you agree with that?

14:31:23  7          MR. SHULTZ:  May I have one moment?

14:31:24  8          THE COURT:  Of course.

14:31:25  9          (Whereupon, a sotto voce discussion was had

14:31:26  10  between Mr. Shultz and defendant Lewis.)

14:31:40  11          MR. SHULTZ:  Yes, Your Honor.  I think I would

14:31:43  12  agree with that.

14:31:44  13          THE COURT:  I understand that's always a bit of an

14:31:46  14  objective call, but, again, I just -- because the record

14:31:49  15  would not otherwise reflect these issues, and you

14:31:51  16  preserved this objection for appeal, I just wanted the

14:31:53  17  record to be clear on that.

14:31:54  18          MR. SHULTZ:  I appreciate that.  We would also

14:31:56  19  maintain the other part about changing the -- what

14:31:59  20  "peers" means.

14:32:00  21          THE COURT:  Your objection you made previously is

14:32:03  22  preserved for appeal.

14:32:04  23          MR. SHULTZ:  Thank you, Your Honor.

14:32:04  24          THE COURT:  If there's nothing else, we'll be in

14:32:06  25  recess until 2:45.

| | | |
|---|---|---|
| 14:32:12 | 1 | (A recess was taken from 2:32 to 2:45 P.M.) |
| 14:45:30 | 2 | CLERK SCHMIDT:  All rise. |
| 14:45:31 | 3 | THE COURT:  Counsel, are we ready for the jury? |
| 14:45:35 | 4 | MS. ANDRUSAK:  (Nods head.) |
| 14:45:37 | 5 | THE COURT:  Mr. Schmidt, you may collect the jury. |
| 14:45:45 | 6 | MR. SHULTZ:  May we be seated, Your Honor? |
| 14:45:46 | 7 | THE COURT:  I'm sorry? |
| 14:45:47 | 8 | MR. SHULTZ:  Never mind.  I asked if we could be |
| 14:45:49 | 9 | seated. |
| 14:45:50 | 10 | THE COURT:  Oh, yeah, you may be seated. |
| 14:45:52 | 11 | MR. SHULTZ:  But I guess the jury's coming in here |
| 14:45:54 | 12 | in a moment. |
| 14:47:08 | 13 | (The jury returned to the courtroom, after which |
| 14:48:07 | 14 | the following proceedings were had:) |
| 14:48:07 | 15 | THE COURT:  Welcome back, ladies and gentlemen of |
| 14:48:09 | 16 | the jury.  You may be seated. |
| 14:48:11 | 17 | Are you ready to proceed? |
| 14:48:14 | 18 | THE JURY (in unison):  (Nods head.) |
| 14:48:17 | 19 | THE COURT:  Government, you may make your opening |
| 14:48:19 | 20 | statement. |
| 14:48:21 | 21 | OPENING STATEMENT |
| 14:48:22 | 22 | MS. ANDRUSAK:  Good afternoon, ladies and |
| 14:48:35 | 23 | gentlemen. |
| 14:48:35 | 24 | "Loyalty supersedes money."  Three words said by |
| 14:48:42 | 25 | Kevin Lewis that perfectly describe what this case is |

14:48:45  1    about.  Loyalty.  And drug trafficking.  But also,

14:48:50  2    loyalty.  Loyalty to a man, Travis Knighten.  Loyalty to

14:48:55  3    the hustle.  Hustling to try and make money.  Hustling to

14:49:00  4    sell drugs as part of a large-scale trafficking

14:49:05  5    organization.  Hustling to sell methamphetamine, known as

14:49:10  6    NHL, ice, or cream.  Hustling to sell heroin, known as

14:49:17  7    dark, black, or Jordans.  Hustling to sell cocaine, soft

14:49:23  8    or soda.  And hustling to sell crack cocaine, known as

14:49:28  9    hard.

14:49:28  10         And they weren't hustling to sell small amounts

14:49:31  11   such as grams, but they were hustling to sell ounces,

14:49:35  12   known as zips, or selling whole ones, which were pounds,

14:49:38  13   and even kilograms.  And, in fact, in the course of seven

14:49:44  14   days, the defendants, both Mr. Lewis and Mr. Vontress,

14:49:48  15   along with a large cast of characters you're going to get

14:49:51  16   to know very well very soon, the organization trafficked

14:49:55  17   roughly 30 pounds of methamphetamine here in Wichita.

14:49:59  18         The evidence in this case will show that this

14:50:03  19   organization starts with Travis Knighten, who was in

14:50:06  20   prison in Oklahoma.  Because of this he had to use a cell

14:50:11  21   phone that he was not allowed to have to communicate with

14:50:14  22   his people outside the prison walls.  Because of his

14:50:19  23   situation, he could not work alone and he created a

14:50:24  24   network of people who helped him distribute drugs.  His

14:50:28  25   network included his right-hand men such as Kevin Lewis

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028

14:50:31  1  and Trevor Wells; his treasurer, Travis Vontress; his

14:50:38  2  couriers, such as Orlando Hogan and Otis Ponds; and his

14:50:43  3  distributors, which included Tia Ward, Dallas Williams,

14:50:47  4  Frederick Collins, and many others.

14:50:51  5      For this organization to function, Mr. Knighten

14:50:54  6  would coordinate with his suppliers, some we could

14:50:58  7  identify and some we couldn't, to set up deliveries for

14:51:02  8  drugs.  He would then put his people on the ground to

14:51:05  9  work, pooling the funds his various distributors had from

14:51:10  10  their recent sales.  Once the money was pooled and

14:51:12  11  accounted for by Mr. Vontress, the drugs would be

14:51:16  12  purchased.  And once his stores were restocked, Mr. Lewis

14:51:21  13  would work with his distributors on the ground to later

14:51:26  14  pick up the drugs to sell themselves.  This organization

14:51:30  15  dealt with methamphetamine, heroin, cocaine, and crack

14:51:38  16  cocaine, though not every member of the organization

14:51:40  17  dealt with all of these drugs.  Some, like Tia Ward, had

14:51:45  18  specialties, and others like Mr. Lewis dealt it all.

14:51:48  19      It was the investigation of this organization that

14:51:52  20  resulted in the four conspiracy counts you heard earlier,

14:51:55  21  the two maintaining a drug-related premises counts, and

14:51:58  22  the multiple use of a communication device in furtherance

14:52:02  23  of drug trafficking that you heard earlier.  It also

14:52:06  24  resulted in the possession with intent to distribute and

14:52:09  25  possession of a firearm in furtherance of drug

14:52:12    1    trafficking counts against Mr. Vontress.

14:52:13    2         Now, while Knighten was the kingpin of this

14:52:19    3    organization, it would not have been successful without

14:52:21    4    the defendants here today.  Travis Vontress, or Bink or

14:52:26    5    Gumbo, was the keeper of the money.  And Kevin Lewis, Y

14:52:32    6    or YT, was the keeper of the drugs.  Two important people

14:52:37    7    to the day-to-day operations of Knighten's organization.

14:52:41    8         Travis Vontress, Bink, Gumbo, once said,

14:52:48    9    "Disappear, disappear, that how we do.  You disappear and

14:52:52   10    I count the green."  This perfectly describes his main

14:52:58   11    role within the organization -- the treasurer.  Money

14:53:01   12    collected by members went to Vontress and money was given

14:53:05   13    out by Vontress for deals authorized by Knighten.  As the

14:53:09   14    treasurer, Vontress was usually in the know as to the

14:53:13   15    deals in the works and constantly had an accounting on

14:53:17   16    the money of the organization, which he provided to

14:53:19   17    Knighten.  In addition to being the money man, Vontress

14:53:24   18    also possessed and distributed drugs, specifically

14:53:29   19    methamphetamine, heroin, and cocaine.

14:53:32   20         Kevin Lewis is one of Knighten's right-hand men, a

14:53:38   21    lieutenant if you will.  He sold drugs for Knighten, he

14:53:43   22    stored large amounts of drugs for Knighten, and he made

14:53:46   23    sure Knighten's people on the ground had access to drugs,

14:53:50   24    usually in large quantities.  As the keeper of the drugs,

14:53:56   25    Lewis, was involved in or in the know as to most of the

| | | |
|---|---|---|
| 14:54:01 | 1 | transactions involved in this case.  And while Lewis |
| 14:54:05 | 2 | admits that heroin is his lane, he didn't shy away from |
| 14:54:09 | 3 | distributing methamphetamine, cocaine, and crack cocaine |
| 14:54:13 | 4 | as Knighten's right-hand man. |
| 14:54:15 | 5 | Now, ladies and gentlemen, in this case you will |
| 14:54:19 | 6 | hear and have to keep track of a lot of nicknames for |
| 14:54:22 | 7 | both the defendants and other coconspirators, some of |
| 14:54:26 | 8 | which had multiple nicknames that were used |
| 14:54:28 | 9 | interchangeably.  You will hear and have to keep track of |
| 14:54:32 | 10 | slang terminology used to reference drugs and quantity |
| 14:54:36 | 11 | amounts.  You will hear and have to keep track of |
| 14:54:38 | 12 | numerous telephone numbers and dates.  But in hearing all |
| 14:54:42 | 13 | of that, you will learn about multiple drug deals with |
| 14:54:47 | 14 | varying quantities that accumulated to a distribution |
| 14:54:50 | 15 | quantity of meth, heroin, cocaine, and crack. |
| 14:54:55 | 16 | But to understand how we got here, we need to take |
| 14:54:59 | 17 | a step back to where this case really begins.  And that's |
| 14:55:02 | 18 | April 10th, 2019.  On that day the FBI started a legal |
| 14:55:09 | 19 | wiretap on the line of coconspirator Dorzee Hill.  The |
| 14:55:15 | 20 | wiretap legally expanded to two phones of Dorzee Hill's |
| 14:55:18 | 21 | and a phone of a coconspirator Mario Ponds. |
| 14:55:22 | 22 | It's at this time the investigation turns to |
| 14:55:26 | 23 | Travis Knighten.  It's at this time the FBI gets turned |
| 14:55:30 | 24 | on to Troub or Trouble, Mr. Knighten, as he's directing |
| 14:55:35 | 25 | people to purchase and pick up drugs from his brother, |

14:55:39    1   Trevor Wells or Punchy, who we expect you to hear from in

14:55:45    2   this case.  And Mr. Knighten is directing those

14:55:47    3   individuals to ███ North Yale.  So on May 31st of 2019,

14:55:53    4   the FBI executes a search warrant on that residence on

14:55:56    5   Yale.  And during this search they locate approximately

14:56:01    6   11 pounds of methamphetamine and a pound of heroin.

14:56:06    7         And it's after this search, starting on June 21st

14:56:09    8   of 2019, that the FBI started its legal wiretap on the

14:56:14    9   contraband phone of Travis Knighten.  And it's through

14:56:20   10   this wire we're introduced to YT and Bink (indicating

14:56:24   11   throughout).  This wiretap was up until July 20th of

14:56:28   12   2019, just shy of a month.  And in that time period, tens

14:56:34   13   of thousands of communications, both phone calls and text

14:56:37   14   messages, were intercepted.  Communications were

14:56:41   15   occurring almost 24 hours a day.  Communications were

14:56:45   16   occurring with multiple people at the same time.

14:56:49   17   Communications were occurring setting up large-scale

14:56:52   18   deals which needed upward of three to five people to

14:56:56   19   complete and smaller-scale deals that needed one to two.

14:56:59   20         And as a result of what was being intercepted on

14:57:02   21   the wire, the FBI obtained numerous search warrants for

14:57:09   22   residences around the Wichita area.  These residences

14:57:12   23   include a house on Somerset, a stash house set up by

14:57:15   24   Knighten and used by Mr. Lewis; a residence on Water, the

14:57:21   25   residence of Tia Ward, a coconspirator who distributed

14:57:25  1  pounds of methamphetamine for Knighten; a residence on

14:57:29  2  Holyoke, Mr. Vontress's residence, and the location where

14:57:33  3  numerous people were sent with money from their drug

14:57:37  4  sales; a residence on Stadium, another residence for

14:57:41  5  Mr. Lewis; and a residence on Chataqua, a house used by

14:57:46  6  Knighten's methamphetamine supplier through coconspirator

14:57:49  7  Richard Adams.

14:57:51  8        And you will hear that some of these residences we

14:57:55  9  found drugs and at others we did not.  For example, at

14:57:58  10  Tia's residence on Water investigators found

14:58:01  11  approximately 13 ounces of methamphetamine, just shy of

14:58:05  12  the 16 roses or 16 ounces of meth she continually

14:58:09  13  re-upped with Knighten.

14:58:11  14        At Somerset investigators found a vacuum sealer,

14:58:15  15  vacuum sealed bags and a digital scale, known drug

14:58:19  16  paraphernalia, that was consistent with how we learned

14:58:22  17  Lewis stored drugs in the basement of that residence.

14:58:25  18        And at Holyoke, Mr. Vontress's residence, the

14:58:30  19  defendant was caught on camera running and tossing a bag

14:58:34  20  of what was tested to be cocaine over the fence before

14:58:38  21  running back into his residence.  And in that residence

14:58:42  22  two firearms were also located:  one in his dresser and

14:58:45  23  one under his mattress.

14:58:47  24        During these searches numerous cell phones were

14:58:50  25  also collected, specifically two from Mr. Lewis that were

14:58:56  1   later downloaded, and additional text messages and a

14:58:58  2   WhatsApp conversation between Mr. Lewis and Mr. Knighten

14:59:00  3   were discovered.  And it's within that WhatsApp

14:59:04  4   conversation that you will see pictures of

14:59:06  5   methamphetamine and heroin went between the two parties.

14:59:09  6       Now, this investigation led to the ultimate

14:59:15  7   charging of the four conspiracies you heard earlier, the

14:59:19  8   conspiracy regarding meth, a conspiracy regarding heroin,

14:59:22  9   a conspiracy regarding cocaine, and a conspiracy

14:59:26  10  regarding cocaine base or crack cocaine.

14:59:29  11      And throughout the course of this trial, we expect

14:59:33  12  you to hear upwards of 40 phone calls between Travis

14:59:37  13  Knighten and numerous coconspirators, including the

14:59:40  14  defendants; to see roughly 500-plus text messages and

14:59:44  15  WhatsApp communications between Travis Knighten or other

14:59:48  16  coconspirators; to see pictures of drugs that were sent

14:59:53  17  by Mr. Lewis to Mr. Knighten and vice versa; to see the

14:59:57  18  methamphetamine, cocaine, and heroin and guns collected

15:00:02  19  on those searches I mentioned earlier; to see videos of

15:00:05  20  surveillance operations and pole cameras documenting a

15:00:11  21  number of transactions that you'll hear throughout the

15:00:13  22  course of this trial.

15:00:15  23      We expect you to hear testimonies of officers who

15:00:17  24  did the surveillance throughout the investigation, and we

15:00:21  25  expect you to hear from two individuals who were part --

15:00:26  1   who were either part of this organization or obtained

15:00:29  2   large quantities of narcotics from this operation to

15:00:33  3   later resell.  These two individuals are Trevor Wells and

15:00:37  4   Ty Henderson.  And they have both been charged with and

15:00:41  5   convicted of crimes.  And you will hear about the plea

15:00:44  6   agreements that they entered into with the Government in

15:00:48  7   exchange for the testimony you will hear during trial.

15:00:51  8       But their testimony will provide you with an

15:00:54  9   inside look into Knighten's organization and how it

15:00:58  10  functioned, to the deals that were conducted, to how

15:01:02  11  Mr. Lewis and Mr. Vontress were involved.  They were

15:01:07  12  inside some of these transactions and not just listening

15:01:09  13  to them from the outside on a wire.  And it is with this

15:01:12  14  evidence we expect to prove, beyond a reasonable doubt,

15:01:16  15  that the defendants did, in fact, participate in the

15:01:20  16  conspiracies in which they are charged, used their cell

15:01:24  17  phones to do it, and maintained residences to further

15:01:27  18  that conspiracy.

15:01:28  19       Now, as you listen and see this evidence, take

15:01:32  20  particular note of the amounts involved in the

15:01:35  21  transactions you hear and those involved in the

15:01:40  22  transactions you hear.  Not every transaction you hear

15:01:43  23  and learn about through the course of this trial involved

15:01:46  24  Mr. Vontress as a coconspirator.  And while the majority

15:01:50  25  involved Mr. Lewis as a coconspirator, not every single

| | | |
|---|---|---|
| 15:01:53 | 1 | one did. |
| 15:01:55 | 2 | So let's talk about each of these conspiracies, |
| 15:01:58 | 3 | starting with Count 2, the methamphetamine conspiracy. |
| 15:02:01 | 4 | Both defendants are charged in this conspiracy.  And you |
| 15:02:04 | 5 | will hear and see evidence of numerous methamphetamine |
| 15:02:07 | 6 | deals involving both of these defendants and other |
| 15:02:11 | 7 | coconspirators.  Some of these deals were large and took |
| 15:02:17 | 8 | place during the course of the wire to show how the |
| 15:02:21 | 9 | defendants, along with the coconspirators, worked |
| 15:02:23 | 10 | together.  And those are the ones I'm going to focus on |
| 15:02:25 | 11 | today, but there were numerous others, smaller, that you |
| 15:02:28 | 12 | will hear throughout the trial. |
| 15:02:29 | 13 | So on July 1st of 2019, the evidence will show |
| 15:02:35 | 14 | that Knighten set up a deal which was ultimately |
| 15:02:38 | 15 | determined to be 16 pounds of methamphetamine from his |
| 15:02:41 | 16 | source, Armando Luna.  Knighten has to get $45,000 |
| 15:02:47 | 17 | together for this deal.  And as the money man, Vontress |
| 15:02:51 | 18 | is told to get the money together.  Lewis is brought in |
| 15:02:55 | 19 | to bring funds he has in his possession to Mr. Vontress. |
| 15:03:03 | 20 | And Mr. Vontress -- or, I'm sorry, Mr. Lewis is told to |
| 15:03:06 | 21 | be prepared for those drugs to be brought to him at the |
| 15:03:10 | 22 | Somerset residence. |
| 15:03:12 | 23 | Now, once the funds are collected, Wack, or Otis |
| 15:03:16 | 24 | Ponds, is brought in to pick up the funds from |
| 15:03:18 | 25 | Mr. Vontress, take those funds to Luna's people, pick up |

| | | |
|---|---|---|
| 15:03:23 | 1 | the drugs, and ultimately take those drugs to Mr. Lewis |
| 15:03:27 | 2 | at Somerset. |
| 15:03:28 | 3 | Now, in this deal the group was not able to come |
| 15:03:32 | 4 | up with the entire 45,000 on July 1st, so, unfortunately, |
| 15:03:37 | 5 | Mr. Ponds only walked away with 11 pounds that day, but |
| 15:03:39 | 6 | he also walked away with a plan to pick up the other 5 |
| 15:03:43 | 7 | the following day, July 2nd. Now, this 11 pounds that he |
| 15:03:50 | 8 | did pick up on July 1st was taken to Mr. Lewis at |
| 15:03:53 | 9 | Somerset. And the following day you will see a picture |
| 15:03:57 | 10 | Mr. Lewis sends Mr. Knighten via WhatsApp of 11 bags of |
| 15:04:01 | 11 | what appears to be methamphetamine, vacuum sealed, the |
| 15:04:06 | 12 | exact way you will hear Mr. Lewis state he stores the |
| 15:04:09 | 13 | drugs so they don't lose their potency. |
| 15:04:12 | 14 | Now, on July 2nd, Mr. Vontress, Mr. Lewis, and |
| 15:04:17 | 15 | Mr. Ponds work together to collect the missing money and |
| 15:04:20 | 16 | procure the additional 5 pounds. You will hear from |
| 15:04:24 | 17 | officers who observed Mr. Ponds at Holyoke, Vontress's |
| 15:04:30 | 18 | residence. You'll hear them testify about following |
| 15:04:34 | 19 | Mr. Ponds to ███ North Chataqua, the stash house known to |
| 15:04:39 | 20 | belong to Knighten's supplier, Armando Luna, and then |
| 15:04:45 | 21 | that he ended up back at Somerset where he is seen |
| 15:04:48 | 22 | meeting with Mr. Lewis in the driveway. |
| 15:04:49 | 23 | The second large deal was on July 7th of 2019, and |
| 15:04:55 | 24 | this group was at it again but this time they were |
| 15:04:58 | 25 | getting 15 pounds of methamphetamine from Luna. Vontress |

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028        136

15:05:02   1   was again the keeper of the money, and Lewis and Tia Ward

15:05:06   2   were directed to Holyoke to drop off money required to

15:05:11   3   get the deal done.  As you will hear, Lewis and Ward were

15:05:16   4   observed by officers at Holyoke in line with when they

15:05:20   5   were told to bring the funds.  And Otis Ponds was again

15:05:26   6   tasked with making the exchange.  Mr. Ponds is again

15:05:30   7   observed going to Chataqua, and this time leaving with a

15:05:33   8   white package.  He is followed to Somerset and ultimately

15:05:37   9   caught on camera taking a white package into Somerset.

15:05:42  10       Now, during this deal Mr. Lewis was instructed

15:05:45  11   that once Ponds brought the drugs, he needed to get 16

15:05:49  12   roses, or ounces as this group liked to call it, together

15:05:54  13   for Tia Ward.  And that's ultimately observed and caught

15:05:59  14   on camera.  Mr. Ponds is seen arriving at Ms. Ward's

15:06:03  15   residence on Water, one of the residences searched, with

15:06:06  16   a gray sack.  And he's seen going into that residence

15:06:09  17   with that gray sack, and he's seen coming out of that

15:06:12  18   residence without the gray sack.  The evidence will show,

15:06:20  19   ladies and gentlemen, how Mr. Lewis and Mr. Vontress

15:06:23  20   worked together with others to obtain both of these

15:06:29  21   transactions' worth of methamphetamine.

15:06:30  22       You will also hear from Ty Henderson.  He will

15:06:35  23   tell you about his experiences purchasing upwards of 5 to

15:06:38  24   10 pounds of methamphetamine from members of this

15:06:41  25   organization, including Mr. Wells and Mr. Lewis.

15:06:47  1        Now, these are not the only methamphetamine deals,

15:06:50  2   as I mentioned earlier.  There were numerous others that

15:06:54  3   you will hear throughout the course of this trial.  You

15:06:56  4   will hear about Mr. Vontress ordering three "ice hockey

15:07:00  5   tickets" or 3 ounces of methamphetamine.  You will hear

15:07:03  6   about Lewis delivering 4, 8, and even up to 16 ounces of

15:07:08  7   methamphetamine to various coconspirators seeking drugs

15:07:11  8   from Knighten.

15:07:12  9        So moving next to Count 4, which is the heroin

15:07:17  10  conspiracy.  Both Mr. Lewis and Mr. Vontress are charged

15:07:22  11  in this conspiracy.  Heroin, or dark, is Mr. Lewis's

15:07:27  12  lane, his expertise, which you will hear him say.  I'm

15:07:32  13  sorry, you will see him say.

15:07:34  14        Similar to the meth conspiracy, you'll learn

15:07:37  15  throughout the course of the trial about a number of

15:07:39  16  incidents where Mr. Lewis sells zips, or ounces, of

15:07:42  17  Jordans to either Mr. Vontress or other coconspirators.

15:07:47  18  However, again, there are two larger deals I'd like to

15:07:50  19  draw your attention to that occurred within the single

15:07:53  20  month that this wire was up.

15:07:55  21        The first larger deal occurs on June 26 of 2019.

15:08:01  22  Knighten, up to this point on the wire, has referenced

15:08:04  23  numerous times getting a "whole nother thing," or a whole

15:08:10  24  one of black or heroin.  We ultimately learn through his

15:08:15  25  communications he's getting 40 ounces or approximately a

15:08:18  1  kilogram.  Communications are intercepted directing the

15:08:21  2  source of supply to drop at Holyoke with Mr. Vontress.

15:08:28  3  In a phone call Mr. Vontress confirms with Knighten that

15:08:30  4  someone is coming by, and Knighten explicitly states it's

15:08:35  5  for "a whole deal on the black world."  And Mr. Vontress

15:08:39  6  is given the time the source had texted Knighten he would

15:08:44  7  be arriving.

15:08:45  8       Now, later that day, Mr. Lewis picks up the drugs

15:08:49  9  from Mr. Vontress and delivers 20 ounces to Dorzee Hill.

15:08:54  10 But before making that delivery to Dorzee, Lewis sends a

15:08:59  11 picture of the heroin in two vacuum-sealed bags with the

15:09:03  12 text 50 grams in each, indicating he was in possession of

15:09:08  13 a thousand grams of heroin or a kilogram.

15:09:14  14      Now, another 20 ounces of heroin ends up going to

15:09:17  15 Eric Goodwin, or E, and this happens on July 1st of 2019.

15:09:22  16 While Goodwin was originally told he would be getting 30,

15:09:26  17 Lewis had sold some of the heroin that was earmarked for

15:09:29  18 Goodwin, and he ultimately ended up walking away with 20

15:09:33  19 or so.  During the communications Goodwin is directed to

15:09:39  20 Somerset, and Mr. Lewis is provided with Goodwin's ETA.

15:09:44  21 And it's at this point, ladies and gentlemen, you will

15:09:48  22 see Mr. Goodwin sitting outside of the Somerset

15:09:51  23 residence.  You will see Kevin Lewis arrive in a gold van

15:09:56  24 and eventually walk down the driveway and wave

15:09:59  25 Mr. Goodwin in.  You will hear from officers who saw both

15:10:03   1   men enter the Somerset residence.  And you will see both

15:10:08   2   men walk back down the driveway, shake hands, and

15:10:11   3   Mr. Goodwin leave.  After this both Mr. Lewis and

15:10:17   4   Mr. Goodwin, through communications, confirm to Knighten

15:10:20   5   the deal is done.

15:10:21   6        The next conspiracy is the cocaine conspiracy,

15:10:26   7   which is Count 5, and again involves both defendants.

15:10:30   8   And as part of this conspiracy, you will hear evidence

15:10:34   9   of, again, two larger-scale deals and multiple

15:10:37  10   smaller-scale deals.  You will also see a video of

15:10:41  11   Mr. Vontress tossing what has been tested as 123 grams or

15:10:46  12   approximately 4 ounces of cocaine over a fence as police

15:10:51  13   enter his residence on July 17th of 2019.

15:10:55  14        Now, the first larger deal in this conspiracy

15:11:00  15   occurred on June 27th of 2019.  You will see evidence

15:11:06  16   that Knighten coordinates with Robert Richmond, or Shot,

15:11:12  17   to get 9 ounces for 7500.  Knighten then instructs

15:11:18  18   Vontress to give Shot 7500 for soda, or cocaine.

15:11:24  19   Vontress is also told, as you will see, that the 9 were

15:11:28  20   coming back to him.  Now, ultimately the source was not

15:11:33  21   ready for this deal and the cocaine was not purchased.

15:11:37  22   While Knighten and Vontress did not ultimately succeed in

15:11:40  23   their plan to obtain cocaine, the evidence will show they

15:11:44  24   tried.

15:11:45  25        The second larger deal occurred on July 11th of

| | | |
|---|---|---|
| 15:11:49 | 1 | 2019.  Again, Knighten and Richmond arrange to grab some |
| 15:11:56 | 2 | soda.  Lewis is informed and Vontress is told to get the |
| 15:12:01 | 3 | money together for Richmond, and Richmond ultimately |
| 15:12:05 | 4 | secures the soda. |
| 15:12:07 | 5 | But what happens next transitions us into our |
| 15:12:10 | 6 | final conspiracy -- the cocaine base or crack conspiracy |
| 15:12:14 | 7 | in which only Mr. Lewis is charged.  Now, once that |
| 15:12:18 | 8 | cocaine was secured by Mr. Richmond, there were |
| 15:12:22 | 9 | communications between Knighten and Richmond as to how |
| 15:12:24 | 10 | much of that should be turned to hard.  Knighten changed |
| 15:12:27 | 11 | his mind frequently, and ultimately Richmond turns 11 |
| 15:12:30 | 12 | zips or 11 ounces hard, two of which are given to Lewis. |
| 15:12:36 | 13 | Now, this is by no means the only crack cocaine |
| 15:12:39 | 14 | deal you will hear throughout the course of this trial. |
| 15:12:42 | 15 | Mr. Lewis continually updates Knighten on his sales of a |
| 15:12:45 | 16 | ball here or getting a few ounces of hard to fix there, |
| 15:12:49 | 17 | or sometimes they just discuss getting hard and what to |
| 15:12:52 | 18 | do with it. |
| 15:12:55 | 19 | Now, remember the wire was up for 30 days, one |
| 15:12:59 | 20 | month.  And in that 30 days there is evidence that all of |
| 15:13:04 | 21 | these larger deals and many smaller ones I haven't |
| 15:13:06 | 22 | discussed were planned, coordinated, and acted upon by |
| 15:13:10 | 23 | these defendants and their coconspirators. |
| 15:13:12 | 24 | Because Knighten was incarcerated, he had to rely |
| 15:13:16 | 25 | on his people on the ground to move his product.  He |

15:13:20   1   communicated nonstop and was constantly using multiple

15:13:25   2   coconspirators, as you'll learn, including the

15:13:27   3   defendants, to achieve a single deal.  While each

15:13:33   4   defendant had their role to play, they knew Knighten was

15:13:38   5   trafficking drugs.  They handled drugs for Knighten, they

15:13:43   6   requested drugs from Knighten, and they worked on getting

15:13:47   7   money together for Knighten, and they worked together to

15:13:50   8   further the goals of the organization.

15:13:53   9        And at this point you might be asking yourself

15:13:57  10   why.  Why do all of this work for Knighten?  Loyalty, as

15:14:03  11   I said.  But it didn't come without some additional

15:14:06  12   benefits.  Mr. Lewis was given that gold van I mentioned

15:14:09  13   to drive.  He was instructed on how much to keep

15:14:12  14   personally from the sale of an ounce of methamphetamine.

15:14:16  15   And he was given a residence to stay at free of charge.

15:14:19  16   And he had Knighten's respect.

15:14:21  17        Vontress gets a cut from Knighten.  You'll hear

15:14:25  18   him discussing taking his hundred out of Knighten's

15:14:28  19   money.  And at various times he's told to keep certain

15:14:31  20   amounts, such as "You keep 2K," or 2,000.

15:14:35  21        But most importantly, both defendants were

15:14:38  22   provided drugs to sell, drugs to make money off of.

15:14:42  23        Now, what you will not see in this case is a large

15:14:46  24   amount of cash.  You'll hear a lot about it, but you

15:14:48  25   won't see it.  You'll see pictures of cash on Mr. Lewis's

15:14:53  1  bed taken from his cell phone or cash found at

15:14:57  2  Mr. Lewis's house on Stadium or at other coconspirators'

15:15:01  3  homes.  But over the next few weeks you will not see the

15:15:04  4  cash in front of you that you're hearing about on the

15:15:07  5  wire.  But you'll hear about the drugs they secured with

15:15:10  6  it.

15:15:11  7        Now, you might be asking yourself -- I mentioned a

15:15:15  8  lot about wire and communications -- how could the

15:15:18  9  investigators know what drugs or quantities are involved

15:15:21  10  when it's just conversation.  You will see that not every

15:15:26  11  phone call or text message names a drug, whether a slang

15:15:31  12  term or explicitly.  Sometimes they will use slang words

15:15:35  13  like I mentioned earlier:  Jordans, NHL, ice, soda,

15:15:41  14  cream.  Other times they won't explicitly use any slang

15:15:47  15  or name of drug.  Members were, in fact, specifically

15:15:52  16  discouraged from using names in messages, like when

15:15:56  17  Knighten told Mr. Lewis "You talk 2 explicitly homie

15:16:00  18  online skip the names and location."

15:16:02  19        As you hear the phone calls and read the text

15:16:06  20  messages, you will see that to determine the specifics of

15:16:09  21  the deal being discussed, the whole picture is needed and

15:16:14  22  not just one communication.  For example, on June 20th of

15:16:23  23  2019, you'll see communications where Knighten tells

15:16:26  24  Mr. Lewis that Otis Ponds will bring him 9 lbs.  9

15:16:31  25  pounds.  No explicit drug is mentioned.  But then

15:16:35  1  Mr. Lewis indicates he has 8 left before this delivery.

15:16:39  2  And Lewis is told to get Tia 16, which in previous

15:16:45  3  messages you'll see is explicitly defined by Knighten as

15:16:48  4  a pound, so get Tia a pound.

15:16:51  5      Next Lewis is told to give Ponds 2, Dallas 4, and

15:16:55  6  Tia 18, and he will have 8 pounds left.  This math is

15:17:01  7  spelled out for you by Mr. Knighten.  16 ounces from the

15:17:06  8  new 9 pounds and 8 they had left over, 8 ounces divided

15:17:11  9  up:  2 to Otis Ponds, 4 to Dallas Williams, an additional

15:17:16  10  2 to get Tia her 18 ounces.

15:17:18  11      And just two days later you'll see Mr. Lewis send

15:17:23  12  Travis Knighten a picture of methamphetamine in eight

15:17:26  13  vacuum-sealed bags.  And if you look closely, it appears

15:17:30  14  as though one of those bags is no longer sealed.  And

15:17:35  15  after that picture you'll hear a phone call where Lewis

15:17:39  16  confirms he sealed and vacuumed the drugs and he sold 70

15:17:44  17  grams, which Mr. Lewis defines as 2 and a half zips, and

15:17:48  18  that they have just under 8 pounds, the 8 pounds that

15:17:52  19  they were discussing two days prior.

15:17:56  20      Now, in addition to discussing certain deals, the

15:17:59  21  communications you will see and hear during this trial

15:18:02  22  lay out the math of this organization.  Like I said,

15:18:06  23  Mr. Knighten will define 16 is a pound, 32 is a key --

15:18:14  24  I'm sorry, 36 is a key.  And they also, for example, lay

15:18:18  25  out what 448 grams is, which is a pound, and that's how

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          144

```
15:18:25   1   Mr. Lewis explains what's in those eight bags, 448 grams
15:18:29   2   or a pound.
15:18:32   3         In addition to the evidence regarding the
15:18:36   4   conspiracies, we believe we'll be able to prove beyond a
15:18:42   5   reasonable doubt that multiple stash houses or premises
15:18:45   6   were maintained to further the conspiracy.  Now, you've
15:18:49   7   heard me talk about Somerset, which is █████ North
15:18:54   8   Somerset.  This is a single-family residence here in
15:18:57   9   Wichita that Knighten set up specifically for Tia Ward,
15:19:03  10   and specifically for Mr. Lewis to manage.
15:19:07  11         The evidence will show that Knighten rented the
15:19:10  12   house with coconspirator Kimberly Schmidtberger, or
15:19:14  13   Leggs, and that Lewis knew what was going to be in the
15:19:18  14   basement and exactly how to store it.  He was told, "Keep
15:19:21  15   them separated 16/16/16."  Pound, pound, pound.  You
15:19:28  16   will hear Mr. Lewis discuss moving his clothes there.
15:19:31  17   You will see pictures of Mr. Lewis in that room, in a
15:19:35  18   room at Somerset, along with mail he brought there and a
15:19:38  19   credit card.  You will see a video of Mr. Lewis arriving
15:19:42  20   at Somerset for the deal with Eric Goodwin we discussed
15:19:45  21   earlier, and you'll hear testimony of surveillance of
15:19:48  22   drugs being dropped off to Mr. Lewis at Somerset.
15:19:50  23         And you've also heard mention of Holyoke,
15:19:55  24   Mr. Vontress's residence.  Throughout this trial you will
15:19:58  25   hear numerous people being directed to take their
```

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          145

15:20:01  1  proceeds to Holyoke.  As I mentioned earlier you will

15:20:07  2  hear about a kilogram of heroin said to be delivered to

15:20:11  3  Holyoke and stored until Mr. Lewis could pick it up for

15:20:15  4  distribution.  And you will see Mr. Vontress toss cocaine

15:20:18  5  stored in his residence as law enforcement arrive.

15:20:23  6       So, ladies and gentlemen of the jury, we expect

15:20:26  7  the evidence to prove beyond a reasonable doubt that

15:20:31  8  Mr. Lewis and Mr. Vontress agreed and conspired with

15:20:35  9  others to possess with the intent to distribute or

15:20:39  10 distribute controlled substances, to maintain

15:20:42  11 drug-related premises, and/or use their cell phones in

15:20:45  12 furtherance of their drug trafficking activities, that

15:20:49  13 they took integral steps towards advancing the goal of

15:20:52  14 distributing drugs, and that they each could reasonably

15:20:55  15 foresee through the conspiracy possessing and/or

15:20:59  16 distributing at least 500 grams of methamphetamine and 1

15:21:05  17 kilogram of heroin.  We expect the evidence to show

15:21:10  18 beyond a reasonable doubt that they each maintained a

15:21:12  19 premises for the purpose of storing and/or distributing

15:21:16  20 controlled substances, and that they used their cell

15:21:20  21 phones because they had no choice, since Mr. Knighten was

15:21:22  22 in prison, to make calls and send messages for the

15:21:27  23 purposes of trafficking controlled substances.

15:21:31  24       Further, we expect the evidence to prove beyond a

15:21:34  25 reasonable doubt that Mr. Vontress possessed cocaine with

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          146

| 15:21:37 | 1 | the intent to distribute it and possessed a firearm in |
| 15:21:40 | 2 | further -- actually two -- in furtherance of that drug |
| 15:21:43 | 3 | trafficking. |
| 15:21:44 | 4 | So, ladies and gentlemen, at the end of this case, |
| 15:21:46 | 5 | after the evidence is presented and final arguments are |
| 15:21:50 | 6 | heard, we'll be asking you to find each defendant guilty |
| 15:21:53 | 7 | as to the specific charges against them in the |
| 15:21:56 | 8 | superseding indictment.  Thank you. |
| 15:22:01 | 9 | THE COURT:  Thank you, Ms. Andrusak. |
| 15:22:02 | 10 | Mr. Shultz, you may present an opening statement. |
| 15:22:10 | 11 | MR. SHULTZ:  Thank you, Your Honor. |
| 15:22:10 | 12 | OPENING STATEMENT |
| 15:22:11 | 13 | MR. SHULTZ:  May it please the Court.  Ladies and |
| 15:22:14 | 14 | gentlemen of the jury, good afternoon. |
| 15:22:15 | 15 | It is my privilege to be here to represent Kevin |
| 15:22:18 | 16 | Lewis.  You've heard the Government now lay out their |
| 15:22:20 | 17 | theory of what the evidence will show, but you haven't |
| 15:22:23 | 18 | heard the rest of the story.  Here it is.  The evidence |
| 15:22:26 | 19 | will not show that Kevin Lewis conspired with anybody to |
| 15:22:30 | 20 | distribute any of the narcotics discussed by the |
| 15:22:32 | 21 | Government.  The evidence will not show that Kevin Lewis |
| 15:22:35 | 22 | used a communication device of any kind to facilitate any |
| 15:22:39 | 23 | drug trafficking crime, and the evidence will not show |
| 15:22:42 | 24 | that Kevin Lewis maintained a drug-involved premises. |
| 15:22:46 | 25 | Rather, the evidence will show, a nearly two-year |

| | | |
|---|---|---|
| 15:22:51 | 1 | Government investigation, multiple wiretapped phones, |
| 15:22:55 | 2 | multiple search warrants and exactly zero distribution |
| 15:22:58 | 3 | quantity narcotics found of any kind on Kevin Lewis. |
| 15:23:03 | 4 | That's right.  At the culmination of this investigation, |
| 15:23:06 | 5 | zero distribution quantity of any narcotic on Kevin |
| 15:23:12 | 6 | Lewis, the "keeper" of the drugs. |
| 15:23:13 | 7 | Let me tell you how this happened.  We believe the |
| 15:23:16 | 8 | evidence will show that nearly four years ago the FBI |
| 15:23:18 | 9 | began, among other law enforcement, investigating alleged |
| 15:23:22 | 10 | drug dealing in Wichita.  Sometime during that |
| 15:23:25 | 11 | investigation, Mr. Lewis's name was brought up by a |
| 15:23:28 | 12 | secret witness -- we still don't know who it is -- and he |
| 15:23:30 | 13 | became a target among these other people.  The FBI spent |
| 15:23:35 | 14 | months and months and months, investigating, making |
| 15:23:40 | 15 | controlled buys against other people.  Mr. Lewis is not |
| 15:23:42 | 16 | involved.  And they eventually start getting wiretaps |
| 15:23:45 | 17 | against other people's phones. |
| 15:23:46 | 18 | You heard the Government talk about a phone tap |
| 15:23:50 | 19 | they got against Dorzee Hill in the spring of 2019, then |
| 15:23:52 | 20 | another tap on the phone of Dorzee Hill in the spring of |
| 15:23:55 | 21 | 2019, then another tap on a guy named Mario Ponds in the |
| 15:23:59 | 22 | spring of 2019.  You've heard the Government say they're |
| 15:24:03 | 23 | not going to bring any of that evidence to you today. |
| 15:24:05 | 24 | They want to talk about this phone on Travis Knighten, an |
| 15:24:10 | 25 | allegedly contraband phone for Mr. Knighten who's in |

15:24:14   1   prison in Oklahoma.  They say that's when we're

15:24:18   2   introduced to YT, introduced to Kevin Lewis.

15:24:20   3        During the period of that phone tap, those --

15:24:25   4   roughly just shorter than a month, the FBI is doing some

15:24:30   5   surveillance.  You will see some of those images.  You

15:24:33   6   will see some of those videos and pictures.  I expect you

15:24:35   7   will hear testimony of some of those things.  They were

15:24:38   8   listening to calls.  You were hear some of those calls.

15:24:41   9   You will hear what the Government believes or thinks that

15:24:43   10  those calls are about.

15:24:44   11       The FBI and the law enforcement developed an

15:24:48   12  understanding and an assumption of what they were hearing

15:24:50   13  and what they were seeing on those calls.  They set up a

15:24:56   14  pole camera that recorded over 10,000 hours of videos,

15:25:00   15  someone else's house.  You might see two minutes of that

15:25:03   16  during this trial, not Kevin's house.  And while

15:25:05   17  listening to Mr. Lewis and while allegedly watching him,

15:25:08   18  the FBI never, during any of these deals the Government

15:25:11   19  mentioned, intervened to interdict or verify that their

15:25:19   20  assumptions about what they were hearing and seeing were

15:25:22   21  correct.  Never in the month of June, from the end of

15:25:25   22  June to the end of July, did they ever intervene and

15:25:28   23  catch any of these people with any specific narcotic

15:25:33   24  alleged to be part of a conspiracy.

15:25:35   25       At no time did they call the prison in Oklahoma

15:25:38   1   and said, "Hey, you might take away his cell phone to

15:25:41   2   stop the drug trafficking."  At no time did they do that.

15:25:44   3   Rather, they wait, they watched, they didn't intervene,

15:25:46   4   and they thought, "We're going to wait and we're going to

15:25:49   5   wait until the end."  And the evidence will show that

15:25:51   6   July 17th, 2019, as the Government said, they thought,

15:25:55   7   "This is the culmination.  We know now we're going to

15:25:59   8   search a number of properties in Wichita."  And they

15:26:03   9   requested and executed search warrants on a number of

15:26:05   10  properties, including the Somerset address the Government

15:26:09   11  discussed, including an address on Stadium, where

15:26:11   12  Mr. Lewis stayed, as well as a car that Mr. Lewis

15:26:13   13  supposedly drove to facilitate drug trafficking.  The

15:26:18   14  early hours of July 17th, 2019, they moved.

15:26:21   15       What did they find as to Kevin Lewis?  No

15:26:25   16  distribution quantities of any narcotics on his person or

15:26:28   17  in his house or in his vehicle.  No distribution

15:26:32   18  quantities of money even comparable to the numbers that

15:26:35   19  they're suggesting we should have found if the kind of

15:26:39   20  drug trafficking that they're alleging was actually

15:26:41   21  happening at any of the houses, at any of Mr. Lewis's

15:26:44   22  houses, on Mr. Lewis's person.  No money or drugs

15:26:48   23  comparable to the numbers that they are alleging based on

15:26:51   24  what they say that you will see and what -- they say they

15:26:56   25  heard and saw during this investigation.

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          150

| | | |
|---|---|---|
| 15:26:57 | 1 | What did they find at the Somerset house that |
| 15:27:01 | 2 | Mr. Lewis supposedly maintained?  They didn't find Kevin |
| 15:27:04 | 3 | Lewis.  There was another man there when they busted in |
| 15:27:07 | 4 | in the morning of July 2017.  They didn't find |
| 15:27:10 | 5 | distribution quantities of any narcotic in Somerset |
| 15:27:13 | 6 | house.  They didn't find substantial quantities of money |
| 15:27:15 | 7 | in the Somerset house.  And there was no confirmation of |
| 15:27:21 | 8 | the codes and the slang that the Government will try to |
| 15:27:23 | 9 | tell you was talking about specific types of drugs at |
| 15:27:26 | 10 | specific times and things like that.  The Government's |
| 15:27:29 | 11 | evidence will talk about those things, but they never |
| 15:27:34 | 12 | found stuff to verify that code. |
| 15:27:36 | 13 | So the Government eventually, over a year later, |
| 15:27:40 | 14 | got into metaphorical bed with two people:  Ty Henderson |
| 15:27:44 | 15 | and Trevor Wells.  These aren't individuals that were |
| 15:27:47 | 16 | contemporaneously providing information to the |
| 15:27:49 | 17 | Government.  These are two men desperate to reduce their |
| 15:27:53 | 18 | prison sentence because they were caught with |
| 15:27:55 | 19 | distribution quantities of narcotics in their house or on |
| 15:27:59 | 20 | their person. |
| 15:27:59 | 21 | You will get to see and hear them testify, and you |
| 15:28:02 | 22 | will get to evaluate their credibility and their |
| 15:28:06 | 23 | modifications for the testimony they will bring.  They |
| 15:28:08 | 24 | are two convicted felons.  They are men caught with |
| 15:28:10 | 25 | distribution quantities of narcotics.  They were |

| | | |
|--|--|--|
| 15:28:13 | 1 | desperate and are desperate to shave time off of their |
| 15:28:17 | 2 | inevitable prison sentences.  They were not honest with |
| 15:28:20 | 3 | police when they met with them initially.  And they are |
| 15:28:24 | 4 | two men that have known the Government's theories, |
| 15:28:26 | 5 | evidence, arguments, and speculation of what they needed |
| 15:28:30 | 6 | for months and months and months, and eventually they |
| 15:28:33 | 7 | each decided, and they calculated and said, "I know how I |
| 15:28:37 | 8 | could fill in the gaps that I know the Government's |
| 15:28:39 | 9 | arguments are lacking."  And that's just what they did. |
| 15:28:41 | 10 |     They crafted their stories to fit the narrative |
| 15:28:45 | 11 | that the Government wanted, and you will get to see and |
| 15:28:48 | 12 | hear this.  You will get to see and hear Trevor Wells. |
| 15:28:52 | 13 | You will get to see and hear Ty or Roosevelt Henderson as |
| 15:28:56 | 14 | they try to tell you what they have to tell you to shave |
| 15:28:59 | 15 | time off their prison sentences. |
| 15:29:02 | 16 |     And when you listen to them and you listen to the |
| 15:29:04 | 17 | Government's case as a whole, you will free Mr. Lewis |
| 15:29:08 | 18 | from these accusations, because the evidence will not |
| 15:29:12 | 19 | show, beyond a reasonable doubt, that Kevin Lewis |
| 15:29:14 | 20 | conspired to distribute any of the alleged conspiracy |
| 15:29:17 | 21 | narcotics in this case.  The evidence will not show |
| 15:29:21 | 22 | beyond a reasonable doubt that Kevin Lewis used a |
| 15:29:23 | 23 | telephone to facilitate any kind of drug deal.  And the |
| 15:29:26 | 24 | evidence will not show beyond a reasonable doubt that |
| 15:29:28 | 25 | Kevin Lewis maintained a premises at ███ Somerset for |

15:29:33    1    the purpose of drug distribution.

15:29:34    2         At the end of this case, you will have doubts,

15:29:39    3    when you consider the evidence carefully, when you listen

15:29:40    4    to what's there and what's not there, and you will have

15:29:43    5    those doubts and they will be reasonable.

15:29:45    6         Thank you very much.

15:29:50    7         THE COURT:  Thank you, Mr. Shultz.

15:29:51    8         Mr. Babbit, you may make your opening statement.

15:29:53    9                   OPENING STATEMENT

15:29:54   10         MR. BABBIT:  May it please the Court, counsel.

15:30:08   11    Ladies and gentlemen of the jury, talk is cheap.

15:30:13   12    Statements don't mean anything.  Anyone can say anything.

15:30:18   13    However, it's what -- we all know anyone can say anything

15:30:22   14    they want, but statements do not mean anything unless

15:30:25   15    someone acts upon those statements.  Some people don't

15:30:28   16    mean what they stay.  Some people don't follow through

15:30:31   17    with what they say.  And some people just lie.  A quick

15:30:37   18    glance at any social media tells one all that he or she

15:30:40   19    needs to know about the reliability of talk.  And, ladies

15:30:45   20    and gentlemen, this case is all about talk.

15:30:49   21         The vast majority of the evidence will be

15:30:51   22    presented by the Government in this case is talk in the

15:30:55   23    form of recorded texts and phone calls, and talk in the

15:31:01   24    form of statements given by individuals who are simply

15:31:03   25    trying to shorten their prison sentences.

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          153

15:31:08   1          Ladies and gentlemen, the charge in this case

15:31:10   2   against Mr. Vontress start with events occurring in April

15:31:16   3   of 2019 and ending in July of 2019.  But the

15:31:21   4   investigation in this case began well before then.  And

15:31:25   5   this investigation involved not only federal law

15:31:29   6   enforcement but local law enforcement.  And through this

15:31:32   7   entire period of investigation, ladies and gentlemen, law

15:31:36   8   enforcement used about every investigative tool you could

15:31:40   9   think of, every resource you could think of, to

15:31:43   10  investigate this case.

15:31:45   11          Now, you're going to learn over the course of this

15:31:48   12  trial, ladies and gentlemen, some of those tools that

15:31:51   13  they used.  Obviously, physical surveillance was one of

15:31:55   14  them.  You'll see evidence of that had been conducted

15:31:58   15  over the course of this trial where they have an

15:32:00   16  individual, an agent, or law enforcement officer, watch

15:32:02   17  someone, follow someone around.  They had the ability to

15:32:06   18  do that as much as they wanted.

15:32:08   19          Those individuals could record individual -- their

15:32:13   20  target, their subjects if they wished, or they could

15:32:15   21  simply take notes and then report back and show -- or at

15:32:20   22  least and record exactly what happened on that day for

15:32:22   23  future reference.

15:32:23   24          They did electronic surveillance, pole cameras.

15:32:27   25  They put these cameras up in hidden areas that were

15:32:32   1   watching over a particular area of interest.  And these

15:32:36   2   cameras would record what was going on day after day

15:32:39   3   after day after day.  And that information could be

15:32:43   4   accessed by the law enforcement at any time.  They could

15:32:46   5   tap into a server, they could check in to a live video

15:32:50   6   feed and they could find out what was going on to the

15:32:52   7   best the camera showed at any given time, or it was being

15:32:56   8   recorded so they could check in and find out what

15:32:59   9   happened two days ago, and just see what was going on as

15:33:02  10   far as the camera showed what was going on.

15:33:05  11        Obviously, ladies and gentlemen, another

15:33:08  12   investigative tool which will be the vast majority of

15:33:10  13   probably what's discussed about over this trial are the

15:33:13  14   wiretaps that were established, where they recorded texts

15:33:18  15   and phone calls from a variety of phones, the most

15:33:21  16   important one of which is the one on Travis Knighten's

15:33:25  17   phone, which occurred in the latter part of -- in the

15:33:28  18   middle of 2019.

15:33:30  19        Now, with all of this, ladies and gentlemen, you

15:33:34  20   will learn that Mr. Vontress does not appear in this

15:33:36  21   investigation until mid-June of 2019.  There's about 30

15:33:42  22   days left before the thing ended in July 17th, 2019, when

15:33:47  23   the multiple search warrants were executed on the

15:33:49  24   residences here across the Wichita area.

15:33:53  25        And what will you learn, ladies and gentlemen,

```
15:33:56   1   over the course of this trial?  You will learn that

15:33:59   2   Travis Vontress was not in the possession of any money.

15:34:04   3   Zero.  But what you will learn over the course of this

15:34:08   4   trial is that Mr. Vontress is accused of basically being

15:34:12   5   the treasurer for this Knighten conspiracy, for these

15:34:16   6   three Knighten conspiracies involving methamphetamine,

15:34:21   7   involving cocaine, involving heroin.  He's --

15:34:27   8   Mr. Vontress is being accused of basically handling over

15:34:30   9   a hundred thousand dollars in cash.  Yet in this case the

15:34:35  10   Government will present to you no money in Mr. Vontress's

15:34:38  11   possession, or anyone else's possession in this case for

15:34:41  12   that matter, of any significant amount.

15:34:43  13          Also, ladies and gentlemen, you will learn that

15:34:48  14   despite all these efforts, all the investigative efforts

15:34:52  15   that I've described to you already, all the efforts that

15:34:56  16   you can imagine that these two law enforcement agencies

15:34:59  17   could put together, no contraband that was linked to

15:35:05  18   Mr. Knighten's conspiracy was found in Mr. Vontress's

15:35:08  19   possession.

15:35:10  20          You will learn over the course of this trial,

15:35:12  21   ladies and gentlemen, that on July 17th, when a search

15:35:15  22   warrant was executed not only on Mr. Vontress's residence

15:35:18  23   but on several other residences in the Wichita area, that

15:35:23  24   when they executed that search warrant Mr. Vontress is

15:35:27  25   seen on a video running out of the house and throwing
```

15:35:31   1   something over a fence.  And I expect over the course of

15:35:34   2   this trial, ladies and gentlemen, you'll learn that the

15:35:37   3   bag that was thrown over the fence contained cocaine and

15:35:40   4   that the amount was a little over a hundred grams.

15:35:44   5        But this case, ladies and gentlemen, isn't about

15:35:47   6   a-hundred-and-some-odd grams of cocaine.  Mr. Vontress is

15:35:52   7   charged in this case with conspiring with Mr. Knighten to

15:35:58   8   distribute kilogram quantities of methamphetamine.  He is

15:36:03   9   accused in this case of conspiring with Mr. Knighten to

15:36:06  10   distribute pound quantities of cocaine.  And he's accused

15:36:12  11   in this case, ladies and gentlemen, of distributing a

15:36:14  12   little over a kilogram of heroin.  Over the course of

15:36:20  13   this trial, ladies and gentlemen, no money that's linked

15:36:24  14   to Mr. Knighten was found in Mr. Vontress's possession,

15:36:27  15   no drugs in Mr. Vontress's possession that is linked to

15:36:32  16   Mr. Knighten.

15:36:32  17        Ladies and gentlemen, on July 17th, 2019, when

15:36:38  18   Mr. Vontress was -- when his house was approached on that

15:36:43  19   day by law enforcement, Mr. Vontress was 42 years of age.

15:36:49  20   His fiance's name is Lisa.  He lived with Lisa and his

15:36:55  21   three children at ███ North Holyoke here in Wichita.

15:37:00  22   And on July 17th, 2019, Mr. Vontress was innocent.

15:37:07  23   Mr. Vontress remains innocent today seated here before

15:37:11  24   you, and that's because the law presumes him so.

15:37:17  25        Back in 1788 Thomas Jefferson stated, "I consider

| 15:37:21 | 1 | trial by jury as the only anchor ever yet imagined by man |
| 15:37:25 | 2 | by which Government can be held to the principles of its |
| 15:37:28 | 3 | Constitution." |
| 15:37:30 | 4 | And those two important heavy constitutional |
| 15:37:35 | 5 | principles:  the presumption of innocence and the burden |
| 15:37:40 | 6 | of proof.  In this case, ladies and gentlemen, the |
| 15:37:42 | 7 | Government must prove beyond a reasonable doubt every |
| 15:37:45 | 8 | single element of each of the offenses charged in this |
| 15:37:50 | 9 | case.  And, ladies and gentlemen, at the conclusion of |
| 15:37:52 | 10 | this trial, the Government will fail to meet its burden. |
| 15:37:56 | 11 | Thank you. |
| 15:37:59 | 12 | THE COURT:  Thank you, Mr. Babbit. |
| 15:38:00 | 13 | Ladies and gentlemen of the jury, you've now heard |
| 15:38:02 | 14 | the opening statements from all parties in this case |
| 15:38:05 | 15 | designed to tell you where they think the evidence is |
| 15:38:07 | 16 | heading. |
| 15:38:08 | 17 | We will now commence with the evidentiary portion |
| 15:38:10 | 18 | of the trial.  Government, can you call your first |
| 15:38:12 | 19 | witness? |
| 15:38:13 | 20 | MR. TREASTER:  Your Honor, the United States could |
| 15:38:15 | 21 | call Special Agent Cameron Heath to the stand. |
| 15:38:22 | 22 | THE COURT:  Agent Heath, if you will come in front |
| 15:38:24 | 23 | of my courtroom deputy, he will swear you in and then you |
| 15:38:26 | 24 | may have a seat in the witness box. |
| 15:38:28 | 25 | SPECIAL AGENT CAMERON HEATH, |

15:38:28   1   having been first duly sworn to testify the truth, the

15:38:28   2   whole truth, and nothing but the truth, testified as

15:39:01   3   follows:

15:39:02   4                       DIRECT EXAMINATION

15:39:02   5   BY MR. TREASTER:

15:39:02   6   Q.      Please state your name for the record.

15:39:03   7   A.      Cameron Heath.

15:39:06   8   Q.      How are you employed?

15:39:07   9   A.      I'm a special agent with the FBI.

15:39:10  10   Q.      And for that position with the FBI do you have a

15:39:13  11   preparatory education?

15:39:14  12   A.      Yes.

15:39:14  13   Q.      And what is that?

15:39:15  14   A.      I have a bachelor's degree in Education and I'm

15:39:18  15   about two-thirds of the way done with a master's degree.

15:39:21  16   Q.      And prior to your employment with the FBI were you

15:39:24  17   previously employed with law enforcement?

15:39:26  18   A.      Yes.

15:39:26  19   Q.      And what was that?

15:39:28  20   A.      I was a state trooper with the Missouri State

15:39:31  21   Highway Patrol.

15:39:31  22   Q.      How long were you with them?

15:39:32  23   A.      Approximately four and a half years.

15:39:35  24   Q.      And then how long have you been with the FBI?

15:39:38  25   A.      Approximately six and a half years.

15:39:41  1  Q.      And did you have training through the Missouri

15:39:42  2  Highway Patrol for -- related to narcotics trafficking?

15:39:46  3  A.      Yes.

15:39:46  4  Q.      And what was that?

15:39:47  5  A.      I went to the basic academy in Jefferson City,

15:39:50  6  Missouri, which was about six months long.  During that

15:39:53  7  academy, I received narcotics training, specifically

15:39:57  8  pertaining to what narcotics looked like, the odor in

15:40:05  9  which a narcotic may be, so just the basics.

15:40:07  10         And then following when I graduated from the

15:40:09  11 academy, when I became a uniformed officer, I went to a

15:40:13  12 drug recognition school that was approximately a week

15:40:15  13 long.  And it was just more in depth as to what I'd

15:40:19  14 already been exposed to during the basic academy.  But

15:40:22  15 you learned more about how the narcotics were trafficked

15:40:27  16 and transported, and along with slang words that were

15:40:30  17 used to describe those narcotics as well.

15:40:34  18 Q.      As a highway patrolman in Missouri, did you have

15:40:37  19 an opportunity to do drug interdiction?

15:40:40  20 A.      Yes, I also did a 30-day internship with our drug

15:40:44  21 interdictors who had K-9s, and specifically focused on

15:40:49  22 the interdiction of drugs on highways, and I also did

15:40:51  23 that as well on my own when I was an officer as well.

15:40:55  24 Q.      So you made traffic stops where you found drugs?

15:40:58  25 A.      Yes.

15:40:59   1   Q.      And then once you got on with the FBI did you have

15:41:01   2   specific narcotics training with them as well?

15:41:02   3   A.      Yes.

15:41:03   4   Q.      And what was that?

15:41:03   5   A.      Similar.  Obviously, I went to the basic special

15:41:08   6   agent training academy at Quantico, Virginia, which was

15:41:10   7   approximately five months long, and the FBI also exposed

15:41:14   8   everyone to narcotics and narcotics investigations.  So

15:41:20   9   they start everyone at a baseline level whether or not

15:41:22  10   you've had prior experience.

15:41:24  11          And then following that, since I became an agent

15:41:27  12   and I was assigned to the field here in Wichita, I went

15:41:30  13   to what's called Safe Streets Gang Task Force training.

15:41:34  14   And specifically I received training on narcotics

15:41:37  15   trafficking, how the narcotics were imported from outside

15:41:40  16   the United States, how they're transported once they do

15:41:44  17   arrive in the United States, and investigative techniques

15:41:46  18   and tools to utilize in investigating those cases.  And

15:41:50  19   then also I received wiretap training from attorneys at

15:41:53  20   the Department of Justice who specialize in wiretaps.

15:41:58  21   Q.      And so at one point in your career did you have --

15:42:01  22   were you assigned to investigate a drug trafficking

15:42:03  23   organization or DTO run by an individual you believed to

15:42:07  24   be Travis Knighten?

15:42:08  25   A.      Yes.

| | | |
|---|---|---|
| 15:42:08 | 1 | Q.      And when did that start?  When did that start |
| 15:42:14 | 2 | approximately? |
| 15:42:14 | 3 | A.      **On the wiretap?** |
| 15:42:16 | 4 | Q.      No, the assignment, just your general assignment. |
| 15:42:18 | 5 | A.      **When we initiated the case?** |
| 15:42:20 | 6 | Q.      Yes. |
| 15:42:20 | 7 | A.      **So the case was originally initiated in the spring** |
| 15:42:25 | 8 | **of 2018, but mind you as the case agent I have multiple** |
| 15:42:32 | 9 | **other obligations as the investigation goes, so generally** |
| 15:42:34 | 10 | **when you're working -- when you start a case you're also** |
| 15:42:37 | 11 | **working other cases, so there may be times when you're** |
| 15:42:40 | 12 | **not working a particular case but the case has been** |
| 15:42:42 | 13 | **initiated.  Right?  So you're focusing on other** |
| 15:42:45 | 14 | **investigations as well.  So it started in the spring of** |
| 15:42:48 | 15 | **2018.** |
| 15:42:48 | 16 | Q.      And what was the general nature of this drug |
| 15:42:52 | 17 | trafficking organization? |
| 15:42:54 | 18 | A.      **The drug trafficking organization during the time** |
| 15:42:57 | 19 | **frame we investigated it in 2019, during the time frame** |
| 15:43:00 | 20 | **of the conspiracy, we identified that Travis Knighten,** |
| 15:43:04 | 21 | **who was incarcerated at the McAlester state prison at** |
| 15:43:07 | 22 | **Oklahoma was facilitating drug trafficking activities** |
| 15:43:11 | 23 | **here in Wichita, Kansas via contraband cell phone.  We** |
| 15:43:14 | 24 | **called it "contraband cell phone" because an inmate at a** |
| 15:43:17 | 25 | **state prison, or in any prison, is not allowed to have a** |

15:43:19    1    cell phone.

15:43:20    2          So he was utilizing that cell phone to communicate

15:43:23    3    with individuals here in the Wichita, Kansas, area to

15:43:27    4    further drug trafficking activities.

15:43:29    5    Q.      And as part of this investigation, did you apply

15:43:32    6    for a wiretap?

15:43:33    7    A.      Yes.

15:43:34    8    Q.      And when was that initially done?

15:43:36    9    A.      So the first wiretap that I applied for was on

15:43:39    10   April the 9th, 2019.  However, we began receiving phone

15:43:43    11   calls and text messages from the phone company on

15:43:46    12   April 10th, 2019.

15:43:48    13   Q.      Okay.  And it was granted then; right?

15:43:52    14   A.      Yes.

15:43:52    15   Q.      And who was it granted by?

15:43:54    16   A.      It was granted by a district court judge, like

15:43:57    17   Judge Melgren here in the District of Kansas, here

15:44:00    18   specifically in Wichita.

15:44:00    19   Q.      And who was that?

15:44:01    20   A.      Judge John Broomes.

15:44:05    21   Q.      And as part of that wiretap, whose phone did you

15:44:08    22   initially tap?

15:44:08    23   A.      Dorzee Hill.

15:44:12    24   Q.      And what was that phone number?

15:44:13    25   A.      It was 316-928-6363.

15:44:21    1  Q.      And as this being the first phone, did you have a

15:44:24    2  abbreviation that you called it for purposes?

15:44:27    3  A.      Yes.  So when you do a wiretap, the target

15:44:30    4  telephone -- or the number that you're doing the tap on

15:44:32    5  is known as the "target telephone," and then you

15:44:35    6  abbreviate it as TT.  So because this was the first

15:44:38    7  wiretap that we'd done in this investigation, this number

15:44:40    8  was known as TT No. 1.

15:44:43    9  Q.      And how were you able to determine that it was the

15:44:47   10  phone of Dorzee Hill?

15:44:48   11  A.      Well, ultimately during this timeframe Dorzee Hill

15:44:51   12  was on federal probation, and so his federal probation

15:44:54   13  officer confirmed that this was the number that he would

15:44:56   14  use to communicate with Dorzee Hill on.

15:44:59   15  Q.      And did Mr. Hill have any nicknames he went by?

15:45:02   16  A.      He primarily went by his first name Dorzee and

15:45:06   17  occasionally he would go by the letter D as well.

15:45:08   18  Q.      How this was this wire good for?

15:45:10   19  A.      It was for 30 days.

15:45:11   20  Q.      And so you say it started on the 9th of April; is

15:45:14   21  that right?

15:45:14   22  A.      No, that's when it was signed.  The order signed

15:45:17   23  for the wiretap by the judge was signed on April the 9th,

15:45:20   24  but the actual wiretap commenced on April the 10th, 2019.

15:45:23   25  Q.      And then when did it -- when did the wire go down?

| 15:45:26 | 1 | A.      On May 9th, 2019. |
| 15:45:29 | 2 | Q.      Okay, so it was good for 30 days? |
| 15:45:31 | 3 | A.      Yes. |
| 15:45:32 | 4 | Q.      And, in general, what did you learn about the drug |
| 15:45:36 | 5 | trafficking of Mr. Hill at that point? |
| 15:45:39 | 6 | A.      During that 30-day period, we identified that |
| 15:45:42 | 7 | during our investigation that Dorzee Hill was utilizing |
| 15:45:45 | 8 | the target telephone No. 1 as a phone in furtherance of |
| 15:45:50 | 9 | cocaine sales. |
| 15:45:51 | 10 | Q.      And based on this initial 30-day period, what was |
| 15:45:55 | 11 | your next investigative step? |
| 15:45:57 | 12 | A.      Well, so during this timeframe, like I said, we |
| 15:46:00 | 13 | identified that he was using this phone to further |
| 15:46:04 | 14 | cocaine sales.  We also identified who his cocaine |
| 15:46:08 | 15 | supplier was during this timeframe.  So what we did was |
| 15:46:11 | 16 | we asked for what was called an extension, a 30-day |
| 15:46:15 | 17 | extension, on the wiretap.  So target telephone 1 we |
| 15:46:18 | 18 | requested a 30-day extension, and then we also asked to |
| 15:46:22 | 19 | do a -- when I say "asked," we present facts in an |
| 15:46:25 | 20 | affidavit to the judge.  And the judge ultimately is the |
| 15:46:27 | 21 | one who signs it.  But we asked for permission to receive |
| 15:46:31 | 22 | phone calls from his cocaine supplier, and his name was |
| 15:46:35 | 23 | Mario Ponds. |
| 15:46:36 | 24 |         Mario Ponds's phone number was 316-303-5458.  But |
| 15:46:41 | 25 | before I get any further on Mr. Ponds, during the first |

15:46:46   1   30 days of wiretap on target telephone 1, we identified

15:46:50   2   that Dorzee Hill had a second phone that he was utilizing

15:46:53   3   in furtherance of a heroin conspiracy.  So as a result of

15:46:56   4   that, we requested from the district court judge for

15:47:00   5   permission to do 30 days of wiretaps on Dorzee Hill's

15:47:04   6   second phone, and that was identified as target telephone

15:47:07   7   2.  And that second phone number of Dorzee Hill's was

15:47:11   8   316-272-6628.  So Dorzee has two phones.  The first one

15:47:17   9   we did was target telephone 1.  We asked for a 30-day

15:47:21  10   extension on that target telephone.  The second phone we

15:47:23  11   did on Dorzee Hill was target telephone 2.  So that was

15:47:26  12   the first -- the timeframe we were doing the second -- or

15:47:29  13   the first extension on Dorzee Hill's phone was the

15:47:32  14   timeframe we were doing the first round of 30 days on his

15:47:34  15   second phone.

15:47:35  16        And then that brings me back to Mario Ponds, who

15:47:39  17   we identified as Dorzee Hill's source of cocaine supply.

15:47:42  18   His number was designated target telephone 3.

15:47:45  19   Q.    Okay.  So on this second round of wiretaps, you're

15:47:48  20   going to continue on target telephone 1, Mr. Hill's;

15:47:51  21   right?

15:47:52  22   A.    Yes.

15:47:52  23   Q.    And then you're going to pick up a second phone

15:47:55  24   that you've identified that he used that ended in 6628,

15:47:58  25   and you call it target telephone 2; is that right?

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028        166

| | | |
|---|---|---|
| 15:48:01 | 1 | A.      Yes. |
| 15:48:01 | 2 | Q.      And now you've decided you try to work up the |
| 15:48:05 | 3 | chain to Mario Ponds, who's his cocaine supplier that you |
| 15:48:08 | 4 | identified? |
| 15:48:08 | 5 | A.      That's correct. |
| 15:48:09 | 6 | Q.      And his -- this was target telephone 3 that you |
| 15:48:12 | 7 | said ended in 5458? |
| 15:48:14 | 8 | A.      Yes. |
| 15:48:15 | 9 | Q.      Okay.  And then how did you determine that |
| 15:48:21 | 10 | Mr. Hill's TT2 belonged to him? |
| 15:48:23 | 11 | A.      So what we identified, he made statements on -- |
| 15:48:27 | 12 | during the first round -- I'm sorry, I'm using a lot of |
| 15:48:30 | 13 | dates, but the first round on Dorzee Hill's target |
| 15:48:32 | 14 | telephone 1, so that 30-day period.  He made statements |
| 15:48:36 | 15 | on his phone that indicated that he had a second phone, |
| 15:48:40 | 16 | and that he had also made statements that he was using |
| 15:48:42 | 17 | that phone in furtherance of a heroin conspiracy. |
| 15:48:45 | 18 |         So we presented some facts to the judge after we |
| 15:48:48 | 19 | identified what number he was using.  So we did what's |
| 15:48:51 | 20 | called phone toll analysis.  So we knew that he |
| 15:48:55 | 21 | communicated with a certain individual, so we subpoenaed |
| 15:48:57 | 22 | the phone records on that individual.  Then what we would |
| 15:49:01 | 23 | do is we knew what dates and times he had spoke with that |
| 15:49:03 | 24 | individual, and we were able to find that and to locate |
| 15:49:06 | 25 | that in his -- in the phone toll analysis of the |

15:49:10  1    individual that was subpoenaed, so we were able to

15:49:11  2    identify the number that he was using.

15:49:13  3         So we presented those facts to the district court

15:49:16  4    judge, who ultimately authorized us to begin receiving

15:49:20  5    phone calls and text messages on target telephone 2.

15:49:23  6    Q.    Okay.  So what were the dates then on this second

15:49:30  7    round of wiretaps?

15:49:33  8    A.    Those dates were May 17th, 2019, to June 15th,

15:49:38  9    2019.

15:49:41  10   Q.    And was it also granted by Judge Broomes?

15:49:44  11   A.    That's correct.

15:49:49  12   Q.    And then how did you determine the third phone,

15:49:51  13   the TT3, belonged to Mario Ponds?

15:49:55  14   A.    So we identified Mario Ponds, like I said, during

15:49:58  15   the first phase of Dorzee Hill's wiretap on target

15:50:03  16   telephone 1.  Dorzee and Mario would communicate.  Dorzee

15:50:07  17   would -- or Dorzee would greet Mario Ponds as Mario.

15:50:12  18   Well, then we would see Mario Ponds on surveillance at

15:50:15  19   Dorzee Hill's house, and we knew what Mario Ponds looked

15:50:19  20   like, so through surveillance we were able to confirm

15:50:21  21   that, in fact, it was Mario Ponds.

15:50:24  22   Q.    And so, in general, on this second set of wires,

15:50:28  23   what did you learn as part of your investigation?

15:50:32  24   A.    So we learned a lot.

15:50:35  25        MR. BABBIT:  Objection.  Judge, may we approach?

| | | |
|---|---|---|
| 15:50:37 | 1 | THE COURT:  I apologize, Mr. Babbit, you're going |
| 15:50:40 | 2 | to have to speak so I can hear you. |
| 15:50:42 | 3 | MR. BABBIT:  Objection.  I think it would be more |
| 15:50:45 | 4 | helpful to approach so I can voice my concern. |
| 15:50:47 | 5 | THE COURT:  Come up. |
| 15:50:55 | 6 | (At the bench with Court and counsel.) |
| 15:51:07 | 7 | MR. BABBIT:  I just object as continuing summary |
| 15:51:09 | 8 | testimony and just hearsay and general opinions given by |
| 15:51:13 | 9 | this agent about past seemingly relevant investigation, |
| 15:51:20 | 10 | part of this investigation. |
| 15:51:21 | 11 | THE COURT:  Well, it seems to me it's part of the |
| 15:51:23 | 12 | res gestae of the underlying.  This is a complicated |
| 15:51:26 | 13 | case. |
| 15:51:26 | 14 | MR. BABBIT:  I understand that.  The more |
| 15:51:28 | 15 | concerning part I have is that he's continually |
| 15:51:31 | 16 | identifying these individuals as drug traffickers and |
| 15:51:35 | 17 | cocaine distributors when, I mean, the next step is he's |
| 15:51:38 | 18 | going to call Travis Knighten the same thing, which, |
| 15:51:45 | 19 | again, I think is part of what this jury's here for.  So |
| 15:51:49 | 20 | if he wants to report the general steps he went through, |
| 15:51:52 | 21 | that's fine.  But he's -- again, we're getting -- this |
| 15:51:55 | 22 | agent is using -- is testifying to an incredible amount |
| 15:51:59 | 23 | of hearsay and summary testaments about everything he's |
| 15:52:03 | 24 | learned over the past year and a half in this case. |
| 15:52:07 | 25 | MR. TREASTER:  Your Honor, he's testifying to his |

15:52:09   1   personal experience on the investigation, how he got the

15:52:13   2   wires, how he identified things.  This isn't hearsay;

15:52:15   3   this is him.

15:52:16   4        THE COURT:  I haven't heard him reference an exact

15:52:19   5   or an actual statement that would be hearsay.  He's

15:52:22   6   summarizing what he's learning, which is not hearsay.

15:52:25   7   When he's saying, "This is what we learned from the

15:52:27   8   wire," that's not hearsay.

15:52:28   9        I admit he's summarizing some names and

15:52:32   10   transactions that are specifically charged here, but it

15:52:35   11   seems to me they're part of, as I said, the res gestae.

15:52:39   12   And I think he's giving what I typically consider

15:52:42   13   standard law enforcement testimony, so I'm going to

15:52:44   14   overrule your objection.

15:52:45   15        (Thereupon, the following proceedings continued in

15:52:45   16   the hearing of the jury, with the defendants present.)

15:52:45   17        MR. TREASTER:  Jo, what was my last question?  I

15:52:45   18   apologize.

15:52:45   19        THE WITNESS:  You asked me what I learned.  Oh,

15:53:21   20   I'm sorry.

15:53:21   21        (Whereupon, the referred-to question was read back

15:53:22   22   by the Court Reporter.)

15:53:22   23   BY MR. TREASTER:

15:53:23   24   Q.   So could you answer that question, Agent?

15:53:25   25   **A.   Yes.  So during the second round of wiretaps, we**

| 15:53:29 | 1 | identified that Travis Knighten's brother, younger |
|---|---|---|
| 15:53:32 | 2 | brother, Trevor Wells a/k/a Punchy, was selling narcotics |
| 15:53:37 | 3 | out of his residence located at ████ North Yale. |
| 15:53:40 | 4 | Q.     And based on that information, what step did you |
| 15:53:43 | 5 | take after that? |
| 15:53:44 | 6 | A.     So we applied for a federal search warrant and |
| 15:53:46 | 7 | were granted one by a federal judge here in Wichita, and |
| 15:53:49 | 8 | then on May 31st, 2019, we executed that search warrant |
| 15:53:54 | 9 | at that residence at ████ North Yale here in Wichita. |
| 15:53:56 | 10 | Q.     So this would have actually been during that |
| 15:54:01 | 11 | second set of wires? |
| 15:54:02 | 12 | A.     Yes.  So we were -- we were still doing the |
| 15:54:04 | 13 | wiretap during this timeframe of TT1, TT2, and TT3. |
| 15:54:10 | 14 | Q.     So on May 31st of 2019 you, as the agent on this |
| 15:54:16 | 15 | case, applied for a search warrant for that address? |
| 15:54:18 | 16 | A.     Yes. |
| 15:54:19 | 17 | Q.     And was it executed? |
| 15:54:21 | 18 | A.     It was actually applied for before May 31st, 2019, |
| 15:54:26 | 19 | but it was executed on May 31st. |
| 15:54:27 | 20 | Q.     On that date.  What type of location is 930 North |
| 15:54:32 | 21 | Yale? |
| 15:54:32 | 22 | A.     It's a family residence. |
| 15:54:34 | 23 | Q.     Here in Wichita, Kansas? |
| 15:54:36 | 24 | A.     Yes. |
| 15:54:37 | 25 | Q.     Okay.  And when that warrant was executed, who was |

| | | |
|---|---|---|
| 15:54:43 | 1 | located there? |
| 15:54:44 | 2 | A.      Trevor Wells. |
| 15:54:46 | 3 | Q.      And was -- so he was there at the time that this |
| 15:54:49 | 4 | warrant was executed; is that what you said? |
| 15:54:51 | 5 | A.      Yes. |
| 15:54:52 | 6 | Q.      Were there any others there? |
| 15:54:54 | 7 | A.      I believe his common-law wife, Monica Soctomah, |
| 15:54:59 | 8 | and then their three, like, juvenile children. |
| 15:55:02 | 9 | Q.      And did you learn of some connection between |
| 15:55:04 | 10 | Mr. Wells and Mr. Knighten? |
| 15:55:06 | 11 | A.      Yes. |
| 15:55:06 | 12 | Q.      And what is that? |
| 15:55:07 | 13 | A.      He's the younger brother.  Trevor Wells is the |
| 15:55:09 | 14 | younger brother to Travis Knighten, and he was selling |
| 15:55:12 | 15 | narcotics for Travis Knighten. |
| 15:55:13 | 16 | Q.      And was Mr. Wells heard on that second set of |
| 15:55:16 | 17 | wires? |
| 15:55:17 | 18 | A.      Yes. |
| 15:55:17 | 19 | Q.      And who was he talking to? |
| 15:55:19 | 20 | A.      Dorzee Hill. |
| 15:55:21 | 21 | Q.      And were you able to determine a phone number he |
| 15:55:24 | 22 | was using? |
| 15:55:24 | 23 | A.      Yes. |
| 15:55:24 | 24 | Q.      And what was that? |
| 15:55:25 | 25 | A.      316-670-2268. |

| | | |
|---|---|---|
| 15:55:36 | 1 | Q.      What was the last four? |
| 15:55:37 | 2 | **A.      2268.** |
| 15:55:40 | 3 | Q.      And how were you able to determine that it was |
| 15:55:42 | 4 | him? |
| 15:55:43 | 5 | **A.      I heard his voice the day that we actually** |
| 15:55:45 | 6 | **executed the search warrant, so I confirmed that his** |
| 15:55:49 | 7 | **voice was the one that matched the phone calls that we** |
| 15:55:52 | 8 | **had intercepted on TT2 before the search warrant.** |
| 15:55:55 | 9 | Q.      Okay.  And does he have any names he goes by? |
| 15:55:59 | 10 | **A.      Yes.** |
| 15:55:59 | 11 | Q.      And what are those? |
| 15:56:00 | 12 | **A.      Punchy or Punch.** |
| 15:56:03 | 13 | Q.      And were there any contraband items found at his |
| 15:56:06 | 14 | location, at his house? |
| 15:56:07 | 15 | **A.      Yes.** |
| 15:56:07 | 16 | Q.      And what were those items? |
| 15:56:08 | 17 | **A.      Approximately 11 pounds of methamphetamine,** |
| 15:56:11 | 18 | **approximately a pound of heroin.** |
| 15:56:13 | 19 | Q.      Okay.  Was his cell phone seized? |
| 15:56:17 | 20 | **A.      Yes.** |
| 15:56:17 | 21 | Q.      And was it there at the house with him? |
| 15:56:19 | 22 | **A.      Yes.** |
| 15:56:20 | 23 | Q.      And was that cell phone subsequently searched by |
| 15:56:23 | 24 | the FBI? |
| 15:56:24 | 25 | **A.      Yes.** |

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          173

15:56:26  1  Q.      Now, following this search warrant on 930 North

15:56:30  2  Yale, the wire goes down -- the second set of wires goes

15:56:34  3  down, what, about two weeks later?

15:56:39  4  **A.      That's correct, on June 15th, 2019.**

15:56:42  5  Q.      Okay.  Did you then apply for a third round of

15:56:45  6  wiretaps?

15:56:47  7  **A.      Yes.**

15:56:48  8  Q.      Okay.  And when was that done?

15:56:51  9  **A.      It was applied for and granted on June 21st, 2019,**

15:56:57  10 **and then we began receiving phone calls and text messages**

15:56:59  11 **that same day as well.**

15:57:02  12 Q.      And who granted this wiretap?

15:57:04  13 **A.      Federal District Court Judge John Broomes.**

15:57:09  14 Q.      And what phones were involved in this third set of

15:57:12  15 wiretaps?

15:57:13  16 **A.      So TT1, TT2, we did not request an extension on**

15:57:18  17 **TT3, and then Travis Knighten's cellular telephone that**

15:57:24  18 **we identified as TT4.**

15:57:28  19 Q.      So in this third set you're now going to extend on

15:57:31  20 TT1 for another 30 days?

15:57:33  21 **A.      Yes.**

15:57:33  22 Q.      And also on TT2 for 30 additional days?

15:57:37  23 **A.      Yes.**

15:57:38  24 Q.      But you didn't want to -- you did not apply for

15:57:42  25 extension on TT3?

```
15:57:43   1   A.      That's correct.

15:57:44   2   Q.      But now you've got a new phone that you applied

15:57:47   3   for; is that right?

15:57:48   4   A.      Yes.

15:57:49   5   Q.      And was that designated TT4?

15:57:51   6   A.      Yes.

15:57:52   7   Q.      And what was that number?

15:57:53   8   A.      It was 316-737-6485.

15:57:59   9   Q.      And who did that number belong to?

15:58:01  10   A.      Travis Knighten.

15:58:02  11   Q.      And how were you able to determine that TT4 ending

15:58:07  12   in 6485 belonged to Mr. Knighten?

15:58:13  13   A.      So Travis Knighten was using a different cell

15:58:16  14   phone number before we did the search warrant at 930

15:58:18  15   North Yale.  He was using another phone number, and we

15:58:21  16   intercepted those communications with his other number on

15:58:24  17   Dorzee Hill's TT2.  So I was familiar with the voice of

15:58:29  18   Travis Knighten before we did TT4 after he changed his

15:58:32  19   number.

15:58:33  20          But when we did the search warrant, there was

15:58:36  21   communications with Travis Knighten's cell phone that he

15:58:40  22   was using to communicate with Dorzee Hill.  Well, when we

15:58:44  23   seized Trevor Wells's phone at ▮▮▮ North Yale, there were

15:58:48  24   communications between Travis Knighten's phone on Trevor

15:58:53  25   Wells's phone, and in those communications there was a
```

15:58:55  1   video of a selfie -- a selfie video of a man in a prison

15:58:59  2   cell.

15:58:59  3        So we believed we knew who Travis Knighten was

15:59:02  4   already, but when we confirmed that Travis Knighten --

15:59:05  5   what Travis Knighten looked like in his prison cell with

15:59:08  6   a corrections photo, we were able to confirm that it was

15:59:10  7   Travis Knighten utilizing that number.  So we confirmed

15:59:13  8   that Travis Knighten's voice was.

15:59:17  9        So we began receiving interceptions on TT2 during

15:59:21  10  the second 30-day period, and we were receiving

15:59:25  11  communications on Travis Knighten's new phone number.  So

15:59:27  12  he got rid of his old phone or his old phone number.

15:59:30  13  It's very common in drug trafficking that individuals

15:59:33  14  will utilize multiple phones.  And then when we made --

15:59:36  15  when you make an overt law enforcement action, such as a

15:59:39  16  search warrant or a traffic stop or something along those

15:59:41  17  lines, individuals become suspicious that law enforcement

15:59:44  18  must be on to them because we're making overt law

15:59:48  19  enforcement action.  And oftentimes when law enforcement

15:59:50  20  overt action takes place, individuals will drop their old

15:59:56  21  phone or get rid of it and get a new phone or a phone

15:59:58  22  number, and that's what happened next.

16:00:01  23  Q.    So when you say that the phone was dropped or

16:00:04  24  changed, you're basing that opinion on your expertise and

16:00:08  25  your training and background as a law enforcement

| | | |
|---|---|---|
| 16:00:11 | 1 | officer? |
| 16:00:11 | 2 | A.    That's correct. |
| 16:00:14 | 3 | Q.    How long did the third wire stay up? |
| 16:00:17 | 4 | A.    We were authorized to listen to phone calls and |
| 16:00:21 | 5 | read text messages for approximately 30 days. |
| 16:00:23 | 6 | Q.    So when did it go down? |
| 16:00:26 | 7 | A.    So the wire didn't actually go down until |
| 16:00:29 | 8 | July 20th, but on about July 18th or July 19th was the |
| 16:00:36 | 9 | last day that Travis Knighten used that phone, 'cause we |
| 16:00:39 | 10 | were going to get to where we did search warrants on |
| 16:00:41 | 11 | July 17th, 2019, and we made an overt law enforcement |
| 16:00:44 | 12 | action, and because of that he changed his number |
| 16:00:47 | 13 | eventually and resulted in the wiretap on his phone not |
| 16:00:53 | 14 | finishing early, but we -- he no longer used that number |
| 16:00:57 | 15 | so we weren't getting calls and texts the last day or |
| 16:01:00 | 16 | two. |
| 16:01:00 | 17 | Q.    And did Mr. Knighten have any nicknames? |
| 16:01:02 | 18 | A.    He did. |
| 16:01:02 | 19 | Q.    And what were those? |
| 16:01:04 | 20 | A.    Troub, Trouble, King Troub, or King Trouble. |
| 16:01:10 | 21 | Q.    And so at the end of this third set of wiretaps, |
| 16:01:15 | 22 | were there any -- was that the end of the wiretaps in |
| 16:01:18 | 23 | this case? |
| 16:01:18 | 24 | A.    That's correct. |
| 16:01:20 | 25 | Q.    But as far as the investigation, what steps did |

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          177

| | | |
|---|---|---|
| 16:01:23 | 1 | you take then towards the end of that wire?  What was |
| 16:01:28 | 2 | done in late July of 2019? |
| 16:01:31 | 3 | A.     So I applied for five federal search warrants at |
| 16:01:35 | 4 | five locations here in Wichita, their addresses that were |
| 16:01:40 | 5 | mentioned in the openings, but I'll go ahead and refresh |
| 16:01:43 | 6 | your memory.  The first one was ▇▇▇ East Stadium, ▇▇▇ |
| 16:01:50 | 7 | North Somerset, ▇▇▇ South Water, ▇▇▇ North Holyoke, and |
| 16:02:00 | 8 | ▇▇▇ North Chataqua, all here in Wichita, Kansas. |
| 16:02:04 | 9 | Q.     Okay.  So you did -- you executed warrants on each |
| 16:02:06 | 10 | of those residence essentially simultaneously that day? |
| 16:02:10 | 11 | A.     That's correct. |
| 16:02:21 | 12 | Q.     Going back to Mr. Knighten, were you able to |
| 16:02:24 | 13 | determine where he was at when he was on the wire? |
| 16:02:25 | 14 | A.     Yes. |
| 16:02:26 | 15 | Q.     And where was he located at? |
| 16:02:28 | 16 | A.     He was at the McAlester, Oklahoma, State |
| 16:02:33 | 17 | Penitentiary. |
| 16:02:33 | 18 | Q.     And why was he -- I mean, not why, but in what |
| 16:02:35 | 19 | capacity was he there?  Was he working there or was he an |
| 16:02:38 | 20 | inmate? |
| 16:02:38 | 21 | A.     He was an inmate. |
| 16:02:39 | 22 | Q.     So you believed the phone that he had was |
| 16:02:42 | 23 | contraband then? |
| 16:02:43 | 24 | A.     That's correct. |
| 16:02:46 | 25 | Q.     So let's talk a little bit about the background |

16:02:49    1    for wires here.  When you got the orders for the wiretaps

16:02:53    2    from Judge Broomes, what do you do as an agent to get

16:02:57    3    this process started with the wiretap?

16:03:01    4    A.      So when a district court judge signs an order, an

16:03:06    5    order for a wiretap on a particular device, whether it be

16:03:08    6    in this case TT1, 2, 3, or 4, the FBI takes that order

16:03:13    7    and then provides it to the phone company.  And let's

16:03:16    8    just say, for instance, we're going to talk about TT1,

16:03:19    9    which was a T-Mobile service provided phone.  So the FBI

16:03:23    10   would take that order, that wiretap order, to T-Mobile

16:03:26    11   and say, "Hey, T-Mobile, Federal District Court Judge

16:03:30    12   John Broomes, the District of Kansas, has ordered you to

16:03:32    13   provide the FBI phone calls and/or text messages coming

16:03:36    14   to and from this phone number for 30 days.  Upon receipt,

16:03:40    15   you will serve this order, and then you will then send

16:03:44    16   those phone calls and text messages to the FBI where we,

16:03:48    17   as the investigators, will be listen to the calls and/or

16:03:50    18   read the text messages."

16:03:53    19   Q.      So I assume this is all computerized; correct?

16:03:59    20   A.      That's correct.

16:03:59    21   Q.      So where were the servers or the downloads of this

16:04:02    22   wire?

16:04:02    23   A.      So as you can imagine, when you do a wiretap you

16:04:04    24   accumulate a lot of data.  There's a lot of phone calls.

16:04:08    25   You know, when you're accumulating a lot of phone calls

16:04:10    1    and text messages, you're using a lot of data.  So not

16:04:13    2    every FBI office can have its own servers to store this

16:04:17    3    data that we're getting.

16:04:20    4         So because of that, the FBI sets up what's called

16:04:23    5    regional hubs.  So our regional hub where our servers

16:04:27    6    were located for these wiretaps was in Dallas, Texas, so

16:04:29    7    the FBI had them offsite where there were servers and

16:04:32    8    this data was stored at.

16:04:36    9    Q.    That's okay.  They were stored in Dallas then?

16:04:39   10    A.    Yes.

16:04:39   11    Q.    Okay.  And where was the actual monitoring

16:04:44   12    location by the FBI?

16:04:45   13    A.    So the monitoring location or the listening post

16:04:47   14    was actually located here in Wichita, Kansas.  Again, not

16:04:52   15    every FBI office has its own servers because it would be

16:04:56   16    too costly for the FBI to have servers in every single

16:04:59   17    FBI office as there's well over 300 offices in the

16:05:02   18    United States.  So what I was trying to say about the

16:05:04   19    Dallas server location is that the Dallas server location

16:05:09   20    serves as a hub for approximately 26 FBI offices across

16:05:13   21    approximately seven states.

16:05:17   22    Q.    And then the monitoring location was here in

16:05:19   23    Wichita at the local FBI office?

16:05:21   24    A.    That's correct.

16:05:21   25    Q.    Was it monitored 24/7 throughout the duration of

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          180

16:05:26   1   all three wires?

16:05:27   2   A.      No.

16:05:29   3   Q.      Was it monitored 24/7 at the end of the last set

16:05:32   4   of wires?

16:05:32   5   A.      Yes.

16:05:32   6   Q.      So the last 30 days, when Mr. Knighten's phone was

16:05:36   7   involved, the FBI monitored that, those three phones,

16:05:40   8   24/7?

16:05:41   9   A.      Yes.

16:05:43  10   Q.      Essentially what does the monitoring room look

16:05:47  11   like?

16:05:47  12   A.      So it's a monitoring room, as I indicated, or a

16:05:50  13   "listening post."   And it's just a room.   It's a private

16:05:54  14   room where there's computers, desktop-looking computers

16:05:58  15   where wire stations are set up and individuals who are

16:06:01  16   monitoring the phone calls and reading the text messages,

16:06:03  17   as we're receiving those from the phone calls, oftentimes

16:06:07  18   they'll have headsets on and they're going to be looking

16:06:09  19   at a desktop screen.   And so when a call comes in, you

16:06:12  20   get notified that a call comes in, the audio begins to

16:06:15  21   play on the headphones, or if a text message comes in you

16:06:18  22   get message that a text comes in and you read the text as

16:06:22  23   it was written.

16:06:24  24   Q.      So when you say "the monitor," how did the

16:06:26  25   monitors, the people doing that, listen to the calls

16:06:28    1    then, do they have to punch something or does it just

16:06:32    2    automatically start?

16:06:33    3    A.        Yes, once you're logged into the system the audio

16:06:36    4    begins to play as soon as the call's intercepted.

16:06:38    5    Q.        How do they keep track of the calls and texts they

16:06:41    6    receive?

16:06:42    7    A.        So from day one, when you start a wiretap, the

16:06:45    8    first call that you receive, and there were some

16:06:47    9    instructions in the jury instructions where it listed

16:06:50    10   sessions, session 12345, for instance.  Well, when the

16:06:55    11   FBI begins receiving phone calls and text messages from

16:06:59    12   these companies, from T-Mobile or whoever it may be, the

16:07:02    13   first call that we receive would be designated session 1.

16:07:05    14   So every phone call or text message following that would

16:07:09    15   just go in sequential order.

16:07:11    16   Q.        Okay.  So -- and that's what you call the session

16:07:14    17   number?

16:07:14    18   A.        That's correct.  So each phone call, each text

16:07:18    19   message is designated a session number.

16:07:20    20   Q.        And as far as what was your job in relation to

16:07:24    21   this case as far as monitoring the wiretap?

16:07:27    22   A.        So I was the case agent or the supervising agent.

16:07:30    23   I had other assistants.  However, I was the case agent

16:07:34    24   for this particular investigation.

16:07:35    25   Q.        So when the wire was up 24/7, were you there 24/7

| | | |
|---|---|---|
| 16:07:39 | 1 | yourself? |
| 16:07:40 | 2 | **A.     I was not there 24/7, but I was there every day** |
| 16:07:43 | 3 | **during the wiretap.** |
| 16:07:43 | 4 | Q.     Do you have any idea, just an estimate, how many |
| 16:07:46 | 5 | hours that you were monitoring live phone calls and text |
| 16:07:52 | 6 | messages? |
| 16:07:52 | 7 | **A.     I would estimate approximately a thousand hours.** |
| 16:07:55 | 8 | **I would say 10 to 12 hours a day for approximately 90** |
| 16:07:59 | 9 | **days.** |
| 16:07:59 | 10 | Q.     And then since the wire went down, have you gone |
| 16:08:02 | 11 | back to review text messages and listen to phone calls? |
| 16:08:04 | 12 | **A.     That's correct.** |
| 16:08:05 | 13 | Q.     And do you have an estimate on how many hours you |
| 16:08:09 | 14 | spent doing that? |
| 16:08:09 | 15 | **A.     I would say at least a total of live and hours** |
| 16:08:12 | 16 | **after the wires went down, approximately 2500 hours.** |
| 16:08:17 | 17 | Q.     So you reviewed the calls and texts in this case? |
| 16:08:20 | 18 | **A.     Yes.** |
| 16:08:22 | 19 | Q.     And is there an estimate on how many calls and |
| 16:08:24 | 20 | texts, in total? |
| 16:08:26 | 21 | **A.     I think there's approximately 60,000 phone calls** |
| 16:08:28 | 22 | **and text messages combined in the series of wiretaps that** |
| 16:08:32 | 23 | **we did.** |
| 16:08:33 | 24 | Q.     Okay.  Now, how -- well, is there automatically |
| 16:08:43 | 25 | information attached to each phone call or text message |

16:08:46  1  as the monitor is either listening to it or reading it on

16:08:50  2  this computer screen?

16:08:50  3  A.     Yes.

16:08:51  4  Q.     What type of information are they given

16:08:54  5  automatically?

16:08:54  6  A.     So, for instance, a phone call comes in, we'll say

16:08:57  7  session No. 1, first phone call we get.  So we get

16:09:01  8  notified by the system, whether it's an incoming or

16:09:05  9  outgoing call, and who the -- what numbers are a part of

16:09:08  10  that conversation.  And then --

16:09:10  11  Q.     So it's critical you know who goes with which

16:09:13  12  number; is that correct?

16:09:14  13  A.     That's correct.

16:09:14  14  Q.     Does it give you the date and time of the call?

16:09:17  15  A.     Yes.

16:09:20  16  Q.     Does it automatically give you names?

16:09:22  17  A.     No.

16:09:23  18  Q.     How is the name associated then?  I mean, is it

16:09:26  19  put in by somebody?

16:09:27  20  A.     Yes, so during the investigation, obviously, we

16:09:29  21  start from session 1, as we progress through our

16:09:33  22  investigation we're able to identify the individuals,

16:09:36  23  most of the individuals, that were utilizing specific

16:09:39  24  numbers.  And so once we identified who was using those

16:09:42  25  numbers, then in the system we could go into the system

| | | |
|---|---|---|
| 16:09:45 | 1 | and identify that particular phone number to a certain |
| 16:09:48 | 2 | individual, so now when we received phone calls or the |
| 16:09:53 | 3 | individual we were intercepting calls on, when those |
| 16:09:56 | 4 | calls come in or out we knew who was communicating if we |
| 16:10:00 | 5 | were able to identify who the users of those numbers |
| 16:10:02 | 6 | were. |
| 16:10:02 | 7 | Q.     Now, there's a term of art called "minimization." |
| 16:10:05 | 8 | Are you familiar with that? |
| 16:10:06 | 9 | A.     Yes. |
| 16:10:06 | 10 | Q.     Was minimization done in this case? |
| 16:10:09 | 11 | A.     Yes. |
| 16:10:09 | 12 | Q.     And could you explain for the jury what |
| 16:10:12 | 13 | minimization is. |
| 16:10:12 | 14 | A.     So minimization is essentially muting the call. |
| 16:10:19 | 15 | So when a call starts we have approximately two minutes |
| 16:10:22 | 16 | to determine who's talking on the phone, what they're |
| 16:10:25 | 17 | talking about, and if they're talking about any of the |
| 16:10:27 | 18 | crimes that we are investigating.  So we have about two |
| 16:10:29 | 19 | minutes to decide all that. |
| 16:10:30 | 20 | And so when we get to about that two-minute mark, |
| 16:10:34 | 21 | if we've identified who's talking and what they're |
| 16:10:38 | 22 | talking about and what they're talking about doesn't have |
| 16:10:40 | 23 | anything to do with the crimes that we're investigating, |
| 16:10:42 | 24 | then we do what's called minimize the call or you're |
| 16:10:46 | 25 | muting the call.  So we can no longer listen to that |

16:10:49    1    call.

16:10:49    2          So while the call is minimized or muted, that data

16:10:53    3    is not recorded.  So after we minimize or mute that call,

16:10:57    4    we'll do what's called a spot-check to see what they're

16:11:00    5    talking about and if they're talking about the crimes

16:11:02    6    that we're investigating.  And if they are, we continue

16:11:05    7    to listen to the remainder of the call.  And if not,

16:11:08    8    we'll do, you know, minimization if need be.

16:11:11    9    Q.    And this is done as an effort to minimize the

16:11:15    10   listening of what would be just normal conversation that

16:11:18    11   don't involve criminal activity?

16:11:20    12   A.    That's correct.

16:11:25    13   Q.    So are these calls and texts then preserved that

16:11:32    14   you've monitored?

16:11:32    15   A.    Yes.

16:11:32    16   Q.    And how is that done?

16:11:34    17   A.    So when the wiretap goes down, we'll talk about,

16:11:37    18   for instance, let's say after the first round of wiretaps

16:11:40    19   on TT1, so from April the 10th, 2019, to May 9th, 2019.

16:11:45    20   So now that the wiretap has went down, those calls and

16:11:49    21   those texts are located on the servers in Dallas.

16:11:53    22          So what the FBI does is the FBI downloads those

16:11:57    23   calls and those texts on the Blu-ray discs or a Blu-ray

16:12:01    24   disc.  So those Blu-ray discs are packaged by the FBI and

16:12:04    25   ultimately they get here to Wichita.  And upon receipt of

16:12:07    1  **them here in Wichita, I have to take that disc or discs**

16:12:11    2  **to the authorizing judge who gave me the authority to do**

16:12:16    3  **the wiretap.  And that judge simply -- what it's called,**

16:12:19    4  **it's called "sealing the tapes."  So he signs the**

16:12:22    5  **evidence tape, or he initials it and dates it, to**

16:12:27    6  **preserve those tapes, if you will.**

16:12:29    7  Q.     At any time during this case did you see any signs

16:12:33    8  of tampering with the recording of the text messages or

16:12:37    9  the phone calls in this case?

16:12:39   10  **A.     No.**

16:12:39   11  Q.     And did Judge Broomes seal each tape involved in

16:12:45   12  this case individually?

16:12:46   13  **A.     Yes.**

16:12:49   14  Q.     And you've received all the text messages and

16:12:51   15  phone calls within this case that we presented in this

16:12:57   16  case?

16:12:57   17  **A.     Yes.**

16:13:00   18  Q.     And as you received say the recordings of the

16:13:04   19  phone calls that'll be offered in this case, did they

16:13:10   20  appear to be accurate recordings of the originals?

16:13:13   21  **A.     Yes.**

16:13:14   22  Q.     Now, have some of the calls that you reviewed, has

16:13:19   23  the Government, you know, cut out portions of those calls

16:13:22   24  that were not relevant or just dealt with things that

16:13:24   25  didn't deal with criminal activity?

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          187

16:13:27    1   **A.      Yes.**

16:13:28    2   Q.      And was there a transcript made of each of the

16:13:30    3   phone calls?

16:13:31    4   **A.      Yes.**

16:13:32    5   Q.      And have you reviewed those transcripts?

16:13:34    6   **A.      Yes.**

16:13:37    7   Q.      And do those transcripts, in your opinion, you

16:13:39    8   know, accurately represent the conversation of the phone

16:13:42    9   calls and the text messages in this case?

16:13:44   10   **A.      Yes.  To the FBI's best ability we have created**

16:13:48   11   **transcripts for phone calls that will be presented.**

16:13:51   12   Q.      Now, the text messages, are those -- what we'll

16:13:54   13   see that you've reviewed for the Court here -- are those

16:13:58   14   word for word what was said across as far as for the text

16:14:01   15   messages?

16:14:01   16   **A.      Yes.**

16:14:03   17   Q.      And then as far as the transcripts, do you think

16:14:05   18   that they aid the listener to understand the

16:14:09   19   conversations?

16:14:09   20   **A.      Yes.  They're a guide or an aid as you're**

16:14:12   21   **following along with the phone calls.**

16:14:14   22   Q.      Okay.  Now, earlier you said that there was

16:14:18   23   several search warrants, I think five search warrants,

16:14:20   24   executed on July 17th of 2019.  Were they done all about

16:14:26   25   the same time of day?

| 16:14:28 | 1 | A.      Yes. |
| 16:14:28 | 2 | Q.      And when was that, approximately? |
| 16:14:30 | 3 | A.      Approximately 6:00 A.M. |
| 16:14:34 | 4 | Q.      Let's talk about the one you talked about, ▉ |
| 16:14:37 | 5 | North Holyoke.  What type of location is that? |
| 16:14:42 | 6 | A.      It's like a family residence. |
| 16:14:44 | 7 | Q.      And who resided at that location? |
| 16:14:47 | 8 | A.      Travis Vontress. |
| 16:14:48 | 9 | Q.      And was Mr. Vontress present when that location |
| 16:14:51 | 10 | was searched? |
| 16:14:52 | 11 | A.      Yes. |
| 16:14:52 | 12 | Q.      And what happened during the initial stages of the |
| 16:14:55 | 13 | execution of that warrant? |
| 16:14:57 | 14 | A.      Travis -- so as the team of searchers or the SWAT |
| 16:15:03 | 15 | team approached the residence to make the house safe for |
| 16:15:07 | 16 | searchers to come in and search, so the Wichita Police |
| 16:15:10 | 17 | Department SWAT team approached the residence, and while |
| 16:15:15 | 18 | they approached the residence they had a drone flying |
| 16:15:17 | 19 | above the house.  And as the police department approached |
| 16:15:20 | 20 | the residence, you can see Mr. Vontress exit the rear of |
| 16:15:23 | 21 | the residence and throw approximately five or six bags of |
| 16:15:27 | 22 | a white powdery substance into the neighboring backyard. |
| 16:15:33 | 23 | Q.      Okay.  And were you able to connect Mr. Vontress |
| 16:15:36 | 24 | to the Knighten drug trafficking organization? |
| 16:15:38 | 25 | A.      Yes. |

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028

189

| | | |
|---|---|---|
| 16:15:39 | 1 | Q.    Was he heard on the wire? |
| 16:15:41 | 2 | **A.    Yes.** |
| 16:15:43 | 3 | Q.    How were you able to determine that it was him on |
| 16:15:45 | 4 | the wire? |
| 16:15:46 | 5 | **A.    So Travis Vontress uses a number of nicknames, or** |
| 16:15:52 | 6 | **individuals talking to Travis Vontress call him a number** |
| 16:15:55 | 7 | **of nicknames, and I think they've been discussed, Bink or** |
| 16:15:57 | 8 | **Gumbo.  And Travis Vontress has also resided at his** |
| 16:16:02 | 9 | **residence for several years, so through our investigation** |
| 16:16:04 | 10 | **we're able to identify that Travis Vontress resided at** |
| 16:16:08 | 11 | **that residence based upon prior Wichita Police Department** |
| 16:16:11 | 12 | **reporting.  Also, his criminal history indicates he's** |
| 16:16:16 | 13 | **resided at that location for several years.** |
| 16:16:19 | 14 | MR. BABBIT:  Objection.  Judge, may we come |
| 16:16:20 | 15 | forward? |
| 16:16:20 | 16 | (At the bench with Court, Mr. Treaster, |
| 16:16:30 | 17 | Mr. Babbit, and Mr. Shultz.) |
| 16:16:30 | 18 | MR. BABBIT:  I jumped up too slow.  So in answer |
| 16:16:32 | 19 | to the question he said two things.  He said, "We've |
| 16:16:34 | 20 | identified him based on Wichita Police Department |
| 16:16:36 | 21 | records," number one, and then he said -- |
| 16:16:41 | 22 | THE COURT:  His criminal history. |
| 16:16:42 | 23 | MR. BABBIT:  The second was criminal history, |
| 16:16:44 | 24 | which my client doesn't actually have any.  He's got |
| 16:16:46 | 25 | something like way the heck back there. |

| | | |
|---|---|---|
| 16:16:48 | 1 | THE COURT: He's got something what? |
| 16:16:50 | 2 | MR. BABBIT: He's got juvenile cases way back |
| 16:16:53 | 3 | there. So my formal -- my formal request is that the |
| 16:17:01 | 4 | Court ask the jury -- that that response, that portion of |
| 16:17:04 | 5 | the response, be stricken and not be considered by the |
| 16:17:08 | 6 | jury. |
| 16:17:08 | 7 | MR. TREASTER: As to the criminal history, I |
| 16:17:11 | 8 | agree. I think that should be stricken. I don't think |
| 16:17:14 | 9 | the jury should consider this. |
| 16:17:16 | 10 | THE COURT: Honestly, this not your fault, |
| 16:17:17 | 11 | Mr. Treaster, but an FBI agent should know better than |
| 16:17:19 | 12 | that. |
| 16:17:20 | 13 | MR. TREASTER: I was about to make the objection |
| 16:17:21 | 14 | for counsel. |
| 16:17:24 | 15 | THE COURT: I mean, I can strike it, Mr. Babbit, |
| 16:17:27 | 16 | but would you like me to do anything more than that? I |
| 16:17:31 | 17 | think his criminal history is negligible. |
| 16:17:35 | 18 | Do you know what his criminal history is, |
| 16:17:36 | 19 | Mr. Treaster? |
| 16:17:37 | 20 | MR. TREASTER: No. I know he doesn't have a |
| 16:17:40 | 21 | felony. |
| 16:17:40 | 22 | THE COURT: He doesn't have a felony? |
| 16:17:42 | 23 | MR. TREASTER: Huh-uh. |
| 16:17:45 | 24 | MR. BABBIT: I mean, I'm going to confirm that -- |
| 16:17:47 | 25 | I'm going to confirm that with law enforcement at some |

| | | |
|---|---|---|
| 16:17:49 | 1 | point, but -- |
| 16:17:51 | 2 | THE COURT:  By the way, in your opening statement |
| 16:17:52 | 3 | you said Mr. Vontress was 14 years old. |
| 16:17:55 | 4 | MR. BABBIT:  I did say that? |
| 16:17:56 | 5 | MR. TREASTER:  Yes. |
| 16:17:58 | 6 | MR. BABBIT:  I said 42. |
| 16:17:59 | 7 | MR. TREASTER:  It sounded like 14. |
| 16:18:01 | 8 | THE COURT:  He looks a lot younger than 42, but he |
| 16:18:03 | 9 | doesn't look 14.  The transcript says 14, and there's a |
| 16:18:06 | 10 | note the court reporter put it, "Check the age." |
| 16:18:09 | 11 | MR. BABBIT:  Jesus Christ. |
| 16:18:09 | 12 | THE COURT:  I think we just did that 'cause she's |
| 16:18:12 | 13 | listening, but anyway.  I mean, I think -- |
| 16:18:23 | 14 | MR. BABBIT:  I'm sorry, I'm pondering.  I want to |
| 16:18:27 | 15 | have a professional response to exactly how to handle |
| 16:18:30 | 16 | what to me was really an inappropriate answer by law |
| 16:18:33 | 17 | enforcement. |
| 16:18:33 | 18 | THE COURT:  It was.  And that's why I'm happy to |
| 16:18:35 | 19 | do more than just strike it. |
| 16:18:40 | 20 | MR. BABBIT:  I'm not sure what more would be.  I |
| 16:18:41 | 21 | mean, I can -- |
| 16:18:42 | 22 | THE COURT:  I can say that he has virtually no |
| 16:18:46 | 23 | significant criminal history.  I don't know about a |
| 16:18:55 | 24 | traffic ticket.  I don't know about the rest of you -- |
| 16:18:57 | 25 | MR. BABBIT:  You can say -- if you can say -- if |

| | | |
|---|---|---|
| 16:18:59 | 1 | we can get him to say he doesn't -- I mean, if we can -- |
| 16:19:02 | 2 | if we can kind of -- |
| 16:19:04 | 3 | MR. TREASTER:  I can prime the pump, but I don't |
| 16:19:05 | 4 | know that he knows that right now.  I can have him say |
| 16:19:08 | 5 | that later once I have a chance to talk to him, and |
| 16:19:13 | 6 | confirm it with him. |
| 16:19:13 | 7 | MR. BABBIT:  Okay, let's do that.  Can we do that? |
| 16:19:15 | 8 | THE COURT:  How would you like to proceed? |
| 16:19:17 | 9 | MR. BABBIT:  Can we take a break, get this |
| 16:19:19 | 10 | confirmed? |
| 16:19:20 | 11 | THE COURT:  I don't want to take a break.  Can you |
| 16:19:21 | 12 | have -- can you -- |
| 16:19:23 | 13 | MR. TREASTER:  Can I ask him? |
| 16:19:25 | 14 | THE COURT:  Go approach the witness quietly and |
| 16:19:28 | 15 | ask him out of the hearing of the jury. |
| 16:19:32 | 16 | (Whereupon, an off-the-record discussion was had |
| 16:19:33 | 17 | between Mr. Treaster and the witness.  The bench |
| 16:20:21 | 18 | conference continued as follows:) |
| 16:20:21 | 19 | MR. TREASTER:  He doesn't know off the top of his |
| 16:20:23 | 20 | head what his history is, so . . . |
| 16:20:27 | 21 | MR. BABBIT:  Then why would he answer -- |
| 16:20:29 | 22 | MR. TREASTER:  He -- |
| 16:20:30 | 23 | MR. BABBIT:  It's part of the foundation for his |
| 16:20:32 | 24 | fricking question. |
| 16:20:33 | 25 | THE COURT:  He's got insignificant criminal |

16:20:35   1   history.  He shouldn't have answered it.

16:20:38   2        MR. TREASTER:  No, he said, "I meant his

16:20:41   3   triple-I," so he's saying, "When I run a triple-I on

16:20:44   4   anybody, it's going to give you associate stuff."  I

16:20:47   5   said, "But you said criminal history."  He said, "Well,

16:20:48   6   that's his triple-I."  That's not his triple-I.  So

16:20:51   7   that's where he is.

16:20:52   8        THE COURT:  So would it be helpful to explain that

16:20:55   9   "by criminal history he meant" and then you have to

16:20:57  10   explain what a triple-I is?

16:20:59  11        MR. TREASTER:  I'm afraid this is going to go

16:21:00  12   south really fast.

16:21:03  13        THE COURT:  I'll do what you want within reason,

16:21:05  14   Mr. Babbit.  What would you suggest --

16:21:06  15        MR. TREASTER:  And I won't object to any

16:21:08  16   correction that you want to do, Judge, or what you want

16:21:10  17   to be done.  I see the problem.

16:21:18  18        MR. BABBIT:  The only correction is to confirm

16:21:19  19   that he doesn't have it, 'cause now they all think he's

16:21:22  20   got a criminal history.  That's the only correction.

16:21:24  21        MR. TREASTER:  I can -- I can get it -- I can get

16:21:26  22   it through him later once I have him confirm it.

16:21:29  23        THE COURT:  But later's going to be tomorrow.

16:21:41  24        MR. BABBIT:  I don't -- it's not -- I don't -- I

16:21:51  25   feel like -- I mean, the -- I think the only correction

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          194

16:21:57    1   is for us to confirm he doesn't have a criminal history,

16:21:59    2   and I want that done now.

16:22:01    3          THE COURT:  Well, we can't do that now.

16:22:02    4          MR. BABBIT:  Well, then I suggest --

16:22:05    5          THE COURT:  I mean, to do it now would be to take

16:22:08    6   a recess and then we'll come back and continue anyway

16:22:12    7   'cause I'm not going to take a recess at 4:30 and then

16:22:14    8   bring them back.

16:22:18    9          MR. BABBIT:  So for now, I mean, I can ask for a

16:22:21   10   mistrial.

16:22:23   11          THE COURT:  Well, you can, but --

16:22:25   12          MR. BABBIT:  I know where that's going.  Okay.  So

16:22:33   13   if you ask him the question -- I don't want to highlight

16:22:42   14   the darn thing.

16:22:43   15          MR. TREASTER:  No, I understand.  I'm just -- I'm

16:22:46   16   going to be honest with you.  I don't want to go down

16:22:47   17   this path with him right now because I'm afraid he'll

16:22:50   18   make it worse.  I really think --

16:22:52   19          THE COURT:  Until you have time to --

16:22:54   20          MR. TREASTER:  Until I have time to get him to

16:22:57   21   understand the difference between a triple-I and criminal

16:23:00   22   history.

16:23:01   23          THE COURT:  So we can do it tomorrow, Mr. Babbit,

16:23:03   24   but this is, after all, day two of a 40-day trial, 25,

16:23:08   25   whatever it is, so I'd do something today if we had an

| | | |
|---|---|---|
| 16:23:13 | 1 | idea as to what to do, but I'm not sure that we do. |
| 16:23:16 | 2 | MR. BABBIT:  And I wish I was bright enough to |
| 16:23:18 | 3 | have a clear -- I just, mistrial.  I understand the |
| 16:23:22 | 4 | Court's not going to grant a mistrial -- |
| 16:23:24 | 5 | THE COURT:  Yeah. |
| 16:23:25 | 6 | MR. BABBIT:  -- on that, but I want this corrected |
| 16:23:26 | 7 | and it needs to be corrected like ASAP, and the only way |
| 16:23:31 | 8 | to do it is to get him to back off that or to have a |
| 16:23:34 | 9 | discussion.  So either if I let him go, if we continue |
| 16:23:43 | 10 | on -- |
| 16:23:44 | 11 | THE COURT:  I think -- and, again, I want to be |
| 16:23:48 | 12 | solicitous of your request but I think the only |
| 16:23:50 | 13 | reasonable approach is to have the agent satisfy himself |
| 16:23:54 | 14 | over the weekend that at least as of 2017, what was the |
| 16:23:58 | 15 | date of the -- |
| 16:24:00 | 16 | MR. TREASTER:  July. |
| 16:24:01 | 17 | THE COURT:  Whatever. |
| 16:24:02 | 18 | MR. TREASTER:  July 17th. |
| 16:24:03 | 19 | THE COURT:  That Mr. Vontress had no significant |
| 16:24:05 | 20 | criminal history.  Start with that tomorrow morning to |
| 16:24:07 | 21 | correct that. |
| 16:24:08 | 22 | MR. BABBIT:  Okay.  I think that'll get us as |
| 16:24:10 | 23 | close as possible to fixing it, 'cause I'm -- the only -- |
| 16:24:14 | 24 | that juvenile case shouldn't give us -- you're not going |
| 16:24:16 | 25 | to create an issue on a juvenile case; right? |

```
16:24:18    1            MR. TREASTER:  No, no, no.
16:24:18    2            THE COURT:  We're not going to talk about --
16:24:20    3            MR. BABBIT:  Okay.  I think he has some
16:24:23    4   fricking -- I think he's got a marijuana case back there.
16:24:26    5   Okay.  So for now I'm going to wait on the Government to
16:24:38    6   figure this out with the agent, and we'll expressly deal
16:24:41    7   with it in the morning.
16:24:41    8            THE COURT:  All right.
16:24:42    9            MR. TREASTER:  Thank you.
16:24:43   10            (Thereupon, the following proceedings continued in
16:24:56   11   the hearing of the jury, with the defendants present.)
16:24:56   12   BY MR. TREASTER:
16:24:57   13   Q.    Okay, so we were talking about Mr. Vontress's
16:25:01   14   phone.  What was the phone number that he used?
16:25:04   15   A.    316-550-8786.
16:25:12   16   Q.    And how did you -- or I should say have you come
16:25:17   17   to know Mr. Vontress during the course of your
16:25:20   18   investigation?
16:25:20   19   A.    Yes.
16:25:20   20   Q.    Okay.  Do you see him in the courtroom today?
16:25:23   21   A.    Yes.
16:25:23   22   Q.    Could you tell us where he's seated and what he's
16:25:26   23   wearing.
16:25:26   24   A.    He's seated next to Mr. Babbit in a blue suit with
16:25:29   25   what looks like a red tie.
```

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          197

| | | |
|---|---|---|
| 16:25:32 | 1 | MR. TREASTER: Your Honor, I'd ask that the record |
| 16:25:34 | 2 | reflect the witness has identified Mr. Vontress. |
| 16:25:36 | 3 | THE COURT: The record will so reflect. |
| 16:25:38 | 4 | MR. TREASTER: Thank you. |
| 16:25:39 | 5 | BY MR. TREASTER: |
| 16:25:40 | 6 | Q. Were there any contraband items found at |
| 16:25:43 | 7 | Mr. Vontress's residence? |
| 16:25:44 | 8 | **A. Yes.** |
| 16:25:45 | 9 | Q. And what were those items? |
| 16:25:47 | 10 | **A. The bags of cocaine that we spoke about previously** |
| 16:25:52 | 11 | **and his cell phone was seized and then two firearms, two** |
| 16:25:56 | 12 | **pistols.** |
| 16:25:57 | 13 | Q. Okay. And was that -- the cell phone that was |
| 16:26:01 | 14 | seized, was it later searched by the FBI? |
| 16:26:04 | 15 | **A. Yes.** |
| 16:26:04 | 16 | Q. Let's move to the location ██ East Stadium |
| 16:26:09 | 17 | Drive. Was a search warrant executed there as well on |
| 16:26:13 | 18 | that same day? |
| 16:26:14 | 19 | **A. Yes.** |
| 16:26:14 | 20 | Q. What type of location is this? |
| 16:26:16 | 21 | **A. It's a residence.** |
| 16:26:18 | 22 | Q. And who resided there? |
| 16:26:19 | 23 | **A. Kevin Lewis.** |
| 16:26:21 | 24 | Q. And was Mr. Lewis present at that location when it |
| 16:26:24 | 25 | was searched? |

| | | |
|---|---|---|
| 16:26:25 | 1 | A.      Yes. |
| 16:26:25 | 2 | Q.     And how was Mr. Lewis then connected to the |
| 16:26:28 | 3 | Knighten drug trafficking organization? |
| 16:26:30 | 4 | A.      We identified during our investigation that Kevin |
| 16:26:33 | 5 | Lewis was one of Travis Knighten's main drug dealers here |
| 16:26:37 | 6 | in the Wichita, Kansas, area. |
| 16:26:38 | 7 | Q.     Was he heard on the wire? |
| 16:26:40 | 8 | A.      Yes. |
| 16:26:41 | 9 | Q.     Were you able to determine -- how were you able to |
| 16:26:43 | 10 | determine that it was Mr. Lewis? |
| 16:26:45 | 11 | A.      So Mr. Lewis goes by the moniker YT, and sometimes |
| 16:26:50 | 12 | Y.  Through Wichita Police Department reporting, Kevin |
| 16:26:55 | 13 | Lewis utilizes the moniker YT, also his residence at the |
| 16:27:00 | 14 | time was at 29 East 14 -- or ████ East Stadium.  We |
| 16:27:05 | 15 | followed Kevin Lewis on multiple occasions and identified |
| 16:27:09 | 16 | him as being the user of the phone number. |
| 16:27:12 | 17 | Q.      Okay.  So it was a combination of -- it was mostly |
| 16:27:15 | 18 | by surveillance, you would hear him say he's going to X |
| 16:27:19 | 19 | place, then you would see Mr. Lewis arrive; is that |
| 16:27:23 | 20 | correct? |
| 16:27:23 | 21 | A.      Yes. |
| 16:27:25 | 22 | Q.     And then have you also come to know Mr. Lewis |
| 16:27:28 | 23 | during the course of this investigation? |
| 16:27:29 | 24 | A.      Yes. |
| 16:27:29 | 25 | Q.     And do you see him in the courtroom today? |

| | | |
|---|---|---|
| 16:27:31 | 1 | **A.        Yes.  He's seated next to Mr. Shultz.** |
| 16:27:33 | 2 | Q.        And what is he wearing? |
| 16:27:35 | 3 | **A.        Looks like a black suit.** |
| 16:27:37 | 4 | Q.        Okay. |
| 16:27:37 | 5 | MR. TREASTER:  Your Honor, I'd ask that the record |
| 16:27:39 | 6 | reflect that this witness has identified Mr. Lewis. |
| 16:27:42 | 7 | THE COURT:  The record will so reflect. |
| 16:27:44 | 8 | MR. TREASTER:  Thank you, Your Honor. |
| 16:27:45 | 9 | BY MR. TREASTER: |
| 16:27:45 | 10 | Q.        And were there any contraband items found at |
| 16:27:48 | 11 | Mr. Lewis's residence? |
| 16:27:50 | 12 | **A.        There was a small amount of cocaine.  We seized** |
| 16:27:55 | 13 | **approximately $1437 and two phones of Mr. Lewis's.** |
| 16:28:02 | 14 | Q.        And were the phones later searched by the FBI? |
| 16:28:04 | 15 | **A.        Yes.** |
| 16:28:05 | 16 | Q.        The third location was ████ North Somerset.  What |
| 16:28:09 | 17 | type of location was this? |
| 16:28:10 | 18 | **A.        That was a residence as well.** |
| 16:28:15 | 19 | Q.        And who did you know that resided at that |
| 16:28:18 | 20 | location? |
| 16:28:19 | 21 | **A.        Mike Beard and Kevin Lewis.** |
| 16:28:21 | 22 | Q.        And was anybody present when you searched that |
| 16:28:24 | 23 | location? |
| 16:28:24 | 24 | **A.        Yes.** |
| 16:28:25 | 25 | Q.        Who was that? |

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          200

| | | |
|---|---|---|
| 16:28:25 | 1 | A.      Mike Beard. |
| 16:28:28 | 2 | Q.    And was Mr. Beard connected to the Knighten drug |
| 16:28:31 | 3 | trafficking organization? |
| 16:28:33 | 4 | A.    We did not believe that he was selling narcotics |
| 16:28:36 | 5 | for Travis Knighten.  However, there were communications |
| 16:28:39 | 6 | that we heard between Mr. Beard and Kevin Lewis. |
| 16:28:45 | 7 | Q.    Was there any contraband found at this Somerset |
| 16:28:48 | 8 | location? |
| 16:28:48 | 9 | A.    Yes. |
| 16:28:48 | 10 | Q.    And what was that? |
| 16:28:49 | 11 | A.    There was a marijuana grow operation. |
| 16:28:52 | 12 | Q.    Okay.  And were there any items of Mr. Lewis found |
| 16:28:57 | 13 | at that location? |
| 16:28:58 | 14 | A.    Yes. |
| 16:28:59 | 15 | Q.    And what were those items? |
| 16:29:00 | 16 | A.    There were photographs of Mr. Lewis with other |
| 16:29:03 | 17 | individuals located at the residence.  There were bills |
| 16:29:06 | 18 | in Mr. Lewis's name at this residence.  And then there |
| 16:29:09 | 19 | was also a Wells Fargo card in the name of Kevin Lewis as |
| 16:29:14 | 20 | well. |
| 16:29:16 | 21 | Q.    Now, the fourth location was 245 North Chataqua |
| 16:29:19 | 22 | that you mentioned.  What type of location was this? |
| 16:29:21 | 23 | A.    That was a residence. |
| 16:29:24 | 24 | Q.    And who resided at that location? |
| 16:29:26 | 25 | A.    It's believed Richard Adams was there, but then |

16:29:30   1   the day of the search warrant the two individuals that

16:29:33   2   were located there were Bo Pennington and his wife,

16:29:36   3   Crystal Pennington, unindicted coconspirators.

16:29:38   4   Q.    Okay.  Were these people connected to the Knighten

16:29:41   5   organization?

16:29:41   6   A.    Richard Adams was.

16:29:43   7   Q.    The other two that were there?

16:29:46   8   A.    I did not have evidence that they were.

16:29:48   9   Q.    Okay.  Was there any contraband found at the

16:29:50  10   Chataqua location?

16:29:52  11   A.    Yes.

16:29:52  12   Q.    What was that?

16:29:53  13   A.    There were multiple items of drug paraphernalia,

16:29:56  14   to include syringes, scales, pipes, bongs.  There was

16:30:05  15   some heroin and some meth, small amounts there, that

16:30:07  16   tested -- field tested positive for methamphetamine.

16:30:09  17   There was packaging material, like plastic bags, and then

16:30:14  18   there was also approximately ten firearms seized from

16:30:17  19   that location.

16:30:17  20   Q.    Was there any other items of interest there at

16:30:21  21   that location?

16:30:23  22   A.    Yes, so there was some U.S. mail, like boxes,

16:30:26  23   white boxes, some U.S. -- like U.S. mail print on them

16:30:29  24   that were located there.

16:30:30  25   Q.    And why was that of interest?

```
16:30:32   1   A.      Because we surveilled a deal between Otis Ponds,

16:30:41   2   so Otis Ponds was the transporter in this investigation

16:30:45   3   or a courier, so he picked up a large box, a white box,

16:30:50   4   what appeared to be a U.S. mailbox and then he was seen

16:30:54   5   delivering that box which we believed contained

16:30:56   6   methamphetamine to the residence at Somerset, and then

16:31:00   7   Mr. Ponds, Otis Ponds, departed the Somerset residence

16:31:05   8   without that box.

16:31:06   9   Q.      Okay.  And then the 1745 South Water location,

16:31:13  10   what type of location was that?

16:31:14  11   A.      That was a residence as well.

16:31:16  12   Q.      And who resided there?

16:31:17  13   A.      Tia Ward.

16:31:19  14   Q.      And was she there when the location was searched?

16:31:22  15   A.      Yes.

16:31:23  16   Q.      And how was Ms. Ward connected to the Knighten

16:31:26  17   drug trafficking organization?

16:31:27  18   A.      We identified her during the investigation that

16:31:29  19   Tia Ward was one of Travis Knighten's main

16:31:32  20   methamphetamine dealers.

16:31:34  21   Q.      Was she heard on the wire?

16:31:36  22   A.      Yes.

16:31:37  23   Q.      And how were you able to determine it was her?

16:31:40  24   A.      Well, they were oftentimes when Travis Knighten

16:31:43  25   would openly greet her as Tia or T.  But we did
```

| | | |
|---|---|---|
| 16:31:48 | 1 | surveillance and followed her as well, where she was |
| 16:31:50 | 2 | using her phone, and then would identify -- she would |
| 16:31:55 | 3 | inform Travis Knighten that she was at a certain |
| 16:31:57 | 4 | location, and then we identified that the communication |
| 16:31:59 | 5 | that she had had with Travis Knighten corroborated her |
| 16:32:04 | 6 | location, and then also we observed her in her vehicle |
| 16:32:07 | 7 | multiple times, which is registered to her. |
| 16:32:09 | 8 | Q.      And did she have any nicknames she went by? |
| 16:32:12 | 9 | A.      She was primarily known as Tia or T. |
| 16:32:17 | 10 | Q.      And then when that location was searched, were |
| 16:32:19 | 11 | there any contraband items found there? |
| 16:32:21 | 12 | A.      Yes. |
| 16:32:21 | 13 | Q.      And what were they? |
| 16:32:23 | 14 | A.      Methamphetamine.  There was approximately $6,000 |
| 16:32:30 | 15 | in cash seized there. |
| 16:32:33 | 16 | Q.      Any firearms? |
| 16:32:35 | 17 | A.      Yes, a pistol and her cell phone. |
| 16:32:38 | 18 | Q.      Okay.  Was the cell phone later searched? |
| 16:32:41 | 19 | A.      Yes. |
| 16:32:42 | 20 | Q.      Okay. |
| 16:32:43 | 21 |         MR. TREASTER:  Your Honor, can I have just a |
| 16:32:44 | 22 | second? |
| 16:32:44 | 23 |         THE COURT:  You may. |
| 16:32:47 | 24 |         (Whereupon, a sotto voce discussion was had |
| 16:32:47 | 25 | between Mr. Treaster and Ms. Andrusak.) |

16:33:18    1  BY MR. TREASTER:

16:33:19    2  Q.      So I'm going to go back here.  So when we talked

16:33:23    3  about Mike Beard, was he intercepted talking to

16:33:28    4  Mr. Knighten on Mr. Knighten's phone?

16:33:30    5  **A.      Yes.**

16:33:31    6  Q.      Okay.  You didn't have any calls with him somehow

16:33:37    7  connected with Mr. Lewis, did you, on that wire?

16:33:43    8  **A.      Could you be a little more specific?**

16:33:45    9  Q.      Right.  Do you have any calls with Mr. Beard

16:33:49   10  talking directly to Mr. Lewis on the wire?

16:33:51   11  **A.      No.**

16:33:52   12  Q.      Okay.  Thank you.

16:33:53   13          MR. TREASTER:  All right.  I'm going to have

16:33:58   14  them -- if you can put that up just for the witness and

16:34:02   15  the attorneys, organizational chart, not for the jury

16:34:07   16  just yet.  Okay.

16:34:15   17          THE COURT:  Can we -- you don't want this

16:34:19   18  displayed yet to the jury?

16:34:20   19          CLERK SCHMIDT:  Right.  It's blacked off.

16:34:23   20          THE REPORTER:  It wasn't at first.

16:34:24   21          THE COURT:  It was on the screen.  Now it's on

16:34:37   22  nobody's screen.  All right.  There, that's great.

16:34:46   23  Thanks.

16:34:48   24  BY MR. TREASTER:

16:34:50   25  Q.      Is this an organizational chart of the drug

| | | |
|---|---|---|
| 16:34:54 | 1 | trafficking organization of Mr. Knighten? |
| 16:34:56 | 2 | **A.      Yes, this is some of the members.** |
| 16:34:58 | 3 | Q.      And were each of the members on here either part |
| 16:35:02 | 4 | of the organization or related to it in some manner? |
| 16:35:05 | 5 | **A.      Yes.** |
| 16:35:06 | 6 | Q.      Okay. |
| 16:35:07 | 7 | MR. TREASTER:  Your Honor, I'd ask that we be |
| 16:35:09 | 8 | allowed to publish this for demonstrative purposes. |
| 16:35:12 | 9 | THE COURT:  What is the exhibit? |
| 16:35:13 | 10 | MR. TREASTER:  It's just a demonstrative exhibit, |
| 16:35:15 | 11 | Your Honor.  We didn't give it a number.  We can if you |
| 16:35:17 | 12 | would like. |
| 16:35:17 | 13 | THE COURT:  So you're not admitting it.  You |
| 16:35:19 | 14 | just -- |
| 16:35:20 | 15 | MR. TREASTER:  I just want to publish it so, as we |
| 16:35:22 | 16 | talk about these people, there's a face. |
| 16:35:23 | 17 | THE COURT:  Do we need to mark it somehow, just |
| 16:35:26 | 18 | for the record? |
| 16:35:28 | 19 | (Whereupon, a sotto voce discussion was had |
| 16:35:29 | 20 | between Mr. Treaster and Ms. MacNeil.) |
| 16:35:34 | 21 | MR. TREASTER:  We'll call it Government's Exhibit |
| 16:35:36 | 22 | 700, Your Honor. |
| 16:35:37 | 23 | THE COURT:  All right.  Any objection to |
| 16:35:39 | 24 | publishing 700? |
| 16:35:41 | 25 | MR. SHULTZ:  Your Honor, I didn't -- |

16:35:42  1          THE COURT:  Mr. Shultz?

16:35:45  2          MR. SHULTZ:  I almost made it a whole day.

16:35:47  3          THE COURT:  So you can kind of keep here a running

16:35:50  4  total of Michael's being very forgetful about turning on

16:35:52  5  his microphone.

16:35:54  6          MR. SHULTZ:  I'm not sure there's enough

16:35:56  7  foundation for what the organization chart is, who made

16:35:59  8  it, where it came from, all that, so I guess at this

16:36:01  9  point I think it's premature to publish it.  I would

16:36:04  10  object on this basis.

16:36:06  11          THE COURT:  I understand that to explain it it's

16:36:08  12  got to be published, but can you enhance the foundation

16:36:12  13  to that a bit, Mr. Treaster?

16:36:13  14          MR. TREASTER:  Yes, Your Honor.

16:36:14  15          THE COURT:  Thank you.

16:36:14  16  BY MR. TREASTER:

16:36:14  17  Q.    So as you look at this document here, who's in the

16:36:18  18  center of the document?

16:36:20  19  **A.    Travis Knighten.**

16:36:21  20  Q.    And then who's on his -- as we look at it, to his

16:36:25  21  right?

16:36:26  22  **A.    Trevor Wells, his brother.**

16:36:28  23  Q.    And who's to the left?

16:36:30  24  **A.    Kevin Lewis.**

16:36:31  25  Q.    And then there's an arrow to the side there --

| | | |
|---|---|---|
| 16:36:35 | 1 | THE COURT:  Mr. Treaster, I think for -- if I may, |
| 16:36:37 | 2 | for foundation, it would be -- rather than explain the |
| 16:36:41 | 3 | exhibit when the jury can't see it, if you can explain |
| 16:36:44 | 4 | how -- have the witness explain generally what it shows |
| 16:36:46 | 5 | and who prepared it and how he knows that it's accurate. |
| 16:36:49 | 6 | That, I think, would be more foundational. |
| 16:36:51 | 7 | BY MR. TREASTER: |
| 16:36:51 | 8 | Q.    What does this generally show? |
| 16:36:52 | 9 | **A.    It shows the photographs of the individuals that** |
| 16:36:55 | 10 | **we'll be discussing that were involved in this drug** |
| 16:36:59 | 11 | **trafficking organization.** |
| 16:36:59 | 12 | Q.    And it's just part of them; right? |
| 16:37:02 | 13 | **A.    That's correct.** |
| 16:37:04 | 14 | Q.    And are you -- are you familiar with how this was |
| 16:37:10 | 15 | prepared? |
| 16:37:11 | 16 | **A.    Say that again.** |
| 16:37:12 | 17 | Q.    Are you familiar with how this was prepared? |
| 16:37:14 | 18 | **A.    Yes.** |
| 16:37:14 | 19 | Q.    And how was it prepared? |
| 16:37:15 | 20 | **A.    By the Government.** |
| 16:37:16 | 21 | Q.    Okay.  And were you involved in some of the |
| 16:37:19 | 22 | preparation of this? |
| 16:37:20 | 23 | **A.    Yes.** |
| 16:37:22 | 24 | MR. TREASTER:  Your Honor, I'd like to publish at |
| 16:37:26 | 25 | this time. |

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028          208

16:37:26  1          MR. SHULTZ:  No objection, Your Honor.

16:37:27  2          THE COURT:  Mr. Babbit?

16:37:28  3          MR. BABBIT:  No objection.

16:37:29  4          THE COURT:  The exhibit -- the demonstrative

16:37:31  5  exhibit may be displayed to the jury.  Members of the

16:37:35  6  jury, we're not admitting this, so this is actually

16:37:37  7  something you'll have back in the jury room.  And I'm

16:37:40  8  sure you're looking at the amount of evidence and

16:37:41  9  wondering how you're going to handle this in the jury

16:37:43 10  room.  We have an electronic way of doing that for you.

16:37:45 11  But this won't be on that.  This is just a demonstrative

16:37:48 12  exhibit to aid in the witness' testimony, just so you

16:37:52 13  understand, so it may be published.

16:37:54 14  BY MR. TREASTER:

16:37:54 15  Q.    So we've talked about some of these individuals

16:37:56 16  already on your testimony today; right?

16:37:58 17  **A.    Yes.**

16:37:58 18  Q.    So in the center there, who is that?

16:38:01 19  **A.    That's Travis Knighten.**

16:38:03 20  Q.    And he goes by what?

16:38:05 21  **A.    Troub or Trouble.**

16:38:07 22  Q.    And then there is, to his right, you said is who?

16:38:11 23  **A.    That's Trevor Wells a/k/a Punch or Punchy.**

16:38:15 24  Q.    And he's also his brother?

16:38:17 25  **A.    That's correct.**

| | | |
|---|---|---|
| 16:38:18 | 1 | Q.    And then to his left as we look at it is who? |
| 16:38:23 | 2 | **A.    To our left?** |
| 16:38:24 | 3 | Q.    Yeah, as we look at it. |
| 16:38:25 | 4 | **A.    Kevin Lewis a/k/a YT.** |
| 16:38:27 | 5 | Q.    And then we will go in that second row across. |
| 16:38:32 | 6 | We've already talked a little bit about Dorzee Hill; is |
| 16:38:36 | 7 | that right? |
| 16:38:36 | 8 | **A.    Yes.** |
| 16:38:36 | 9 | Q.    And so he was the subject of multiple wires in |
| 16:38:40 | 10 | this case? |
| 16:38:40 | 11 | **A.    Correct.** |
| 16:38:41 | 12 | Q.    And then next to him is who? |
| 16:38:42 | 13 | **A.    That's Tia Ward.** |
| 16:38:46 | 14 | Q.    And then next to her is? |
| 16:38:48 | 15 | **A.    Travis Vontress a/k/a Bink or Gumbo.** |
| 16:38:52 | 16 | Q.    And now Mr. Lewis and Mr. Vontress, there's phone |
| 16:38:55 | 17 | numbers under their names; is that correct? |
| 16:38:58 | 18 | **A.    Yes.** |
| 16:38:58 | 19 | Q.    And what are those phone numbers? |
| 16:38:59 | 20 | **A.    Do you want me to read them out loud?** |
| 16:39:04 | 21 | Q.    No, no, I mean, do those numbers go with them? |
| 16:39:06 | 22 | **A.    Yes, those are their phone numbers.** |
| 16:39:08 | 23 | Q.    And then next to Mr. Vontress is who? |
| 16:39:10 | 24 | **A.    That's Otis Ponds a/k/a Wack.** |
| 16:39:14 | 25 | Q.    And then there's a dotted line to who's that? |

16:39:16    1   A.      Richard Adams.

16:39:17    2   Q.      And you talked a little bit about Mr. Adams and

16:39:22    3   the Chataqua address; is that right?

16:39:24    4   A.      Yes.

16:39:24    5   Q.      And then above him is who?

16:39:26    6   A.      That's Armando Luna a/k/a Diablo.

16:39:30    7   Q.      And you hadn't really talked about him, but why is

16:39:32    8   there an arrow between him and Mr. Knighten?

16:39:35    9   A.      So we identified during this investigation that

16:39:37    10  Armando Luna a/k/a Diablo was Travis Knighten's main

16:39:41    11  source of methamphetamine supply.

16:39:44    12  Q.      And then down along the bottom row, another five

16:39:48    13  individuals.  You have Dallas Williams; is that correct?

16:39:51    14  A.      Yes.

16:39:52    15  Q.      And then next to him is who?

16:39:53    16  A.      Eric Goodwin.

16:39:55    17  Q.      And then in the center of those five?

16:39:57    18  A.      Frederick Collins a/k/a P-Boy.

16:40:00    19  Q.      And then next to him?

16:40:02    20  A.      Robert Richmond a/k/a Shot.

16:40:05    21  Q.      And then the lady on the end there?

16:40:06    22  A.      Kimberly Schmidtberger a/k/a Leggs.

16:40:09    23  Q.      So let's talk a little about Otis Ponds.  So in

16:40:14    24  the investigation, did you become familiar with Mr. Otis

16:40:17    25  Ponds?

| | | |
|---|---|---|
| 16:40:17 | 1 | A.      Yes. |
| 16:40:18 | 2 | Q.      Did you hear him on the wire? |
| 16:40:20 | 3 | A.      Yes. |
| 16:40:20 | 4 | Q.      And how were you able to identify him on the wire? |
| 16:40:23 | 5 | A.      He went by the moniker Wack, and then there was |
| 16:40:28 | 6 | individuals with the Wichita Police Department who were |
| 16:40:29 | 7 | familiar with him.  But ultimately we identified him via |
| 16:40:32 | 8 | surveillance, physical surveillance. |
| 16:40:34 | 9 | Q.      Okay.  And what was his phone number? |
| 16:40:39 | 10 | A.      405-421-8965. |
| 16:40:44 | 11 | Q.      And did he drive a specific vehicle normally? |
| 16:40:47 | 12 | A.      Yes, he drove a red Chevrolet Silverado. |
| 16:40:51 | 13 | Q.      And did he have a particular job within the |
| 16:40:53 | 14 | organization? |
| 16:40:54 | 15 | A.      Yes.  He was the courier or transporter of large |
| 16:40:59 | 16 | sums of money.  He would pick up large sums of |
| 16:41:03 | 17 | methamphetamine and transport those narcotics. |
| 16:41:07 | 18 | Q.      So he would courier both drugs and money? |
| 16:41:10 | 19 | A.      Correct. |
| 16:41:14 | 20 | Q.      And then we just talked about Mr. Luna.  Was he |
| 16:41:18 | 21 | then connected to the wire in some way? |
| 16:41:20 | 22 | A.      Yes. |
| 16:41:20 | 23 | Q.      And did you see him on -- or did you hear him or |
| 16:41:23 | 24 | see texts from him? |
| 16:41:24 | 25 | A.      There was primarily text messages between Armando |

| | | |
|---|---|---|
| 16:41:27 | 1 | Luna and Travis Knighten. |
| 16:41:30 | 2 | Q.    And what was his phone number? |
| 16:41:33 | 3 | A.    It was 918-470-4406. |
| 16:41:43 | 4 | Q.    And did he have any nicknames he went by? |
| 16:41:45 | 5 | A.    Yes, Diablo. |
| 16:41:47 | 6 | Q.    And how were you able to identify him? |
| 16:41:49 | 7 | A.    So Armando Luna was also incarcerated in the same |
| 16:41:53 | 8 | prison that Travis Knighten was.  Travis Knighten had |
| 16:41:55 | 9 | indicated such during his communications.  He also |
| 16:41:58 | 10 | described Armando Luna as "esse."  That's a term that's |
| 16:42:03 | 11 | used to describe a Hispanic male.  And so we had this |
| 16:42:06 | 12 | information and we provided that information to the |
| 16:42:08 | 13 | Oklahoma Department of Corrections, and they assisted us |
| 16:42:11 | 14 | in identifying who Armando Luna was. |
| 16:42:14 | 15 | Q.    So you had two gentleman, Mr. Knighten and |
| 16:42:18 | 16 | Mr. Luna, that were incarcerated in Oklahoma and they |
| 16:42:21 | 17 | both had contraband phones, talking to each other? |
| 16:42:23 | 18 | A.    That's correct. |
| 16:42:25 | 19 | Q.    Kimberly Schmidtberger, the lady on the bottom row |
| 16:42:28 | 20 | to the right, did you hear her on the wire? |
| 16:42:32 | 21 | A.    Yes. |
| 16:42:32 | 22 | Q.    And what was her phone number? |
| 16:42:37 | 23 | A.    Kimberly Schmidtberger a/k/a Leggs, her phone was |
| 16:42:41 | 24 | 316-351-1435. |
| 16:42:45 | 25 | Q.    And how were you able to identify her? |

| | | |
|---|---|---|
| 16:42:47 | 1 | A.       Through surveillance operations as well, and then |
| 16:42:51 | 2 | along with others involved in this investigation |
| 16:42:54 | 3 | confirmed her voice during law enforcement contact as |
| 16:42:57 | 4 | well. |
| 16:42:59 | 5 | Q.    And you mentioned a/k/a Leggs; is that right? |
| 16:43:01 | 6 | A.       That's correct. |
| 16:43:02 | 7 | Q.    Why was she called Leggs? |
| 16:43:04 | 8 | A.       Travis Knighten called her Leggs because she did a |
| 16:43:07 | 9 | lot of legwork for him. |
| 16:43:09 | 10 | Q.    What types of things did she do for Mr. Knighten? |
| 16:43:12 | 11 | A.       So she would collect funds as well.  She would |
| 16:43:16 | 12 | sell narcotics for Travis Knighten.  She would travel out |
| 16:43:21 | 13 | of town to sell narcotics.  Also, she would introduce new |
| 16:43:26 | 14 | females to this organization, 'cause Travis Knighten had |
| 16:43:29 | 15 | made multiple statements that he thought highly of women |
| 16:43:35 | 16 | in trafficking narcotics because he trusted them more, he |
| 16:43:38 | 17 | said.  So he would have Kimberly Schmidtberger recruit |
| 16:43:42 | 18 | females to introduce to the organization. |
| 16:43:48 | 19 | Q.    And then next to her is Robert Richmond.  Did you |
| 16:43:52 | 20 | hear him on the wire? |
| 16:43:54 | 21 | A.       Yes. |
| 16:43:54 | 22 | Q.    And what was his phone number? |
| 16:43:56 | 23 | A.       So Robert Richmond, a/k/a Shot, his phone number |
| 16:44:03 | 24 | was 316-821-7934. |
| 16:44:06 | 25 | Q.    And did he have any nicknames he went by? |

| | | |
|---|---|---|
| 16:44:08 | 1 | A.       Yes, a/k/a Shot. |
| 16:44:10 | 2 | Q.       How were you able to identify him on the wire? |
| 16:44:13 | 3 | A.       Similar situation, through surveillance we |
| 16:44:16 | 4 | confirmed his identity.  We were able to confirm that the |
| 16:44:19 | 5 | times when he was using the phone correlated with when we |
| 16:44:22 | 6 | were seeing him on surveillance, also confirmed his voice |
| 16:44:25 | 7 | through contact with law enforcement that he had with us. |
| 16:44:30 | 8 | Q.       Did he have a particular job within the |
| 16:44:32 | 9 | organization? |
| 16:44:33 | 10 | A.       Yes. |
| 16:44:33 | 11 | Q.       And what was that? |
| 16:44:34 | 12 | A.       So he was a -- mainly a cocaine dealer that we |
| 16:44:38 | 13 | discovered during this investigation, but he was also |
| 16:44:40 | 14 | known amongst this organization as being kind of like the |
| 16:44:43 | 15 | cook of crack cocaine.  So when you have powder cocaine, |
| 16:44:46 | 16 | you add other items to that cocaine and it will turn into |
| 16:44:52 | 17 | crack cocaine, so he was kind of the guy that would make |
| 16:44:54 | 18 | the cocaine, the powder cocaine into crack cocaine. |
| 16:44:57 | 19 | Q.       And he would talk with -- you'd hear him talking |
| 16:45:00 | 20 | to Mr. Knighten about this activity? |
| 16:45:01 | 21 | A.       Yes, that's correct. |
| 16:45:05 | 22 | Q.       There on the bottom row Mr. Eric Goodwin, did you |
| 16:45:09 | 23 | hear him on the wire or see texts from him during the |
| 16:45:12 | 24 | wire? |
| 16:45:12 | 25 | A.       Yes, it was primarily text messages between him |

| | | |
|---|---|---|
| 16:45:14 | 1 | and Travis Knighten. |
| 16:45:16 | 2 | Q.    And what was his phone number? |
| 16:45:18 | 3 | A.    310-35 -- I'm sorry, 310-651-4123. |
| 16:45:28 | 4 | Q.    And did he have any nicknames he went by? |
| 16:45:31 | 5 | A.    Yeah, he was known as E, just the letter E. |
| 16:45:35 | 6 | Q.    And how were you able to identify him? |
| 16:45:38 | 7 | A.    Similar situation, on a surveillance operation, he |
| 16:45:43 | 8 | was communicating with Travis Knighten indicating that he |
| 16:45:44 | 9 | was at a certain location.  We identified him based upon |
| 16:45:49 | 10 | the vehicle he was driving, so Eric Goodwin was |
| 16:45:51 | 11 | originally from Wichita, Kansas, but he had moved to |
| 16:45:54 | 12 | Virginia, so he was living in the state of Virginia |
| 16:45:56 | 13 | during this investigation, so he would come to Wichita |
| 16:45:59 | 14 | because he could get heroin at a very cheap rate. |
| 16:46:02 | 15 | Anyways, we saw him on surveillance operation at a |
| 16:46:07 | 16 | location.  We ran the license plate on the vehicle.  It |
| 16:46:11 | 17 | came back to Eric Goodwin.  We took the photo of his |
| 16:46:15 | 18 | driver's license, confirmed his identity. |
| 16:46:17 | 19 | Q.    Did you see -- was there surveillance done of a |
| 16:46:20 | 20 | meet between him and Mr. Lewis at ███ North Somerset? |
| 16:46:24 | 21 | A.    Yes. |
| 16:46:26 | 22 | Q.    Okay.  Kevin Walker, who is he? |
| 16:46:33 | 23 | A.    Kevin Walker, he went by the nickname Funk, and he |
| 16:46:39 | 24 | was involved -- we identified that he was involved in |
| 16:46:42 | 25 | heroin sales with Dorzee Hill. |

3-1-22 USA v. LEWIS, VONTRESS No. 20-10028        216

| | | |
|---|---|---|
| 16:46:44 | 1 | Q.      And did you hear him on the wire? |
| 16:46:47 | 2 | A.      Yes. |
| 16:46:47 | 3 | Q.      And what was his phone number? |
| 16:46:48 | 4 | A.      It was 316-794-6303. |
| 16:46:52 | 5 | Q.      And how were you able to identify him? |
| 16:46:55 | 6 | A.      Again, the same method, surveillance.  He was at |
| 16:46:59 | 7 | Dorzee Hill's all the time.  We also would utilize his |
| 16:47:05 | 8 | phone calls in conjunction with surveillance to determine |
| 16:47:09 | 9 | his identity. |
| 16:47:11 | 10 | Q.      And did he have a particular job that he did |
| 16:47:15 | 11 | within the organization? |
| 16:47:15 | 12 | A.      Yes.  He was involved in heroin sales. |
| 16:47:18 | 13 | Q.      And then moving to Mr. Dallas Williams there on |
| 16:47:22 | 14 | the bottom of the screen, did you come into contact or |
| 16:47:25 | 15 | did you hear him on the wire, I should say? |
| 16:47:27 | 16 | A.      Yes. |
| 16:47:29 | 17 | Q.      And what was his phone number? |
| 16:47:30 | 18 | A.      His phone number was 316-461-9526. |
| 16:47:37 | 19 | Q.      And did he have any nicknames he went by? |
| 16:47:38 | 20 | A.      He just went by Dallas. |
| 16:47:41 | 21 | Q.      And how were you able to identify him? |
| 16:47:43 | 22 | A.      So actually he's related to or at least |
| 16:47:48 | 23 | self-proclaimed related to Travis Knighten and Trevor |
| 16:47:52 | 24 | Wells.  Well, on the day we did the search warrants at |
| 16:47:54 | 25 | ████ North Yale, both Trevor Wells and his common-law |

16:47:59  1  spouse, Monica Soctomah, were taken in for questioning,

16:48:02  2  and Dallas Williams actually came to the scene and took

16:48:05  3  those juvenile children.  So I had some interaction with

16:48:09  4  Dallas Williams that day, so I heard his voice.

16:48:10  5        But also, during the wire, when Travis Knighten's

16:48:14  6  communicating, he would call Dallas Williams by his name

16:48:17  7  or he would reference Dallas Williams by his name, but I

16:48:19  8  became, like I said, familiar with his voice during the

16:48:22  9  interaction that I had with him at the search warrant.

16:48:23  10  Q.    And what did he do within this organization?

16:48:26  11  A.    He sold methamphetamine.

16:48:29  12  Q.    And then Frederick Collins?

16:48:31  13  A.    Yeah, Frederick Collins a/k/a P-Boy.

16:48:35  14  Q.    Did you hear him on the wire?

16:48:37  15  A.    Yes.

16:48:37  16  Q.    And what was his phone number?

16:48:40  17  A.    316-794-9667.

16:48:47  18  Q.    And how were you able to identify him?

16:48:50  19  A.    A similar situation, with surveillance

16:48:52  20  corroborating his identity.  Also, there was law

16:48:55  21  enforcement that was familiar with him as well, which

16:48:59  22  helped us confirm his identity.

16:49:02  23  Q.    And what was his job within the organization?

16:49:05  24  A.    So he sold methamphetamine, and then he also would

16:49:08  25  sell cocaine and cook cocaine into crack from time to

| | | |
|---|---|---|
| 16:49:11 | 1 | time. |
| 16:49:13 | 2 | Q.    All right.  Ty Henderson, who's not on this |
| 16:49:17 | 3 | screen, but did you come to know him within this |
| 16:49:21 | 4 | investigation? |
| 16:49:22 | 5 | A.    Yes. |
| 16:49:23 | 6 | Q.    And did you hear him on the wire? |
| 16:49:25 | 7 | A.    Yes. |
| 16:49:26 | 8 | Q.    And what was his phone number? |
| 16:49:27 | 9 | A.    786-514-4788. |
| 16:49:35 | 10 | Q.    And how did you verify that that was his number? |
| 16:49:40 | 11 | A.    Well, he was not identified during the wire other |
| 16:49:44 | 12 | than Ty. |
| 16:49:44 | 13 | Q.    Right. |
| 16:49:45 | 14 | A.    But he was called Ty during the wire.  He was from |
| 16:49:48 | 15 | out of town. |
| 16:49:48 | 16 | Q.    Were you able to identify that number as his after |
| 16:49:51 | 17 | the wire went down? |
| 16:49:52 | 18 | A.    Yes. |
| 16:49:52 | 19 | Q.    And how were you able to do that? |
| 16:49:54 | 20 | A.    He admitted to it during the conversation with law |
| 16:49:57 | 21 | enforcement, or the FBI.  He provided that that was his |
| 16:50:00 | 22 | number. |
| 16:50:00 | 23 | Q.    Okay.  And what was his connection to the |
| 16:50:03 | 24 | organization? |
| 16:50:03 | 25 | A.    So he was from Great Bend, Kansas, or that area, |

16:50:06   1   **and he would come into town from Great Bend and he would**

16:50:09   2   **purchase large quantities of methamphetamine from Kevin**

16:50:11   3   **Lewis.**

16:50:12   4         MR. TREASTER:  Your Honor, if I could just have a

16:50:13   5   minute.

16:50:13   6         THE COURT:  Of course.

16:50:15   7         (Whereupon, a sotto voce discussion was had

16:50:15   8   between Mr. Treaster and Ms. Andrusak.)

16:50:35   9         MR. TREASTER:  Your Honor, I have no further

16:50:38  10   questions.  This'll end the summary portion of the

16:50:40  11   agent's testimony.

16:50:41  12         THE COURT:  So I'm assuming you have more

16:50:43  13   questions of this witness, but just no more questions on

16:50:46  14   this topic?

16:50:47  15         MR. TREASTER:  On the summary, Your Honor, yes.

16:50:48  16         THE COURT:  Okay.  So this would probably be a

16:50:50  17   good time to take our evening recess.

16:50:51  18         MR. TREASTER:  Yes, I would think so, Your Honor.

16:50:53  19   Then, of course, so the jury knows, Agent Heath has

16:50:56  20   multiple -- he'll be called multiple times as we take

16:50:59  21   this case in chunks.

16:51:00  22         THE COURT:  And I suppose I should mention that to

16:51:02  23   the jury.  What we normally do is put on one witness at a

16:51:05  24   time and they tell us everything they have to tell us,

16:51:07  25   and we put on another witness.  In part Agent Heath, as

16:51:10   1   the case agent, is going to be here throughout the case

16:51:13   2   anyway, and counsel talked with me in advance.  Some

16:51:15   3   witnesses are going to be called back and forth to try to

16:51:18   4   talk about each aspect of the case in total, and then

16:51:21   5   talk about another aspect of the case, and you may see --

16:51:27   6   I think in music they call it a reprise -- you may see

16:51:31   7   some witnesses come back on.  But I assume Mr. Heath's

16:51:34   8   going to be back on the stand in the morning anyway.

16:51:37   9         MR. TREASTER:  Yes, Your Honor.

16:51:37   10        THE COURT:  But we'll take an evening recess at

16:51:41   11  this point.  I want to reconvene tomorrow morning at

16:51:43   12  8:30.  We'll start putting in full days, in the interest

16:51:45   13  of moving the trial along as quickly as we can.

16:51:48   14        Let me just say one thing to you, ladies and

16:51:50   15  gentlemen, as we go into recess for the evening.

16:51:55   16        I have a lot of voice but it would help if I

16:51:57   17  turned on my mic, so I apologize.

16:51:59   18        Let me say one thing to you as we recess for the

16:52:02   19  evening.  And I'm not going to say this at every break,

16:52:06   20  but I'm going to call this the "admonition of the Court."

16:52:09   21  So when I say that, you'll know what I mean.  The

16:52:11   22  admonition of the Court is, obviously, don't talk to

16:52:14   23  anybody about this case, let anybody talk to you about

16:52:17   24  it.

16:52:17   25        Particularly you're going to go home tonight and

| | | |
|---|---|---|
| 16:52:19 | 1 | people are going to want to know what's the case about, |
| 16:52:21 | 2 | what are the attorneys like, what kind of witnesses are |
| 16:52:24 | 3 | you hearing from, tell me about the defendants, does the |
| 16:52:30 | 4 | judge look very smart.  You can't answer any of those |
| 16:52:34 | 5 | questions.  Don't talk about the case at all.  Don't do |
| 16:52:36 | 6 | any research on the case, on anything related to it.  Use |
| 16:52:43 | 7 | the internet to check sports scores or check in on |
| 16:52:49 | 8 | Ukraine if you want, but don't do any research on this |
| 16:52:51 | 9 | case at all. |
| 16:52:52 | 10 | I thought I had one other thing I wanted to talk |
| 16:52:54 | 11 | to you about.  I'm sorry, hold on. |
| 16:53:05 | 12 | No, I think I've covered it. |
| 16:53:08 | 13 | So that will not necessarily go through in detail |
| 16:53:13 | 14 | every evening, but that's the admission of the court. |
| 16:53:14 | 15 | Have a good evening and we will reconvene tomorrow |
| 16:53:16 | 16 | morning at 8:30.  The Court's in recess until that time. |
| 16:53:20 | 17 | CLERK SCHMIDT:  All rise. |
| 16:53:26 | 18 | We'll let the jury leave first. |
| 16:53:30 | 19 | (The jury left the courtroom, after which the |
| 16:53:59 | 20 | following proceedings were had:) |
| 16:53:59 | 21 | THE COURT:  Agent, you can resume to the table if |
| 16:54:02 | 22 | you'd like. |
| 16:54:04 | 23 | (Witness excused from the witness stand.) |
| 16:54:04 | 24 | THE COURT:  Counsel, you all may be seated. |
| 16:54:06 | 25 | Anything that we need to discuss before we break |

| | | |
|---|---|---|
| 16:54:11 | 1 | for the evening? |
| 16:54:12 | 2 | MR. TREASTER:  The Government doesn't have |
| 16:54:13 | 3 | anything, Your Honor. |
| 16:54:15 | 4 | MR. SHULTZ:  Nothing from Mr. Lewis. |
| 16:54:17 | 5 | MR. BABBIT:  No, Your Honor. |
| 16:54:18 | 6 | THE COURT:  All right.  I try most days to restart |
| 16:54:21 | 7 | at 8:15.  I just like to start a fairly full day.  There |
| 16:54:24 | 8 | may be a day or two where I have to adjust that slightly, |
| 16:54:27 | 9 | I'll let you know, but that's usually the trial schedule |
| 16:54:29 | 10 | I like to run, 8:15 roughly to 5:00 so that's what we'll |
| 16:54:34 | 11 | plan on, so I will see you all in the morning.  We're in |
| 16:54:37 | 12 | recess until then. |
| 16:54:38 | 13 | (Whereupon, the proceedings were adjourned at |
| 16:54:39 | 14 | 4:54 P.M.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 10th day of August, 2022.


                        s/ Johanna L. Wilkinson
                        Johanna L. Wilkinson, CSR, CRR, RMR
                        United States Court Reporter